```
 1              IN THE UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF TENNESSEE
 2                    NASHVILLE DIVISION

 3                                  )
      UNITED STATES OF AMERICA      )
 4                                  ) Case No.
                                    ) 3:25-cr-00115
 5           v.                     )
                                    ) Magistrate Judge Holmes
 6    KILMAR ARMANDO ABREGO GARCIA  )
                                    )
 7  - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 8                 BEFORE THE HONORABLE

 9           MAGISTRATE JUDGE BARBARA D. HOLMES

10                    June 13, 2025

11                     (REDACTED)

12  - - - - - - - - - - - - - - - - - - - - - - - - - - - -

    APPEARANCES:
13

            For the Plaintiff:  Robert E. McGuire
14                               U.S. Attorney's Office
                                 (Nashville Office)
15                               Middle District of Tennessee
                                 110 Ninth Avenue, S
16                               Suite A961
                                 Nashville, Tennessee 37203-3870
17
            For the Defendant:  William Gilbert Allensworth
18                               Richard L. Tennent
                                 Dumaka Shabazz
19                               Federal Public Defender
                                 810 Broadway, Suite 200
20                               Nashville, Tennessee 37203

21            Also Present:  Jeremy Franker
                             Alex Thomason
22

23  PREPARED BY:
                    LISE S. MATTHEWS, RMR, CRR, CRC
24                    Official Court Reporter
                    719 Church Street, Suite 2300
25                     Nashville, TN 37203
                    lise_matthews@tnmd.uscourts.gov
```

1                        I N D E X

2                  Friday, June 13, 2025

3

4                  INDEX OF WITNESSES

5
WITNESSES:                                    PAGE
6

7  PETER T. JOSEPH
       DIRECT EXAMINATION BY MR. MCGUIRE          12
8      CROSS-EXAMINATION BY MR. TENNENT           78
       REDIRECT EXAMINATION BY MR. MCGUIRE       129
9      RECROSS-EXAMINATION BY MR. TENNENT        138

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBITS **(SEALED)**

| PLAINTIFF'S EXHIBIT | | MARKED FOR I.D. | RECEIVED IN EVD. | WITH-DRAWN |
|---|---|---|---|---|
| 1 | 11/30/22 BWC Traffic Stop Footage | 14 | 14 | |
| 2 | Screenshot of Handwritten List | 22 | 22 | |
| 3 | Snapchat Posts | 70 | 70 | |
| 4 | Photograph of Passenger Roster | 25 | 25 | |
| 5 | 2020 Order of Protection | 145 | 145 | |
| 6 | 2021 Order of Protection | 145 | 145 | |

| DEFENDANT'S EXHIBIT | | MARKED FOR I.D. | RECEIVED IN EVD. | WITH-DRAWN |
|---|---|---|---|---|
| 1 | 10/10/19 U.S. Immigration Court Memorandum, Decision, and Order | 146 | 146 | |
| 2 | 6/9/25 Frimpong Letter | 147 | 147 | |
| 3 | Declaration Under Oath of Third-Party Custodian | 150 | 150 | |

1    The above-styled cause came on to be heard on

2  June 13, 2025, before the Honorable Barbara D. Holmes

3  Magistrate Judge, when the following proceedings were had,

4  to-wit:

5    THE COURT:  Good morning, everyone.  Go ahead and

6  have a seat.

7    We are here in the matter of *The United States v.*

8  *Kilmar Armando Abrego Garcia*, Number 3:25-00115 --

9    MR. SHABAZZ:  Your Honor, one moment.

10    THE COURT:  Are we having trouble with the

11  translation equipment?

12    MR. SHABAZZ:  We're good, Your Honor.

13    THE COURT:  Very good.  Thank you, Mr. Shabazz.

14    And please, Interpreter, let us know if there are

15  any issues.

16    Mr. Shabazz, make sure Mr. Garcia lets you know if

17  there are any issues so that we can address those promptly.

18    MR. SHABAZZ:  Yes, Your Honor.  Thank you.

19    THE COURT:  And just to that same end, we may be

20  taking more frequent breaks today because this is a big ask

21  of the interpreters to be the ones working hardest in the

22  courtroom, of any of us, probably, and we want to make sure

23  we are respectful of their work today.

24    Before we begin today's proceeding, I want to take

25  a moment to just remind everyone of the courtroom decorum

1  protocols, which were made publicly available on the Court's

2  website, I believe were posted throughout the courthouse and

3  may have been reviewed by court security personnel with

4  people entering the courtroom before the courtroom was opened

5  today.

6  The foundational pillars of those protocols are

7  fairness, courtesy, civility, and respect. And that's how

8  all of us are going to conduct ourselves today. Open courts

9  are a hallmark of the American justice system, and we will

10  provide that access today, the commitment to which depends on

11  ensuring that proper decorum is observed. To that end,

12  visible or audible reactions to testimony, presentation or

13  examination questions by counsel or the Court's rulings or

14  remarks are not permitted. When court is in session, no one

15  should be talking except the judge, the witness, or counsel

16  addressing the Court, and the interpreters, of course.

17  Photography and audio or visual recording or

18  broadcasting of any kind are strictly prohibited. There is

19  no eating or drinking, and no electronic devices allowed in

20  the courtroom.

21  And any noncompliance will be promptly addressed,

22  which may include removal from the courtroom.

23  All right. With those protocols having been

24  reviewed and reminders having been given to everyone, I am

25  going to go ahead and swear in both court reporters -- court

```
1   interpreters, excuse me, and then I'll take counsel
2   appearances and we'll begin the proceedings.
3            If you would each raise your right hands.
4            (Interpreters sworn.)
5            THE COURT:  Very good.  You may each have a seat.
6            All right.  Mr. McGuire, if you would enter an
7   appearance and anyone else who is with you at counsel table
8   who might be participating today.
9            MR. MCGUIRE:  Good morning, Your Honor.  Rob
10  McGuire and Jeremy Franker for the United States.
11           MR. FRANKER:  Good morning, Your Honor.
12           THE COURT:  All right.  Jeremy?
13           MR. MCGUIRE:  Franker.
14           THE COURT:  Spell his --
15           MR. MCGUIRE:  F-r-a-n-k-e-r.
16           THE COURT:  Very good.
17           MR. MCGUIRE:  Yes, ma'am.
18           MR. ALLENSWORTH:  Good morning, Your Honor.  Will
19  Allensworth from the Federal Public Defender's Office, along
20  with my colleagues, Federal Public Defender Dumaka Shabazz;
21  Assistant Federal Public, Defender Richard Tennent; Assistant
22  Federal Public Defender, Alex Thomason; our chief
23  investigator, Michelle Hendricks; Amber Kaset of AK
24  Investigations; and our paralegal, Ruben Martinez.  We
25  represent Kilmar Armando Garcia.
```

1       THE COURT:  All right.  Thank you,

2  Mr. Allensworth.

3       All right.  We are scheduled today for a number of

4  proceedings, the first of which is Mr. Abrego Garcia's

5  arraignment.

6       So, Mr. Allensworth, have you now had an

7  opportunity to review the indictment that was returned on or

8  about May 21st of 2021 in full with Mr. Abrego Garcia with

9  the assistance of an interpreter?

10       MR. ALLENSWORTH:  Yes.  And that indictment has

11  been read to him word for word in Spanish.

12       THE COURT:  All right.  I'm going to remind

13  Mr. Abrego Garcia again of the offenses of which he's charged

14  in the indictment and the possible penalties he faces, and

15  then I'll hear from you, Mr. Allensworth, with respect to the

16  arraignment.

17       Mr. Abrego Garcia, we went over this at the

18  initial appearance, but I want to remind you for purposes of

19  today's arraignment that, by the circumstances described in

20  the indictment returned on May 21st of 2025, you are charged

21  in Count One with, from in or around 2016 through in or

22  around 2025, conspiring to unlawfully transport undocumented

23  persons in violation of Title 8, United States Code, Section

24  1324(a)(1), subpart (A)(v) and subpart (B)(i), which, if

25  convicted, carries a maximum prison sentence of up to ten

years and a maximum fine of up to $250,000.

By the circumstances described in the indictment, you are charged in Count Two with on or about November 30th of 2025 unlawfully transporting undocumented persons in violation of Title 8, United States Code, Section 1324(a)(1), subpart (A)(ii) and subpart (B)(i), which, if convicted, carries the following penalty according to the language of the statute. A person who violates subparagraph (A) shall, for each alien in respect to whom violation occurs, be imprisoned for not more than ten years.

These charges are accusations only and of which you are presumed innocent, and it is the government's burden to prove at trial that you are guilty beyond a reasonable doubt.

Mr. McGuire, have I correctly recited the charges and the penalties that Mr. Abrego Garcia faces if convicted as charged?

MR. MCGUIRE: Yes, Your Honor.

THE COURT: Mr. Allensworth, anything you would like to add or clarify about either the charges or the penalties?

MR. ALLENSWORTH: No, thank you.

THE COURT: All right. Mr. Abrego Garcia, do you understand generally the charges against you in the indictment?

1          MR. SHABAZZ:  Can you repeat that, Your Honor?

2          THE COURT:  Mr. Abrego Garcia, do you understand

3   generally what you're accused of in the indictment, what the

4   government is accusing you of?

5          THE DEFENDANT:  I understand.

6          THE COURT:  All right.  Mr. Allensworth, I'm ready

7   to hear from you with respect to entry of a plea.

8          MR. ALLENSWORTH:  On behalf of Mr. Abrego Garcia,

9   Your Honor, I've received a copy of the indictment in this

10  matter and reviewed it with him.  Mr. Abrego Garcia waives

11  formal reading and pleads not guilty to the two counts

12  contained therein.

13         THE COURT:  All right.  It has been confirmed at

14  the initial appearance and again through counsel today that

15  Mr. Abrego Garcia is in receipt of Indictment Number

16  3:25-00115; that it has been read to him word for word in

17  Spanish; and that he has had an opportunity to review the

18  indictment with counsel.  Through counsel, Mr. Abrego Garcia

19  waives formal reading of the indictment and enters pleas of

20  not guilty as to all offenses of which he's charged in the

21  indictment.

22         And the Court will so enter those pleas.

23         All right.  Before we start the proceedings, let

24  me just make a couple of other housekeeping notes.

25         There was a motion filed by defense counsel this

morning with respect to which the Court has entered an order

that I believe has been provided to each set of counsel.

There was also an order on the government's

motion, which was filed yesterday, an order entered today on

that motion filed yesterday, of which counsel I believe has

also been provided with a copy.

If there are any questions about either of those

orders, you are welcome to address them now.

Does anyone have any questions about those orders?

MR. MCGUIRE:  No, Your Honor.

MR. ALLENSWORTH:  No thank you.

THE COURT:  All right.  Then, Mr. McGuire, are we

ready to proceed?

MR. MCGUIRE:  Yes, Your Honor.

THE COURT:  All right.  Let me, just for purposes

of everyone understanding how we're going to proceed today,

consistent with the reasoning and direction in the *White*

opinion and the Court's standard practices for these kind of

proceedings, it is my intention to proceed with the evidence

as to both Sections 3142(f) and 3142(g) of the Bail Reform

Act and the issues raised, and with the government presenting

its proof first, followed by any evidence presented by

Mr. Abrego Garcia, but with reservation of determination of

all of those issues.

And the attorneys know that that's my standard

```
 1   practice, is both because of directions in the statute
 2   itself, directions in applicable cases, and in the interests
 3   of judicial economy and efficiency to proceed with all of the
 4   evidence, and then it will be sorted out as I make my
 5   determinations.
 6              Mr. Allensworth, are you ready to proceed?
 7              MR. ALLENSWORTH:  I am, Your Honor.
 8              THE COURT:  All right.  Go ahead and call your
 9   first witness, Mr. McGuire.
10              MR. MCGUIRE:  Your Honor, we call Special Agent
11   Pete Joseph.
12              THE COURT:  All right.  Special Agent Joseph, if
13   you would come up, please.  Watch your step on the ramp
14   because it's a little deceptive.
15
16                   PETER T. JOSEPH,
17   called as a witness by Plaintiff, was duly sworn and
18   testified as follows:
19
20              THE COURT:  All right.  If you would go ahead and
21   come up in the witness chair.  And, once you're seated, if
22   you would state your first and last name and spell each of
23   those for the record, please.
24              THE WITNESS:  Good morning.  My name is Peter T.
25   Joseph, P-e-t-e-r, T., J-o-s-e-p-h.
```

```
 1              THE COURT:  Whenever you're ready, Mr. McGuire.
 2                       DIRECT EXAMINATION
 3    BY MR. MCGUIRE:
 4    Q.    Agent Joseph, how long have you been a federal agent?
 5    A.    November will be 23 years.
 6    Q.    And during your 23 years -- have they all been with
 7    Homeland Security Investigations?
 8    A.    Yes, sir, they have.
 9    Q.    During your time as a Special Agent with Homeland
10    Security, have you investigated cases involving human
11    smuggling before?
12    A.    Yes, sir.
13    Q.    Were you assigned to investigate a human smuggling event
14    that occurred in Putnam County, Tennessee, on November 30th,
15    2022?
16    A.    Yes, sir.
17    Q.    And approximately when did you first become assigned to
18    that matter?
19    A.    April 28th, right around there.
20    Q.    Prior to that date, had you heard the name of Kilmar
21    Armando --
22              THE COURT:  Let me just interrupt you,
23    Mr. McGuire, to get a full date from the witness.
24              Is that April 28th of this year?
25              THE WITNESS:  Yes, Your Honor.
```

1          MR. MCGUIRE:  Thank you, Your Honor.

2          THE COURT:  Sure.

3    BY MR. MCGUIRE:

4    Q.   Prior to that date, had you heard the name Kilmar Abrego

5    Garcia before?

6    A.   I had not.

7    Q.   As part of your investigation, did you seek to learn

8    more about the traffic stop by the highway patrol, the

9    Tennessee Highway Patrol, on November 30th, 2022?

10   A.   Yes, sir.

11   Q.   And was the trooper who initiated the traffic stop

12   wearing a body-worn camera or BWC?

13   A.   Yes, sir.

14   Q.   And, as part of your investigation, did you review that

15   footage?

16   A.   I did.

17          MR. MCGUIRE:  Your Honor, I have previously

18   provided a copy of that footage to the defense, and I had

19   previously provided it to chambers on a CD.  And we would ask

20   that that be marked and admitted as the Government's

21   Exhibit 1.

22          THE COURT:  Any response, Mr. Allensworth?

23          MR. ALLENSWORTH:  No objection.

24          THE COURT:  All right.  That footage will be

25   admitted -- that video footage will be admitted as

1    Government's Exhibit 1.

2              (Whereupon, Plaintiff Exhibit 1 was marked for

3              identification and received in evidence.)

4    BY MR. MCGUIRE:

5    Q.    And, Agent Joseph, what was your understanding of why

6    the particular vehicle was stopped by the Tennessee Highway

7    Patrol?

8    A.    Speeding violation.

9    Q.    What kind of vehicle was it that was pulled over?

10   A.    It was a Chevrolet Suburban.

11   Q.    And when the trooper who conducted the pull-over

12   approached the vehicle, did he approach from the -- to the

13   driver's side or to the passenger side?

14   A.    The passenger's side.

15   Q.    And what did the trooper remark on immediately upon

16   approaching the vehicle and coming to the passenger window?

17   A.    He made a comment about just how many people were in the

18   vehicle.

19   Q.    And did the trooper then ask the driver where he was

20   coming from?

21   A.    He did.

22   Q.    And what did the driver say?

23   A.    Said he was coming from St. Louis.

24   Q.    Did he describe where he was headed?

25   A.    Said he was headed to Maryland.

Q.   At some point did the driver admit to driving 70 miles
an hour in a 65-mile-an-hour zone on that part of the
interstate?
A.   He did.  And he also acknowledged that his driver's
license was expired.
Q.   And did he provide the trooper with the expired driver's
license that he did have?
A.   He did.
Q.   And was the driver then identified?
A.   He was.
Q.   And who was it?
A.   Kilmar Armando Abrego Garcia.
Q.   At some point, did the trooper ask the driver,
Mr. Abrego Garcia, who the car belonged to?
A.   He did.
Q.   And how did the driver, Mr. Abrego Garcia, describe the
person who owned the vehicle?
A.   He said the vehicle belonged to his boss.
           MR. MCGUIRE:  Your Honor, if you could permit me a
moment just to plug my laptop in, I'm going to play about the
two minutes of Exhibit 1.
           THE COURT:  All right.
           MR. MCGUIRE:  I just need to log in.  It will take
me a minute or two.
           (Respite.)

                    (A portion of Exhibit 1 played.)

 1              THE COURT:  Mr. McGuire, if you could pause it for

 2     just a moment.

 3              MR. MCGUIRE:  Yes, ma'am.

 4              THE COURT:  I'm just wondering how difficult it's

 5     going to be for the interpreters -- let's talk about that for

 6     just a moment, about how much of this needs to be interpreted

 7     for Mr. Abrego Garcia.

 8              MR. MCGUIRE:  Your Honor, the primary speaker is

 9     Mr. Abrego Garcia.  He is communicating with the trooper in

10     English.

11              There is a second portion that's about a minute

12     that I intend to play.  That communication from the trooper

13     to the passengers is primarily in Spanish.  So I don't

14     anticipate there will be any interpretation problems and,

15     frankly, selected these portions with that in mind.

16              So that's really the best I can describe to the --

17     to the Court in the sense of the person speaking the most is

18     the defendant.

19              THE COURT:  All right.

20              Mr. Allensworth, do you have any particular issues

21     you want to raise with respect to translation of the video?

22     I'm sure the interpreter will keep up and translate as much

23     as possible.  I think some of it's going to be a little bit

24     hard to hear because of background noise.  But you tell me

1  what your thoughts are about the translation.

2          MR. ALLENSWORTH:  I know that they will do their

3  best, and I'm fine proceeding.

4          THE COURT:  All right.  Very good.

5          Go ahead then.

6          MR. MCGUIRE:  Your Honor, I'm just going to start

7  from where we originally picked back up.

8          THE COURT:  That's fine.  Thank you, Mr. McGuire.

9          (A portion of Exhibit 1 played.)

10 BY MR. MCGUIRE:

11 Q.   Agent Joseph, were the troopers able later to confirm

12 who the vehicle was registered to?

13 A.   Yes, sir.

14 Q.   And who was that vehicle registered to?

15 A.   A man named Jose Hernandez Reyes.

16 Q.   And in 2022, had Mr. Hernandez Reyes previously been

17 convicted of an immigration-related offense?

18 A.   Yes, sir.

19 Q.   And what was that?

20 A.   Reentry.

21 Q.   And had he also been convicted of being an alien

22 smuggler?

23 A.   Yes, sir.

24 Q.   Later on in the footage, did the trooper ask the

25 defendant about his recent travels?

1    A.    He did.

2    Q.    And what did the defendant say in terms of where he had

3    been?

4    A.    Said he spent the last two weeks in St. Louis on a

5    construction crew.

6    Q.    And did the troopers observe any luggage in the vehicle?

7    A.    There were no luggage found in the vehicle.

8    Q.    And, according to the defendant, this crew was doing

9    construction.

10          Were there any tools that would be used in

11   construction work that the troopers observed in the vehicle?

12   A.    There were no tools identified in the vehicle.

13   Q.    Now, while this traffic stop was unfolding, did other

14   troopers arrive?

15   A.    They did.

16   Q.    And did at least the one trooper express some concerns

17   about what was really going on?

18   A.    Absolutely.

19   Q.    And kind of what was -- what was his statement about

20   what he thought was going on?

21   A.    The trooper, whose name is Doug Foster, he has

22   experience in human trafficking -- or human smuggling, as

23   well as -- professional experience, as well as advanced

24   training.  He knew exactly what was going on and sharing his

25   knowledge with the other officers, on the body-worn camera.

1          MR. TENNENT:  Your Honor, on this point I'm going
2    to object to the opinion of an officer who is not here that
3    is being testified to via hearsay.
4          MR. MCGUIRE:  I'm going to move on, Your Honor.
5          THE COURT:  All right.  And I will -- I'm going
6    to -- because Mr. McGuire is moving on, I'm going to sustain
7    the objection in that respect.
8    BY MR. MCGUIRE:
9    Q.   Was it determined eventually how many passengers were in
10   the van?
11   A.   They determined it was nine.
12   Q.   And did it start -- was there some discussion about how
13   many it actually was?
14   A.   There was.  There was some confusion.  It was very
15   tinted windows, lot of people packed in the vehicle.
16   Q.   How many -- you said there were nine people in the
17   vehicle.
18          How were they laid out within the vehicle?
19   A.   There were nine passengers plus the defendant.
20   Q.   All right.
21   A.   So total of ten.  The layout was we had one in the front
22   passenger seat, followed by three in the first row, another
23   three in the second row, and then in the third row there was
24   two.
25   Q.   And was there anything that the troopers noticed about

1   the Suburban seats that struck them as unusual?

2   A.    During the stop they observed -- the officer noticed --

3   or commented that he had never seen a fourth row -- or a last

4   row in a Suburban.

5   Q.    And at some point on the body cam footage, can one of

6   the troopers be seen going behind the vehicle to the -- to

7   the back windshield?

8   A.    Yes, sir.

9   Q.    And what is -- what is he able to see and that's

10  captured on his video?

11  A.    He's able to see some people sitting in that very last

12  row.

13  Q.    And are they basically right up against the back window?

14  A.    Right up against it.

15  Q.    At some point did the troopers attempt to contact a

16  federal agency?

17  A.    They did.

18  Q.    And what did they do?

19  A.    They contacted the FBI's Terrorist Operations Center.

20  Q.    And was that -- why was -- what prompted them to do

21  that?

22  A.    The defendant's name registered a hit when they ran it

23  through law enforcement databases.

24  Q.    And so did that result in the troopers giving whoever

25  answered the phone there some kind of information?

```
1   A.   Yes, sir.
2   Q.   But did a federal agent respond to the scene that night?
3   A.   They did not.
4   Q.   At some point did the trooper and other troopers attempt
5   to get information from the occupants?
6   A.   They did.
7   Q.   And how was that accomplished?
8   A.   It could be seen on the body-worn camera.  One of the
9   officers had a decent handle on the Spanish language,
10  conveyed a message to the passengers and passed a legal pad
11  throughout the vehicle, where it appeared that each passenger
12  wrote down their name, date of birth, and potential -- their
13  residence.
14           MR. MCGUIRE:  Your Honor, subject to the Court's
15  approval -- I'm trying to get this to work -- I'm going to
16  play -- at approximately 1:56 on the body cam in Exhibit 1 a
17  portion of this process.
18           THE COURT:  All right.
19           (A portion of Exhibit 1 played.)
20  BY MR. MCGUIRE:
21  Q.   Agent Joseph, the piece of paper that was passed around
22  to the occupants of the vehicle that were not the defendant,
23  did -- is there a portion of the body camera footage where
24  that list or piece of paper can be seen on the body camera?
25  A.   Yes, sir.
```

1  Q.   I'm going to pass you up an exhibit, and I want to see

2  if you're able to recognize it.

3           And, Agent Joseph, is that the photograph or

4  screenshot that we just discussed?

5  A.   Yes, sir.

6  Q.   And is what is depicted in there essentially the list as

7  it looks on the body camera?

8  A.   That's right.

9           MR. MCGUIRE:  Your Honor, I would ask that be made

10  Exhibit 2 to the hearing.

11           THE COURT:  Any objection?

12           MR. ALLENSWORTH:  No objection.

13           THE COURT:  All right.  That will be Government's

14  Exhibit 2.

15           (Whereupon, Plaintiff Exhibit 2 was marked for

16           identification and received in evidence.)

17           THE COURT:  Do you have an extra copy for me,

18  Mr. McGuire?

19           MR. MCGUIRE:  Yes, ma'am, I sure do.  I didn't

20  know if you wanted the one that's been marked or --

21           THE COURT:  You can provide me with this copy.

22  We'll let the witness keep the one that's marked.

23           MR. MCGUIRE:  Yes, ma'am.

24           THE COURT:  Thank you.

25

1  BY MR. MCGUIRE:

2  Q.    The information that was requested from the passengers

3  was what?

4  A.    Name, date of birth.

5  Q.    And were they also asked for destination?

6  A.    It appears so.

7  Q.    Ultimately, what happened to the defendant and the

8  passengers on that trip that night?

9  A.    They were ultimately released.

10 Q.    Now, in November of 2022, was immigration enforcement

11 the same kind of priority that it is for HSI today?

12 A.    No, sir.

13 Q.    Now, at -- this year you described you were assigned to

14 look more into this traffic stop; is that correct?

15 A.    That's correct.

16 Q.    And, as part of your investigation, did you interview

17 one of the troopers that was at the scene that night?

18 A.    Yes, sir.

19 Q.    And who was the trooper that you interviewed?

20 A.    Douglas Foster.

21 Q.    Was that the gentleman you were referring to before?

22 A.    Yes, sir.

23 Q.    And he can be seen on the body cam that's in Exhibit 1?

24 A.    That's correct.

25 Q.    He's not the officer wearing the body cam, though; is

1  that correct?

2  A.   He is not.

3  Q.   And he was not the officer who was involved in pulling

4  over the defendant's vehicle -- or the vehicle the defendant

5  was driving?

6  A.   That's correct.

7  Q.   He's just another trooper who responded?

8  A.   Yes, sir.

9  Q.   At some point when you spoke with him --

10      MR. MCGUIRE:   And I think this is where it might

11  become relevant, Your Honor.

12  BY MR. MCGUIRE:

13  Q.   -- was -- had Mr. Foster conducted or been involved in

14  human smuggling investigations before?

15  A.   He had.

16  Q.   And so was he trying to gather evidence that might be

17  useful for that?

18  A.   Absolutely.

19  Q.   Okay.  When he followed up -- or excuse me -- when you

20  followed up on this investigation, did you recover a picture

21  that the trooper had taken of the list of passengers that was

22  circulated that night?

23  A.   Yes, sir, I did.

24  Q.   Agent Joseph, I'm going to hand you a document and want

25  to see if you recognize it.

1         Sir, do you recognize what that is?

2  A.   Yes, I do.

3  Q.   And what is it?

4  A.   That's the ID sheet that we just saw on the body cam

5  that got passed around the vehicle.

6  Q.   That is a picture of it?

7  A.   It's a picture of it.

8  Q.   Is it functionally the roster of passengers as they

9  wrote themselves on the piece of paper?

10 A.   Yes, sir.

11        MR. MCGUIRE:  Your Honor, I had previously marked

12 that as Exhibit 4, and I would ask that it be made Exhibit 4

13 to this hearing.

14        THE COURT:  Any response, Mr. Tennent?

15        MR. TENNENT:  No objection.

16        THE COURT:  All right.  That will be made

17 Government's Exhibit 4.

18        (Whereupon, Plaintiff Exhibit 4 was marked for

19        identification and received in evidence.)

20 BY MR. MCGUIRE:

21 Q.   Since you received this photograph of this roster of

22 individuals being transported, have you and other agents been

23 able to identify at least some of these individuals by the

24 name and information listed on the piece of paper?

25 A.   Yes, sir.

1  Q.    Have any of them been determined to be -- to have been
2  illegally in the United States on November 30th, 2022?
3  A.    Yes, sir.
4  Q.    Approximately how many so far?
5  A.    It's currently an ongoing search, but right now we're at
6  six.
7  Q.    Of the nine?
8  A.    Of the nine.
9  Q.    And were -- in terms of connecting those individuals to
10  recent unlawful entries to the United States, was there some
11  time connections that were of interest to you as an
12  investigator?
13  A.    There were.  There were two apprehensions on
14  November 6th of '22 that were marked to be in the same group,
15  both Mexican, I believe, and they were returned to Mexico.
16  Q.    So this would have been two individuals who were
17  encountered on November 6th and deported on November 6th --
18  or -- or put back into Mexico, but were in the defendant's
19  vehicle on November 30th, 2022?
20  A.    Yes, sir.  They were apprehended in the same group on
21  November 6th, and they were also, according to this sheet, in
22  the same vehicle.
23  Q.    Have you been able to -- or other agents been able to
24  preliminarily identify the countries of origin of some of the
25  individuals who were passengers of the defendant on that day?

1  A.    Yes, sir.

2  Q.    And what countries did they come from?

3  A.    Mexico, Honduras, and El Salvador so far.

4  Q.    The last name on the list -- and I don't want you to

5  read it out loud -- but the last name on the list has a

6  birthday, as all the other names on the list do?

7  A.    Yes, sir.

8  Q.    The way it appears is the individual wrote their name,

9  wrote their date of birth, and then several of them off to

10 the side wrote their destination?

11 A.    That's correct.

12 Q.    The last name on the list, what was the birthday of that

13 individual?

14 A.    2007.

15 Q.    That was the year?

16 A.    That was the year.

17 Q.    And so in 2022, in November of 2022, how old would that

18 person have been?

19 A.    Would have just turned 15.

20 Q.    And is it fair to say that investigators are still

21 investigating both the identities and the list of these

22 individuals?

23 A.    Absolutely.

24 Q.    Particularly for the minor to make sure that person is

25 okay?

1  A.    Absolutely.

2  Q.    Because right now we don't know?

3  A.    We don't know right now.

4  Q.    Agent Joseph, you and other agents worked to obtain

5  license plate reader data; is that correct?

6  A.    Yes, sir.

7  Q.    Generally what is license plate reader data?

8  A.    Cameras that are positioned at various places across the

9  United States that capture license plates, images of license

10 plates.

11 Q.    And are they usually maintained by law enforcement

12 agencies?

13 A.    Yes, sir.

14 Q.    For example, I think the City of St. Louis maintains

15 approximately 400 license plate reader cameras --

16        MR. TENNENT:  I'm going to object to his knowledge

17 about license plate readers, Your Honor.

18        MR. MCGUIRE:  That's fine, Your Honor.  I'll

19 just -- was just offering it as an example.

20 Q.    But is it fair to say --

21        THE COURT:  All right.  Hold on just a moment

22 then --

23        MR. MCGUIRE:  I can rephrase.

24        THE COURT:  Rephrase the question.  And then we'll

25 see if Mr. Tennent has any further objection.

1  BY MR. MCGUIRE:

2  Q.   Fair to say that major metropolitan areas in your

3  experience maintain --

4          THE COURT:  Be sure you get close to a microphone,

5  Mr. McGuire.

6          MR. MCGUIRE:  Yes, ma'am.

7          THE COURT:  Because we want to make sure we're not

8  making things more complicated for the court reporter.

9          MR. MCGUIRE:  Thank you.  Ms. Matthews is used to

10 my ambling around, I suspect, but I will do that, yes, ma'am.

11 Q.   Is it fair to say that major metropolitan areas have

12 multiple license plate readers?

13 A.   Yes, sir.

14 Q.   Depending on the size of the jurisdiction, it can even

15 be hundreds?

16 A.   Absolutely.

17 Q.   The defendant told the trooper that he had been in

18 St. Louis; is that correct?

19 A.   That's correct.

20 Q.   Did you review to find whether there were any license

21 plate reader hits for that vehicle in the St. Louis,

22 Missouri, area?

23 A.   We conducted a search, and there were none found.

24 Q.   For over what period of time?

25 A.   Over that year.

1  Q.    The entire year of 2022?

2  A.    Yes, sir.

3  Q.    Were there license plate reader hits in other areas that

4  were of interest to your investigation?

5  A.    Yes, sir.

6  Q.    And generally what were those?

7  A.    On November 18th it registered a hit in Spring, Texas,

8  followed by, on the 24th, there was one on the

9  Texas/Louisiana border.

10  Q.    And that would have been far closer to November 30th?

11  A.    For sure.

12  Q.    And within -- inside the two-week period that the

13  defendant had described to the trooper that he was in

14  St. Louis?

15  A.    That's correct.

16  Q.    Are you familiar with an earlier HSI report from

17  mid-April that said that someone believed that he had --

18  traveling from Houston through St. Louis?

19  A.    Yes, I read it.

20  Q.    And did you write that report?

21  A.    No, sir.

22  Q.    Does that connect with any of the evidence that you've

23  heard in this case?

24  A.    No.

25  Q.    From your review of the video, does the defendant

1  describe traveling from Houston?

2  A.    He does not.

3  Q.    And does he decide -- does he say where he's coming from

4  and where he's going?

5  A.    It was always St. Louis to Maryland.

6  Q.    Agent, if you were driving from St. Louis to Baltimore,

7  generally what is the most direct route?

8  A.    There's a highway, essentially a straight line across

9  St. Louis -- I believe it's I-70.

10  Q.    If you were to travel from St. Louis to Baltimore or

11  Maryland through the State of Tennessee, would it add time to

12  your travel?

13  A.    It would add three to four hours to the trip.

14  Q.    In April of 2025, were agents of HSI alerted to an

15  individual who may have information about the human smuggling

16  situation that involved the defendant?

17  A.    Yes, sir.

18  Q.    At the time that you received that information, was that

19  individual in federal custody?

20  A.    He was.

21  Q.    And had he been previously convicted -- been convicted

22  of felony offenses before?

23  A.    Yes.

24  Q.    Has he since been moved to a federal halfway house?

25  A.    Yes, sir.

1 Q.    And why was -- do you know why that was done?

2 A.    It was done for safety reasons.  Additionally, he was

3 getting -- nearing the end of his sentence, where he was

4 close to being eligible for that downgrade.

5 Q.    And does the defendant -- or excuse me -- does the

6 individual who you spoke with or who we'll describe as the

7 first cooperator, has he been granted some deferred action on

8 a deportation?

9 A.    He has.

10 Q.    And why was that done?

11 A.    Because he was a prospective witness for a court

12 proceeding, trial.  So we needed to -- otherwise he would be

13 deported.

14 Q.    And when is that deferred action scheduled to be

15 reviewed?

16 A.    Around a year.

17 Q.    And could he be deported at that time?

18 A.    Potentially.

19 Q.    On or about May 7th, did you interview that individual

20 in the presence of his attorney and pursuant to a proffer

21 agreement with the United States?

22 A.    Yes, sir.

23 Q.    And had he been previously interviewed by other HSI

24 agents?

25 A.    He had.

1  Q.   Did this first cooperator describe to you that he knew
2  the defendant?
3  A.   He did know the defendant.
4  Q.   And how did he describe the relationship?  Approximately
5  when did it start?
6  A.   Met in around 2016 in Maryland.
7  Q.   And how did they meet, generally?
8  A.   They were both drivers, transportation for illegal
9  aliens.
10  Q.   And at some point did they begin working together,
11  according to his statement?
12  A.   Yes, sir.
13  Q.   Now, where did they initially meet?
14  A.   In Maryland.
15  Q.   At some point did this first cooperator move from
16  Maryland to another place?
17  A.   He moved to Houston.
18  Q.   And did they continue to maintain relations even after
19  he moved from Maryland to Texas?
20  A.   Yes, sir.
21  Q.   Ultimately did the first cooperator describe a business
22  relationship with the defendant?
23  A.   He did.  He expanded his transportation business from
24  Texas to various places in the United States, and he employed
25  the defendant as a driver.

Q.   And did that first cooperator express some confidence
that the defendant knew that the individuals he was
transporting were illegally in the United States?
A.   Yes.
Q.   Did this cooperator describe where the individuals to be
transported -- how they learned about them, where they came
from?
A.   Yeah.  He said their primary -- we call source of
supply, source of humans, was -- was a foreign national that
was in Central America or South America, and she supplied a
large percentage of their business.
Q.   And is it fair to say that there were potentially other
people who also supplied illegal aliens to this organization?
A.   Absolutely.
Q.   The foreign national that you described that was the
primary source of supply or maybe was -- let me ask it this
way.
        The foreign national that you described, was she
the primary source of supply?
A.   She was.
Q.   And once individuals came across the United States, is
that when this side of the organization would get contacted?
A.   That's correct.
Q.   And then that -- this side, the American side of the
organization, for lack of a better term, that included the

1  defendant, would be involved in transporting those folks
2  across into the United States?
3  A.    That's right.
4  Q.    During these trips, did the cooperator describe
5  something done by him and the defendant regarding cellphones?
6  A.    Yeah.  So he stated that they would -- the drivers
7  would -- to include the defendant -- would collect the
8  passengers' cellphones, and that was in an effort to minimize
9  risk of detection, communication.  And from my experience
10 it's also a measure of control.
11 Q.    Did the first cooperator describe the use of cover
12 stories during this scheme?
13 A.    He did.
14 Q.    And what did he say about that?
15 A.    He said he and the defendant had discussed a number of
16 cover stories they would use if encountered by law
17 enforcement.
18 Q.    And what was one of those cover stories that was of
19 particular interest in your investigation?
20 A.    He said that he would -- they would tell officers that
21 they were driving a construction crew.
22 Q.    Did the first cooperator describe whether he knew the
23 defendant to have any other job other than alien smuggling in
24 2022?
25 A.    He was not aware of any other job, and noted that he was

1 always available to drive aliens.

2 Q.   The defendant was always available?

3 A.   The -- yes, sir.  The defendant was always available.

4 Q.   And did the first cooperator have a conversation with

5 the defendant about him being stopped in Tennessee in

6 November of 2022?

7 A.   Yes.

8 Q.   And what did he say about that?

9 A.   Said he was aware of the stop and that he was released.

10 Q.   And how had the defendant communicated with the first

11 cooperator?

12 A.   Rephrase.

13 Q.   What -- did they meet in person?  Was it by phone?  Was

14 it over text?  How --

15 A.   Oh, both.  Yeah.  Absolutely.

16 Q.   And was there a phone call that you have confirmed

17 exists?

18 A.   Yes, sir.

19 Q.   Between the first cooperator and the defendant?

20 A.   Yes, sir.

21 Q.   Along the same time frame as November 30, 2022?

22 A.   Absolutely.

23 Q.   All right.  And did the first cooperator describe

24 whether that 2022 trip in Tennessee that we've been

25 discussing involved transporting illegal aliens?

1   A.   Yes.

2   Q.   And is that because that's what they were doing?

3   A.   That was their business.

4   Q.   Did the first cooperator say whether the defendant had

5   been stopped on other occasions?

6   A.   He knew of one other occasion.

7   Q.   And what was the when and where of that?

8   A.   It was on I-81 in Virginia.

9   Q.   And are you familiar with the Virginia area?

10  A.   I am.

11  Q.   Is that where you -- one of your previous postings?

12  A.   Yes, sir.

13  Q.   And that -- he -- did the first cooperator describe that

14  as a traffic stop?

15  A.   He did.

16  Q.   Were you able to verify anything about that traffic stop

17  that the first cooperator described?

18  A.   Members of the investigative team were able to find the

19  citation.

20  Q.   And citation issued by who?

21  A.   I believe it was Virginia State Police.

22  Q.   And where did that occur -- not necessarily -- let me

23  ask it this way:  Was it on an interstate or state road?

24  A.   Interstate.

25  Q.   And what interstate was it?

1  A.    81.

2  Q.    Is that the interstate that the cooperator had described

3  as where the defendant had been stopped?

4  A.    I believe so.

5  Q.    And was that important to you?

6  A.    Absolutely.

7  Q.    Why was it important to you --

8  A.    Because it substantiated that he was being truthful to

9  us.

10 Q.    How much did the first cooperator say that the defendant

11 was being paid for a particular smuggling run?

12 A.    He estimated that he would pay the defendant between

13 1,000 and $1,500 per trip.

14 Q.    During the course of the traffic stop on November 30th,

15 2022, did the troopers locate an amount of money in the

16 defendant's possession?

17 A.    Yes, sir.

18 Q.    And what was that?

19 A.    It was an envelope -- it was not seen on the body-worn

20 camera, but it was stated that an envelope was in his pocket

21 containing $1,400.

22 Q.    So an envelope in his pocket, not his wallet?

23 A.    That's correct.  He -- he delineated that he also had --

24 the defendant said he had his wallet with him.

25 Q.    Did the first cooperator describe about how much money

1  the defendant was making annually for his smuggling
2  activities?
3  A.   He estimated in excess of $100,000.
4  Q.   Did you discuss firearm possession during this first
5  interview with -- with your first interview with the first
6  cooperator?
7  A.   Briefly.
8  Q.   And generally what was the tenor of that discussion?
9  A.   The sentiment was that both he and the defendant really
10 liked guns but they would never transport them just because
11 it was too high risk.
12 Q.   Now, during this first interview with the first
13 cooperator, did you ask about MS-13, about whether the
14 defendant was affiliated with MS-13?
15 A.   Briefly.
16 Q.   And what did he say?
17 A.   He said he hadn't seen anything that would indicate that
18 as far as physically, but that asking those types of
19 questions can be dangerous.
20 Q.   And was this particular interview then cut short for
21 time constraints?
22 A.   Yes, sir.
23 Q.   Did you then go back with other law enforcement officers
24 and speak to the first cooperator again about a week later?
25 A.   We did.

1  Q.   And during this interview, did you go into more detail

2  on particular subjects?

3  A.   We did.

4  Q.   Was one of these subjects firearms?

5  A.   It was.

6  Q.   And in that discussion, what -- what came out about the

7  firearms that might have been different or evolved from the

8  first statement?

9  A.   He stated that he was a collector and buyer and seller

10 of guns, and that he would regularly give guns to his drivers

11 and specifically to -- that he had given one or two to the

12 defendant.

13 Q.   And when he gave them to the defendant, did he describe

14 to you what the defendant had then done with the -- with the

15 guns?

16 A.   Yeah.  He said he transported them back to Maryland and

17 kind of joked with us that, you know, guns are a lot cheaper

18 in Texas than they are in Maryland.

19 Q.   And was that -- was that transport done separately or

20 during a run where the defendant was smuggling aliens?

21 A.   It was jointly with the smuggling of aliens.

22 Q.   Did the first cooperator more fully describe his sources

23 of supply and where this foreign national who was his primary

24 source of supply was from?

25 A.   He did.

1   Q.   And where did he describe that person being from?

2   A.   Guatemala.

3   Q.   And have you been able to verify that that person

4   actually exists in real life?

5   A.   We have.

6   Q.   In the first interview that you had with the first

7   cooperator, it sounds like he described the defendant showed

8   no outward signs of MS-13?

9   A.   That's right.

10  Q.   Or being membership, tattoos and the like.

11          Was there a discussion about the transport of gang

12  members that you noted with interest?

13  A.   Yeah, he said he would regularly -- the organization

14  would regularly transport gang members.  And that he noted

15  that the defendant had a different correspondence or greeting

16  with the gang members than he had personally had with other

17  gang members.  "He" being Cooperator 1.

18  Q.   Did the first cooperator talk about other people, such

19  as close family members, and even children, that traveled

20  with the defendant but weren't paying, for lack of a better

21  term, customers on these trips?

22  A.   Yes, sir.

23  Q.   And what did the first cooperator describe about the

24  defendant's use of close family members and children?

25  A.   He stated that he would regularly travel with them.

1    Q.    And "he" being who?

2    A.    I'm sorry.  The defendant would regularly travel with

3    close family members and children, and on return -- noted on

4    return trips the children were forced to ride on the

5    floorboard of the car.

6    Q.    And why did -- why was that done, from the first

7    cooperator's perspective?

8    A.    It was -- it generated a high revenue stream.  You could

9    get more -- adult clients in seats, where the children could

10   sit on the floorboard.

11   Q.    And so these -- is it fair to say that these children

12   were used as sort of a cover?

13   A.    Yes, sir.

14   Q.    Is that the way the first cooperator sort of described

15   it?

16   A.    He did.

17   Q.    Was there a discussion about -- between you and the

18   first cooperator about issues related to the transportation

19   of minor females?

20   A.    Yes.

21   Q.    And how did that -- how did that subject come up within

22   the scope of the conspiracy that you were investigating?

23   A.    So Cooperator 1 noted that on three or four occasions

24   the defendant traveled without the family members, collected

25   the load of aliens for transport.

1           The foreign source of supply that we just
2   referenced had called Cooperator 1 --
3           MR. TENNENT:  I'm going to object to this.  Your
4   Honor, I absolutely understand we allow reliable hearsay.
5   He's been testifying to the alleged firsthand knowledge of
6   Cooperator 1.  We are now getting a hearsay statement made by
7   some other declarant to Cooperator 1.  And that second tier
8   of hearsay I think makes it inadmissible, and I would object.
9           THE COURT:  Mr. McGuire?
10          MR. MCGUIRE:  Yes, Your Honor.  As Mr. Tennent
11  well knows and the Court well knows, obviously we want to try
12  to use the rules of evidence, and the Court does that as a
13  good guide.  However, the Court knows that in these kinds of
14  hearings the rules of evidence don't apply and are
15  sufficiently relaxed so that the Court can hear all the
16  appropriate information to make the decision that the Court
17  has to make.
18          Specifically on this issue, Your Honor, the
19  presence of minors and the victimization of minors is a key
20  issue in this hearing.  And I would submit, Your Honor, this
21  is a statement by a person with knowledge to the law
22  enforcement agent.  The Court can decide what weight you
23  intend to give it, but I don't think it's a bar for us to ask
24  about it and elicit that testimony today.
25          THE COURT:  Any response, Mr. Tennent?

1          MR. TENNENT:  I respectfully disagree.  Reliable

2     hearsay is still the rule.  You know, I think slightly

3     different context, but as recently as May of this year, the

4     Sixth Circuit in *U.S. v. Black* again reiterated that the

5     hearsay must still be reliable for these sorts of more

6     informal hearings.  And I suspect we're about to hear that

7     this is even thirdhand hearsay that somebody else told

8     somebody else who told Cooperator 1.  And I strongly object

9     to these multiple tiers of hearsay that are ultimately going

10    to amount to rumor and innuendo.

11         THE COURT:  It is correct that the rules of

12    evidence don't ordinarily apply in detention proceedings and

13    other kind of pretrial proceedings in criminal cases.  That

14    is not to say that the Court can still not follow the rules

15    of evidence and make findings about whether the testimony

16    ought to be admitted because of concerns about -- or not --

17    because of concerns about reliability.

18         Ask your question again, and I'm going to let the

19    witness describe what the source of the information is, and

20    then I'm going to decide whether it can -- whether he can

21    testify to that -- those statements or not.

22         MR. MCGUIRE:  I'll try to break it down a little

23    bit further, Your Honor, as well, that I think -- there is a

24    significant portion of this that did come from the statement

25    directly that Mr. Joseph heard.

1  Q.   Agent Joseph, did the first cooperator describe that

2  minor females were transported as a part of this conspiracy?

3  A.   Yes.

4           THE COURT:  That's not -- I think it was

5  Mr. Tennent's objection, though, that it is the source of

6  that --

7           MR. MCGUIRE:  Yes, Your Honor.

8           THE COURT:  -- of that information from the person

9  that you've referred to as Cooperator 1.

10          So, I'm supposing when you say you're breaking it

11 down that you're going to get to at some point what the

12 source of that information is, and then I'll let Mr. Tennent

13 raise that objection again if he wishes to do so.  I just

14 want to be clear about that.

15          MR. MCGUIRE:  Yes, ma'am.

16 Q.   Did the first cooperator describe a problem with the

17 defendant and these minor females?

18 A.   Yes, sir.

19 Q.   How did he describe that problem?

20 A.   Received a complaint that he was acting sexually

21 inappropriate toward them.

22          THE COURT:  All right.  I'm going to -- is that

23 the -- what you're objecting to, Mr. Tennent?

24          MR. TENNENT:  It is, Your Honor.

25          THE COURT:  All right.  I'm --

1          MR. FRANKER:  I'm just going to pass a note to
2     Mr. McGuire, if the Court would allow.
3          THE COURT:  My preference would be to not have
4     tag-teaming, but certainly, if you want to give Mr. McGuire a
5     note, go ahead and give Mr. McGuire a note.
6          MR. FRANKER:  Thank you.
7          THE COURT:  I'm going to sustain the objection
8     because now we are, Mr. McGuire, getting into multiple levels
9     of hearsay.  This is a critical issue.  You are correct.  And
10    because it's a critical issue, it's all that much more
11    important that I have the most reliable information, the most
12    direct source of testimony from which to make the decision.
13    And that's not what I'm getting with this testimony.
14          So I'm going to sustain the objection as to that
15    question.
16          MR. MCGUIRE:  Well, is the Court -- let me raise
17    this.  Your Honor, we would submit that this is a statement
18    by a coconspirator in furtherance of the conspiracy.  And I
19    can unwind that a little bit, but as a proffer I'll tell you
20    the way this was presented was by one of the coconspirators
21    describing a problem with the defendant, another
22    coconspirator, that affected the conspiracy; that the first
23    cooperator ultimately describes these complaints were a
24    problem.  He confronted the defendant about it because he was
25    concerned that they would lose the source of supply's

1  business if the behavior continued.

2          I would submit, Your Honor, that the statements

3  between the defendant and the cooperator, the cooperator and

4  the source of supply, are all statements in furtherance of

5  the conspiracy.  They are all designed to keep the conspiracy

6  running; therefore, they're an exception under the hearsay

7  rules and specifically are not hearsay.

8          I understand the Court's concern, and we want to

9  give the Court the best evidence.  But even under the rules

10  of evidence as they apply, I think we've established that a

11  conspiracy exists, that the statements that the cooperator

12  relayed to the agent are essentially recaps of statements in

13  furtherance of the conspiracy.

14          THE COURT:  Well, let me break that down a little

15  bit, Mr. McGuire, and then I'll give Mr. Tennent an

16  opportunity also to respond.

17          We are not here today to -- on any trial of the

18  conspiracy charge.  So when you say you think you've shown or

19  established a conspiracy, it is not for me to determine

20  whether Mr. Abrego Garcia is guilty of the first offense of

21  which he's charged in the indictment.  In fact, as you know,

22  the Bail Reform Act specifically requires that the

23  presumption of innocence remains in effect all throughout

24  these proceedings, and that is how we are operating.  That's

25  the road we're traveling down.

           So I'm not convinced that you saying that you
believe you've established a conspiracy and that this is a
statement by a coconspirator in furtherance of a conspiracy
holds the same weight in a detention hearing that it might
hold in a trial on the merits of the offenses charged.

           I'll take a look at that issue, and -- and I may
allow you to come back to this testimony.

           Mr. Tennent, do you want to weigh in further on
this objection?

           MR. TENNENT:  Well, I completely -- obviously
agree with Your Honor.  And I would just stress, in relation
to the argument that Mr. McGuire has made, I'm not objecting
to what Person A told Person B.  I'm objecting that Person A
was told something by somebody else, allegedly the
complainant, or, in fact, somebody who was relaying the
complaint.

           I mean, imagine, we have somebody allegedly in the
van.  They complain.  They tell someone.  That person
complains.  We now get it to whoever this so-called other
conspirator is.  I'm objecting to all of those tiers on up,
as well as that first tier -- or the second tier as well.
But I'm specifically really troubled by those third and
fourth tiers, as that complaint comes from someone who is
unnamed, who is unknown.

           THE COURT:  I understand.

1        MR. TENNENT:  Yes.

2        THE COURT:  And I am concerned, as well, that for

3   purposes of a critical issue of -- first of all, whether the

4   government is entitled to a detention hearing at all, and

5   then potentially whether the -- there is a basis upon which

6   to detain Mr. Abrego Garcia if -- if I find that there are

7   grounds for a detention hearing, that this is a critical

8   issue.

9        And I'm going to reserve ruling, only on the basis

10  of whether a statement by a coconspirator in furtherance of a

11  conspiracy is an exception that is appropriately applied in

12  the context of a detention hearing.

13       And I'll take a look at that during a break and

14  let you come back to that testimony or re-call Special Agent

15  Joseph if -- if he's already off the stand at that point.

16  But I am going to at least at this point sustain the

17  objection.

18       And then you should note, Mr. McGuire, that, if

19  you want to come back to that, if I make a determination that

20  there is a sufficient basis to proceed with that testimony,

21  that you can proceed with it at that point.

22       And, again, I'll -- I'll take a look at that issue

23  when we recess for a break.

24       MR. MCGUIRE:  Yes, Your Honor.  And I understand

25  the Court's ruling.  The only reason I referred to the

1 conspiracy is because I believe that's one of the things that

2 we have to establish to get the exception. So that -- I

3 understand the Court's bailiwick in this hearing is not to

4 determine guilt or innocence. I fully understand that.

5          But I think to have a statement in furtherance of

6 a coconspirator -- in furtherance of a conspiracy, there must

7 first be a conspiracy. So, just for the limited purpose of

8 the evidentiary consideration, that was the push of my

9 argument. I understand -- and I understand the Court's

10 thoughts as well.

11 Q.   Just to reset, briefly, Agent Joseph, this conspiracy

12 smuggled minor females, according to the statement of the

13 first coconspirator?

14 A.   Yes, sir.

15 Q.   And he expressed to you some concern about their

16 welfare?

17 A.   That's right.

18 Q.   That they might be victimized?

19 A.   Correct.

20          MR. TENNENT: I'm going to object to that. That

21 seems to be his conclusion based on this thirdhand hearsay.

22          THE COURT: Well, there's a lot of leading that's

23 going on generally. And, again, the rules of evidence are

24 relaxed for purposes of a detention hearing, but leading

25 witnesses is -- the extent of leading of this witness, I'm

1    going to instruct you at this point, Mr. McGuire, try to
2    modify your examination to have non-leading questions.  And
3    that is a highly leading question, for you to suggest the
4    answer to Special Agent Joseph.

5            If you want to -- want to reask your question in
6    another way, I'll give you that opportunity, but I'm going to
7    sustain Mr. Tennent's objection as to the specific question.

8            MR. MCGUIRE:  Yes, Your Honor.  I was trying to do
9    it in a way that I thought was in accordance with Your
10   Honor's prior rulings and stick to the first coconspirator's
11   statement.  But I -- I think we've sort of trod this ground.
12   Q.   Agent Joseph, did the first coconspirator testify under
13   oath before a federal grand jury investigating this case?
14   A.   He did.
15   Q.   In mid-May, did you speak to another individual who had
16   knowledge of the alien smuggling conspiracy involving the
17   defendant?
18   A.   Yes, sir.
19   Q.   And is he presently in federal custody charged with a
20   federal crime?
21   A.   He is.
22   Q.   But not here in the Middle District of Tennessee?
23   A.   No, sir.
24   Q.   Did he express that he hoped to receive some
25   consideration on that charge if he cooperated?

1  A.    Yes, sir.

2  Q.    But that's not a decision that I could make as the U.S.

3  Attorney here?

4  A.    No, sir.

5  Q.    Have to be in another district?

6  A.    Absolutely.

7  Q.    Was that interview also conducted in the presence of his

8  lawyer and subject to a proffer agreement with the United

9  States?

10  A.    Yes, sir.

11  Q.    Did that person also agree to become a cooperator in

12  this investigation?

13  A.    He did.

14  Q.    Did he describe whether or not he was involved in alien

15  smuggling activities over the past several years?

16  A.    He acknowledge that he was a member of the trafficking

17  organization.

18  Q.    And how did he describe that the trafficking or the

19  smuggling operation generally worked?

20  A.    That his organization that he was a part of was largely

21  responsible or entirely responsible for transportation within

22  the United States.  So another organization would get them

23  across the Mexican/U.S. border.

24  Q.    And did that person, the second cooperator, have some

25  kind of familial tie with the first cooperator?

1  A.    Yes.

2  Q.    Did the second cooperator describe where or -- or sort

3  of who the primary source of supply for the illegal aliens

4  was?

5  A.    Yes.   He ran the organization for a short time, and he

6  was familiar with the source of supply.

7  Q.    And was that person also a foreign national?

8  A.    Yes.

9  Q.    Did this second cooperator describe when he had first

10 met the defendant?

11 A.    He did.   He said around 2019.

12 Q.    And where did they meet?

13 A.    Maryland.

14 Q.    Did he describe whether he observed the defendant

15 engaging in alien smuggling activities?

16 A.    He did.

17 Q.    Did he describe whether -- or -- the other people, other

18 than illegal aliens, may have traveled with the defendant?

19 A.    He said that he would drive with close family relatives

20 while transporting illegal aliens for the organization.

21 Q.    Did he describe the use of children?

22 A.    He did.

23 Q.    What did he describe about that?

24 A.    He said they were -- on return trips from Texas to the

25 East Coast or to Maryland, they were forced to ride on the

1  floor of the vehicle.

2  Q.    Did the second cooperator describe whether the

3  conspiracy transported undocumented and unaccompanied

4  children?

5  A.    He estimated -- he did.  He estimated he had transported

6  approximately ten or less.

7  Q.    That he personally?

8  A.    He personally did, yes.

9  Q.    And was that during the time of this alien smuggling

10  conspiracy?

11  A.    Yes, sir.

12  Q.    Did he describe where the children were from?

13  A.    He said they were from Ecuador.

14  Q.    And did he describe ultimately where they were headed

15  once they got to Maryland?

16  A.    Final destination was New York.

17  Q.    Was the second cooperator asked about whether the

18  defendant transported drugs on these alien trafficking runs?

19  A.    He said he observed him trafficking drugs on at least

20  one occasion.

21  Q.    Did he confront the defendant about this?

22  A.    He did.

23  Q.    Why did he describe he confronted the defendant?

24  A.    He said it was bad for business.  So the defendant had

25  not -- did not take well to being counseled or being scolded

1   about transporting narcotics.

2   Q.   Did the second cooperator describe how that

3   confrontation made him feel vis-à-vis the defendant?

4   A.   He said he felt intimidated.

5   Q.   What about firearms?

6   A.   So, Cooperator 2 stated on three occasions that he

7   witnessed the defendant purchased five guns on each occasion,

8   guns consisting of handguns, assault rifles.

9   Q.   And how would those -- or what would happen to those

10  firearms once the defendant received them, according to the

11  second cooperator?

12  A.   They were covertly placed or surreptitiously placed in

13  the vehicle under the kids' -- children's belongings in the

14  rear of the car, concealed, and he would transport those --

15  those weapons along with the aliens.

16  Q.   Did the second cooperator describe how much money the

17  conspiracy was making during the time he was working within

18  it?

19  A.   Yeah.  He described the pay structure.  So the source of

20  supply would, he believe, charge 8,000 per person to get --

21  to go from -- for example, Guatemala across the U.S. border.

22  The trafficking organization -- the transportation

23  organization would receive 1,000 per person.  And then the

24  organization would then pay the drivers between 1,000 and

25  $1,500 per load of eight to ten aliens per trip, whatever

1  they could fit in the vehicle.

2  Q.    And the notion that a driver might make between 1,000

3  and $1,500, was that notable to you in the investigation?

4  A.    Absolutely.

5  Q.    And why was that?

6  A.    Because he -- the defendant was found to have $1,400 in

7  his pocket, in an envelope in his pocket on November 30th,

8  '22, at the traffic stop.

9  Q.    Let's also try to get a sense of the scale from this

10  second cooperator about how many illegal aliens the -- the

11  primary source of supply sent to the conspiracy.

12           About how many was that?

13  A.    He estimated 50 a month.

14  Q.    And did he describe about what percentage that source of

15  supply was for the whole organization?

16  A.    25 percent.

17  Q.    And so, if the conspiracy was -- was basically making

18  $1,000 a passenger, and was getting 50 passengers a month,

19  that's $50,000 a month?

20  A.    That's right.

21  Q.    From one source?

22  A.    One source.  Which he said they had many.

23  Q.    On the foreign side of the conspiracy, have you been

24  able to determine anything about danger to migrants posed

25  during the course of this conspiracy?

1  A.    Yes, sir.

2  Q.    And what was that?

3        MR. TENNENT:  Your Honor, I'm going to object

4  primarily on relevancy.  I think so far we've heard that

5  Mr. Abrego was allegedly a driver in the United States from

6  Houston to Maryland, is the allegation.  And I suspect we're

7  going to hear about something that supposedly happened before

8  any individuals had reached Houston, before they had ever

9  reached Cooperator 1's trafficking organization and instead

10 were in this other source of supply's organization south of

11 the border.  And I don't know why it would be relevant what

12 happened in this other alleged organization's supply network

13 south of the border.

14        THE COURT:  Mr. McGuire, I'm not sure that you had

15 gotten to that point in your questioning, but go ahead and

16 respond to the objection.

17        MR. MCGUIRE:  Yes, Your Honor.  I mean, I think

18 the testimony that the agent will elicit is a mass casualty

19 event involving some of these same actors.  One of the things

20 the Court has to determine is the danger.  And I think one of

21 the arguments the defendant might make is that this is not a

22 dangerous operation.  And I think it's important for the

23 Court to hear testimony that it is a dangerous operation.  It

24 is dangerous within the people that are part of this

25 particular conspiracy that the defendant is in.  And I think

1  that goes to danger.

2          Now, the Court can decide that it doesn't go very

3  much to danger, but I think that's what makes it relevant,

4  and that's why I would -- I would ask to be able to pursue

5  this line of questioning as it relates to the danger that

6  this conspiracy poses to members of the public.

7          THE COURT:  Is part of that testimony going to be

8  that Mr. Abrego Garcia was involved in this mass casualty?

9          MR. MCGUIRE:  No is the short answer, Your Honor.

10  But, as the Court knows, you know, conspiracy -- being a part

11  of a conspiracy might have unintended consequences.

12          Now, whether something is reasonably foreseeable

13  is also usually something that a court will look at as it

14  relates to either sentencing in the context of a drug

15  conspiracy, is perhaps the biggest one.  In the context of a

16  drug conspiracy, as the Court well knows, an individual might

17  be selling drugs on the behalf of a conspiracy but might be,

18  through their participation in the conspiracy, connected to

19  other reasonably foreseeable acts.

20          THE COURT:  You are correct with respect to -- to

21  trial of the charges.  You are correct with respect to

22  sentencing after conviction.

23          What we're here for, though, is to determine

24  whether Mr. Abrego Garcia -- well, first of all, whether the

25  government is entitled to a detention hearing.  And, if I

1  make that determination, then whether Mr. Abrego Garcia is

2  detainable based on the government being able to prove

3  dangerousness or likelihood of nonappearance, which is an

4  individual determination about Mr. Abrego Garcia.

5       I'm going to overrule the objection with the

6  caveat, Mr. McGuire, that it is of marginal relevance what

7  may have happened in some other similar kind of organization

8  to which it is alleged -- of which it is alleged Mr. Abrego

9  Garcia might be a part.  Because it's not an individual

10  determination.

11       What -- the language of the statute is that that

12  person's release poses a danger to the community.  So my task

13  is to determine the extent to which Mr. Abrego Garcia

14  himself, if I find that you are entitled to a detention

15  hearing, might pose a danger to the community.  It is an

16  individual determination.

17       So I'm going to overrule the objection with that

18  qualification and let you explore this a little further, but

19  there might come a point at which I find that we are so

20  attenuated to the considerations for -- under the Bail Reform

21  Act for detention that I -- that I fully sustain the

22  objection.

23       MR. MCGUIRE:  Your Honor, I think I really only

24  have about one more question.

25       THE COURT:  Okay.

1    BY MR. MCGUIRE:

2    Q.    And, Agent Joseph, the -- have you been able to

3    determine whether the foreign source of supply for this

4    conspiracy, the person who was supplying the illegal aliens,

5    had been involved in a serious event involving the deaths

6    migrants?

7    A.    Yes, sir.

8    Q.    And was that during the course of the conspiracy alleged

9    in this indictment?

10   A.    Yes, sir.

11   Q.    Didn't happen in the United States; is that --

12   A.    It did not happen in the United States.

13   Q.    Did the second cooperator describe whether the

14   conspiracy transported illegal aliens who were gang members?

15   A.    He did.

16   Q.    And what was his estimation of about how many gang

17   members were transported as part of the conspiracy?

18   A.    He estimated that they transported -- 30 percent of

19   their clients were gang members.

20   Q.    Did he describe the ways in which the defendant greeted

21   those gang members or interacted with them?

22   A.    Yeah.  He said it was very -- he used the word

23   "familial."  It was just -- it stuck out to him as being very

24   different than what he had -- his own interactions with the

25   gang members.

1          MR. MCGUIRE:  Your Honor, the second cooperator

2    told Agent Joseph about some of the same kinds of behavior as

3    it related to the minor females that was part of one of my

4    previous exchanges.  And I would just proffer to the Court --

5    I think that's probably easier -- that, if the Court were to

6    allow that testimony, the testimony would be that the second

7    cooperator described that there had been complaints about the

8    defendant's inappropriate sexual behavior towards adult and

9    minor females, and that it was bad for business, and that the

10   second cooperator confronted the defendant about that during

11   the conspiracy, to serve the purposes of the conspiracy.

12          THE COURT:  All right.

13   BY MR. MCGUIRE:

14   Q.    Did this second cooperator testify under oath before a

15   federal grand jury investigating this case?

16   A.    Yes, sir, he did.

17   Q.    In May of this year, did you sit in on an interview

18   conducted by other law enforcement officers of a female

19   witness that we can refer to as NV?

20   A.    Yes, sir.

21   Q.    And does she have any pending criminal charges?

22   A.    She does not.

23   Q.    Is she an American citizen?

24   A.    She is.

25   Q.    Now, has she worked with law enforcement before and been

1  compensated for those -- that information?

2  A.  That's correct.

3  Q.  But not for you or HSI Nashville?

4  A.  No.  No, sir.

5  Q.  Does she live here in Tennessee?

6  A.  She does not.

7  Q.  Did NV state when she first met the defendant?

8  A.  She did.  She stated she was 13 or 14 when she met him.

9  Q.  And how old is she now?

10  A.  Twenty.

11  Q.  Where did she say she met him?

12  A.  She met him in Maryland.

13  Q.  Did she say anything about whether -- about her

14  knowledge of the defendant's affiliation with a gang?

15  A.  She believed him to be a member of MS-13.

16  Q.  Did she describe having personal experiences with both

17  MS-13 and a rival gang known as 18th Street or 18 Barrio?

18  A.  Yes, sir.  She stated that her family was mostly

19  affiliated with the 18th Street gangs, but that she had had

20  some personal relationships with MS-13 members.

21  Q.  Did she describe whether she was aware of the

22  defendant's alien smuggling activities?

23  A.  She said she was aware of it.  Received that through

24  conversations with the defendant.

25  Q.  And what did he tell her or what did he ask her to do,

1   according to her?

2   A.    He said that he was involved in that, and he pointed out

3   some other drivers, other associates, and actually asked her

4   if she would accompany him on some of the trips to transport

5   illegal aliens.

6   Q.    Did she describe communications between herself and the

7   defendant?

8   A.    She did.

9   Q.    And how did they communicate?

10  A.    Social media.  Snapchat, specifically.

11  Q.    Did she identify a Snapchat handle that the defendant

12  used to contact her?

13  A.    She did.

14  Q.    And generally what was that Snapchat handle?

15  A.    It was titled Soytuga.

16  Q.    And were you able -- you and other agents able to find

17  evidence about that Snapchat handle?

18  A.    We did.

19  Q.    And just generally what was that?

20  A.    The investigative team determined it was -- it shared --

21  while it was more of a covert account as far as names,

22  anonymous, it shared an IP address with a residence we knew

23  the defendant was staying in.

24  Q.    Did she describe -- now, you weren't working this as

25  part of your investigation?

1  A.   This was not part of my investigation.   Another member

2  of the investigative team was chasing this down.

3  Q.   Did she describe communications with the defendant when

4  she was 15 years old?

5  A.   Yes, sir.  She said she was -- the defendant -- it was a

6  sexual -- it was sexual in nature, although not physically.

7  Q.   And did she describe when she was 15 any communication

8  about nude images?

9  A.   She stated the defendant asked her for naked pictures.

10  Q.   And what was her response?

11  A.   She did not send him naked pictures of herself.

12  Q.   Did they -- were there other indicators that you

13  reviewed that they had a sexualized relationship?

14  A.   Yes, sir.  They were sending --

15          MR. TENNENT:  Your Honor, I think -- and I

16  probably should have done this earlier -- I'm not quite sure

17  what on Earth factor this applies to.  It seems slanderous,

18  but I don't know what relevancy it has.  So I think I need to

19  object for relevancy on what he's getting into right now.

20          THE COURT:  All right.  Mr. McGuire?

21          MR. MCGUIRE:  Yes, Your Honor.  It goes to danger.

22  And it also reinforces some other evidence in this case about

23  the defendant's sort of cavalier attitude when it comes to

24  minors.

25          I would offer an exhibit that the -- I expect the

1    agent to be able to authenticate as coming from this witness.

2    And it goes to danger, Your Honor.  And, respectfully, the --

3    the danger consideration is more than just the charges or

4    what the defendant is facing.  This Court has to determine

5    whether the defendant poses a danger to the public and can

6    use pretty much any source that the Court determines is

7    important for that analysis.

8           There have been multiple cases where -- and I've

9    cited them to this Court before -- where the Court can use

10   even acquitted conduct to describe whether or not the

11   defendant is a danger.  It doesn't have anything to do with

12   whether he's guilty or not guilty of a crime, but whether

13   he's a danger and whether that danger can be controlled by

14   conditions.

15          This testimony goes to the heart of that, Your

16   Honor.  This is who the defendant is.  This is who is being

17   asked to be released by you.  And I think it's important to

18   your inquiry for you to understand the things about him that

19   might make him a danger to the public.

20          THE COURT:  Any response, Mr. Tennent?

21          MR. TENNENT:  You know, I would, one, put a really

22   strong caveat on what he just said.  He's presuming he gets

23   through subsection (f).  So he's definitely arguing this is

24   relevant as to (g).

25          So, first off, I want to be really clear, this has

1  nothing to do under their position on whether they're even

2  entitled to a detention hearing.  So, if it were admissible,

3  it should be capped.

4        Beyond that, I submit that this hearsay statement

5  from somebody about something -- some flirtatious event that

6  happened five years ago is so attenuated that it is

7  irrelevant even with (g) consideration.

8        MR. MCGUIRE:  Your Honor, I'm just traveling off

9  what I understand the Court's order to be, is that we're

10  going to let all the evidence go, and then you're going to

11  decide what to make of it.

12        And that's -- I mean, Mr. Tennent's correct, it

13  goes more to that.  But that's what I understood the Court

14  wanted us to do.

15        THE COURT:  Well, let me just be clear.  And you

16  understood correctly, Mr. McGuire, that I am proceeding today

17  to hear all of the evidence under both 3142(f) and 3142(g).

18        Mr. Tennent's point, though, is not without some

19  appeal that, you know, this is evidence that, if I find

20  ultimately that there is no basis for a detention hearing,

21  it's evidence that is primarily a 3142(g) factor of

22  dangerousness, which I also agree with you that, in

23  evaluating dangerousness, the Court has the ability to

24  consider conduct that is outside the offenses charged and

25  even to the extent which you've described of charges that

1    never reach conviction.

2            So it is with that cabining as Mr. Tennent

3    describes it that I am going to allow this testimony to

4    proceed.  But because of the nature of the hearing,

5    Mr. McGuire, that we are proceeding with a lot of -- of

6    testimony that goes to 3142(g) about which there is a strong

7    contest by Mr. Abrego Garcia's attorney would never be

8    reached, never be permitted, if I find that there is no basis

9    for detention.

10           We're not going to belabor any of this testimony.

11   You need to present this in as expeditious, non-salacious

12   manner as possible.  And then I will make a determination

13   about whether it is evidence that I can consider at all for

14   purposes of -- including 3142(f).  If I find that there was

15   no basis for a detention hearing, then I'm not going to

16   consider this evidence at all, which would be that outcome.

17           If I find that there is a basis for a detention

18   hearing, then I'll consider it for purposes of 3142(f), (g),

19   whatever subfactors it falls under.

20           All right?

21           MR. MCGUIRE:  Yes, Your Honor.

22           THE COURT:  So --

23           MR. MCGUIRE:  And, frankly --

24           THE COURT:  I'm sorry.

25           MR. MCGUIRE:  I apologize.

 1          THE COURT:  You did not -- I said, "All right?"
 2    which signalled to you that I was finished, and I had one
 3    more thought that I always like to close the loop on the
 4    objection.
 5          So, to that extent, I'm overruling the objection,
 6    but to that extent only, that, because of the nature of
 7    today's proceeding, I find that it does have some relevance
 8    to the 3142(g) considerations, if I get that far, but I want
 9    it to be presented as I've described.
10          MR. MCGUIRE:  Yes, Your Honor.  And I have
11    basically two more questions to admit this exhibit.  And,
12    frankly, have maybe 20 or 30 more questions total for my
13    direct examination.
14          I agree with the Court and have endeavored my best
15    to present this evidence as -- without salaciousness and as
16    expeditiously as possible.  I've had good discussions with
17    the defense pursuant to your Court's order and my friends in
18    the defense bar to try to streamline the issues as much as we
19    possibly could.
20          But I'm almost finished with my direct, Your
21    Honor.
22          THE COURT:  All right.
23          MR. MCGUIRE:  Can I pass this to the witness --
24          THE COURT:  Yes.
25          MR. MCGUIRE:  -- and see if he can recognize it.

```
1          THE COURT:  And do you have an extra copy that you
2   can provide for me, please?
3          MR. MCGUIRE:  Yes, ma'am.
4   Q.   Agent Joseph, do you recognize what's been handed to
5   you?
6   A.   Yes, sir.
7   Q.   And what is it generally?
8   A.   These are some screenshots that were provided by NV
9   talking about OnlyFans, which I believe was largely known for
10  having a high content -- sexual content.
11  Q.   And the individual at the top, that Tuma, that's the
12  Soytuga person?
13  A.   That's right.
14         MR. TENNENT:  Your Honor -- and I've been waiting
15  on this.  I wanted to give Mr. McGuire full opportunity.  But
16  we haven't heard any testimony about Tuma other than this
17  conclusion that Tuma is Soytuga.  I don't use Snapchat.  My
18  kids do.  But if you're Soytuga, you're Soytuga.  This isn't
19  Soytuga.  This is Tuma.  And so perhaps there's a connection
20  there.  But they've put on testimony that allegedly Soytuga
21  has some connection to an IP address that is somehow
22  connected to my client.  But I'm going to object to any
23  Snapchats involving Tuma.
24         THE COURT:  Mr. McGuire?
25         MR. MCGUIRE:  Can I show this to Mr. Tennent?
```

         THE COURT:  You can.  I think that's a foundation
objection as -- in addition to others, but yes, you can
certainly share that information.
         (Respite.)
         MR. TENNENT:  Your Honor, I'm going to cabin my
objection merely to the relevance of this.  And I may --
         THE COURT:  So your objection is to relevance?
         MR. TENNENT:  That's correct, Your Honor.  I'm
withdrawing my foundation objection.
         THE COURT:  All right.  But still proceeding with
an objection as to relevance?
         MR. TENNENT:  Yes, Your Honor.
         THE COURT:  Your response to the relevancy part of
Mr. Tennent's objection, Mr. McGuire?
         MR. MCGUIRE:  Respectfully, Your Honor, I think
the Court ruled that you overruled that objection.
         I think his second objection was foundational,
which it sounds like he's withdrawing.  So I would ask that
that be made Exhibit 3 to this hearing.
         THE COURT:  All right.  It will be -- this will be
admitted as Government's Exhibit 3.
         (Whereupon, Plaintiff Exhibit 3 was marked for
              identification and received in evidence.)
         THE COURT:  Is this one of the exhibits that needs
to be placed under seal, Mr. McGuire?

```
 1            MR. MCGUIRE:  Your Honor, I would respectfully
 2   request that it be placed under seal.  I've tried to -- and
 3   let me be very clear that the Court did this -- or asked us
 4   to do this, and I neglected to do it earlier.  Frankly, all
 5   of the exhibits that the United States intends to admit needs
 6   to be placed under seal because of either the presence of
 7   personal information within them, references to minors, or
 8   conduct involving minors.
 9            And so I think -- this is Exhibit 3 -- would,
10   obviously, based on the testimony, potentially embraces a
11   minor.  Exhibit 1 and 2 have personal information, such as
12   birthdays.  They have personal information of the defendant
13   and other people in them.
14            And then we have two other exhibits that we're
15   going to offer -- well, I'm just going to proffer to the
16   Court that have personal information of the defendant and his
17   wife and children within them.
18            So I really -- I think it's pretty much everything
19   needs to be placed under seal.
20            THE COURT:  All right.  So that was not my
21   understanding from the motion.  I believed that the motion
22   referred only to minor children, but you're now expanding the
23   motion to request that all of the Government's Exhibit's
24   exhibits be placed under seal.  Is that correct?
25            MR. MCGUIRE:  Yes, Your Honor.  And it might just
```

1 have been unartfully drafted.  I noted that there was

2 personal information and information about minors -- or at

3 least that was the draft that I saw.  But a lot has happened

4 over the last week.  So. . .

5          THE COURT:  Yes indeed, Mr. McGuire.  And it may

6 be that I simply misread the motion or misunderstood the

7 motion.

8          MR. MCGUIRE:  I don't know that there's an

9 objection to placing it under seal, Your Honor.

10          THE COURT:  Any objection, Mr. Tennent, to placing

11 all of the Government's exhibits under seal?

12          MR. TENNENT:  We're just not taking a position.

13          THE COURT:  All right.

14          MR. TENNENT:  We don't object.

15          THE COURT:  Do you want to talk with your

16 co-counsel?  There's. . .

17          MR. TENNENT:  I'm. . .  We do not object, Your

18 Honor.

19          THE COURT:  All right.  I'm going to place the

20 exhibits under seal, at least for the time being.  I -- I'm

21 not sure that the parts of the video that you played in court

22 today, Mr. McGuire, included any personally identifying

23 information, other than Mr. Abrego Garcia's name.  But I

24 intend to review the video in its entirety.  And to the

25 extent that it does include any other personal identifying

information, I will place it under seal.

Certainly Exhibit -- I think it was Exhibit 4 --
was the roster.  It definitely includes personal identifying
information.  This exhibit does as well.

So, for the time being, I will place all of the
exhibits under seal, letting you, Mr. McGuire, tell me as the
government proceeds with its proof whether there are exhibits
that do not contain that kind of information and therefore do
not need to be sealed.

And also subject to further order that, as this
case progresses, it may be that you receive an order from me
or from Judge Crenshaw that instead directs you to somehow
redact that information -- I'm not sure about editing the
video, but redacting the information and then filing redacted
versions -- or submitting redacted versions of the exhibits.
You know, we don't really file exhibits anyway, but if they
were to be made available for any purpose or used for any
other purpose.

So, for the time being, subject to further order,
I'm going to place at least the exhibits that the government
has introduced so far -- I'll extend that to all the
government's exhibits based on Mr. McGuire's representation
that they all include either information about minors or
personal identifying information about others, and -- and
instruct you, Mr. McGuire, to let me know if there is a

1  particular exhibit that does not fall within the scope of
2  that ruling.
3           MR. MCGUIRE:  Yes, Your Honor.  I don't believe
4  there will be.  And we'll be ready to comply with any order
5  the Court issues in terms of redacting, whether it's this
6  Court or Judge Crenshaw.
7           THE COURT:  All right.  Very good.
8  BY MR. MCGUIRE:
9  Q.   Agent Joseph, I can't remember if I asked this, so I'll
10 just do it if I haven't.
11          Did the witness, NV, testify under oath in front
12 of the grand jury investigating this matter?
13 A.   Yes, sir, she did.
14 Q.   As a part of the investigation, are you aware of
15 another -- well, who we'll call Female Cooperator 1, who
16 agreed to cooperate with the United States?
17 A.   Yes, sir.
18 Q.   And was -- was she in custody at the time?
19 A.   She was not.
20 Q.   Did she have a familiar relationship with some of the
21 other coconspirators?
22 A.   She did.
23 Q.   Is she -- does she have deferred action on any
24 deportation?
25 A.   She does not.

1  Q.    Okay.  Is that potentially contemplated?

2  A.    Yes, sir.

3  Q.    And why would that be?

4  A.    She might be a potential witness for a trial.

5  Q.    Did she describe her knowledge about the defendant's

6  participation in the alien smuggling conspiracy that has been

7  discussed?

8  A.    Yes, sir.

9  Q.    When was she in the conspiracy?

10 A.    She was in -- right around when she came to the United

11 States, around 2021 -- '19.  Somewhere in there.  Apologize

12 if I'm not precise on the dates.

13 Q.    Early on?

14 A.    Early.

15 Q.    Early compared to later?

16 A.    Yes, sir.

17 Q.    Did she describe whether she knew that the defendant

18 brought family members and children with him as cover for

19 alien smuggling activities?

20 A.    She observed that, yes, sir.

21 Q.    I want to ask you, then -- well, did she testify before

22 a federal grand jury in Texas in relation to this

23 investigation?

24 A.    She did.

25 Q.    Finally, I want to ask you about another female

1    cooperator.

2            And, Your Honor, this will be my last area of

3    testimony.

4            Did this individual describe whether she knew --

5    well, did she describe whether she knew about the defendant's

6    participation in smuggling activities?

7    A.   Yes, sir.  She was also a member of the transportation

8    organization.

9    Q.   And was one -- what was one of her roles within this

10   organization?

11   A.   As we often see in -- in a lot of these criminal

12   transactional organizations and organization in general, she

13   was responsible for finances, deposits, bookkeeping.

14           MR. MCGUIRE:  May I have one moment, Your Honor?

15           THE COURT:  Yes.

16           (Respite.)

17           MR. MCGUIRE:  Thank you, Your Honor.  Almost

18   finished --

19           THE COURT:  All right.

20           MR. MCGUIRE:  -- with this witness.

21   Q.   Agent Joseph, the -- the individual we were just

22   speaking about, did she have romantic ties to other members

23   of the conspiracy?

24   A.   Yes, sir.

25   Q.   And you described a moment ago that one of her roles was

1  transferring money?

2  A.   Yes, sir.

3  Q.   Could you describe a little bit more about kind of

4  generally how that worked within the conspiracy based on your

5  investigation?

6  A.   Largely it was a cash business, what we've learned, but

7  there were some wire transfers that were made between

8  coconspirators.

9  Q.   Were there wire transfers that you uncovered that were

10  also -- that were basically committed by other people not

11  necessarily even in the conspiracy?

12  A.   Yes, sir.

13  Q.   Did those people have ties to members of the conspiracy?

14  A.   They did.

15  Q.   Is that something that you're familiar with in your

16  experience in investigating human smuggling cases?

17  A.   Well, as I touched on earlier, it's fairly typical for a

18  lot of the criminal investigations that I've been a part of

19  over the last 22-plus years.

20  Q.   And is there a prospect that the conspiracy will avoid

21  detection if others are used to move money?

22  A.   Certainly.

23        MR. MCGUIRE:  Your Honor, I don't have any other

24  questions for Agent Joseph at this time.

25        THE COURT:  All right.  Cross-examination,

1  Mr. Tennent.

2          MR. TENNENT:  Thank you, Your Honor.

3          THE COURT:  Let me ask this, Mr. Tennent.  And

4  I'll not holding you to this.  How much -- how long do you

5  think your cross-examination is likely to take?

6          MR. TENNENT:  Thirty minutes.

7          THE COURT:  All right.

8          Are the interpreters okay?  Do we need to take a

9  break?  I know you're switching off.  So we'll. . .

10          INTERPRETER:  We're fine.

11          THE COURT:  All right.  So then, since we started

12  a little bit later this morning, I'm just going to go ahead

13  and let you do cross-examination, Mr. Tennent.  And then

14  we'll probably take a lunch break.

15          And then, before we do that, I want to hear how

16  much more evidence the government has and what evidence you

17  might intend to put on so that we figure out how long a

18  break.  Because it is my intention to finish hearing the

19  proof today.

20          So -- but go ahead.  Any time you're ready.

21          MR. TENNENT:  Thank you, Your Honor.

22                    CROSS-EXAMINATION

23  BY MR. TENNENT:

24  Q.   Good morning, Agent Joseph.

25  A.   Good morning.

```
 1  Q.   I'm Richard Tennent.  I'm a federal defender.  I'm here
 2  to defend Kilmar Abrego.
 3  A.   Yes, sir.
 4  Q.   As we start, is Agent Joseph how I should address you?
 5  A.   That's fine.
 6  Q.   Okay.  I'm going to try, if we can, to address him by
 7  his name, as Mr. Abrego.
 8            Is that okay?
 9  A.   Sure.
10  Q.   Okay.  Great.
11            So you've let us know --
12  A.   Do you want just Mr. Abrego or Mr. Abrego Garcia?
13  Q.   No.  Mr. Abrego is what he prefers.
14  A.   Gotcha.
15  Q.   Thank you.
16  A.   Yes, of course.
17  Q.   Thank you.
18            You had nothing to do with this case before April
19  28th?
20  A.   No, sir.
21  Q.   By May 21st, three weeks and two days later, you had an
22  indictment, correct?
23  A.   Yes, sir.
24  Q.   When you started on April 28th, you had the videotape of
25  this traffic stop?
```

1  A.    Yes, sir.

2  Q.    You had suspicions that this traffic stop involved human

3  smuggling?

4  A.    Absolutely.

5  Q.    And you wanted to see whether your suspicions could be

6  supported?

7  A.    Wanted to find the facts.

8  Q.    Wanted to find the facts.

9        So for the last three weeks you've been trying to

10 find the facts?

11 A.    Absolutely.

12 Q.    And you found those facts first from -- and you've been

13 calling him "Cooperator 1."

14       In the indictment he's referred to as "CC1,"

15 correct?

16 A.    If you say so --

17 Q.    Okay.

18 A.    -- I'll agree with you.

19 Q.    He is a two-time felon, at least, who's been deported

20 five times, correct?

21 A.    That's my understanding.

22 Q.    All right.  At the time you met him --

23             THE COURT:  Sorry.  Deported how many times?

24             MR. TENNENT:  Five times, Your Honor.

25 Q.    He was serving a 30-month sentence when you met him?

```
 1   A.    That's right.
 2   Q.    He's now living in the community?
 3   A.    Partially.  Halfway house.
 4   Q.    A halfway house?
 5   A.    So whatever your definition of a halfway house would be.
 6   Q.    All right.  He doesn't have guards or bars?
 7   A.    No, he most certainly does.  It's a secure facility.  So
 8   there's check-in times.  It's locked doors.
 9   Q.    Okay.  He gets to leave --
10   A.    That type thing.  I think he has a room.
11   Q.    He gets to leave for work and that sort of thing?
12   A.    He has not been granted work authorization yet.  But
13   that's probably something that's coming.
14   Q.    Okay.  So he is on his way to be able to work in the
15   United States?
16   A.    That's right.
17   Q.    Okay.  He is, in fact, though, here illegally, as
18   evidenced by his five prior deportations?
19   A.    Yes, sir.
20   Q.    So he is the first significant witness you've testified
21   about?
22   A.    That's right.
23   Q.    Okay.  The second significant witness is his close
24   relative who appears as CC3 in the indictment, correct?
25   A.    Yes, sir.
```

1  Q.    Okay.  And so that close relative -- and by "close

2  relative," I'm trying to be respectful and not identify

3  people, but I mean like husband/wife, brother/sister,

4  parent/child.  A very close relationship --

5  A.    Fair enough.

6  Q.    -- between -- okay.

7           So CC3 is a close relative of CC1.

8           And, as you've already testified, he said he would

9  help you against Mr. Abrego in return for his release from

10  jail?

11  A.    That's correct.

12  Q.    Okay.  He is an admitted human trafficker?

13  A.    Yes.

14  Q.    He has been deported?

15  A.    He has, yes.

16  Q.    In fact, he's in custody right now for his illegal

17  reentry?

18  A.    Yes, sir.

19  Q.    Okay.  And, as of yet, though, he has not had his

20  request to be released from jail fulfilled; is that right?

21  A.    No, sir.  He's criminally charged.

22  Q.    Okay.  But he is awaiting whatever resolution of that

23  case may be?

24  A.    Yes, sir.

25  Q.    Okay.  And he, too, is potentially applying for deferred

1  action so long as he's a witness in this case?
2  A.    Yes, sir.
3  Q.    Okay.  So he too could stay in the United States and
4  return for his testimony?
5  A.    For whatever specified period of time the assigning
6  officials see fit.
7  Q.    You've referred to three women.
8        The second is also a close relationship to CC1 and
9  I guess to CC3 then?
10 A.    Yes, sir.  I would group that person the same
11 description you previously outlined.
12 Q.    Okay.  And the first -- the younger woman you referred
13 to is also a friend or colleague of the three of them?
14 A.    Are we referring to --
15 Q.    And I apologize.  My ears are not great anymore --
16 A.    Sorry.
17 Q.    -- the initials, you were saying MV?
18 A.    N, November Victor.
19 Q.    November Victor?
20 A.    Yes.
21 Q.    NV is also connected with this other family?
22 A.    No.  No, sir.
23 Q.    She's a family friend?
24 A.    No, sir.
25 Q.    You don't think so?

1  A.   No.  Not to my knowledge.

2  Q.   Not to your knowledge.

3  A.   Connected to the other people you were speaking of?

4  Q.   Yeah.

5  A.   No, sir, not to my knowledge.

6  Q.   Not to your knowledge.  Okay.

7          Is the third woman you talked to connected to

8  them?

9  A.   She was in a relationship with one of them.

10  Q.   Okay.  So four of the five witnesses that you have

11  talked about, and the only four witnesses that you claim put

12  him in this trafficking organization, are all close family

13  relatives or dating one?

14          MR. MCGUIRE:  Your Honor, I guess I object.  I

15  think Mr. Tennent just --

16          THE COURT:  Pull the microphone closer to you,

17  Mr. McGuire.

18          Go ahead.

19          MR. MCGUIRE:  Yes, Your Honor.  I think

20  Mr. Tennent inadvertently said they're the only witnesses.  I

21  recall the testimony that NV was also recruited by the

22  defendant to participate in the alien smuggling scheme.  So,

23  to the extent that his question implies that that's not

24  correct -- and I don't -- I think that's just an

25  unintentional --

1          MR. TENNENT:  Yes.

2          MR. MCGUIRE:  -- but I want to correct the record.

3          THE COURT:  Go ahead and ask your question again

4    now with whatever -- if you concur with Mr. McGuire's

5    correction, then go ahead and reask your question with that

6    correction, Mr. Tennent.

7    BY MR. TENNENT:

8    Q.    Suffice it to say you found these five witnesses, four

9    of whom are closely intertwined?

10   A.    Yes, sir.  That's fair.

11   Q.    All right.  And I guess two of them are in custody

12   seeking relief, and the woman is also seeking deferred

13   action; is that right?

14   A.    I believe that's to be -- that's true.

15   Q.    Okay.  Beyond those people, you've already testified

16   about your license plate readers, right?  And those actually

17   relate to CC1's Suburban?

18   A.    That's right.

19   Q.    You have not done any license plate readers on

20   Mr. Abrego's personal vehicles?

21   A.    No.  We were focused on the Suburban.

22   Q.    And the Suburban in fact has no hits in Maryland?

23   A.    We didn't recover any hits in Maryland.

24   Q.    Okay.  No hits in D.C.?  No hits in Baltimore?

25   A.    Not that I recall.  Potentially it was on there.  Was

1  focused on the absence of hits in Missouri.

2  Q.   Okay.  But this was the full year of 2022.

3            And during that full year of 2022, you got hits in

4  Louisiana?

5  A.   Uh-huh.

6  Q.   And Georgia?

7  A.   Yes, sir.

8  Q.   Okay.

9  A.   It's possible it's on there.  I just can't personally

10 give you a firm answer without going through it.

11 Q.   Very good.  Very good.

12            These interviews, were they audio recorded?

13 A.   They were not.

14 Q.   And certainly not video recorded?

15 A.   No, sir.

16 Q.   So what you've testified here today in regards to CC1

17 and CC3 is based on your notes?

18 A.   That's right.

19 Q.   As to the three women, you have no notes?

20 A.   I wasn't present.  I was present for one that I sat in

21 on.

22 Q.   Okay.  I apologize --

23 A.   I'm sorry.  I should have been more clear about that.

24 Q.   I was totally misunderstanding.

25            So you weren't present for the interview with the

1  second woman you testified about, who is in a close familial
2  relationship with CC1?
3  A.   I personally did not.
4          MR. TENNENT:  Okay.  You know, Your Honor,
5  obviously the cat's out of the bag.  But I -- I misunderstood
6  that.  I would have, of course, moved to object to the
7  secondhand hearsay as to the second woman we heard about.
8          THE COURT:  Well, I'm going to let you explore
9  that a little further with respect to how he became aware of
10  that information.  And then, if you want to move to strike
11  that testimony or something of that nature, I'll let you do
12  that either now or at some later point in the proceeding,
13  Mr. Tennent.
14          MR. TENNENT:  Let me just do this.
15  Q.   So we're talking about the woman who is not in custody
16  who has a familial relationship with CC1 who is contemplating
17  deferred action?
18  A.   Yes, sir.
19  Q.   You were not present for her interview?
20  A.   No, sir.
21  Q.   So all the information you told about her was told to
22  you by another officer?
23  A.   We work this as -- we have the assistance of a joint
24  task force on this.  So we were -- we are a federal agency.
25  We have a long reach.  So we had many resources at our

1  disposal.  So members of the investigative team of course

2  conducted those interviews out of practicality because I'm of

3  course in Tennessee and they are of course in Texas.

4  Q.   I'm not fussing at you with time and space.

5           What I'm interested in, though, is -- so your

6  information is based on what you were told?

7  A.   Yes, sir.

8  Q.   So you were orally told what this person orally told

9  someone else?

10 A.   Yes, sir.

11          MR. TENNENT:  Okay.

12          So, Your Honor, I'm going to move to strike that

13 testimony on an oral recitation of an oral recitation.

14          THE COURT:  Mr. McGuire, do you want to address

15 that now, or do you want to -- I'm going to give you an

16 opportunity to try to -- and I only use the word

17 "rehabilitate" -- you know why I'm using the word

18 "rehabilitate."

19          MR. MCGUIRE:  I understand what the Court is

20 saying.

21          THE COURT:  I'm going it give you a chance on

22 redirect to speak further to this issue with Special Agent

23 Joseph.

24          And, Mr. Tennent -- I will take under advisement

25 Mr. Tennent's request to strike because I'm still not

1    entirely clear either.  Is it correct that there are no
2    reports of these interviews, that it is one agent just
3    telling another agent, without any written report, what the
4    interview consisted of?
5            MR. MCGUIRE:  No, Your Honor.  There are ROIs
6    documenting the reports.  I think the question that
7    Mr. Tennent asked was were you told this, and that is also
8    true.
9            THE COURT:  Okay.
10           MR. MCGUIRE:  I mean, we had multiple phone calls
11   about all of these individuals.  But I -- you know, that
12   is -- that is true.
13           I will say, Your Honor, I think part of it was --
14   you know, the Court -- I don't want to use the word
15   "admonished" -- but the Court certainly wanted me to continue
16   to expedite my presentation, and I was -- that was towards
17   the end, and I was trying to get on my horse to be
18   efficient --
19           THE COURT:  Well, don't ever feel like you are
20   rushed by anything I say, Mr. McGuire.  I do want evidence to
21   always be presented in an orderly, efficient fashion, but
22   efficiency does not mean anybody should feel rushed through.
23   Efficiency means let's not get off on tangents, let's not
24   expand on things solely for purposes of -- of restating
25   points that you want to drive home in a particular way.

 1          So efficiency, it does not always mean quickly.

 2     Sometimes there can be a lot to efficiency that doesn't

 3     necessarily encompass a shorter time frame.

 4          So I'll give you a chance on redirect, if there's

 5     more that you want to explore with this witness about what

 6     the issues that Mr. Tennent has raised or any other, because

 7     I want you to be able to present your evidence in the manner

 8     that you want to present it, consistent with the rules that

 9     do apply and the Court's instructions about the nature of the

10     evidence that I will consider for purposes of a detention

11     hearing.

12               MR. MCGUIRE:  Yes, Your Honor.

13               THE COURT:  Does that make sense, Mr. McGuire?

14               MR. MCGUIRE:  It does, Your Honor.

15               THE COURT:  Okay.

16               MR. MCGUIRE:  I just wanted to tell the Court what

17     was in my thought process --

18               THE COURT:  All right.

19               MR. MCGUIRE:  -- you were at that particular

20     witness.

21               THE COURT:  Well, Mr. McGuire, I've never known

22     you to not tell me if you were thinking that I was somehow

23     stepping on -- on what you were doing.  And so don't be

24     reluctant to do that today.

25               MR. MCGUIRE:  Yes, Your Honor.

 1          THE COURT:  If you feel like I'm in some way
 2     hampering your presentation of the proof, that is certainly
 3     not my intention, to -- to not let you put on evidence.
 4          Let me say this.  You know me well enough to know
 5     that, if there is a basis to exclude evidence, then I'm going
 6     to exclude the evidence based on what I think the law
 7     requires.  But I am not going to rush someone through in an
 8     ordinary detention hearing because that's not the way we run
 9     detention hearings.  I want there to be -- I want both sides
10     to give me as much information as they think I need to make
11     the informed, proper decision.
12          I mean, there might come a time in a particular
13     case where, if things are going on for two days and that
14     seems to be without good reason -- but that's not this case.
15     That's not today.  So, don't hesitate to speak up during the
16     rest of the proceeding if -- if you want to proceed in a
17     different way than what you're understanding I'm directing.
18          MR. MCGUIRE:  Yes, Your Honor.
19          THE COURT:  Thank you.
20          Go ahead, Mr. Tennent.  I didn't mean to --
21          MR. TENNENT:  No, no.  Thank you.
22          THE COURT:  -- totally interfere with your
23     examination.  So go ahead.
24     BY MR. TENNENT:
25     Q.   So, just to be clear, you're not testifying based on any

1  written reports regarding this close relative?

2  A.   That's correct.

3  Q.   Okay.  So it's entirely based on your memory of an oral

4  statement provided to you by another agent?

5  A.   In part.  Yes, sir.

6  Q.   Well, is "in part" you read a written report?

7  A.   I read a transcript.

8  Q.   You read a transcript?

9  A.   Yes, sir.

10 Q.   Okay.  So the woman who is the family relationship --

11 there's a transcript of her testimony?

12 A.   Yes, sir --

13          MR. MCGUIRE:  Your Honor --

14          THE WITNESS:  -- she tes- --

15          MR. MCGUIRE:  -- can we approach?

16          MR. TENNENT:  Oh.  We're talking grand jury.

17          THE COURT:  Yes, come on up.

18          MR. MCGUIRE:  Thank you.

19          (Bench conference outside the hearing of the

20          public.)

21          ////////////////////////////////////////////////

22          //////////////////////////////////////////

23          /////////////////////////////////////////////////

24 //////////////////////////////////////////

25          ////////////////////////////////////////





1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22          (In open court.)

23          MR. TENNENT:  And I apologize.  I don't really

24  want to highlight this as being a major part of the cross,

25  but I think diligence requires that I explore this real

1  quickly.

2  Q.   So the third woman that you talked about who did the

3  finances, allegedly, that is somebody who is not --

4              MR. SHABAZZ:  Richard, hold on.

5              Okay.  Sorry.  We're back.

6              THE COURT:  All right.  Was there some problem

7  with the equipment?

8              MR. SHABAZZ:  Yeah.  It was just -- but it's back

9  on now.

10             THE COURT:  All right.  Very good.

11             And always speak up.  Just let me know because I

12 might not always be paying attention to what's happening over

13 there, or I'm paying attention to what Mr. Tennent is asking

14 and what the witness is saying.  So don't hesitate to speak

15 up or let -- someone let me know if there's an issue that's

16 not resolved.

17 BY MR. TENNENT:

18 Q.   And that third woman, that is somebody that you just

19 received an oral report on what she had said?

20 A.   There are notes on that.  Totally honest, I could not

21 understand them.  It was -- the information I've testified to

22 was from oral conversation.

23 Q.   Okay.  Great.

24             So, as to the third woman that you've testified

25 about, the finances woman, you've testified about what

```
 1  another agent told you he told him.  And you couldn't
 2  understand that agent's notes.
 3  A.    Break that down for me.
 4  Q.    Yeah, yeah, yeah.  I'm not trying to be confusing.
 5  A.    I know you're not.
 6  Q.    We've got our third woman.
 7  A.    Yes, sir.
 8  Q.    You talked about her briefly.  And she said something
 9  about finances.
10  A.    Yeah.
11  Q.    But in any case this woman who said something about
12  finances, all you know about her is what another agent told
13  you?
14  A.    That's correct.
15  Q.    Okay.  And even though that other agent did take notes,
16  you didn't understand those notes; so your testimony is based
17  entirely on what that other agent told you?
18  A.    Yes, sir.
19          MR. TENNENT:  Okay.  So, again -- and, I mean, I'm
20  not expecting Your Honor to rule right now; Mr. McGuire may
21  want to explore this more -- but I am moving to strike that
22  little bit of testimony.  I'm not saying it's the world's
23  most significant part of any of this, but I think out of
24  diligence it's incumbent on me to move to strike that
25  secondhand hearsay.
```

1          And I'll move on unless you want --

2          THE COURT:  All right.  I'm going to take both of

3    the requests to strike both the testimony about the first

4    female individual and then about -- I think it was the

5    testimony about actually the third -- I'm not quite sure what

6    order of presentation they were, but the two female

7    individuals who are not the minor, I'll take those under

8    advisement.

9          I'm going to let you and Mr. McGuire have further

10   conversations.  You can let us know if that doesn't satisfy

11   that request.

12         I'll also let Mr. McGuire further address that in

13   his direct examination, and then, at the end of the day, I'm

14   going to ask you, if it hasn't been resolved, to make some

15   argument on that, as well as the argument on the merits of

16   all of the other issues that are before the Court.

17   BY MR. TENNENT:

18   Q.   So really, now, I want to focus on the interviews with

19   CC1 and CC3.  Okay?

20         These are the interviews you were the lead agent

21   on and you took notes on.

22         MR. MCGUIRE:  Your Honor, just for the ease of

23   everyone, I think I referred to them as the first and second

24   cooperators.  Can we do it that way?  I think that's going to

25   be cleaner for the record, as opposed to -- and I think

 1  Mr. Tennent seems like he's willing to do that.  I just think
 2  that way we all are talking about the same --
 3          THE COURT:  Well, let's just make notes for -- for
 4  the record also, including my purposes when I have to review
 5  the records and try to connect all these dots that CC- --
 6  well, the person whom you referred to as Cooperator 1 is CC1
 7  in the superseding indictment?
 8          MR. MCGUIRE:  Your Honor, I would respectfully
 9  request -- I asked the questions the way I asked them to try
10  to limit the opportunities to identify the cooperators.
11          THE COURT:  Okay.
12          MR. MCGUIRE:  And so I'm uncomfortable enunciating
13  who is who and -- because I'm afraid that that might lead to
14  their unmasking and potential reprisal.  I asked the
15  questions the way I asked them and identified those
16  individuals as the first and second cooperator so that there
17  could be a distinction and so that it could be followed and
18  so the Court could sort of bucket what they said under one
19  heading.
20          And I would submit, Your Honor, that's the
21  cleanest and most appropriate way to refer to those two
22  witnesses going forward.
23          THE COURT:  Well, since we're not here trying the
24  charges in the indictment --
25          MR. MCGUIRE:  Yes, ma'am.

```
 1              THE COURT:  -- that's not an unreasonable request.
 2              Mr. Tennent, does that work for purposes of the
 3   flow of your examination and ultimately argument?
 4              MR. TENNENT:  I think it does.
 5              THE COURT:  All right.  So we're talking -- then
 6   we're going to refer to those individuals as "Cooperator 1"
 7   and Cooperator -- or I think it was "Cooperator 1" and
 8   "Cooperator 2."
 9              MR. MCGUIRE:  I think I said "first cooperator"
10   and "second cooperator."  But it's potato, potahto at this
11   point.
12   BY MR. TENNENT:
13   Q.   You interviewed the first cooperator --
14              THE COURT:  Thank you.
15              MR. MCGUIRE:  Thank you.
16   BY MR. TENNENT:
17   Q.   -- on May 7th, right?
18   A.   That's right.
19   Q.   And the only recording we have of that are your notes
20   that were done on May 15th, correct?
21   A.   The report?
22   Q.   Yes.
23   A.   I wrote a report for both the 7th and the 15th.
24   Q.   Yes.  Right, right, right.
25              Your report on the May 7th interview is dated
```

 1  May 15th; is that right?

 2  A.    The report -- was that the day -- may have been the day

 3  it was uploaded.

 4  Q.    I don't know how your system works.  I just know I --

 5  A.    I'm sure I specified a date in the body of the report of

 6  when the encounter took place.

 7  Q.    Oh, no, no.  The encounter took place May 7th.

 8  A.    Okay.

 9  Q.    That's not my -- I'm just making sure that we're all on

10  the same page, that your notes for the May 7th interview were

11  completed on May 15th.

12          THE COURT:  If you want to show him what you're

13  referring to, Mr. Tennent, that might help clarify.

14          MR. TENNENT:  And I'm not intending to use these

15  as exhibits.  These are purely --

16          THE COURT:  You don't -- you don't have to use

17  them as exhibits.  I'm simply suggesting that you show him so

18  that you all can be on the same page about what you're

19  referring to when -- during your examination.

20  BY MR. TENNENT:

21  Q.    So, Agent Joseph, I've handed you what I believe are all

22  the ROIs you've done in this case.  And the only thing that's

23  altered is I put little page numbers on the bottom corners so

24  that we would easily be able to find pages.

25  A.    So --

1          THE COURT:  And you don't have to leave the

2     document with Agent Joseph unless you want to, Mr. Tennent.

3     I wasn't suggesting that you have to give him -- unless he's

4     unable to testify from recollection, I simply wanted you to

5     show him the document so we didn't spend a whole lot more

6     time trying to figure out if you're talking about same thing,

7     which we've now -- I've probably prolonged the time.  But

8     it's up to you whether you want to leave the document with

9     him or not.

10          MR. TENNENT:  It could come up again, Your Honor,

11    so it might be just easiest.

12    Q.   So your report on that first May 7th interview is on

13    pages 3, 4, and 5, right?

14    A.   Okay.

15    Q.   Is that correct?

16    A.   3, 4, and 5.  Yes, sir.  May 7th.  Yep.

17    Q.   And so that reflects that that report was approved on

18    May 15th?

19    A.   It was approved on the 15th; that's right.

20    Q.   Okay.  Very good.

21          So your May 7th interview, the report is done on

22    May 15th --

23    A.   No, it was approved on the 15th.

24    Q.   Okay.

25    A.   Difference.

1  Q.    Difference?

2  A.    For sure.

3  Q.    For sure.

4  A.    So would you like me to explain?

5  Q.    When did you write that report?

6  A.    Shortly after -- shortly after the interview.

7  Q.    Shortly after the interview?

8  A.    Absolutely.

9  Q.    All right.

10 A.    It's always fresher in my head then.  So after 23 years

11 I learned how to do a thorough report, and if it's done

12 closer to the interview, it's going to be far more accurate.

13 Q.    So within days?  How soon is "soon"?

14 A.    Yeah.  A day or two.  I'm going to have people I trust

15 proofread it, and then I'm going to put it into the system

16 for supervisory approval.

17 Q.    Okay.

18 A.    And then it's on the supervisor at that point when it's

19 approved.

20 Q.    All right.  So in this case it took eight days to get

21 through the approval process?

22 A.    If I had my computer, I could probably go back and see

23 if my supervisor was on leave.  Only one person can approve

24 it in my chain of command --

25 Q.    Very good.

1  A.   -- unless I make alternate measures to have other people

2  approve it.

3  Q.   All right.  Your second report on the second interview

4  with Cooperator 1 was approved on May 19th; is that right?

5  A.   That's right.

6  Q.   And then your interview with Cooperator 2 was approved

7  on May 21st, the day the indictment was returned in this

8  case; is that right?

9  A.   I wrote both those reports -- one of the -- on the

10 evening of -- of the interview, and the other one on the

11 plane on the way home.

12 Q.   Okay.  So that is -- we don't have a recording, we don't

13 have a video, we don't have a transcript.

14 A.   We generally don't record anything if an attorney is

15 present.

16 Q.   Okay.  And that's interesting actually.

17       Was the same attorney present for both CC- -- I

18 mean, informant -- Cooperator 1 and Cooperator 2?

19 A.   Well, they don't share an attorney --

20 Q.   They don't share an attorney.

21 A.   -- of course.

22 Q.   Do they share a defense investigator?

23 A.   No.

24 Q.   They don't?

25 A.   No, sir.

```
 1   Q.   Can I refer you to page 6.
 2   A.   I'm looking at it.
 3   Q.   Okay.  And then page 11.
 4   A.   6 and 11.
 5   Q.   Both of those, towards the end of those pages, they
 6   identify everyone who was present for those interviews.
 7            And in both cases does it not identify Defense
 8   Investigator Luz Martinez?
 9   A.   It does, sir.  And that's absolutely just a typo on my
10   part from cutting and pasting.
11   Q.   Okay.  So you cut and pasted and made typos?
12   A.   That's exactly what I just said.
13   Q.   Yeah.
14   A.   I --
15   Q.   Mistakes happen?
16   A.   Absolutely.
17   Q.   Okay.
18            All right.  Now, you've got years of experience
19   working with jailed cooperators who are bargaining for
20   release?
21   A.   Yes, sir.
22   Q.   Okay.  Probably hundreds if not thousands of times
23   you've met with jailed cooperators who want you to believe
24   them?
25   A.   Quite a few for sure.
```

1  Q.    A lot of times you find out you don't believe them,
2  correct?
3  A.    Absolutely.
4  Q.    Because there's all sorts of reasons people lie to you,
5  correct?
6  A.    Yes.
7  Q.    They want to tell you what you want to hear?
8  A.    That's right.
9  Q.    Okay.
10        And, in fact, they already, by the very nature of
11 them being in jail, have a history of dishonesty?
12 A.    Generally.
13 Q.    They can have personal beefs with the people they're
14 providing information against?
15 A.    Sure.
16 Q.    Okay.  So, again, in your training and experience, what
17 you do, normally, is you seek corroboration for what they've
18 told you, right?
19 A.    That's right.
20 Q.    Right?
21        So here we have these four closely related family
22 members who are giving you information, right?  And I want to
23 talk to you -- well, I guess I already actually have.
24        The corroboration you got outside of what these
25 people told you was the license plate readers?

A.    Yes, sir.

Q.    Which showed that Cooperator 1's vehicle was in Texas 12
days before the stop?

A.    That's right.

Q.    And it also shows that Cooperator 1's vehicle was in
Georgia, Louisiana, Arkansas, and Texas?

A.    That's right.

Q.    You don't have any other corroboration for what these
witnesses are telling you?  At this point.  You're continuing
to investigate, but at this point you don't have any more
corroboration --

          MR. MCGUIRE:  I would respectfully object, Your
Honor.  I understand that there is a discovery function in
these detention hearings, but I think the case law is pretty
clear that they can't be fishing expeditions.  And questions
such as "Do you have any other corroboration," I would
submit, Your Honor, is open ended and essentially allows the
defense to use a detention hearing for an impermissible
discovery function.

          MR. TENNENT:  Your Honor, I think he answered the
question.  He doesn't have any other corroboration.  That's
what I was getting at.

          THE WITNESS:  I didn't say that.

          MR. MCGUIRE:  Hang on.

          THE COURT:  Hang on.  Agent Joseph, this is

1  discussion between the lawyers --

2           THE WITNESS:  I understand.  Sorry.

3           THE COURT:  -- and me.

4           Yes, there is some authority to that effect

5  generally, Mr. McGuire, but the -- the statements of these

6  conspirators, cooperators -- I'm not sure -- I've lost track

7  of what you called them -- cooperators, I think -- maybe

8  coconspirators, but cooperators -- is the primary if not the

9  sole basis of the government's proof both as to 3142(f)

10 factors and then the 3142(g) factors.

11          So the government can't use the -- that

12 investigative process as both a sword and a shield and say

13 this is the proof that the government relies on to carry its

14 burden but Mr. Tennent is not going to have an opportunity to

15 explore it.

16          I don't think the question that he asked about

17 lack of other corroboration is -- I don't think it was overly

18 broad.  He was simply asking what other corroboration was

19 there.  Maybe he asked it as a -- as a -- not as an open-

20 ended question, but -- and he can certainly ask it as a --

21 more of a cross-examination question if he would like to do

22 that.

23          Rephrase the question, Mr. Tennent, and then I'll

24 rule on Mr. McGuire's objection.

25

1  BY MR. TENNENT:

2  Q.   So what I was getting at is, you try to corroborate

3  these statements with external sources, non --

4  noncooperators.  You try to see if --

5  A.   We look for corroboration wherever we can.  Certainly.

6  Q.   Okay.  So here, as you've testified, you did license

7  plate readers?

8  A.   That's right.

9  Q.   You've pulled my client's phone records?

10  A.   That's right.

11  Q.   Okay.

12  A.   A portion of it, yes, sir.

13  Q.   All right.  And you're still going through them right

14  now?

15  A.   That's right.  It's an active investigation.

16  Q.   It's an active investigation?

17  A.   They all are.

18  Q.   All are.  But you've testified to, I'm presuming, the

19  evidence that indicates that my client was driving back and

20  forth across the country trafficking people, correct?

21  A.   Yes.

22  Q.   Okay.  So we've heard it from you today?

23  A.   That's right.

24  Q.   All right.

25            I now want to kind of explore the big picture.

1  And some of this you've testified to.

2          But Cooperator 1 is the owner of a business in

3  Texas that contracts with heavy hitters?

4  A.    Yes, sir.

5  Q.    One of the heavy hitters provided him about one in four

6  customers?

7  A.    That's right.

8  Q.    Okay.  He had other heavy hitters who supplied him with

9  the other 75 percent?

10  A.    I -- I believe in subsequent conversations he was mostly

11  referring to the heavy hitter was the one you just

12  referenced, the foreign source of supply that represented 25

13  percent.

14  Q.    Okay.  He had other sources of supply?

15  A.    He did.

16  Q.    And these sources of supply you testified to were being

17  paid about $8,000 per person?

18  A.    That's my understanding, from origination to handoff.

19  Q.    He then got between 1,000 and $1,900 per person

20  trafficked?

21  A.    "He" being Cooperator 1?

22  Q.    Cooperator 1.

23  A.    I -- I guess, if that's how it works out.  So -- I think

24  I testified the original source of supply charges 8,000.  And

25  then he -- he would receive 1,000 per person.

1   Q.   Can I -- see if it would refresh your memory to turn to

2   page 8 of your ROIs.  Bottom of the second paragraph.

3          Do you need this?  I've got another copy.

4          MR. MCGUIRE:  No.

5   BY MR. TENNENT:

6   Q.   And, obviously, the copy I've been provided is redacted

7   to remove identifying information, but I'm thinking that I'm

8   reading that Cooperator 1 stated somebody, a heavy hitter,

9   paid him between 1,000 and $1,900 per person to be

10  transported within the United States?

11  A.   Yes, sir.  That's what it says.

12  Q.   Okay.  And is that an accurate recitation --

13  A.   If that's what he said, that's what I put in my report,

14  yes.

15  Q.   Okay.  So 8,000 per person to the people at the top of

16  the chain who -- are any of those in custody right now?

17  A.   Yes.

18  Q.   Okay.  Is the heavy hitter who paid him 20 -- or was it

19  25 percent of the business, is that person in custody?

20  A.   Yes, sir.

21  Q.   All right.

22         He, who is now in the halfway house, is paid

23  between 1,000 and 1,900 per person?

24  A.   That's right.

25  Q.   And then he has multiple drivers.

1            As a matter of fact, he gave you the names of at

2    least five different drivers beyond his claim of Mr. Abrego?

3    A.    Either he did or Number 2 did, yes.

4    Q.    Okay.  Definitely you had names of multiple --

5    A.    Yes.  Yes, sir.

6    Q.    And Number 2 himself was a driver?

7    A.    He was.

8    Q.    Okay.  And so those drivers get paid no matter -- well,

9    maybe it has something to do with how many people are in the

10   van, but they get paid 1,000 to $1,500 for doing the driving?

11   A.    That's my understanding.

12   Q.    Okay.  Now, Cooperator 1 has, he says, known Mr. Abrego

13   since 2016?

14   A.    Yes, sir.

15   Q.    He is from El Salvador himself, correct?

16   A.    Yes, sir.

17   Q.    He's been back to El Salvador quite a few times on

18   deportations, correct?

19   A.    He has.

20   Q.    Right.  And he told you that he did not observe any

21   signs or markings that indicated that Mr. Abrego was an MS-13

22   member?

23   A.    That's correct.

24   Q.    Okay.  So in ten years of knowing him, he didn't see any

25   indicia that he was a member of MS-13?

1  A.    I reported what he told me.

2  Q.    Okay.  What both Cooperator 1 and Cooperator 2 said was

3  that they transported members of gangs, right?

4  A.    Yes.

5  Q.    And "gangs" include Barrio 18, correct?

6  A.    I would think so.  Yes, sir.

7  Q.    Okay.  There may be smaller gangs, but the big ones are

8  MS-13 and Barrio 18, right?

9  A.    I believe so.

10  Q.    Okay.  And so they transported members of both gangs?

11  A.    They did.

12  Q.    Okay.

13  A.    Presumably.  You know, he didn't say it specifically,

14  but, yes, sir, I would believe that to be true.

15  Q.    Okay.  The point being is they testified that they

16  transported gang members generally, and they said that

17  Mr. Abrego was friendly with whoever these gang members were,

18  or familial, or whatever the term was?

19  A.    Yes, sir.  The familial was Number 2.  I believe so.

20  Q.    Familial?

21  A.    Yes, sir.

22  Q.    So whether they were MS-13 on one side, Barrio 18 on the

23  other side, he was familial with gangsters?

24  A.    Generally speaking, I believe that to be true.  We don't

25  have specific information saying that he had rival gangs in

1  the same car.

2  Q.   Okay.

3  A.   That would certainly be something for a follow-up at

4  some point.

5  Q.   All right.  So clearly there is more follow-up that

6  needs to be done?

7  A.   As I said, it's an ongoing investigation.

8  Q.   All righty.

9        You know, and one of the big things you've been

10  trying to investigate is guns?

11  A.   Yes, sir.

12  Q.   Okay.  When you first talked to Cooperator 1, he said,

13  "Yeah, we both like guns," but he didn't tell you anything

14  about gun trafficking?

15  A.   That's correct.

16  Q.   Okay.  Now, this is the owner of the business, right?

17  A.   Yes, sir.

18  Q.   Okay.  Second time -- during the second interview, now

19  he remembered that he had sold or given -- he wasn't sure --

20  one or two guns --

21  A.   That's right.

22  Q.   Okay.  So he didn't know whether it was a sale or a

23  gift, right?

24  A.   No.  Yes, sir.  That's -- he couldn't remember.  You're

25  right.  Correct.

1  Q.   And he didn't remember if it was one or two?

2  A.   That's right.

3  Q.   All right.  But Cooperator 2 had a radically different

4  memory?

5  A.   He did.

6  Q.   Okay.  Cooperator 2 says he's a gun trafficker?

7  A.   "He" being -- "he" being the --

8  Q.   Cooperator 2.

9  A.   Cooperator 2?

10 Q.   Yes.

11 A.   Cooperator 2 is a gun trafficker?

12 Q.   Yes.

13 A.   Yes.  Yes.  He would go and buy the guns, yes.

14 Q.   So Cooperator 2 is the one who is claiming more guns?

15 He disagrees or disputes what Cooperator 1 said?

16 A.   He does.

17 Q.   Okay.

18 A.   That's right.  He was buying the guns at the direction

19 of Cooperator 1, according to 2.

20 Q.   Okay.  So the two of them are inconsistent on that key

21 point?

22 A.   They are inconsistent.

23 Q.   All right.  Now, I really want to drill down on what

24 they told you about Mr. Abrego driving across country with

25 his family.

1          They both told you that he typically did these
2    drives with his wife and his two children, correct?
3    A.    Yes.  Yes, sir.
4    Q.    They told you that there were about three or four times
5    when he didn't have his wife and children with him?
6    A.    That's right.
7    Q.    So all those other times they had his wife -- he had his
8    wife and children with him?
9    A.    That's what they -- that was their -- that was their
10   statement.
11   Q.    Cooperator 1 claimed he did the trip twice a week?
12   A.    Yes, sir.
13   Q.    Cooperator 2 claimed he did the drive -- the trip from
14   Maryland to Houston and back two or three times per week?
15   A.    That's right.
16   Q.    Do you have children, Agent Joseph?  I don't need to
17   know details, but do you have children?
18   A.    Yes, sir, I do.
19   Q.    Have you ever been on a road trip with your children?
20   A.    Too many times.
21   Q.    Okay.  How do they start to act after three hours on the
22   road?
23   A.    They of course get a little antsy.
24   Q.    What about after six hours on the road?
25   A.    I don't think I've done one quite that long yet.  Maybe

1  one.  We'll see.  A lot of breaks built in there.

2  Q.   Have you ever done a 24-hour?

3  A.   No, sir.

4  Q.   Have you ever done a 24-hour outbound, then made them

5  sit on the floor for 24 hours while they're in a packed van

6  with ten other men?

7  A.   Of course not.

8  Q.   What Cooperator 1 told you was as many as three times

9  per week, Mr. Abrego would drive 24 hours from Maryland -- so

10 let's start on a Monday.  He would spend all of Monday

11 driving to Texas.  He would spend all of Tuesday with his

12 children sitting on the floorboards, his two children sitting

13 on the floorboards.  Wednesday, they would all drive back.

14 Thursday, they'd finish Trip Number 2.  Friday, they would

15 all drive back.  And Saturday, after 144 hours on the road,

16 he would finally stop driving around with his children

17 sitting on the floorboards.

18          That's what he told you?

19 A.   That's the statements.  If that's your interpretation of

20 it. . .

21 Q.   He told you he did it with his family and his two

22 children?

23 A.   That's their statements.  That's why we include it in

24 the report.

25 Q.   Do you know how many children he has?

```
 1   A.    I believe he has three.
 2   Q.    Yeah.  He does.  That's right.
 3         Do you know that two of them have autism?
 4   A.    I believe I read that.
 5   Q.    Okay.  Smaller things, but I want to get them out.
 6         You are involved in human trafficking
 7   investigations on a regular basis, you said?
 8   A.    I've been exposed to them in my career for sure.
 9   Q.    Okay.  Is there a reason why people lie about their
10   identities while they're moving around the country?
11   A.    Yes.
12   Q.    Okay.  Sometimes they just have fake papers, right?
13   A.    My experience, not usually at that point.  That usually
14   comes later.
15         THE COURT:  And I'm just going to interrupt to
16   clarify something.  Mr. Abrego has been charged with human
17   smuggling.  He's not been charged with human trafficking, so
18   that we're all on the same page about that, because I don't
19   want Special Agent Joseph to be talking about his experience
20   with human traffickers when what we're talking about is
21   smuggling of undocumented persons.
22         Is that correct, Mr. McGuire?  Would you agree
23   with that characterization?
24         MR. MCGUIRE:  I would, Your Honor.
25         MR. TENNENT:  My bad wording.
```

1          THE COURT:  That's okay, Mr. Tennent.  I -- it is

2     very easy to use them interchangeably, but there's a very

3     distinct difference under the law.

4          So I just want to be sure that Agent Joseph is on

5     the same page as you are about which of those kinds of cases.

6          MR. TENNENT:  Okay.

7     Q.    And especially during the -- some administrations, where

8     Dreamers and other opportunities were available for

9     immigrants who were under 18, there's a vested interest in

10    coming to the United States before you turn 18, correct?

11    A.    Yes, sir.

12    Q.    The person whose name appears at the bottom of that one

13    sheet you turned in, you do not know, it seems like, anything

14    about them at this point; is that right?

15    A.    Yes, sir.  To my knowledge, it's being actively worked

16    on, probably as we speak.  But I personally do not know if

17    that has been -- person's been identified yet.

18    Q.    Okay.  And whoever that person is, you don't know if

19    they are a relative of any of the other nine people on that

20    list?

21    A.    I don't know yet.  No, sir.  That's something we're of

22    course going to explore.

23    Q.    Right.  So at this point you don't know if the date of

24    birth listed there is accurate or false, correct?

25    A.    We have a sheet with handwritten notes on it.

1  Q.   Okay.  And you don't know if that person was accompanied
2  by family members?
3  A.   We don't know.
4  Q.   Okay.  Some other things you've done to try to
5  investigate or corroborate.
6          On June 11th -- so just two days ago -- you
7  personally interviewed Tennessee Highway Patrolman Foster; is
8  that right?
9  A.   That's right.
10 Q.   Okay.  When you interviewed him, you discovered that his
11 body-worn camera footage has been purged?
12 A.   It has been.
13 Q.   Okay.  Other than the screenshot he had, he doesn't have
14 any police reports of that incident?
15 A.   He does not.  No, sir.
16 Q.   Okay.
17 A.   Not to my knowledge anyway.
18 Q.   Okay.  And he told you his memory was that he is almost
19 certain that the passports he looked at did not have stamps
20 from port of entry?
21 A.   It was actually a text message he sent me after our
22 phone call.
23 Q.   Okay.
24 A.   Where he -- it was almost identical to that.  I -- he's
25 almost 100 percent certain the passports had no U.S. port

1   stamps in them.

2   Q.    But he in fact at the time took photographs of all the

3   passports?

4   A.    That's what he claimed, yes, sir.

5   Q.    Okay.  That's what he claimed?

6   A.    Yes, sir.

7   Q.    And those photographs can't be found?

8   A.    Yeah.  I've been looking.  We have searched for them and

9   I'm still looking, various angles and plans of attack.  But

10  it's -- it has -- not yet recovered.

11  Q.    Okay.  As part of your investigation, have you reviewed

12  Mr. Abrego's ICE file?

13  A.    No, sir.

14  Q.    Okay.  Then I won't ask you about it.

15          I'm about to conclude, but I want to consult with

16  my co-counsel, if that's all right, Your Honor.

17          THE COURT:  Of course.

18  BY MR. TENNENT:

19  Q.    So just -- I want to conclude, and I don't want to be

20  unfair to you.  You've been very respectful to me --

21  A.    Yes, sir.

22  Q.    -- and I appreciate that.  Okay?

23          You've got multiple agents out there, the United

24  States does, investigating this case right now?

25  A.    Yes, sir.

1  Q.    You've got agents going to jails and prisons around the
2  United States right now trying to talk to people who you
3  think might know something about Mr. Abrego?
4  A.    They have done it through the course of the
5  investigation, yes, sir.
6  Q.    Okay.  We know -- and you've been very candid about it,
7  which I appreciate -- that Cooperator 1 has gotten into a
8  halfway house early, and he is now not being deported.
9           That's what's happened to him?
10 A.    For the moment, yes, sir.
11 Q.    We know that Cooperator 2 is asking for relief?
12 A.    He is.
13 Q.    We know that one of the women who has provided some
14 information is also asking for withholding of removal?
15 A.    Yes, sir.
16 Q.    And I may have said that term wrong --
17 A.    No.  I'm with you.
18 Q.    Okay.  Right now some agents at the very least, if not
19 you, but some agents are out there offering people these
20 things; is that true to your knowledge?
21 A.    I've never seen that.
22 Q.    Okay.
23 A.    I've never promised anything to anyone without
24 consulting my management or the attorney that I'm working
25 with.

1  Q.   So you don't personally know whether people are being

2  offered deals right now to testify about Mr. Abrego?

3  A.   I can't testify to what other people are or are not

4  doing outside of any conversations I've had with them.

5  Q.   In fact, you would agree that that would be unethical

6  and something you personally would never do?

7  A.   As far as offer a reward for testimony?  Absolutely not.

8       THE COURT:  Absolutely not, you would never do it

9  or absolutely not --

10      THE WITNESS:  I would never offer anybody

11 something to testify without going through chain of command,

12 conferring with my attorney.

13      THE COURT:  All right.

14 BY MR. TENNENT:

15 Q.   So, like in this case, the benefits that have accrued to

16 Cooperator 1, that all came from the chain of command

17 approving those benefits, correct?

18 A.   Yes, sir.  I was not a part of that.

19      MR. TENNENT:  I really appreciate your candor and

20 patience with me.

21      THE WITNESS:  Yes, sir.

22      MR. TENNENT:  I'll probably just grab that from

23 you, so we don't. . .

24      THE COURT:  All right.  Mr. McGuire, how much

25 other proof is the government going to have after Special

1  Agent Joseph's testimony?

2          MR. MCGUIRE:  So, Your Honor, we have no

3  additional witnesses.  I have two documents that are the

4  orders of protection obtained against the defendant that I'm

5  going to make an exhibit by proffer.  That would be

6  Government's Exhibit 5 and 6, and then that would be the

7  close of our proof.

8          I would intend to redirect, as the Court

9  described, Agent Joseph, but that's it.

10         THE COURT:  All right.  And then what proof is

11 there going to be on behalf of Mr. Abrego?

12         MR. ALLENSWORTH:  Your Honor, we intend to call

13 Mr. Abrego's brother, and we will be offering three exhibits

14 by proffer.

15         THE COURT:  All right.  So would it be the request

16 of the attorneys, including because there were some things

17 that you're going to talk about at lunch, that we take a full

18 hour for lunch break so that you have some time to do both,

19 eat lunch and also try to address the issues that were --

20 were raised in the bench conference?

21         MR. MCGUIRE:  Your Honor, I think it is highly

22 unlikely that I will eat lunch, but I am happy to take a

23 break for the Court and everyone else's convenience and deal

24 with the issue that we discussed at the bench conference.

25         THE COURT:  All right.  I also need to look at

1  some things.  So let's take until 1:30, a 1:30 break for
2  lunch.
3          Mr. McGuire, let me ask you this question.  In
4  some of the papers that were filed there was a reference to
5  an ICE hold or ICE detainer for Mr. Abrego.  And I want to --
6  I'm telling you I want to hear some more about that.  It
7  doesn't have to be now, but that is part of -- that is going
8  to be a circumstance that the Court needs to at least know of
9  if it is, in fact, correct as part of my determination.
10         MR. MCGUIRE:  Your Honor, it is correct.  He does
11  have an ICE detainer.  I'm prepared to talk about that and
12  try to answer the questions that I can as a non-immigration
13  lawyer.
14         THE COURT:  All right.
15         MR. MCGUIRE:  But I am prepared to do that.
16         THE COURT:  Well, I'm going to give the lawyers at
17  the close of the proof an opportunity to argue both as to the
18  3142(f) factors and the -- considerations and the 3142(g)
19  considerations.  Depending on the time, that argument -- my
20  intention is to try to have that argument today.  If it gets
21  close to the end of the day and you want to request that we
22  come back and you argue another day, I'll entertain that
23  request at least.  But I'm hoping that -- that we're able to
24  both conclude the proof and conclude the argument today.
25         MR. MCGUIRE:  I can speak for myself in that I

1    will not be making that request.  I would like to try to

2    finish this hearing today.  I expect my learned counsel on

3    the other side probably have a similar view, but I don't want

4    to speak for them.

5            THE COURT:  All right.

6            So then we're going to take a lunch break until

7    1:30, and then we'll reconvene at that time.

8            (Whereupon, a lunch break was observed.)

9            THE COURT:  Good afternoon, everyone.  Go ahead

10   and have a seat.

11           All right.  We're back on the record.  I wanted to

12   address a couple of matters that arose this morning and then

13   hear from counsel about your intentions regarding those

14   matters.  Most specifically, Mr. Tennent, whether you might

15   want to have an extended recross.

16          If I have correctly reviewed my notes, there were

17   three matters that came up, one of which was the testimony of

18   Agent Joseph with respect to some complaints that were made

19   about Mr. Abrego that were multiple layers of hearsay.  And

20   Mr. Tennent raised the issue of -- of whether that

21   information could be excluded.  And I had at the time

22   sustained the objection.

23          What I'm going to do is instead overrule the

24   objection.

25          Mr. McGuire had proffered that evidence.  I'll

give you an opportunity to extend your cross-examination if
that's what you would like to do, Mr. Tennent, with respect
to that evidence.

And, in further consideration of this as well as
the discussion that we had regarding the motions to strike, I
have determined that the better course is for me to allow the
testimony in and then to give the testimony whatever weight
it should be accorded, and -- with the statement to both sets
of counsel that the more indirect the testimony is that there
is a correlation between the remoteness of the testimony and
the weight it's appropriately afforded.  And, the more
indirect the testimony is, the less weight it's likely to be
given in my ultimate determination of how that evidence
affects the ultimate outcome.

So I am going to instead overrule that objection,
but I will allow you, Mr. Tennent, an opportunity if you
would like to recross the agent about that with respect to
the proffer that Mr. McGuire made.  And with respect to the
motions to strike, I'm going to deny the motions to strike
for the same reasons.

And you can either recross right now, Mr. Tennent,
or, if Mr. McGuire wants to address those -- the bases and
the specific testimony in his redirect, he can.

And then I'll give you a limited opportunity --
and that's true with respect to -- I don't want to go through

all of Agent Joseph's testimony about those -- these three
issues, Mr. McGuire, but if you want to include that as part
of -- a limited part of your redirect, you can.

And I will give you, Mr. Tennent, an opportunity
for limited recross at that point. I generally don't allow a
recross. That's where we cut off the evidence. But if you
want to proceed with a limited recross just on those three
issues, I'll give you an opportunity to extend your
cross-examination or wait and see if Mr. McGuire further
covers those in his redirect and then offer you to make a
limited recross at that point.

MR. TENNENT: You know, Your Honor, at this point,
I'm happy with the information that's been elicited under my
cross-examination, and I don't need to get into some -- some
of those side matters, I think. I think the substantive
stuff I've asked about and I'm happy with that.

Obviously --

THE COURT: I --

MR. TENNENT: -- recross --

THE COURT: And I appreciate you saying that at
this point.

I will reserve the opportunity for you, though,
depending on what Mr. McGuire asks in his redirect
examination. If it addresses any of those three issues and
you wish to recross at that point on those limited three

issues, then you just speak up and make that request, and I
will certainly afford you that opportunity.

          But otherwise you are finished with
cross-examination, correct?

          MR. TENNENT:  I am, Your Honor.

          THE COURT:  All right.  So, Mr. McGuire, redirect.

          MR. MCGUIRE:  And, Your Honor, I will redirect,
mindful of the Court's direction and try to be as expeditious
as possible.  I do want to cover a couple of those topics
briefly, just for the record to be clear.

                    REDIRECT EXAMINATION
BY MR. MCGUIRE:
Q.   Agent Joseph, the first and second cooperators described
a conflict between members of the conspiracy about the
transportation of females and minor females.

          Do you recall them making those statements?
A.   Yes, I do.
Q.   And if you could summarize the statements that -- about
the conflict between those coconspirators briefly, that would
be great.
A.   They had received information that the defendant was
acting inappropriately toward females and minor female
clients.
Q.   And would that have been during transports?
A.   Yes, sir.

1  Q.   At one point during his cross-examination Mr. Tennent

2  asked you about transportations where the defendant's wife

3  and children traveled with him.

4          Do you recall that line of questioning?

5  A.   Yes, sir.

6  Q.   On these occasions when there were complaints about

7  Mr. Abrego being sexually inappropriate with females and

8  minor females, what did the cooperator say about the presence

9  or absence of his wife and children?

10 A.   That they were absent from those trips.

11 Q.   And so, when Mr. Tennent was cross-examining you about

12 the number of trips Mr. -- or the defendant took --

13          MR. TENNENT:  Your Honor, I think -- and I

14 appreciate Mr. McGuire trying to move things along, but I

15 think it's getting a little leading.  And I would object.

16          THE COURT:  I'm sorry.  It's getting a little?

17          MR. TENNENT:  Leading.  Leading is my objection,

18 Your Honor.

19          THE COURT:  It is leading.  And I also appreciate

20 your attempts at efficiency, Mr. McGuire, but try to pose

21 non-leading questions.

22          MR. MCGUIRE:  I hear what you're saying, Your

23 Honor.  I'll do the best I can.

24 Q.   Agent Joseph, do you recall the aspect of Mr. Tennent's

25 cross-examination where he was asking about Mr. -- the

1  defendant's wife and children traveling with him?

2  A.    Yes, sir.

3  Q.    Do you recall that he sort of posed a 144-hour scenario?

4  A.    Of course.

5  Q.    Did the coconspirators say that Mr. -- or the

6  defendant's wife and children traveled with him every single

7  time that he did a transport?

8  A.    No.  Just said that it was often.

9  Q.    And, as we've just discussed, were there times where

10 Mr. -- or the defendant's wife and children were not present

11 on trips?

12 A.    Of course there were times they were not present.  Yes.

13 Q.    Mr. Tennent cross-examined you about the statements of a

14 female coconspirator for which you were not present.

15        Do you recall those?

16 A.    Yes, sir.

17 Q.    One of the things that you reviewed, though, because you

18 were not present, was prior testimony; is that a fair

19 statement?

20 A.    Yes, sir.

21        MR. MCGUIRE:  And, Your Honor, for the purpose of

22 the record, we provided the defense the opportunity to read

23 that statement during the break, as we -- the parties

24 discussed with the Court at sidebar.

25        THE COURT:  Very good.

1  BY MR. MCGUIRE:

2  Q.   And, Agent Joseph, what did that witness testify to in

3  your review of her testimony?

4           MR. TENNENT:  Your Honor, if I may.  I think this

5  is outside the scope.  I don't believe I elicited anything

6  about what she testified to.  I think my cross -- I think --

7  my cross-examination was entirely about a relationship with

8  Cooperator 1, and I think we're now trying to elicit more

9  substantive proof that would have been better addressed on

10  direct, respectfully.

11          MR. MCGUIRE:  And, respectfully, Your Honor, I

12  would submit that a significant portion of Mr. Tennent's

13  cross-examination was oriented towards challenging the

14  reliability of the cooperators' statements.

15          And specifically as to this one, he challenged the

16  veracity or reliability of her statement because his position

17  was Agent Joseph had not heard it directly from her.

18          I think it's appropriate on redirect for me to

19  explore and provide the Court with the most accurate and

20  honest information about the information that Agent Joseph

21  had and testified about.

22          More importantly, I think it's -- I'm entitled on

23  redirect to try to use my questions to rebut points that I

24  believe the defense has made during their cross-examination.

25          THE COURT:  On this particular objection I'm going

1  to overrule the objection for much of the reasons that

2  Mr. McGuire has explained.  It is not -- it is not topic by

3  topic what Mr. Tennent explored in cross-examination, but I

4  find that it is all part of the general scope of what

5  Mr. Tennent elicited in cross-examination.  So I am going to

6  at least give Mr. McGuire some latitude, but certainly,

7  Mr. Tennent, as you always do so well, if you think it's gone

8  too far afield, you can -- you can restate an objection at

9  that time.

10            MR. MCGUIRE:  And, Your Honor, to be clear, I'm

11  not going to go point by point through this.  But I do think

12  it's important to ask about some of the high-level topics

13  that were covered.

14  Q.    Did this witness testify that she knew the defendant?

15  A.    Yes, she did.

16  Q.    Did she describe that she knew him to be involved --

17  well, what did she describe him to be involved in?

18  A.    She was -- intimately had an association with him and

19  knew him and physically witnessed the smuggling of aliens,

20  the business that he ran of regarding smuggling of aliens.

21  Q.    And did he [sic] observe the defendant's wife and

22  children involved in those activities on at least one

23  occasion?

24  A.    She did.  She ID'd him from a picture, knew him by first

25  name only, and then stated through her testimony that he

1    often would travel with his wife and children.

2    Q.    Did she describe that she had become estranged from

3    other cooperators that we've discussed today?

4    A.    Yes.

5    Q.    And that, while they had family relations, were they

6    still in good, positive, familial contact?

7    A.    They were not in good, positive, familial contact.

8    Q.    At one point did she become emotional during her

9    testimony when talking about family members?

10            MR. TENNENT:  Your Honor, I'm going to object.  If

11    I understand right, we're talking about a transcript of grand

12    jury testimony.  I don't know how one would know if it's

13    emotional from the transcript.

14            THE COURT:  Mr. McGuire, your response?

15            MR. MCGUIRE:  Your Honor, I'm -- I'm -- if I can

16    have a moment, I'm thinking of a very specific passage where

17    I believe she -- that it is even commented on during the --

18    well, let me ask it --

19            Actually, can I rephrase my question, Your Honor?

20            THE COURT:  Yes.

21    BY MR. MCGUIRE:

22    Q.    Are there statements within the transcript that you

23    reviewed about the witness becoming emotional?

24    A.    Yes, sir.  Toward the end of the affidavit a question

25    was asked why she got emotional regarding anything --

1   regarding her son.

2   Q.   And at one point was she asked about whether she would

3   seek a benefit for her testimony?

4   A.   She did.

5   Q.   What was her response?

6   A.   She affirmed that she was seeking a benefit.

7   Q.   Was that her initial response?

8           THE COURT:  I'm sorry.  That she was or was not

9   receiving a benefit?

10          THE WITNESS:  I believe that she was but --

11  throughout the testimony -- I would have to reread the

12  transcript, though, to be 100 percent sure on that.

13          MR. MCGUIRE:  That's okay, Agent Joseph.  You've

14  had a long day.  You've had a long day.  Maybe after the

15  interpreter's, maybe the second longest -- maybe the Court --

16  dealing with me and Mr. Tennent.

17  Q.   Agent Joseph, Mr. Tennent asked you on cross-examination

18  about corroboration and corroborative steps.

19          Do you remember that --

20  A.   Yes, sir.

21  Q.   -- cross-examination?

22          And he posited that -- he sort of gave you things,

23  a laundry list of things, that he -- that he wanted your take

24  if they were corroborative.

25          Do you remember that?

```
1   A.   Yes, sir.
2   Q.   Is that all the things that you've done to try to
3   corroborate these witnesses' testimony?
4   A.   No.
5   Q.   Would the video of the traffic stop be an example of
6   something that was corroborative?
7   A.   It's highly corroborative.
8   Q.   What about phone records?
9   A.   Absolutely.
10          THE COURT:  Go ahead, Mr. Tennent.
11          MR. TENNENT:  I'll let him ask the question.  He
12  said "would be."
13          THE COURT:  All right.  Go ahead, Mr. McGuire.
14  BY MR. MCGUIRE:
15  Q.   And I'm -- I'm taking my -- my question sort of in
16  direct, kind of bookend, to Mr. Tennent's question.
17          Would you -- did you find -- maybe that's a better
18  way to ask it.  Did you find phone records that were
19  corroborative of the witnesses' statements?
20  A.   Yes, sir.
21  Q.   Did you find official records, such as traffic tickets,
22  that were corroborative of the witnesses' statements?
23  A.   We did.
24  Q.   Did you find social media accounts and things that are
25  available for review that are corroborative of the witnesses'
```

1    statements?

2    A.    Yes, sir.

3    Q.    Vehicle registration records?

4    A.    Absolutely.

5    Q.    Are there other grand jury subpoenas and search warrants

6    that you've been involved in to try to find corroborative

7    evidence?

8    A.    Yes, sir.  Some are even outstanding.

9    Q.    And are you still doing that?

10   A.    Absolutely.

11   Q.    I mean, why are you still doing that?

12   A.    Because it's an ongoing investigation.

13   Q.    And during the scope of your review, have you found any

14   piece of evidence that shows that the defendant is not

15   involved in this conspiracy?

16   A.    No, sir.  My job as a Special Agent is to find facts,

17   both -- all facts, mitigating and aggravating.  Just because

18   we had enough to reach indictment doesn't mean I'm going to

19   stop searching for facts.

20           MR. MCGUIRE:  May I have one moment, Your Honor?

21           THE COURT:  Yes.

22           MR. MCGUIRE:  Your Honor, I don't have any other

23   questions.

24           MR. TENNENT:  May I briefly recross?

25           THE COURT:  I'm going to give you a brief

opportunity to recross, Mr. Tennent, just because of the
reasons I talked about at the beginning of this afternoon's
continuation.

        MR. TENNENT:  Thank you, Your Honor.

                RECROSS-EXAMINATION

BY MR. TENNENT:

Q.    Just so I don't do this. . .

A.    Yes, sir.

Q.    I'll hand this up to you.

        Fair to say that the exact language that both
Informant 1 and Informant 2 gave you regarding how Mr. Abrego
traveled was that he typically traveled with his wife and
children?

A.    I can go and find it -- that sounds like accurate
language.

Q.    Okay.  It's on pages 9 for Informant 1 and it's on page
13 for Informant 2.

A.    Thank you.

Q.    And I apologize, I didn't want to lead you, so I didn't
highlight it.

        MR. MCGUIRE:  Richard, I don't find -- if you show
him exactly --

        MR. TENNENT:  Yeah.  Yeah.  I apologize.

Q.    It's the middle paragraph on 9 --

A.    Yes, sir.  The word "typically" is right there.  So I

1  guess it comes out of the definition of the word "typically."

2  Q.    Okay.  And on page 13 is Informant 2.

3            And, again, it was -- he used the word "typically"

4  travel with his wife and two children?

5  A.    Yes, sir.

6  Q.    Okay.  And then on page 14, the bottom paragraph,

7  Informant 2 described it as there were "a few occasions" that

8  Abrego traveled without his wife and children, correct?

9  A.    Yes, sir.

10            MR. TENNENT:  Thank you so much.

11  Q.    And you've testified you are continuing to try to find

12  the facts in this case?

13  A.    Yes, sir.

14  Q.    Okay.  So that means you are going through the phone

15  records, correct?

16  A.    Among other things, yes, sir.

17  Q.    Okay.  But you've testified to today all of the facts

18  that you have found so far?

19  A.    No, I haven't testified to all the facts we found so

20  far.

21  Q.    Okay.

22  A.    Just the ones I've been questioned on.

23  Q.    All right.  Well, I'm going to leave it to the

24  government to choose the questions they ask you.

25            But suffice it to say a second ago you said that

```
1   vehicle registration corroborated.
2           In fact, you found the vehicle registration that
3   verifies that Mr. Abrego was driving Informant 1's truck?
4   A.   Correct.
5           MR. MCGUIRE:  Objection, Your Honor.  Objection to
6   the -- can we approach briefly?
7           THE COURT:  Sure.  Come on up.
8           (Bench conference outside the hearing of the
9           public.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
```

20                    (In open court.)

21  BY MR. TENNENT:

22  Q.   And then, just moving on, again, your corroboration was

23  LPRs that showed that that particular vehicle was in Texas 12

24  days before, correct?

25  A.   Texas and Louisiana.

1  Q.    And Arkansas and Georgia?

2  A.    Yes, sir.

3  Q.    Okay.  But 12 days before it was in Texas?

4  A.    To cover the -- the time where he claimed that he was --

5  the solid two weeks that he was in St. Louis.

6  Q.    Okay.  Now, clearly, that isn't his vehicle.  That

7  vehicle belongs to someone else?

8  A.    It's registered to someone else.

9  Q.    Okay.  And then just very, very last thing and I will

10  hopefully give you a respite from all of this.

11         Whatever issues this last woman we were talking

12  about had with Informant 1, she and her children did, in

13  fact, live with him for a period of months, correct?

14  A.    Short time, yes, sir.

15  Q.    Okay.  And had also -- she at least -- I don't know on

16  conception of children or anything -- but had lived with him

17  in El Salvador in the past?

18  A.    That's correct.

19         MR. TENNENT:  That's all I have, Your Honor.

20         THE COURT:  All right.

21         MR. MCGUIRE:  Nothing further for this witness,

22  Your Honor.

23         THE COURT:  All right.  Thank you very much,

24  Special Agent Joseph.  You are welcome to step down.  If you

25  will hand me those exhibits.

1          THE WITNESS:  Thank you, Your Honor.

2               (Witness excused.)

3          MR. MCGUIRE:  I'm sorry, Your Honor.

4          THE COURT:  This is not the exhibit.  This is

5     Mr. Tennent's copy.

6          MR. TENNENT:  Yeah.  I'm so sorry.

7          May I approach, Your Honor?

8          THE COURT:  Yes.  Absolutely.  Thank you.

9          MR. MCGUIRE:  Your Honor, we have two additional

10    exhibits that I have marked as Government's Exhibit 5 and

11    Government's Exhibit 6 that I've previously provided to

12    Ms. Cobos.

13          One, Exhibit 5, is a copy of a 2020 order of

14    protection taken out by the defendant's wife in Maryland.

15          Exhibit 6 is a 2021 order of protection that was

16    also taken out by the defendant's wife.

17          These matters are referred to in the pretrial

18    services report, Your Honor, but some of the statements that

19    I think are probative on danger were just, for whatever

20    reason, not included, I don't think necessarily by design,

21    but it is just to fill out the record as to the statements

22    that the defendant's wife made on those two occasions under

23    oath.

24          THE COURT:  All right.  And any objection to

25    admission of these two exhibits, Mr. Tennent?

1          MR. TENNENT:  No objection.

2          THE COURT:  Or Mr. Allensworth?

3          All right.  The Court will then admit these.

4     They'll also be placed under seal because they do contain a

5     significant amount of content that has personally

6     identifiable and other kinds of -- such information.  So they

7     will be placed under seal subject to further order as well.

8                    (Whereupon Plaintiff Exhibit 5 and Plaintiff

9                    Exhibit 6 were marked for identification and

10                   received in evidence.)

11         MR. MCGUIRE:  And, Your Honor, that's the proof on

12    behalf of the United States as to the detention of the

13    defendant.

14         THE COURT:  All right.

15         Proof on behalf of Mr. Abrego, Mr. Allensworth?

16         MR. ALLENSWORTH:  Your Honor, I think I told you

17    earlier that I was going to be introducing three different

18    exhibits.  And I'm actually going to be introducing two.  I

19    gave them both to the Court, I think, electronically

20    yesterday, but I have paper copies.

21         The -- Defense Exhibit 1 is a memorandum and

22    decision and order from the United States Immigration Court

23    in Baltimore, Maryland, from October 10th, 2019, granting

24    Mr. Abrego Garcia withholding of removal.

25         I would like to submit this to the Court.

1           THE COURT:  Any objection, Mr. McGuire?

2           MR. MCGUIRE:  Your Honor, I would note under the

3    Court's prior ruling I'm not going to object but would just

4    note for the record, Your Honor, that that document contains

5    the same kind of two-layer hearsay that the defendant

6    objected to or was concerned about in the government's proof.

7    So I would just submit that, Your Honor.

8           THE COURT:  I will admit that as Defense Exhibit

9    1, and you can make those arguments during your argument,

10   Mr. McGuire.

11          MR. MCGUIRE:  Yes, Your Honor.

12          MR. ALLENSWORTH:  And, Your Honor, I would also

13   ask that this be kept under seal.

14          THE COURT:  We'll place that under seal as well

15   for the same reasons.

16          (Whereupon, Defendant's Exhibit 1 was marked for

17              identification and received in evidence.)

18          MR. ALLENSWORTH:  Thank you.  And I'm going to

19   also introduce as Defense Exhibit 2 a letter that we received

20   dated June 9th, 2025, from a woman named Ama Frimpong, the

21   legal director for a nonprofit group called CASA that works

22   with immigrant communities in Maryland that has had a lot of

23   contact with Mr. Abrego Garcia's family during the time that

24   he has been in custody and that he was deported, and this

25   document is basically a statement of the kinds of community

support and services that this organization can help him
connect with in the event of his release.  Most especially,
that they would be able to help him receive counseling, which
I think, given everything that he's been through, would be
helpful in the event of his release.

            THE COURT:  All right.  Any response, Mr. McGuire?

            MR. MCGUIRE:  No objection, Your Honor.

            THE COURT:  All right.  That will be admitted as
Defense Exhibit 2.

            (Whereupon, Defendant's Exhibit 2 was marked for
            identification and received in evidence.)

            MR. ALLENSWORTH:  And I also told the Court
earlier that I was going to be calling a witness -- that I
was going to be calling our prospective third-party
custodian, and I have elected not to do that.  The Court has
information about our third-party custodian in the pretrial
bond report, and I am going to rest on that.

            THE COURT:  All right.

            Mr. Allensworth, I let the lawyers -- I generally
try to let the lawyers decide on how to present their case
and on what evidence they're going to rely.  And I'll -- it
is up to you to decide.

            I will say this, that certainly none of the
information provided in the way that you've described it is
provided under oath, and nor do I have a third-party

declaration under oath.  If it is your intention to present
someone as a third-party custodian, it is my standard
practice to have them testify, to ask them questions about
their understanding of the responsibilities of being a
third-party custodian.

During COVID, we employed a different procedure
where we -- we created the third-party custodian declaration
and allowed third-party custodians to present their
understanding of third-party custodian responsibilities that
way.  But it's -- that statement is also required to be
executed under penalties of perjury under federal law.

Again, I'm not going to tell you how to present
your case with any more direction than those.

MR. ALLENSWORTH:  Sure.  You know, Your Honor,
could I ask you for a five-minute recess?

THE COURT:  You can.

MR. ALLENSWORTH:  Thank you very much.

THE COURT:  The Court will be in recess briefly.

(Recess.)

THE COURT:  Go ahead and have a seat, everyone.

All right.  The Court has received the declaration
under penalty of perjury.

Mr. Allensworth, is it your intention to make this
an exhibit also placed under seal?

MR. ALLENSWORTH:  That is my intention, Your

1  Honor.

2          THE COURT:  All right.  Mr. McGuire.

3          MR. MCGUIRE:  Your Honor, I understand the Court

4  is likely to receive this evidence, and I understand the

5  reasons for that.

6          I would respectfully object to just the

7  presentation of a signed declaration by third-party

8  custodian.  I would submit, Your Honor, that's significantly

9  out of practice for this district.  Normally third-party

10 custodians are offered as witnesses subject to

11 cross-examination, and that is not the procedure here.  And,

12 frankly, we had some questions for this witness that we would

13 have wanted -- that we thought potentially reflected on his

14 fitness as a third-party custodian.

15         Obviously, as the Court noted, the defense can

16 proceed however they want.  But just for the purposes of the

17 record I would object to this being offered without witness

18 testimony on this issue.

19         Thank you, Your Honor.

20         THE COURT:  Have you talked to defense counsel

21 about whatever the concerns are potentially about the -- the

22 offered repudiative third-party custodian?

23         MR. MCGUIRE:  Yes, Your Honor, we communicated

24 last night some areas of questioning that we would intend

25 that might have some implications, some legal implications

1  for the third-party custodian.  We flagged that for the
2  defense so that they could provide that.  I don't want to get
3  too far into it, but we did talk -- at least we conveyed the
4  information last night, Your Honor.
5          THE COURT:  All right.  The government's objection
6  is noted.  I am going to accept the declaration under penalty
7  of perjury and also treat it like all of the other evidence
8  in this case, afford it appropriate weight and consideration
9  in the final determination.  So it will be admitted as the
10  Defense Exhibit 3.
11          (Whereupon, Defendant's Exhibit 3 was marked for
12          identification and received in evidence.)
13          THE COURT:  And requested it to be placed under
14  seal is that correct, Mr. Allensworth?
15          MR. ALLENSWORTH:  Yes, Your Honor.
16          THE COURT:  All right.  And for the same reasons
17  that the Court has placed other exhibits under seal, the
18  Court will include this with all of the other exhibits under
19  seal.
20          All right.  Any other evidence, either directly or
21  by proffer, Mr. Allensworth?
22          MR. ALLENSWORTH:  No further proof from the
23  defense, Your Honor.
24          THE COURT:  All right.  Any rebuttal proof from
25  the government?

1    MR. MCGUIRE:  No, Your Honor.

2    THE COURT:  Do counsel wish to be heard on what

3  I'm going to call two categories of issues in -- for

4  determination following today's proceeding, which are the

5  3142(f) factors and the 3142(g) factors?

6    And I want to again make clear that, by requesting

7  argument on the 3142(g) factors, no one should take that as

8  any kind of prediction or forecast that I will reach 3142(g).

9  It is for purposes of you being able to point out to me where

10  you think there are strengths in your evidence, weaknesses in

11  the other side's evidence or argument.  That is the sole

12  purpose of allowing you to argue both of these issues.

13    So no one -- again, no one construe it as

14  suggesting that I have made up my mind about one or both of

15  these issues.

16    So let me hear first from the government, though,

17  because, Mr. McGuire, as you know, it's your burden as to

18  both issues, ultimately.

19    MR. MCGUIRE:  Yes, Your Honor.

20    And, Your Honor, I will start with a discussion of

21  the factors -- the first factor that I think is sort of hotly

22  contested, which is that the United States is entitled to a

23  detention hearing by operation of 18 U.S.C. 3142(f)(1)(E),

24  and that the offense involves a minor victim.

25    Your Honor, I would submit the plain language of

1  the statute is the best language. "Involves" means what it
2  says. In other portions of the detention statute, Congress
3  has specifically chosen enumerated statute numbers to convey
4  what it means about when the United States might be entitled
5  to a detention hearing.

6          Under this particular subsection, I would submit
7  Congress intended it to be broad because of the harms at
8  play. Congress intended to protect minor children and
9  protect people who might have been involved in committing a
10 crime with a firearm.

11         THE COURT: I understand that argument,
12 Mr. McGuire, but in some respects isn't that argument counter
13 to the -- the existence of the Bail Reform Act, which is
14 itself an exception to the default standard that someone
15 who's not yet been convicted of a crime is entitled to
16 liberty until there is a conviction, and so that the -- the
17 bases for detention should be strictly construed and not
18 expanded so that the -- almost any case falls within that
19 3142(f)(1)(E) language?

20         If the government is correct, it becomes a very,
21 very broad scope of cases that would -- in which detention
22 hearings would be permitted. If "involves" means any time a
23 child is attendant at the commission of a crime, does that
24 then make it a 3142(f)(1)(E) case, in which a detention
25 hearing then is permissible?

1    MR. MCGUIRE:  Your Honor, I think the Court is

2 correct that it is -- it should have to be narrowly drawn.

3 And that's why the *Watkins* decision says that you have to

4 find facts that make it make sense.

5    In other words, I would submit, Your Honor, the

6 case -- or the scenario that the Court posited, which is that

7 a child was simply attendant, may not involve a minor victim,

8 if the Court did fact-finding and heard testimony that that

9 was it -- let's just -- let's say, for instance, it was

10 somebody breaking into an ATM, and a child happened to be

11 standing next to the ATM when it was broken into.  That would

12 not necessarily be an offense that involved a minor victim,

13 entitling the United States to detention.  That is so far

14 from what this is to be almost unrecognizable.

15    Your Honor, Count Two specifically involves a

16 minor victim.  The Court heard testimony that a child that

17 was barely 15 years old, who appears to potentially be

18 unaccompanied, is in the defendant's vehicle with another

19 group of men, adult men, most of whom had illegally reentered

20 the United States.

21    THE COURT:  But you see, Mr. McGuire, what you've

22 said is, "a young person who appears to be no more than

23 15" -- maybe between 15 and 16 -- "appears to be

24 unaccompanied," isn't that a lot of supposition?  First of

25 all, that that person is a minor?  Because this is a roster

that was testified to by Special Agent Joseph was prepared by
somebody else, so that there's no indication that it might
have been something he would have ordinarily prepared in the
ordinary conduct of his business, and then there's -- I heard
no evidence that that person was unaccompanied by a family
member.

And that all is even without a discussion -- and
I'm supposing that we're going to have one because that's
what you do; you're a good lawyer and you've thought about
these things, so I expect that you're going to be prepared to
address this -- that's all even before we get to the
discussion, though, of what a victim means.

Am I to suppose that every young person who comes
to the United States, maybe unaccompanied by their parents,
that they are victims in some fashion?

As Mr. Tennent inquired on cross-examination, a
lot of the young people who -- who receive the benefit of
DACA, which I've forgotten exactly -- that's deferred
action -- I've forgotten what the exact acronym stands for
but basically Dreamers -- I don't know that they would call
themselves victims.

So am I supposed to suppose -- am I supposed to
bootstrap from that there was a person in that vehicle who
there was some roster prepared that indicated he was 15 years
old, that I'm supposed to extrapolate from that that he was

1   unaccompanied by his parents and that he was in the United

2   States because of some victimization?

3                   MR. MCGUIRE:  Your Honor, I think the testimony

4   was that the passengers themselves filled out the piece of

5   paper.  It was not the law enforcement officer.  And that's

6   borne out in the body cam.

7                   Essentially, the officer hands the piece of paper

8   to the individuals, who themselves write down the requested

9   information, which is their name, their birthday, and where

10  they're traveling.  So I would submit, Your Honor, that

11  information didn't come from law enforcement.  It was

12  received by law enforcement from the 15-year-old who provided

13  that information.

14                  THE COURT:  From the person who provided that

15  information.  So I have to suppose, first of all, that that

16  information can be taken as true for all purposes from a

17  person who is -- is sitting in a car that's been stopped by

18  the side of the road for -- I think the entire video's about

19  an hour, and that they are truthfully providing to law

20  enforcement information requested, when I have no other

21  evidence before me about those people, other than their names

22  on that roster and their birth dates and maybe some -- some

23  of them provided some part of an address.

24                  I have no information about their inclination to

25  cooperate with law enforcement to try to avoid their own

1  detection.

2          I mean, there's a lot of assumptions that I have

3  to make, Mr. McGuire, to accept that that 15-year-old is a

4  minor victim within the meaning of 3142(f)(1)(E).

5          MR. MCGUIRE:  This is a rhetorical question, but

6  what proof has the Court heard that that's not true?  I mean,

7  the defense hasn't meaningfully challenged it other to say

8  some people don't tell the truth.  Well, that's true all the

9  time.

10          THE COURT:  It's not the defense's burden to

11  demonstrate a basis for a detention hearing under

12  3142(f)(1)(E).

13          MR. MCGUIRE:  I don't disagree, Your Honor.  But I

14  think the analysis, if you are presented with a piece of

15  evidence and approach it automatically that they -- they are

16  potentially or likely not telling the truth, when there's no

17  external factor that anybody has raised that that would be

18  the case -- I mean, in other words, that's -- we're always

19  going to be receiving information.

20          I think to receive a piece of information in the

21  context that the agent described and just assume that that

22  child is not 15 and he's really 23 for some reason, I think

23  is -- frankly, not the way we normally receive evidence.  We

24  normally receive evidence and then we -- now, the Court's

25  correct.  We don't have that 15-year-old as a witness at this

 1  point.  We've not shied away from that.

 2          THE COURT:  We also don't have -- I think his name

 3  was Douglas -- THP Trooper Douglas here to say, "I looked at

 4  that person who signed that piece of paper and gave his birth

 5  date as 2007, and he looked to me like he was 15 years old.

 6  He didn't look to me like he was shaving yet.  He was very

 7  slight in build."  I mean, I don't have any of that kind of

 8  additional evidence to suggest that there was something more

 9  than just a name on a piece of paper and a birth date on a

10  piece of paper.

11          And this is the dilemma -- and, you know,

12  Mr. McGuire, this is the dilemma I always have to struggle

13  with and judges always have to struggle with, is the

14  weight -- and maybe more so in cases where the evidentiary

15  rules are relaxed -- but this is -- that I have to determine

16  what weight to give to a particular piece of evidence or

17  testimony that I've allowed in, notwithstanding the fact that

18  it might be one or more layers of hearsay.

19          MR. MCGUIRE:  I guess I would submit, Your Honor,

20  this information came from the transportee.  That is the

21  uncontradicted testimony.  So you have to assume that the

22  transportee is going to lie about his age without any good

23  reason for why --

24          THE COURT:  I don't know that I would necessarily

25  concede to you, Mr. McGuire, that this information came from

the transportee.  This information came -- according to Agent
Joseph, according to Trooper Douglas, that this information
came from the transportee.  So I don't even have Trooper
Douglas here to say, "I passed a piece of paper to all of the
occupants of the vehicle on that day, and they all signed
this piece of paper.  And, yes, I -- I've shown you the
photograph that I took of this piece of paper."  I mean, I
don't even have an authentication of the photograph.

I have Agent Joseph testifying that that's the
photograph that Trooper Douglas gave him, but that's the
extent of the authentication.

And I understand that the ordinary rules of
evidence don't apply.  But you understand that the more
attenuated the evidence becomes from what would be the
ordinary kind of presentation of evidence, the less reliable
it is.

Ordinarily, would you -- would you agree with me
about this?  That ordinarily, if you were going to offer a
photograph, you would have the person here who took the
photograph or someone who was able to directly authenticate
the photograph, and if the photograph depicted some kind of
compilation of information, better yet you have the person
who compiled that information to be able to testify about the
accuracy and the -- of and the circumstances under which that
information was compiled.

1          And, of course, if it's offered as some kind of

2    business record exception under the ordinary hearsay rules,

3    you would have the -- the records custodian here to testify

4    that that is a business record kept in the ordinary course of

5    business.

6          I'm not saying to you that I'm completely

7    discounting it.  I'm simply illustrating for you the problems

8    with the definitiveness with which the government asserts

9    that I have to accept for all purposes that this person was a

10   minor in the vehicle at the time, and then the next step,

11   which is that, because he was a minor in the vehicle at the

12   time, he was a minor victim at the time.

13        MR. MCGUIRE:  Two responses, Your Honor.

14        First is we only played portions of the body cam.

15   But one portion we did play shows the exact procedure that

16   I'm talking about.  And it's longer on the body cam.  The

17   trooper goes to the individuals, explains in Spanish what he

18   is asking them to do.  You can see them passing around the

19   piece of paper and filling it out themselves.

20        So, Your Honor -- and I know -- we played a

21   portion of that.  And it was for what sort of probably feels

22   like to all of us a long time ago.  But this morning that was

23   one of the portions we played in open court so that the Court

24   could see and feel like this was the piece of paper that the

25   migrants filled out themselves using the process that the

officer asked them to do.  That's the authentication.

We also offered Exhibit 2, which shows that same piece of paper on the same body cam during the interaction with the migrants.

The photograph was also testified to by Agent Joseph from Trooper Foster --

THE COURT:  Foster.  Not Douglas.  I'm sorry.

MR. MCGUIRE:  That's okay.  He probably would rather we call him some other name.  They may be looking for him after the hearing.

But the defense really didn't object or posit that this was an inauthentic document.  They raised lightly on cross-examination sort of how do we know that it's true.  And that's a fair comment.

But I don't think anyone has challenged that this photograph is an accurate and supportable piece of evidence as it relates to what these migrants wrote down.

I would submit, Your Honor, there has been no legitimate challenge made that it's inaccurate, other than it is harmful to the defendant's position.

THE COURT:  Is it the responsibility, though, of the defense counsel to challenge the legitimacy or offer other evidence?  Can they not just rest on an argument that this information is sufficiently unreliable, that I ought not to give it weight that even preponderates in favor of a basis

1    for a detention hearing?

2            MR. MCGUIRE:  Of course the defense doesn't have

3    to do anything.  But I don't think the Court can assume that

4    just because they don't do anything that that means there

5    must be some challenge that they're not making.

6            It is -- there's no question it's our burden, Your

7    Honor.  What I'm trying to argue to the Court is this is a

8    detention hearing.  This is not the jury trial.  We described

9    the witnesses through Agent Joseph who described the things

10   that they did, said, and otherwise.  That is the way that we

11   do detention hearings in this district all day, every day.

12   And it is more robust than almost every other district in the

13   country because almost everywhere else you can proceed by

14   proffer.

15           I'm not saying I like that better.  I'm just

16   trying to communicate to the Court that I think it is unfair

17   to hold the government to a super-burden in terms of putting

18   on witnesses and eliciting evidence and testimony that is not

19   only not present normally in this district, but not present

20   virtually anywhere else in the United States.

21           And I would submit, Your Honor, that we called the

22   case agent, who was subject to vigorous cross-examination.

23   We have the body cam -- the whole video that the Court has.

24   Photographs of this document that has not been meaningfully

25   challenged.

1        And I would just respectfully submit, Your Honor,

2   this is a challenge in one of the suitor.  No one is

3   challenging that this is an accurate document.  The defense

4   has sort of lightly suggested maybe he was lying about his

5   age for reasons known only to God.  And I would submit, Your

6   Honor, that's just not a compelling argument for why you

7   shouldn't believe that that was a 15-year-old boy who was

8   being transported by this defendant in part of a human

9   smuggling scheme.

10        THE COURT:  And -- and I don't disagree with you,

11  Mr. McGuire, that they do things much differently in other

12  districts.  In fact, they hold detention hearings on the day

13  of the initial appearance, and they do them entirely by

14  proffer.  You and I can have a policy debate all day long

15  about whether that is a proper way to handle detention

16  hearings.  It's part of the reason why we schedule detention

17  hearings for days after an initial appearance and the person

18  remains in custody, even though the hearing might be three

19  days later or five days later, is to allow the government,

20  and frankly the defense, to put together evidence, the best

21  evidence -- and, you know, I say that at the initial

22  appearance, that it's an opportunity for everybody to put

23  together the best evidence, for the government to present its

24  best evidence, for the defendant to put together its best

25  evidence to respond to the government's motion so that the

decisions we make are based on the most reliable evidence

available, because these are such consequential decisions and

because, in many cases, not all, because some cases are

presumptively detention cases, but in many cases, as here,

these are very consequential decisions of -- of removing

someone's liberty when they've only been accused of a crime;

they've not been convicted of a crime.

That's my point, is that I have to evaluate and

make the best assessment of the reliability of this evidence.

And you've made a good argument.  I'm sure

Mr. Tennent or Mr. Allensworth -- or Mr. Shabazz if he's

going to argue -- and I'm only going to let one of them

argue -- that they will make their best arguments about the

weight that should be afforded to this evidence.

You have, as always, Mr. McGuire, done a fine job

of -- of making your case on behalf of the government about

why I should accept the roster photograph as -- as

establishing that there was a minor child in the car, at

least, and then I'll have to consider the rest of the

government's arguments about, if I find that that is

sufficiently -- does sufficiently establish a minor child in

the car, about whether that person was a victim or not.

MR. MCGUIRE:  Yes, Your Honor.  And let me -- I'll

close that point, and then I have a couple more arguments

about the minor victim piece.  And, like I said -- I'm not

saying we should do it differently other places. I'm just
noting for the record that I don't want to be held to an
extra burden, and I don't think the Court's conveying that.

THE COURT: I appreciate that. Because I was just
about to say --

MR. MCGUIRE: I knew you were.

THE COURT: -- I'm not holding you to any extra
burden that you're not already held to by the Bail Reform
Act. And the fact that other courts do it differently is up
to them to wrestle with. And, you know, there's a whole lot
of public debate about the volume of people who are detained
based on proffered hearings, hearings in which the only
evidence is proffered evidence at an initial appearance.

MR. MCGUIRE: Yes, Your Honor.

I would -- the last point I would make about this
particular trip is -- and I think this will be borne out on
the body cam. The piece of paper is being passed front to
back. The front seat passenger is the first person who is to
fill it out. And that's corroborated on the body cam because
the trooper reiterates that person's name out loud. He reads
it back to the passenger.

THE COURT: And I will watch the body cam.

MR. MCGUIRE: Yes, Your Honor.

THE COURT: From beginning to end.

MR. MCGUIRE: The -- I will warn you, there's a

good bit of standing around. So -- but at any rate, the note goes front to back. Which means if the 15-year-old logically was the last person to receive the piece of paper to write his name on it, then that means he was sitting in the back after-market row.

It does -- Your Honor, there would not be seatbelts back there. There would be no way for them to be. And so we're talking about --

THE COURT: What evidence do I have of that, Mr. McGuire?

MR. MCGUIRE: Your Honor, I would submit, Your Honor, just kind of walking-around sense. It's an after-market Chevy Suburban row. I mean, seatbelts -- the Court can take judicial notice that seatbelts have to be anchored to the frame of the vehicle. Like, I don't think that's much debate. We have, like, dozens, if not hundreds of federal safety standards related --

THE COURT: I don't disagree with you about the safety standards, but I know nothing about this Suburban other than there was an extra row added.

But even though I don't know about the ways in which additional seating can be added to a vehicle, what all that involves, whether you just take a row of seats out of one Suburban and you put it in the back of another Suburban, or if there is a way to after-market modify a Suburban to

1   make it a more passenger available vehicle which would

2   involve some frame modifications as well.

3           So I'll accept your statement and also give it the

4   weight that it warrants about there maybe were no seatbelts

5   in the after-market row.

6           MR. MCGUIRE:  Your Honor, my arguments, as you

7   know from hearing me talk a lot, which I'm sympathetic to,

8   that my arguments are routinely grounded in common sense.  I

9   would bet everybody in this courthouse an ice cold beer that

10  there are not seatbelts in that back row because of basically

11  the way everybody knows how a car works and that's the

12  argument.  And I think it makes the most sense based on the

13  assembled facts that we all have that are visible on the body

14  cam.

15          And the Court can reject it, and I understand it.

16  But I'm just saying that I think a common-sense application

17  of the facts is always welcome, and that makes -- frankly,

18  just makes the most sense based on everything else, and I

19  think you can make logical inferences as part of your

20  determination, just as we ask jurors to do routinely.

21          THE COURT:  And you know that I, too, Mr. McGuire,

22  tend to -- to be one to apply common sense as well when

23  common sense is appropriate.

24          I have also learned, though, that I do not presume

25  that I know things about things that I don't know enough

about. And one of those things is I don't know enough about
automobile modifications to -- to necessarily be able to say
with certainty or not with certainty about what would be
involved in adding a third row to a Chevy Suburban. But
we've spent enough time talking about that particular issue.

MR. MCGUIRE: Yes, ma'am.

THE COURT: And I'll consider it as you've raised
it.

MR. MCGUIRE: And I would submit, Your Honor, that
we have other proof that the Court has heard today about the
danger that this conspiracy and these activities have posed
to children. You've heard testimony that there was danger
posed to the defendant's children, that he traveled with them
using them essentially as cover for his illegal activities,
and that when he traveled with those children they would
routinely be sitting in the floorboards of the vehicle where
I know there would be no seatbelts, and they would be -- that
was done to maximize the profits of the conspiracy. I would
submit, Your Honor, those children were at risk.

We flagged for the Court that migrant
transportation is inherently dangerous. And we described the
one example that is connected to members of this conspiracy.
And it's -- and it's -- I'm not trying to argue that
Mr. Abrego Garcia is somehow -- well, I guess what I would
say is it is dangerous -- it is a dangerous business. And --

1    and it was dangerous for his children.

2            You also heard testimony that -- and it was kind

3    of sad, frankly, the way that this testimony was described --

4    that there was a conflict between coconspirators because the

5    defendant was sexually inappropriate with minor females who

6    were being transported.  And it was not raised, sadly,

7    because these young women were at risk; it was raised because

8    the coconspirators were afraid that the source of supply was

9    going to cut off their business.

10           This is a mean set of facts.  As the defense

11   described, these people are criminals.  I don't shrink from

12   that.  These people -- these coconspirators, at least -- you

13   know we've heard about their criminal histories.  They're

14   criminals.  They are involved in active criminal activity for

15   profit.  And on these occasions, the defendant's described

16   sexually inappropriate behavior was not a problem morally,

17   ethically, or legally.  It was a business problem.

18           And I would submit, Your Honor, that has the

19   patina of truth.  These were not coconspirators who said, "I

20   was offended by his conduct," and tried to pose it as some

21   altruistic motivation.  They described it to the agent as

22   that was a problem for the -- for the business, for the

23   conspiracy.

24           That's how the Court can rely on it.  This was --

25   these were not men who came in and said, "I was offended by

1    the defendant's conduct."  They were describing, "It was

2    going to potentially hurt my bottom line."  That's how you

3    know you can rely on it.

4             I would submit, Your Honor, that this case

5    involves a minor victim in multiple different ways.  I don't

6    think there's much question that there was concern that

7    these -- these minor females were they to be victimized,

8    would be victims.

9             And Your Honor -- and I know the Court has read

10   our papers, and I would submit, Your Honor, that the

11   transportation of minor children has been recognized in our

12   sentencing guidelines, that they could be vulnerable victims

13   and they can be vulnerable victims if unaccompanied or the

14   conditions of transport are dangerous.

15            And I would submit that Congress through the

16   sentencing guidelines has recognized that because it's true.

17            And I've cited, Your Honor, the -- in our papers

18   that -- and this is from the *United States v. Miguel* case,

19   which is the Ninth Circuit case from 2004 (as read):

20               Young children may be more vulnerable to

21               illegal transportation because they do not

22               appreciate the danger involved or are too

23               frightened to assert themselves.

24            If this young man, who had just turned 15,

25   thousands of miles from anybody he knows, in a car with a

1   bunch of grown men, all of whom are doing something illegal,

2   if that 15-year-old child was related to any one of us, we

3   would be worried about him.  We would be worried about him

4   because it was dangerous.  We would perceive that

5   immediately.  And that's somebody's kid.

6           And I would submit, Your Honor, the defendant took

7   the actions he did to potentially victimize these young

8   people for profit.  He wasn't doing them a favor.  He wasn't

9   giving them a ride because he cared about them.  He was

10  giving them transportation for pay.  And if that didn't work

11  out, he didn't give a damn what happened to that child.

12  That's the evidence that the Court has heard about how this

13  conspiracy operates.

14          I would submit, Your Honor, that there is -- there

15  are situations where a minor victim or a minor might be

16  present at a crime that would not qualify under (f)(1)(E), as

17  the Court described.  This is not it.  This is not it.

18  Congress wanted (f)(1)(E) to apply when children are at risk.

19  Specifically, Your Honor, in *Kirkpatrick*, which we cited to

20  the Court, they've applied that (f)(1)(E) is available to the

21  government when there's not a minor victim at all, where an

22  adult undercover officer poses as a child and engages in

23  sexually suggestive --

24          THE COURT:  Which is a really different situation,

25  though, isn't it, Mr. McGuire?  Because in those situations,

the person charged with the crime, many times those are --
are offenses involving child sexual abuse material or -- or
other kinds of similar materials that they believed the
person was a minor and -- and those cases then talk about --
many times it was an attempt -- there were charges of
attempted -- some violation -- some attempted violation.

MR. MCGUIRE:  Your Honor, the point that I'm
making is, if an offense where there is no actual minor can
involve a minor, then an offense that actually involves a
minor should involve a minor victim.  That doesn't seem
illogical to me.  In fact, it seems like good sense.

The proof before this Court is that there were
multiple minors that were unaccompanied that were transported
during the course of this conspiracy.  That the defendant
transported his own children in an unsafe manner.  That on
the body cam it appears that he transported, based on the
record that the Court has, a 15-year-old kid for money.

It's -- it just boggles the mind to think that
Congress would not have considered this offense to involve a
minor victim.

I'm not saying that it applies every time.  And
that's why I think the *Watkins* court encourages courts to do
the fact-finding that the Court is going to do in this case:
Hear testimony, consider evidence.  Consider things that are
offered about whether there's any meat on that bone.

And I would submit, Your Honor, that what the
defense has argued eloquently in their papers is -- is
nonsensical.  The case involves a minor victim except when it
doesn't, except when it's enumerated, except when it's in
this particular category of things.  Which is not at all what
the statute says.  And the way *Watkins* reads, the statute is
that the idea is for the Court to prevent harm by determining
whether or not a defendant should be detained pending trial.

And, Your Honor, I would submit that's the proof
we've made out here.

Your Honor, I know I've been talking for a long
time.  I would submit, Your Honor, that the other two factors
under (f)(2)(A) and (f)(2)(B) also apply even if the Court is
unpersuaded that the offense involves a minor victim, even
though I believe firmly that it does.  It did on the night
the defendant was stopped, and it does through the course of
the conspiracy.

But, even if the Court is unpersuaded by that --
and, again, you just have to find that by preponderance, more
likely than not.  We're not at reasonable doubt here.  It's
50 percent plus a feather.  Did this conspiracy involve a
minor victim?  All -- all I have to get is just past the
50-yard line.

Your Honor, as to (f)(2)(A) and (f)(2)(B), there's
a preponderance of evidence that the defendant is a serious

1  risk of flight.  And I've described this in my papers.  And I
2  know the Court wanted to hear about his immigration status,
3  so I'll talk about that now, subject to the Court's approval.
4          THE COURT:  That's fine.  I mean, the risk of
5  flight discussion in your papers was essentially an
6  acknowledgment that, on the one hand, there is no risk of
7  flight because there -- I mean, basically, it was an academic
8  discussion.
9          MR. MCGUIRE:  That's right.
10          THE COURT:  That there is no actual risk of flight
11  because, if I release Mr. Abrego, he will go into ICE
12  custody.  So it is for the sake of the argument for academic
13  purposes only, but I'm happy to hear from you about if you
14  contend otherwise.
15          MR. MCGUIRE:  I'm going to really be a lawyer here
16  and say it's not academic if you agree with me.  It has a
17  real live issue.  Or if you agree with the government's
18  position.
19          Because if the Court -- I think it's reasonable to
20  consider what the potential risk of flight is absent of the
21  fact that the defendant is not going to be released from
22  custody any time soon, if ever.  Because he does have the
23  immigration detainer.
24          But, if that were not the case, what would be the
25  motivation for the defendant to flee?  The Court has

previously identified the seriousness of the offense as it

relates to the punishment that could be involved.

These are serious offenses. Each has a maximum of

ten years. There's no mandatory minimum. And we've cited a

case to the Court that could amplify the punishment based on

the number of aliens involved, which in this case we believe

to be nine, and we would believe that the jury would find

that in a special verdict form should they be asked. That

could potentially also substantially enhance the defendant's

punishment.

I haven't done a guideline calculation, Your

Honor, but I would submit, Your Honor, the transportation in

Count Two, in light of the longstanding conspiracy where

hundreds of migrants were transported illegally by the

defendant would bear on the length of his sentence. That's

substantial.

But, frankly, that's not where the concern for

flight lies the most. Although it's significant. The

defendant is facing deportation to El Salvador. If he is

convicted, the deportation becomes more -- far more difficult

for him, almost to where it's impossible. If he is convicted

of this offense, the fact that he would be deported becomes a

near certainty at that point, based on the -- the statues

that I've cited to the Court. That would give somebody an

enormous motivation to flee that is totally separate and

1  apart from the offenses that are charged.

2          The defendant is in a unique position.  He is very

3  well known in the United States.  He has potential access to

4  resources, illicit or overt, that other similarly situated

5  defendants do not have.  There are individuals in this

6  country with extraordinarily strong feelings about policy,

7  about immigration, about the current administration.  And

8  obviously not even most -- I would say even a tiny fraction

9  of those people would ever consider assisting a fugitive.

10 But that number is not zero.

11         And -- and that is a different and unique

12 perspective that this defendant has, that is not true of an

13 alien smuggling case where the defendant is not known outside

14 of his family and his attorney.

15         I would submit, Your Honor, that is a unique set

16 of circumstances.  That makes his risk of flight more

17 serious.  There are potential individuals who could assist

18 him that we don't know who they are or will ever know who

19 they are.

20         And I would submit, Your Honor, one of the things

21 about a detention hearing is we are always engaged in the

22 theoretical.  It is impossible to -- not impossible -- but

23 it's very difficult to imagine a scenario where a defendant

24 admits that he will flee from justice.  Or that there will be

25 competent evidence that the Court can turn to in terms of

1  writings or some witness statement that the defendant intends
2  to flee from justice.
3         The Court has to forecast, what are the chances,
4  and how comfortable are you with your odds?  And I would
5  submit this case is uncomfortably high because the defendant
6  doesn't want to be deported, and I can't blame him.  But
7  nonetheless, that is an extraordinary motivation to flee that
8  is unique to this matter.  And I would submit, Your Honor,
9  because that's case, he does pose a serious flight risk.
10        As to danger to others, Your Honor -- and this
11 really sort of is along the arc of obstruction or witness
12 intimidation -- we've highlighted the defendant's gang ties
13 during the testimony today that were testified to in -- by
14 several witnesses, at least one witness that the Court heard
15 from through Agent Joseph definitely described him as a
16 member of a violent street gang.  There were other aspects of
17 that testimony as it related to how he related to gang
18 members that would be corroborative of that piece.  That is
19 something that the Court can consider.
20        And that there is a risk of obstruction or witness
21 intimidation.  The defendant is capable of such intimidation.
22 If you -- the Court reads the orders of protection petitions
23 that were filed by his wife, they are disturbing.  She
24 describes a domineering individual who uses violence to get
25 what he wants her to do.  I don't believe that she lied when

1 she filled those out.  I think she told the truth.  I think
2 she ultimately made the decision that she wanted to reconcile
3 for romantic purposes, for her children, or whatever her
4 decision metric was -- and I don't pretend to understand what
5 that might be.  But what she put in that petition is the
6 truth.  She did not lie on those petitions.  And the person
7 that she describes is domineering, is intimidating, is
8 violent, and expresses that -- at one point in the order of
9 protection, he tells her mother that, if he kills her,
10 there's nothing anybody can do to him.
11          That is the kind of person that would have very
12 little compunction about trying to obstruct justice.
13          THE COURT:  And these occurred -- both these
14 orders of protection occurred in 2020 and 2021?
15          MR. MCGUIRE:  That's correct, Your Honor.
16          THE COURT:  So the last evidence that the
17 government has presented in support of any of its arguments
18 under 3142(f) or 3142(g) are events that occurred
19 November 30th of 2022 with the traffic stop and the -- and
20 the allegations that Mr. Abrego was transporting people in a
21 van for --
22          MR. MCGUIRE:  I would submit, Your Honor,
23 basically like the orders of protection that we've described,
24 when they occurred, I would submit is less probative than who
25 they occurred to and the nature of what Ms. Vasquez described

1    in the petition.

2            THE COURT:  But you would agree with me,

3    Mr. McGuire, that my task is to evaluate from today to the

4    date of trial what to -- and assess what the potential danger

5    is, if I get past the 3142(f) considerations and find that

6    this is a -- a case in which a detention hearing is

7    permitted, that it is to assess the dangerousness that

8    Mr. Abrego's release would present from today up to the date

9    of trial.  And that the last evidence that I have with

10   respect to your particular argument about his volatile nature

11   is these protective orders in '20 and 2021 and then his --

12   the evidence that the government contends is -- is indicative

13   of his intention to commit crimes by -- when he was stopped

14   with a Suburban full of other people, but nothing since

15   November of 2022?

16           MR. MCGUIRE:  Your Honor, we've alleged the

17   conspiracy to be ongoing up until, I think, 2025, I think is

18   what the indictment alleges.

19           So I would submit, Your Honor, that the proof

20   would be this was continuing course of conduct up until the

21   time --

22           THE COURT:  Certainly that's what the government

23   has alleged.  But the proof I have today for purposes of

24   determining the basis for detention hearing and then the

25   basis for assuming the government prevails on that issue, and

1  then the basis for determining whether to detain Mr. Abrego
2  is -- it doesn't go from 2022 up to 2025.  The basis stops at
3  evidence of his conduct in November of 2022, and the evidence
4  that you're discussing now about the protective orders is
5  even more remote than that.  It is -- it is 2020 and 2021.
6          MR. MCGUIRE:  Your Honor, I would submit, Your
7  Honor, that it is -- but it is unchallenged that the
8  defendant has changed anything about himself or his life at
9  this detention hearing.
10         Your Honor, the orders of protection are the
11 ones -- or the incidents of domestic violence that we know
12 about.  We haven't -- the Court hasn't heard -- and I
13 understand where the burdens lie, Your Honor.
14         But I also understand that Mr. Tennent,
15 Mr. Allensworth, and Mr. Shabazz are the A team.  No
16 disrespect intended to anybody else in the Public Defender's
17 office.  They're really, really excellent criminal defense
18 attorneys.
19         Your Honor, we heard nothing about the defendant.
20         Your Honor, I would submit, Your Honor, that the
21 last -- the pieces of evidence that we have from somebody who
22 knows him the best, his wife, mother of his child, has
23 described this temperament.  And the Court just can't
24 blithely assume -- not that I think you're doing that -- I
25 meant one cannot assume -- that between then and now he's had

this Road to Damascus conversion and is suddenly not
intimidating, violent, angry, dangerous. I just don't think
that the Court can think that has changed, absent any piece
of evidence to the contrary. I mean, that happened. And
that's who he is. And that's who he is as far as the Court
knows right now. You haven't heard anything.

THE COURT: Except I haven't heard anything,
Mr. McGuire, that, after the time that he was subject to
these orders of protection and then they were presumably
withdrawn or dissolved or something happened -- because
they're not still in effect, are they?

MR. MCGUIRE: Your Honor, I -- honestly, the one
from 2021 might still be. I'm -- frankly, I haven't looked
through all the way to the back of the documents to tell you
that.

But what I would say, Your Honor, is, if that's
true, I think that he's been living with Ms. Vasquez prior --
or post-2021. I mean, I think that's --

THE COURT: So --

MR. MCGUIRE: Based --

THE COURT: -- between 2021 and today, when these
orders of protection were first taken out, there's not been
other incidents that you are aware of or that the government
has presented to the Court for me to make a finding about
that that's conduct that Mr. Abrego continued after -- I

1  mean, it is equally plausible, is it not, Mr. McGuire, that
2  after Mr. Abrego and his wife reconciled after these issues,
3  as you've described it, for whatever reason they did, that --
4  that he then did have a reckoning that he needed to change
5  his conduct, which is indicated by the government's lack of
6  any evidence that -- of any other similar kind of conduct
7  during that time.
8        I also do have the CASA letter that was the
9  defense exhibit that talks about his -- his prior -- prior to
10 his detention, his work history, and that their intention,
11 CASA's intention to play a critical role in -- in ensuring
12 that the family situation remains a -- a safe and strong
13 one -- you're -- you're --
14        MR. MCGUIRE:  Your Honor --
15        THE COURT:  -- grinning, Mr. McGuire.
16        MR. MCGUIRE:  We had an extended discussion about
17 whether the note that the migrants wrote with their birthdays
18 could be relied upon.  And now -- but the Court is basically
19 accepting as whole cloth a letter from someone who hasn't
20 testified about -- we don't even know how they know the
21 defendant or how many times they've talked to him.  Or the
22 depth of their --
23        THE COURT:  But it's fewer layers of hearsay,
24 Mr. McGuire.  I've got a letter from someone on CASA
25 letterhead signed by that person.  You're right, that person

did not testify.  But Officer Joseph's testimony was that

that was a sheet that was filled -- that Trooper Douglas told

him was filled out by somebody else.  So we've got at least

two layers of hearsay there.

You're right that I'm going to have to evaluate

the strength to be given, the weight to be given to the

various pieces of evidence, which is what we always do in

detention hearings.  And it's not uncommon for there to be

hearsay evidence presented by both sides, or proffered by

both sides.  I mean, that's the nature of the detention

hearing process, generally, and we, as you and I discussed

however long ago when you started your argument, we tried to

require more in this district than is required in other

districts.

But it is not -- I don't find it inconsistent for

me to say that there is some question about the -- the weight

to be given to the roster letter and say that this is at

least a similar kind of evidence.  I mean, I might find that

they cancel each other because neither one of them is direct

evidence.

MR. MCGUIRE:  Two things, Your Honor.  One is that

that letter, unlike the roster letter, was written with a

specific intent in mind.  And that is to assist the

defendant.  That was why it was solicited.  That is why it

was offered as a piece of evidence.  The roster letter was

written by the migrants in the car.

        THE COURT:  I mean, I'm just going to stop you
there, Mr. McGuire.  Because I have watched enough of the
video to know that those troopers were not entirely without
some motive of their own.

        MR. MCGUIRE:  I'm not --

        THE COURT:  So I don't want you to walk into
saying that the obtaining of that roster was just great law
enforcement.  It was appropriate.  Don't -- don't
misunderstand me.  But I've overheard enough of what those
officers -- what those troopers said to each other to be
satisfied that --

        And I'm just going to ask.  There's a person on
the last row who keeps gesturing.  And she's very
distracting.  The person I think -- she's in a turquoise top.
And I'm sorry, ma'am, but I'm going to have to ask you to
either stop nodding your head and raising thumbs up and just
contain yourself, or to go ahead and step outside if you're
unable to do that.

        So what I was saying, Mr. McGuire, is that I have
reviewed enough of that video to know that the officer -- the
troopers who arrived on the scene after the initial stop
arrived with the mentality that this was a case of human
smuggling, and that everything they did from that point was
in facilitation of that perception that they had intercepted

1  a human smuggler.  So I don't want you to wade into trying to

2  vouch for their -- for them not having any -- any purpose in

3  compiling that list either.

4          MR. MCGUIRE:  And I'm not -- I'm not suggesting

5  that, Your Honor.  I'm just noting that, when the migrants

6  filled it out, they were not motivated by -- to assist -- I

7  mean, they were -- they were complying with a request.

8          THE COURT:  A direction.

9          MR. MCGUIRE:  I don't disagree.  But I don't know

10  that their motivation was to necessarily assist the defendant

11  or necessarily to assist the highway patrol.  They were doing

12  what they were asked to do.

13          THE COURT:  I wasn't talking about the motivation

14  of the people filling out the list, because the people

15  filling out the list were being directed by a law enforcement

16  officer to do something.  And it's -- I don't think they had

17  any motive other than to comply with the direction of the law

18  enforcement officer.

19          My point is, the law enforcement officer directed

20  the compilation of that list to further what their

21  determination was of what they had walked into on the evening

22  of November 30th of 2022.

23          MR. MCGUIRE:  And I'm submitting that the

24  motivation that matters -- the motivation of the migrants in

25  writing their names and birth date is different than the

motivation of the individual who wrote the letter with the
intention of assisting the defendant to gain a victory in his
court case.

THE COURT:  All right.  Fair enough.

MR. MCGUIRE:  And I would submit, Your Honor, that
that -- I want to go back to something the Court said.  The
Court said, "Isn't it equally plausible that the defendant
has sort of changed his ways?"

I would submit, Your Honor, it is plausible.  I
mean, I don't -- you know, I would grant the Court that.  I
would submit it is not equally plausible.  It is more
plausible that when an individual takes that kind of action
against someone they have sworn to love and protect, not
once, but twice -- and in there, Ms. Vasquez describes this
isn't the only time this has happened.  She describes having
videos of injuries and bruises, that this abuse happened over
a period of time -- that it is more plausible that the
defendant is the same person that took those terrible
activities against someone that he cared about and who he had
a child with.

THE COURT:  And then didn't take those same
actions for the next four years?

MR. MCGUIRE:  That we know about, Your Honor.  I
mean, I would say evidence -- absence of evidence is not
evidence of absence.  Right?  Domestic violence, as the Court

knows, happens in private.  It happens at home.  And the
Court's heard me argue this before.  When we see reports of
domestic violence, we are seeing the shark fin.  We are
seeing the tip of the iceberg.  We are seeing what got so bad
enough that a woman in a violent situation decided to do
something about it.

THE COURT:  There is no disagreement about that
from me, Mr. McGuire.  And I fully agree with you that things
can go along well in a domestic situation, even for extended
period of time, and then there -- something tragic that
happens.

What I've got to decide is how do I evaluate the
likelihood that if -- that if I release Mr. Abrego that there
is some unremedial -- non-remedial risk of danger, including
to his family -- although maybe less so because there's no
dispute that he's going to go into ICE custody.

But, again, because you said for the sake of
discussing ordinary -- more ordinary situations, I have to
evaluate whether there are non-remedial risks that, if I
release him, that he's going to engage in conduct that
there's no evidence he's engaged in in the last four years.
And -- and that's what I'll do.

MR. MCGUIRE:  And, Your Honor, I would just submit
that, as to the serious risk of obstruction or witness
intimidation under the (2)(b) factor, it is important -- sort

1  of character counts.  Right?  A kind of person who would

2  victimize a member of his own family is the kind of person

3  who would potentially try to intimidate witnesses.

4          As the Court and the defense has rightly

5  discerned, the cooperating witnesses are important to the

6  United States' case.  There's no getting around that.  I'm

7  not shy about that.  Because, like most criminal

8  conspiracies, the people who have the most information are

9  the people involved.  Conspiracies involving crimes happen in

10  the shadows.  That's this point.  They're trying to get away

11  with it.  And so the people who know the most about it are

12  the people who are also involved.

13          And I would submit, Your Honor, those witnesses

14  are in -- are in -- are at risk.  That's why we've taken such

15  great steps to try to protect their identities today.  Not

16  only they're at risk just generally, but the defendant has

17  connections to international smuggling operations and is

18  involved in a criminal street gang, all of which raise the

19  level of potential -- the seriousness of the risk of

20  obstruction and witness intimidation.

21          As to -- if the Court determines the United States

22  is entitled to a detention hearing, and I think I've talked

23  about a lot of points I was trying to make, then the Court

24  just has to decide if the defendant is a flight risk or is a

25  danger to the community.

 1           And I'll start with the danger --

 2           THE COURT:  Is there anything that you haven't

 3      already articulated, Mr. McGuire, that would not -- that

 4      would be in addition to the 3142(g) factors?

 5           MR. MCGUIRE:  The only --

 6           THE COURT:  In other words, I don't need you to go

 7      over everything again.

 8           MR. MCGUIRE:  I'm not going to.

 9           THE COURT:  My assumption is, when you talked

10      about them, they were for purposes of both 3142(g) and, if

11      necessary, 3142- -- I'm sorry -- for 3142(f) and, if

12      necessary, 3142(g).

13           So tell me whether there's additional evidence

14      that you think further supports any basis for detention

15      should I get there under 3142(g).

16           MR. MCGUIRE:  The only point that I wanted to make

17      that I hadn't made previously, Your Honor, is that I think

18      Judge Newbern once made a very astute observation, in that

19      she said domestic violence is almost impossible -- she might

20      have said extraordinarily difficult -- to control with

21      conditions; that that kind of behavior is very hard to

22      control.

23           We have a defendant with a demonstrated history of

24      his wife making serious and terrible allegations that this

25      Court has a difficulty of controlling.

1          I would submit, Your Honor, now may be the
2     appropriate time to talk about what would happen if the Court
3     orders release or -- or how that plays into the Court's
4     decision on detention.
5          The defendant does have an ICE hold.  As the Court
6     knows, he has a withholding of removal order from El Salvador
7     but is deportable.  The 2019 order that the defense admitted
8     describes that.  He does not have legal status in the United
9     States.  He does not have the ability to make an asylum
10    claim.  He is deportable to basically any country except
11    El Salvador right now.
12         If -- that -- he will not appear in court if -- if
13    the Court -- well, let me put it like this:  The risk of
14    nonappearance is significant because of his potential
15    deportation.  He will not appear in court if he's deported,
16    is what I was trying to argue, Your Honor, and that's
17    something that we've cited in our papers in the *Cobix-*
18    *Espinosa* case out of Kentucky, where the district court found
19    that to be a very persuasive concern as it related to
20    nonappearance, which is the flight prong by preponderance.
21         THE COURT:  But which as you know is not a
22    specific consideration under 3142(g).  And, as you also know,
23    there's a whole long line of authority of other district
24    courts who have said that it is not the job of the judiciary
25    to get in the middle of a decision that is within the

exclusive province of two executive branch departments,
Department of Homeland Security and The Department of
Justice; that you have to either decide whether you're going
to prosecute a person or whether you're going to deport or
remove that person.

And I don't know if they're your cases,
Mr. McGuire, certainly some of your colleagues have been in
front of me before and argued, well, you would be surprised
how little communication there is between his and DOJ, which
cannot be argued with a straight face in this case because
Special Agent Joseph is an his law enforcement person.  So,
obviously, there is a lot of cooperation in this particular
case between those two departments.

MR. MCGUIRE:  Well, let me try to break that out,
Your Honor.

Homeland Security Investigations is a law
enforcement agency, certainly, that our office works with.
The individuals who pursue immigration results on behalf of
the United States are attorneys with Department of Homeland
Security.  They're not in his.  It's sort of like the
difference between FBI and The Department of Justice.  Like,
you could work in the FBI and not -- not work in The
Department of Justice.

THE COURT:  Well, then, we're right back to it is
not the responsibility of the Court to settle a -- a -- for

1  lack of a better description -- a dispute or a disagreement
2  between two executive branches about which one of their
3  preferences is going to control with respect to the outcome
4  of a particular individual.

5  MR. MCGUIRE:  Frankly, the way I've laid it out --
6  and we've discussed this before, Your Honor -- is I think the
7  defendant's potential deportation really goes more to a
8  serious risk of flight.  If he were to hit the street, he
9  would have an enormous reason to run that doesn't have
10  anything to do with the serious criminal offenses --

11  THE COURT:  But he never hits the street if he
12  goes into ICE -- well, I shouldn't say he never hits the
13  street.

14  He would have to somehow break out from ICE
15  custody for him ever to hit the street.

16  And I have no intention of getting in the middle
17  of any ICE deportation -- I'm sorry -- ICE detainer or ICE
18  hold.  If I elect to release Mr. Abrego, I would impose
19  conditions of release, and then the U.S. Marshal is expected
20  to release him.  And if that is into the custody of ICE, it's
21  into the custody of ICE.  And then it's -- it is above my pay
22  grade at that point, Mr. McGuire, and it becomes an issue for
23  some other judge, maybe some other court even, to address at
24  that point.

25  MR. MCGUIRE:  And he would be most likely detained

1   in ICE custody for the foreseeable future until his potential

2   deportation from the United States.

3          I think, based on the understanding I have from

4   attorneys in Department of Homeland Security, that is the

5   most likely outcome.  As the Court flagged, some judge in

6   another place could take another action, but, based on their

7   experience, that is the most likely outcome.

8          But I would submit, Your Honor, that it matters

9   whether the Court detains an individual who is involved in a

10   long-running criminal conspiracy that has -- that is

11   dangerous, that involves the transportation of minor children

12   that are unaccompanied in dangerous capacities, putting his

13   own family members at risk, for someone with the history and

14   characteristics that he has.

15          So I would submit, Your Honor, that it's factually

16   accurate that the defendant will be detained almost no matter

17   what the Court decides, at least for a little while.

18          And, you know, maybe something happens on the

19   Homeland side.  I would submit, Your Honor, that it is a --

20   it is -- it is frustrating of Congress's intent when they

21   described if an offense involves a minor victim, that the

22   government should be able to show why he should be detained.

23   They did that for a reason.  They did that to try to protect

24   children.  And I would submit, Your Honor, that this

25   conspiracy has put untold number of children at risk.

1          And the defendant's right in the middle of it.

2   You can't watch that tape and not think -- and I understand

3   the Court's not going to decide guilt or innocence, but just

4   from a view of the evidence, the evidence as it relates to

5   Count Two is strong.

6          And I understand under the *Stone* case in the Sixth

7   Circuit, we consider the strength of the evidence differently

8   than other circuits.  And --

9          THE COURT:  Right.  And that is not the evidence

10  of guilt.  In fact, my task always has to be to approach this

11  with the presumption that Mr. Abrego is innocent of the

12  offenses of which he's charged, whether that's a

13  consideration of dangerousness or any other aspect of the

14  issues before the Court today.  And certainly under

15  3142(g)(2), which is the strength of the evidence, it is

16  strength of evidence of dangerousness, not strength of

17  evidence of guilt.

18         MR. MCGUIRE:  And there's no question that he's

19  presumed innocent.  We afford him that presumption unless and

20  until the United States is able to convince a jury of his

21  peers that he is guilty of offenses beyond a reasonable

22  doubt.  And I don't shrink from that burden.  I welcome that

23  burden.

24         But, as it relates to the strength of the evidence

25  as to danger, I would submit, Your Honor, that what the Court

has on the video -- and, again, I understand the Court is
trying to -- to make a good decision here.  But based on a
common-sense view of that tape, in addition to what evidence
the Court has heard about the transportation of minors, about
the way the defendant used his own family, about who he is in
the universe, the most common-sense application of those
facts to the given law is that this offense involved a minor,
that the defendant is both a flight risk and a danger to the
community.

Because of all those things, I would submit, Your
Honor, this Court should order him to be detained pending
further proceedings, regardless of what happens in the
immigration forum.

THE COURT:  All right.

MR. MCGUIRE:  Thank you, Your Honor.  You've been
very patient with me.

THE COURT:  As you have been with me.  Thank you,
Mr. McGuire.

Mr. Allensworth?

MR. ALLENSWORTH:  Your Honor, I would like --

THE COURT:  Get to the podium and then ask for
permi- -- whatever it is, Mr. Allensworth.

MR. ALLENSWORTH:  I would like to address the
Court about the (f) factors and then have Mr. Shabazz address
the Court about the (g) factors.  That's the way the

1  witness --

2        THE COURT:  Okay.  I had said I wasn't going to

3  let two of you argue, but you're right -- well, we haven't

4  separated this whole proceeding, but we've tried to maintain

5  that one thing has to happen and then another thing may or

6  may not follow.  So I certainly don't find that to be

7  unreasonable.

8        So, to that extent, I clarify my earlier comment

9  about who can argue what.

10        MR. MCGUIRE:  Your Honor, I just want the record

11  to reflect that I'm tougher than the public defenders.

12        THE COURT:  They made you argue the entire thing.

13  Is that your suggestion, Mr. McGuire?

14        MR. MCGUIRE:  Just that I'm tougher than them.

15  That's all I'm saying.

16        THE COURT:  That you had to stand up and endure

17  for the entirety of the argument.

18        MR. MCGUIRE:  Yes, Your Honor.

19        THE COURT:  All right.

20        Go ahead, Mr. Allensworth.

21        MR. ALLENSWORTH:  So, Your Honor, in our

22  memorandum in opposition to the government's motion for

23  detention hearing, we kind of laid out what we think is the

24  legal framework for the Court in terms of interpreting and

25  applying subsection (f)(1)(E).  And so I'm going to start by

just addressing the preponderance issue as to whether or not the government has met its evidentiary burden in establishing that that factor applies.

And, as far as I could tell, I think that there are four discrete pieces of evidence that the government is relying on in invoking the -- that particular category.

There's the proof regarding the 15-year-old -- the alleged 15-year-old in the Suburban on November 30th.

And I would just say that I think any time -- if you believe, as the government is alleging, that all of the passengers in that van are undocumented immigrants, all of those people have a real disincentive to give their accurate identifying information to law enforcement. And I think that that -- in this particular situation, as Agent Joseph conceded on cross-examination, if you're going to be undocumented in the U.S., it is better to be under 18 than over 18 for the reasons that the Court was articulating when Mr. McGuire was addressing this issue.

The -- you know, the Dream Act, DACA, Deferred Action for Childhood Arrivals, there have been --

THE COURT: That's what DACA stands for.

MR. ALLENSWORTH: I wrote that down when you were asking what it -- but, you know, there have been major pushes to try to legalize the status of people who came to this country as children, and that means that -- that if

1  somebody -- people have an incentive to understate their age.

2  And just take that for what it's worth.

3          I would also note -- I don't remember what exhibit

4  the sheet is, the photograph, of the --

5          THE COURT:  I think it's 4.

6          MR. ALLENSWORTH:  -- 4 --

7          THE COURT:  Regardless of the exhibit number.

8          MR. ALLENSWORTH:  -- if you would just look at

9  that, and look at the last figure in this year that's

10 supposed to be 2007 -- does that look like a 1 that's been

11 changed to a 7?

12         THE COURT:  Well, there is some -- I understand

13 why you're making that argument, Mr. Allensworth.  And this

14 is why, in the absence of the original documentation,

15 those -- exhibits of this nature lend themselves to those

16 kinds of questions about reliability.

17         MR. ALLENSWORTH:  I think it's just worth

18 considering.

19         This individual was not identified.  We don't know

20 if that person was unaccompanied.  I think that the

21 government has just not established by a preponderance of the

22 evidence that this individual is a minor.

23         Mr. McGuire was saying he just has to get to 51

24 percent.  That may be.  I agree that that's a lower burden

25 than proof beyond a reasonable doubt, but it's still

significant. And I think that they just have not cleared that hurdle here.

And, as the Court I think was saying a moment ago, I don't think that it is fair to characterize this person as a victim. There is no evidence that any actual harm came to this person. There is no evidence that Mr. Abrego Garcia put this person in any specific risk.

And I think that, you know, the mere -- even if you accept the government's interpretation of the term "involves" as it appears in subsection (f)(1)(E), even if you think -- even if you construe that broadly in the way that the government is encouraging you to, you know, still, they have to show that this person is a victim.

And Mr. Abrego Garcia is not charged with a human trafficking offense that involves trafficking somebody for the purpose of sexual abuse or for involuntary labor or for any kind of harm. I mean, he ultimately is charged just with giving people rides, with transporting people. And I think that characterizing this individual, even if they were a minor, as a victim is just not -- not reasonable. It's not a fair application of the statute.

The other incident that Mr. McGuire has been referring to is the allegedly sexually aggressive behavior with minor females. And I would just say that the way this testimony came in was pretty messy. There were hearsay

1    objections.  I think Your Honor ultimately overruled our

2    objection on hearsay grounds.  But still, the -- it is not

3    clear how many layers of hearsay there were before this

4    allegation made it to the coconspirator, who then shared it

5    with a different coconspirator, who supposedly then had a

6    conflict with Mr. Abrego Garcia about this.

7            There's just a lot -- it's -- actually, you don't

8    know how many layers of hearsay there are here.  I don't

9    think that the government's proof actually established that.

10           And I wanted to draw your attention to a case that

11   Mr. Tennent alluded to, I think, when he was doing his

12   cross-examination of Agent Joseph.  The case name -- forgive

13   me -- is *United States v. Curtiss Eugene-Darnell Black*.  It's

14   a Sixth Circuit unreported *per curiam* opinion that was issued

15   on May 9th of this year.  It's 2025 WL 1356614.  And I just

16   think it's worth taking a look at.

17           It was a -- it was an opinion that reversed a

18   sentencing order because -- I think -- I could be mistaken

19   about this.  I believe the defendant had been convicted of a

20   922(g)(1) offense.  And at sentencing the Court applied the

21   stolen firearm enhancement.  And that -- the basis for

22   applying that enhancement was a police report that contained,

23   I think, four different levels of hearsay that -- you know,

24   and the bottom level said the gun was stolen.

25           And the Court basically says that, although

1  reliable hearsay is admissible at a sentencing hearing, that
2  at some point this proof becomes so attenuated that it just
3  doesn't constitute proof by a preponderance of the evidence.

4        And that's a sentencing case.  It's not a pretrial
5  detention case.  But it still involves the same standard of
6  evidence.  It still involves preponderance of evidence.

7        THE COURT:  Right.  But it doesn't -- but is it
8  correct that in a sentencing of that nature that -- tell me
9  what the evidentiary standard is in terms of application of
10 the rules of evidence.

11       MR. ALLENSWORTH:  It's preponderance.

12       THE COURT:  No.  But I'm -- I'm not communicating
13 very well with you.

14       Can the Court take into consideration hearsay
15 evidence in a sentencing hearing?  Magistrate judges at least
16 in this district don't do sentencing hearings,
17 Mr. Allensworth.

18       MR. ALLENSWORTH:  Sure.

19       THE COURT:  So. . .

20       MR. ALLENSWORTH:  Yes, a court can consider
21 reliable hearsay.

22       But I think that the point that the Sixth Circuit
23 is making in the *Black* opinion is just that, when a statement
24 becomes so attenuated, when it's filtered through so many
25 layers of hearsay, that at some point the probative value of

1   the statement is degraded and it just is not able to

2   establish by 51 percent, by a preponderance of the evidence,

3   that the statement that the original declarant is making is

4   true.

5         And I think that same basic principle applies

6   here, even though we're talking about a different context,

7   we're talking about detention as opposed to sentencing --

8         THE COURT:  -- that whole standard --

9         MR. ALLENSWORTH:  -- of evidence.

10        THE COURT:  I'm sorry.  That whole standard is

11  made -- the standard of preponderance of the evidence -- as

12  Judge Richardson noted in the *White* case, it's made a little

13  more problematic, too, where the determination of serious

14  risk of flight is a subjective one, and it's not easily

15  quantifiable by -- I think the answer that he -- or the -- or

16  the example that he gave, was the masked robber in fact the

17  defendant.  Another one would be, you know, was the person

18  wearing a mask?  I mean, there's certain kinds of

19  determinations where preponderance of the evidence is a lot

20  easier application than a determination of serious risk of

21  flight, where the -- it is not easily determined by a

22  mathematical formula of -- not to suggest that Mr. McGuire is

23  wrong, because ordinarily preponderance of the evidence is 50

24  percent plus a father, 50.1 percent, however you want to

25  describe that, but the subjective component of that

1  determination is what makes the preponderance of the evidence

2  not as easily quantifiable as saying all I have to do is --

3  is put a toe over the line and that's sufficient.

4          MR. ALLENSWORTH:  I think he said, "This is hard

5  but I'll do my best."  Something to that effect.

6          But, beyond that, I would just also note that you

7  don't -- you don't know any details about those allegations.

8  You don't know the age or the identities of these supposed

9  minor females that he's allegedly harassing.

10         And also, I think that you just have to keep in

11  mind that the cooperators the government is relying on here

12  have very serious credibility issues.  I think that this case

13  presents kind of all the reasons that people are skeptical

14  about confidential informant evidence.  These are individuals

15  who are -- you know, are trying to get out of prison.  One of

16  them successfully, one of them sounds like he's still trying.

17         The first cooperator is able not to just get out

18  of custody but also to avoid deportation, despite having

19  been -- unless I'm misremembering -- having been deported

20  five times in the past.

21         And, you know, their stories are facially

22  implausible.  I think that Mr. Tennent did a very effective

23  cross-examination of Agent Joseph on the issue of whether or

24  not it would be plausible for Mr. Abrego Garcia to be going

25  on runs as frequently as these men were alleging.  I can't

1 remember the exact details.  I think that Cooperator 1 said
2 it was one or two times per week.  Cooperator 2, unless I'm
3 mistaken, said it was three times per week, usually with
4 children.  Agent Joseph acknowledged that two of Mr. Abrego
5 Garcia's children are special needs, or autistic, and I think
6 the idea that he is taking them on these cross-country trips
7 multiple times per week is just ridiculous on its face.
8           And both men have incentives to lie.  They
9 contradict each other.  I think that they just have some
10 pretty serious credibility problems that are also relevant to
11 whether or not the government has proven this allegedly
12 sexually aggressive behavior towards minor females.
13           The government is also alleging that Mr. Abrego
14 Garcia was transporting his own children during these --
15 during these routes and that they were unsecured, that they
16 didn't have seatbelts on, and they were sitting on the floor
17 so they could seat adults and maximize their profits.
18           And, again, I would just say that he has not
19 established by a preponderance of the evidence that that ever
20 happened.  He's relying entirely on the statements of
21 these -- the Cooperators 1 and 2.  And I think that the
22 scenario that they're describing is just facially
23 implausible.
24           I would also --
25           THE COURT:  And what about Mr. McGuire's argument

1　that you've -- that the defense has not done anything to

2　challenge the evidence so I should consider the evidence to

3　be supportive of the reasons for which the government offers

4　it?

5　　　　MR. ALLENSWORTH:  I think your response to him was

6　correct, that the government has the burden of proof, and

7　that there's no rebuttable presumption that the government's

8　evidence is reliable.  I mean, it may be fair or unfair, but

9　the defense is not required to prove anything in this

10　particular situation.  It's the government's burden to

11　establish whatever facts are the hook for applying one of

12　these subsection (f) categories, and we're not required to

13　rebut their proof.  If -- if their evidence is inherently

14　unreliable, then we're not required to introduce our own

15　evidence to rebut it.  I guess that's all I would say.

16　　　　I would also just say that -- again, if you reject

17　our argument that the involvement of a minor victim has to be

18　an element of the offense, and if you accept Mr. McGuire's

19　argument that basically the Court should be able to look at

20　the conduct underlying the defense, the way that the *Watkins*

21　court held, still, I think that there has to be some kind of

22　nexus between the involvement of the child and the offense

23　that the defendant is charged with.

24　　　　And here, keep in mind, Mr. Abrego Garcia's

25　children are U.S. citizens.  They're not undocumented

immigrants.  They were born here.  The offense that he's charged with is transporting undocumented immigrants or aliens.  And that's just -- that -- him having his children without a seatbelt in the car has nothing to do with that.

And so I would just submit that there isn't a sufficient nexus, even if -- even if you accept his method of -- of applying that provision of the statute, there's not a sufficient nexus between the involvement of the child and the offense that the defendant was charged with.

The government also -- I don't think that Mr. McGuire actually argued this in closing, but alluded to a mass casualty incident that took place in another country.  And I don't think that we heard a lot of proof about that.  I think -- I can't even remember if the Court sustained an objection to that testimony or not.

But I would just say I think that they clearly did not establish by a preponderance of the evidence that that incident ever happened, let alone that it had anything to do with Mr. Abrego Garcia.  And I think in a conspiracy case a defendant can be held libel for criminal acts by coconspirators if they're reasonably foreseeable to the defendant, and the government clearly didn't establish that here.

And so I think -- I just think that that clearly is not a hook for the application of (f)(1)(E).

1        And I would also note -- you've heard testimony
2  about an individual referred to as NV and a social media
3  exchange that Mr. Abrego Garcia supposedly had with her about
4  how she should post pictures of herself on a pornography
5  website.  And I would just say that has no bearing whatsoever
6  at all on the (f) factors.  That's just not relevant.  It has
7  nothing to do with the runs and it's just not -- it's not a
8  hook for them to argue for a detention hearing.
9        Just going back quickly.  At the -- at the legal
10  issues that we were discussing in terms of (f)(1)(E) in our
11  filing, I do think that interpreting the term "involves" as
12  requiring that the presence of a minor victim be an element
13  of the offense is the best way of reading that statute.  And
14  I would just note that that's how the word "involves" is used
15  in the prefatory clause.
16        THE COURT:  But does it give full effect --
17  Mr. Allensworth, does restricting the application of the --
18  or the construction of the word "involves" in the way that
19  you've requested in your briefing and are making in your
20  argument, does it give full effect to the purpose of adding
21  minor victims to the statute, which was through a passage of
22  the Adam Walsh Act, where the purpose was to provide
23  protection to children from not only sexual abuse but just
24  protection to children generally, provide a broader spectrum
25  of protection to children generally -- if we restrict the

1　language in the way that you've requested, does it give that

2　statute the full effect that Congress intended?

3　　　　　　MR. ALLENSWORTH:  I read the legislative history

4　argument in the *Watkins* opinion, and I just thought about

5　what about the underlying policy considerations of the Bail

6　Reform Act itself?  I think if you construe the term that

7　broadly, you know, like we say in our filing, the statute

8　just stops being about release being the norm and detention

9　being the exception.  I think, being that you're supposed to

10　have seven narrowly defined categories that can justify the

11　government seeking a detention hearing, and if you open it up

12　like that, I think it just undermines the whole statutory

13　scheme.

14　　　　　　And so I don't -- I would also just note that

15　obviously *Watkins* is not controlling authority in this

16　jurisdiction.  I think that it's the only circuit court

17　opinion that I'm aware of that squarely addresses this issue.

18　　　　　　And I would just note that other federal courts

19　have gone the other way.  I think in our motion -- in our

20　memorandum we cite *U.S. v. Hart*, which was a Southern

21　District of Indiana opinion from 2020 --

22　　　　　　THE COURT:  But those cases were not -- they did

23　not involve this question of minor victim, correct?  I think

24　both of those cases that you've cited --

25　　　　　　MR. ALLENSWORTH:  Firearms cases.

1        THE COURT: Were firearms. So -- frankly, as was

2 *Watkins* a firearms case. And the government's motion for

3 detention in *Watkins*, if I recall the case correctly, was not

4 based on a 3142(f)(1)(E) grounds --

5        MR. ALLENSWORTH: No.

6        THE COURT: -- that the Second Circuit added that

7 as, even if the Second Circuit was wrong about the grounds

8 upon which the government sought detention -- a detention

9 hearing, that (f)(1)(E) provided another basis in the opinion

10 of the Second Circuit. So it was basically -- as you've

11 described it in your brief, it was basically dicta.

12        But I think both of the cases you cited were also

13 firearms cases, correct.

14        MR. ALLENSWORTH: Yes. I mean, I guess I think

15 it's still the same basic legal issue.

16        THE COURT: Well, there are some district -- there

17 are some other district court cases. There's a *U.S. v.*

18 *McAnally* out of Oklahoma that I think was a minor child

19 victim case. There are some other cases that have adopted

20 the reasoning of *Watkins* in 3142(f)(1)(E) minor child

21 victim -- minor victim cases.

22        But you're right. None of them are -- you are

23 correct in terms of none of them are controlling on this

24 Court. They -- the reasoning might provide some guidance or

25 some level of persuasion, but none of them are binding

1  precedents.

2         MR. ALLENSWORTH:  I think that bail issues just

3  don't percolate up to circuit courts that often.

4         THE COURT:  I would tend to agree with you about

5  that.

6         MR. ALLENSWORTH:  So let me ask you, when you were

7  researching this, did you find any cases --

8         THE COURT:  I may or may not answer the question,

9  Mr. Allensworth.

10         MR. ALLENSWORTH:  -- applying (f)(1)(E) where a

11  defendant had the same charges Mr. Abrego Garcia,

12  transporting undocumented aliens?

13         THE COURT:  I have been unable to find that in my

14  research.  I suspect that if Mr. McGuire had found one, he

15  would have recited it in his papers.  And it may be, as you

16  say, that there could be any number of reasons for that.

17  That the smuggling cases don't get brought that often.  That

18  the smuggling cases get resolved very quickly.  That there's

19  some other reason why there are not detention hearings sought

20  in smuggling cases.

21         I frankly was unable to find, Mr. Allensworth,

22  that we have ever had another smuggling case of undocumented

23  individuals, undocumented migrants in this district at all.

24         MR. MCGUIRE:  Your Honor, I tried one of those

25  cases to Judge Crenshaw in 2018.

 1          THE COURT:  All right.

 2          MR. MCGUIRE:  I actually tried two of them.

 3          THE COURT:  All right.  Can you -- and I would

 4    appreciate if you would give me the names because I was

 5    unable to find from a search of CMECF that we had had a case.

 6          MR. MCGUIRE:  I can email Your -- I don't know

 7    that I remember their names -- the names of the defendants

 8    off the top of my head, but I remember the trial

 9    specifically.

10          THE COURT:  All right.  Well, if you would send

11    that information to the courtroom deputy and also make sure

12    that you copy Mr. Allensworth, Mr. Shabazz, and Mr. Tennent

13    on the email.

14          MR. MCGUIRE:  I certainly will.

15          THE COURT:  Because apparently our CMECF search

16    function does not perform as well as I thought it might,

17    because, when we did that search, it did not result in any --

18    it did not generate any results that there had been other

19    cases tried -- or other cases brought for smuggling under

20    1324 -- Title 8 -- I guess it's 1324(a).

21          MR. MCGUIRE:  And not for nothing, but I do think

22    at least one of those defendants was detained prior to trial.

23          THE COURT:  All right.

24          MR. MCGUIRE:  I think maybe they both were, but I

25    don't remember --

1          THE COURT:  I'm surprised that you did not cite
2    that in your papers, Mr. McGuire.
3          MR. MCGUIRE:  I regret the omission, Your Honor,
4    now, especially.  But I'll cite -- I'll provide those cases
5    to the Court.  I don't want to be incorrect about the
6    detention decision.  I think in both cases they probably
7    waived.  I don't know that we had contested detention
8    hearings.  I don't remember.
9          THE COURT:  All right.
10         MR. ALLENSWORTH:  Would it be based on (f)(1)(E)?
11         MR. MCGUIRE:  No.  I -- honestly, well, I can't
12    even remember their names at this point.
13         THE COURT:  Sorry to interrupt your argument,
14    Mr. Allensworth.
15         MR. MCGUIRE:  Me, too.
16         MR. ALLENSWORTH:  I'm just going to move on to the
17    serious risk of flight.
18         THE COURT:  Sure.
19         MR. ALLENSWORTH:  I think that -- I actually think
20    this is sort of an easy question for the Court.  As Judge
21    Richardson makes clear in the *White* opinion, the risk of
22    flight is a narrower concept.  It's sort of a subset of risk
23    of nonappearance, harder for the government to prove.  And it
24    involves nonaccidental failure to appear.  That's the way
25    that he construes it.

1    I think that there were other authorities, there

2  was the Professor of Golden article that he talks about in

3  that opinion that was saying that it has to be flight from

4  the jurisdiction.  And I think Judge Richardson said that's

5  too much.

6    Really, flight in this context means volitional

7  failure to appear in court.  And I think that the

8  government's principal argument for why Mr. Abrego Garcia

9  presents a serious risk of flight is he's got an ICE detainer

10 and that he might get deported.

11   And I would just point out that deportation is

12 inherently a nonvolitional reason to not show up in court.

13 He obviously does not want to be deported.  That wouldn't be

14 a decision that he's making.  That would be involuntarily

15 nonappearance.  And that just doesn't count as serious risk

16 of flight under (f)(2)(A).

17   THE COURT:  And I think there's quite a few

18 district court cases -- and I think at least one case out of

19 the Tenth Circuit -- that is based on that same reasoning,

20 Mr. Allensworth.

21   MR. ALLENSWORTH:  Yeah.  I -- so I just think that

22 clearly his immigration status is not a basis for the

23 application of that particular factor.

24   And -- but, you know, the Court was asking about

25 his immigration status.  And I'm not an immigration lawyer.

So I feel like I only have sort of a tenuous grasp on some of those issues in his case.

But I will tell you that I've had a lot of contact with his immigration attorney who represented him at the U.S. Supreme Court, Simon Sandoval-Moshenberg, and I spoke to him this morning and basically just asked him to confirm that I was right about the basic relief that they're planning on seeking for him.

So, as I understand it, he has an immigration detainer. He has an order of removal, but the government cannot legally execute it without further proceedings in which Mr. Abrego Garcia could raise a defense under the Convention Against Torture. The order of removal has been withheld as to El Salvador, and he cannot be deported to that country.

If the government seeks to deport him to any other countries, like Mexico or Honduras or Panama, then he has the right to seek protection from going to that country as well, and that would be a protracted legal process.

I think the defense to deportation would be something called chain deportation under a provision of the Convention Against Torture. And I think the issue there is, if you are deported to another country, I think that country will typically, in turn, deport you back to your country of origin. You'll only be allowed to stay there for a limited

1  period of time unless you go there with some kind of

2  permanent residency.

3          And, before the government can send him to any

4  other country, they're going to have to prove that that

5  country will not chain deport him to El Salvador.  And I

6  think that that proceeding would take place in front of an

7  immigration judge, and he would be entitled to a full

8  evidentiary trial.  And I believe that is true even if

9  Mr. Abrego Garcia is convicted of the charges he currently

10  faces.

11          So, with due respect to Mr. McGuire, I don't know

12  that it's accurate to say that, if he's convicted of this,

13  that it's guaranteed that he's going to be deported.

14          THE COURT:  Do I need to get into any of that,

15  though?

16          MR. ALLENSWORTH:  I don't think so.  I'm just --

17  I'm saying it just to say it because you were asking about

18  it.

19          THE COURT:  I'm not an immigration judge either,

20  and the immigration statues are equal in -- in what I would

21  say complication as the Bail Reform Act of cross-references

22  and one thing has to happen before another thing happens and

23  entirely dependant on particular circumstances.

24          So, unless I need to wade into the immigration

25  issues, my only point is -- my only point was that, if I

release him and there is an immigration detainer or hold, is
there a risk that he's -- is there a serious risk of
flight -- well, back up.

Under 3142(f)(2)(A), can there be a serious risk
of flight if there is an immigration hold on him anyway?

And, you know, Chief Judge McDonough out of the
Eastern District has said no, there cannot be entitlement to
a detention hearing under those circumstances because that
person -- there is no serious risk of flight because that
person will go into the custody of Immigration and Customs
Enforcement.  And unless there's some pretty strong evidence
that they would have the ability to break out of that
facility that -- that there is no risk of flight.

So that was the sole purpose of my wanting
Mr. McGuire to address that issue.  But not to get deep into
the weeds on any immigration arguments or what might or might
not happen to Mr. Abrego in any ultimate immigration
proceeding.

MR. ALLENSWORTH:  Okay.

THE COURT:  But I appreciate you checking on that
question.

MR. ALLENSWORTH:  I would just add also that you
haven't heard any evidence that he's ever failed to appear in
court or that he's ever fled from law enforcement.  I think
that's relevant.

1          Mr. McGuire was talking about Mr. Abrego Garcia

2    having political sympathizers who might have significant

3    resources who might then harbor him in the event that he was

4    released from immigration detention.  And I would just say

5    that that is so speculative that it is just clearly not

6    grounds for the application of this factor.

7          In terms of (f)(2)(B), obstruction or intimidation

8    of a witness, I think that is also a pretty simple issue for

9    the Court.  As far as I can tell, the government's argument

10   is that, because he is a member of MS-13, then necessarily he

11   presents a risk of obstruction of justice or intimidation of

12   a witness.  And I think -- I just think that's clearly not

13   true.

14         One issue, I guess -- maybe this is the threshold

15   issue -- they haven't established by a preponderance of the

16   evidence that he's a member of MS-13.  I think that the first

17   cooperator on the May 7th interview said that although he had

18   known Mr. Abrego Garcia for nine years that he had never had

19   any reason to believe that he was affiliated with MS-13.  I

20   think in the March 15th interview he may have changed his

21   tune about that for some reason.  But I think in the initial

22   interview that he did with Agent Joseph --

23         THE COURT:  Well, I'm going to go back and listen

24   to all the proof.  But certainly my recollection and notes

25   are that there was at least contradictory testimony about

1    that.

2            MR. ALLENSWORTH:  Yeah.

3            THE COURT:  And that indications were that he may

4    have -- that one witness, cooperating witness may have

5    indicated that they believed there was familiarity that

6    Mr. Abrego might have shown with respect to some gang

7    members, but not MS-13 necessarily.  I think Mr. Tennent

8    elicited that testimony on cross-examination, that it wasn't

9    even clear that it was MS-13 gang.

10           MR. ALLENSWORTH:  I believe that that was the

11   second cooperator, the person that's referred to as CC3 in

12   the indictment, that he had -- that he was basically buddy-

13   buddy of gang members that they were driving.

14           I don't think that that's worth any weight at all.

15   I think there was also testimony from Agent Joseph that the

16   person referred to as NV had identified him as being MS-13.

17   I don't think there was any testimony about her basis of

18   knowledge of why she would say that.  So I would just argue

19   that that also is probably not worth giving any weight.

20           Mr. McGuire was making arguments about the

21   temporary restraining order, the order of protection,

22   whatever the term for that is in Maryland.  And I believe

23   that there was one in 2020 and then there was one in 2021.

24   And I would just submit that those are -- both of those are

25   remote in time.  But, maybe more importantly, none of the

1    allegations in those order of protection forms that you have

2    are corroborated by anything.

3         And, when I heard him making that argument, I was

4    thinking about the section of *White* where Judge Richardson is

5    discussing Mr. White's pending evading arrest charge.  And I

6    think he basically says -- I understand he's talking about in

7    the context of a different provision of the BRA, but he says

8    that, while that may be unhelpful to him, it's not

9    adjudicated; he has no basis of knowing whether or not the

10   allegations of evading arrest are true or not.

11        And I think the same thing is basically true here,

12   that these are uncorroborated allegations in these old order

13   of protection forms and --

14        THE COURT:  Well, they were sufficient to at least

15   result in issuance of an order of protection by some court.

16        MR. ALLENSWORTH:  I think they were ex parte order

17   of protection.  And I think --

18        THE COURT:  Which is often the nature of orders of

19   protections, is that, at least in the first instance, they're

20   granted ex parte for any number of reasons, including safety

21   and to be protective, to serve the purposes for which they're

22   issued.

23        MR. ALLENSWORTH:  Well, I think in Tennessee, that

24   is how it works.  That in general sessions court and circuit

25   court, a person can go -- the petitioner can get an ex parte

order that is good for, I think, about 30 days.  The case
gets docketed for the full hearing.  And, if the person
doesn't show up, then the order expires.  And, if they do
show up, there's an opportunity for an evidentiary hearing
where the respondent has the opportunity to push back against
the allegations and fight the issuance of the full order.

I had the impression that the system in the
Maryland was basically the same, even if some of the
terminology was different.  But, in any event, I feel pretty
confident that that May 2021 order was not still in effect,
that it was dismissed, and that there was no full evidentiary
hearing.  I could be mistaken about that, but that's my
recollection.

THE COURT:  All right.

MR. ALLENSWORTH:  And that's all I have.  So I
would just submit to the Court that the government has not
met its burden to prove the application of either of the
three provisions of subsection (f) that it's invoking in its
argument that it's entitled to a detention hearing, and I
think that's dispositive of this whole case.

THE COURT:  All right.  Very good.  Thank you.

Mr. Shabazz.

And we may have, Mr. McGuire, because my courtroom
deputy is the most adept of all of us of navigating CMECF --
I think the case may have been 3:17-cr-00079, *U.S. v. Mateo*

1  *Lucas.*

2        Does that sound familiar?

3        MR. MCGUIRE:  Yes.  It's Alberto Mateo Lucas, Your

4  Honor.  I found it at the break, too.  That was the last case

5  I tried with Judge Crenshaw, that I personally tried, on an

6  alien smuggling case.

7        THE COURT:  All right.  Very good.

8        Go ahead, Mr. Shabazz.

9        MR. SHABAZZ:  Thank you, Your Honor.

10        Your Honor, we believe that the Court should view

11  the government's evidence and arguments through the lens of

12  suspicion and skepticism.

13        Why do I say suspicion?  Because, when you look at

14  the timing of the indictment, the timing of the

15  investigation, notably which only came after the government

16  denied him due process in the first place and then subjected

17  him to cruel and unusual punishment by sending him to CECOT.

18        Why do I say skepticism?  Skepticism because of

19  the reliance on unverified, untested, uncross-examined

20  snitches who are all asking for something and who are all

21  receiving something.

22        So we ask the Court to keep those two in mind as

23  you analyze these bond factors.

24        Mr. Garcia, who -- Mr. Abrego Garcia, who

25  maintains his innocence, he begins his analysis with the

1    premise that the default position of the law is that he

2    should be released.  And this is rooted in the sacred concept

3    that Mr. Garcia, like everybody else in the United States, is

4    presumed innocent until proven guilty, which is enshrined in

5    our constitution.

6                So, when we talk about the nature and

7    circumstances of the offense, the circumstances of this case

8    show that Mr. Abrego is neither a flight risk or a danger.

9                When we look at the facts and talk about flight

10   risk, the highway patrol, Tennessee Highway Patrol, flashed

11   the blue lights to pull him over.  Did he attempt to flee?

12   Did he put them on a high-speed chase?  No.  He simply pulled

13   over in a timely manner and in an appropriate manner.

14               When the officers approached the vehicle,

15   Mr. Abrego was calm.  He was respectful.  He was cooperative.

16   You'll see on the video when the officers walks up, he says,

17   "Hello there."  That was him saying that.  "Hello there."

18   Very cordial.  Nonaggressive.  Very respectful.  He answered

19   every question the officer asked him.  He even offered to

20   call his boss to verify the insurance information.

21               Now, let's talk about dangerousness when we apply

22   these facts to the case.  He never engaged in any type of

23   aggressive behavior, aggressive attitude, and certainly no

24   aggressive actions, no signs of violence, defiance, and he

25   was unarmed.

1        The government is arguing that oh, well, it was

2   dangerous because, you know, there's a third row that

3   probably didn't have seatbelts.

4        First of all, we have no idea.  Like the Court has

5   said, I don't know about after-market things.  But I know if

6   you get some after-market rims and put them on your car, they

7   work the way they're supposed to.  Kia has three rows in

8   multiple cars.  All of those have seatbelts.  Ultimately,

9   there's been no proof that there was any danger.

10        When we look at other types of smuggling cases, we

11   have these vans and trucks with no windows, no A/C, no

12   heating, all of these types of factors that increase the

13   danger in those types of things.

14        When you look at the video, the passengers that

15   you can see all have on seatbelts.  Mr. Abrego had on a

16   seatbelt.  The front seat passenger had on a seatbelt.  When

17   the officer opened the door, that individual had a seatbelt,

18   and the person next to him was wearing a seatbelt.  No

19   indication that any other danger was -- was going on here.

20        Another danger factor that is notably absent from

21   these facts is the absence of drugs.  On the video, troopers

22   brought in a K9, a highly trained drug-sniffing --

23        THE COURT:  They did.

24        MR. SHABAZZ:  -- dog, walked it around, didn't

25   find anything.  No hits.  You heard the discussion.  The

1  officers were wanting to get into the car and realized, we

2  don't even have probable cause.  The dog didn't hit.  You

3  know, there was no probable cause to get in there.  And drugs

4  certainly are violent.

5          The other thing is they pulled Mr. Abrego out of

6  the vehicle -- they didn't pull him, I apologize -- they

7  asked him to get out of the vehicle.  He fully cooperated.

8  He didn't run across the interstate.  He didn't run into the

9  woods.  He did everything that they said.

10          But what is important is, at no time did he offer

11  any danger, any physical resistance, any type of force or any

12  type of resistance at all to the government.

13          The offense itself is not a crime of violence.

14  It's not a crime of terrorism.  It doesn't involve minors, no

15  controlled substances, firearms, or explosives or destructive

16  devices, all of which are important under the nature and

17  circumstances of the offense.

18          So this clearly supports release.

19          Next, let's talk about the weight of the evidence.

20  This also weighs in favor of release.  The weight of evidence

21  demonstrating his level of dangerousness is minimal.  Again,

22  no resistance to officers, no guns, no drugs.  There's been

23  no firsthand testimony, no firsthand proof at all that

24  Mr. Abrego has ever even touched a gun.

25          Even if this weight went towards conviction, which

1    that's not the proper standard, the evidence is still weak.

2    It is very skeptical.  The conspiracy is based entirely on

3    snitch cooperator evidence.

4            And just an example.  Let's talk about the history

5    and characteristics of Snitch Number 1.  He's undocumented.

6    He's been deported five times.  He's been convicted of

7    smuggling people, allegedly admitted that he is the boss of

8    an entire transportation company that does that, has other

9    felony convictions, and up until two months ago he was

10   serving a federal sentence for transporting undocumented

11   persons.

12           He didn't cooperate with the government up front

13   at the beginning of their charge.  No.  He waits until

14   Mr. Abrego Garcia's face has been splashed all over the news

15   and some federal agents come talking to him, dangling carrots

16   out in front of him.

17           Former Assistant United States Attorney Sunny

18   Koshy talked about cooperating witnesses, and there's a

19   chapter in his report where he discusses the evolving

20   testimony of snitches, which we see here.  What happened is

21   --

22           MR. MCGUIRE:  I'm sorry.  Can I object?

23           A, I don't know what report he's talking about.

24           And the second thing I would note -- I would

25   respectfully request -- you know, when Mr. Shabazz and the

```
 1   Public Defender's office represent cooperators, they don't
 2   call those people "snitches," and I would respectfully
 3   request that they not call someone's else's client
 4   "snitches."
 5           But I don't know what report he's talking about.
 6   I'm sorry, Your Honor.
 7           MR. SHABAZZ:  And I'm not offering the report as
 8   anything --
 9           THE COURT:  Well, tell me what the report -- two
10   things.
11           First of all, I'm going to have you tell me what
12   the report is so that if Mr. McGuire while he's waiting wants
13   to look it up, he can look it up.
14           And, you know, I understand why you wouldn't want
15   somebody called a snitch if it were a jury.  It frankly makes
16   no difference to me.  It was much the same reason that
17   Mr. Tennent asked that -- that Agent Joseph call
18   Mr. Abrego -- call him Mr. Abrego instead of calling him the
19   defendant.  So doesn't carry quite the same connotation,
20   negative connotation, but you can be assured, Mr. McGuire,
21   that it does not influence me one way or the other for
22   Mr. Shabazz to use that terminology.
23           MR. SHABAZZ:  Thank you, Your Honor.  And I will
24   adjust.  That's a fair point.  Cooperator.  If there was a
25   jury here, I would call him a snitch, because that's exactly
```

1    what he is.

2            But what Mr. Koshy, Sunny Koshy, former Assistant

3    U.S. Attorney, in this district, in Case 3:22-cr-00340 --

4            THE COURT:  Okay.  3:22-cr- --

5            MR. SHABAZZ:  00340.

6            THE COURT:  00340.  All right.

7            MR. SHABAZZ:  Document 187-1.  And in that report,

8    Mr. Koshy talks about the evolution of cooperating defendant

9    testimony.

10           THE COURT:  I suspect that Mr. Koshy used quite a

11   bit of cooperating witness testimony during the course of his

12   career, but I will take a look at his report, only for

13   purposes of --

14           MR. SHABAZZ:  And I'm not saying give it any

15   weight.  You can consider it for, you know, whatever.

16           But he said (as read):

17               Based on my professional experience, cooperator

18               testimony frequently evolves over time in ways

19               that increasingly favor the prosecution.  The

20               pattern is so common that I consider it a

21               structural feature of the cooperative process.

22           And what he ultimately says, he says (as read):

23               It reflects the cooperator's growing

24               understanding of what information prosecutors

25               value and what they want from him.

1          And you heard testimony that, just within the last
2    two months, they've been sending FBI agents and law
3    enforcement all over the United States, trying to drum up
4    some business, some cooperators, people who are getting
5    really good deals.
6          Cooperator Number 1, despite all of his
7    deportations, his criminal history, being the criminal
8    mastermind behind a transport business, he's chilling at the
9    halfway house.  He's not in jail.  He's not getting deported.
10   He's living his life right here in the United States of
11   America.  But he sounds like the exact type of person that
12   this government should be wanting to deport.
13          Instead, they're drumming up all of this business,
14   all of these cooperators -- we've heard about six so far --
15   to try to get one man out.  They're going to give all these
16   other people these deals to stay in the country just to send
17   him away.
18          But that is part of the problem with relying on
19   these unverified, untested, unnamed, unquestioned cooperators
20   who are getting these deals.
21          And the evolution that Mr. Koshy talked about is
22   exactly what we saw here.  First, the guy goes in, "No, no,
23   no, he's definitely not MS-1.  I've never known him to be
24   MS-1.  Nothing about guns."
25          And then, as the prosecutors and the agents are

asking him questions, he starts realizing those are important. "Yeah. You know what? He is MS-13. That's right. You know what? He did have guns. It was one or two."

That didn't quite get them to the point where they were going to release him early. So then he's like, "Oh, he had a bunch of guns. He's transporting guns. That's what he does."

That is an evolution based on the deal that he hopes to get.

You can even look at the exaggerations that these cooperators have given. Mr. Tennent did an excellent job of showing how implausible and almost ridiculous it is to believe that this guy is somehow doing these 24-hour each way trips three or four times a week with special needs children.

Even if you take the special needs children out of it, which there is zero proof of that, it still is implausible. Who can make that many trips back and forth in that time constraint without the ability to sleep even?

The government's Cooperator Number 1, his -- just keeps evolving testimony. He's playing the government. He's playing a game, and the government has given him a get out of jail free card. I mean, what's next? Money?

All of these cooperators are unreliable, untested. This house of cards is built on the credibility of

1  unverifiable cooperators.  This Court has no way to evaluate

2  any of that.

3           That is why Mr. Tennent was so adamant to make

4  sure the Court understood the different layers of the

5  hearsay.

6           The other reasons why the Court should not, one,

7  even allow the testimony, it is unreliable.  We understand

8  the Court does it to evaluate, to determine if it's reliable

9  and then give it the appropriate weight.  And that's what

10  this Court always does.  And in this case, the weight of

11  these cooperators is zero.  Zero value in this case.  Again,

12  never been tested, but given promises to stay in the United

13  States, getting out of jail, staying in a halfway house.

14          Now, let me talk about, briefly, the history and

15  characteristics.  The bond report talks about he is a father,

16  has three children.  It talks about, when we look at the

17  physical and mental condition, the bond report talks about

18  after the ICE detention, he became depressed.  He's also

19  experiencing trauma and depression from his illegal

20  deportation to CECOT.

21          Detention almost guarantees he would never get any

22  proper mental health services he needs.  On the other hand,

23  release would allow him to get those services.

24          When we look at ties to the community, he's been

25  here since -- I believe -- what was it?  2012?  Lived in

1    Maryland.  He's worked here.  He's even joined the local
2    union, as we presented through the CASA letter.
3            But, more importantly, his whole family is here.
4    All of his loved ones are here.  His supportive wife, his
5    beautiful children, his brother, his mother, his closest --
6    his closest loved ones live right here in the United States.
7    He has no incentive to flee.
8            When you look at the employment, the CASA letter
9    talks about the type of employment he has, the sheetrock.
10   He's -- I mean, sheet metal.  He's joined the local union,
11   Union 100 up there.  He has zero history of drug or alcohol
12   abuse.
13           And what is important also when we look at
14   dangerousness under the history and characteristics, the
15   Court has to look at his criminal history.  Mr. Abrego
16   doesn't have a single felony.  Not one.  Not 34.  Zero.  He
17   has zero prior felony convictions.  He has no convictions for
18   crimes of violence such as murder, kidnapping, rape, robbery.
19   No drug trafficking convictions.  No firearm convictions.  He
20   doesn't even have a misdemeanor conviction.  He's never even
21   been charged with a misdemeanor.
22           So, when we talk about the history and
23   characteristics of a dangerous person, this is not it.
24           THE COURT:  And the Sixth Circuit has said that
25   a -- as you know, Mr. Shabazz, that a prior criminal history

1   is not a predicate to detention.

2           MR. SHABAZZ:  Sure.

3           THE COURT:  That it makes the government's job

4   easier if the person has a lengthy or -- or serious violent

5   criminal history.

6           I would qualify that by saying that often those

7   cases in which there is no prior criminal history and

8   detention is still imposed, that the crimes are of a much

9   different nature than the crime charged here.

10          But you would agree that the Sixth Circuit has at

11   least made that statement, that a prior criminal history is

12   not required to detain someone?

13          MR. SHABAZZ:  Right.  It's certainly a very

14   important factor.  And, as the Court noted, those other cases

15   often come up in things such as child pornography, you know,

16   soliciting images with mandatory minimum 15 years.

17          THE COURT:  Serious drug trafficking crimes.

18          MR. SHABAZZ:  Serious drug trafficking crimes.

19   That's right.  Many of those may not have -- particularly

20   with the child porn would not have a -- prior convictions.

21   And I think those are the types of matters we look at.

22          But certainly having a criminal history is a very

23   important factor whether it's dangerous or not.

24          Not only that, him not having any criminal history

25   also means he's never missed a court date.  He's never shown

```
 1    any risk of nonappearance in court.  He's never had to be on
 2    probation and failed to show up for probation.  All of those
 3    are in favor of him, and those are just other factors of
 4    somebody that does not have prior criminal convictions.
 5              When we talk about flight risk, the bond report,
 6    it cites to his foreign ties to a -- his ties to a foreign
 7    country as a possibility of flight risk.
 8              Mr. Abrego has fought all the way to the Supreme
 9    Court of the United States to stay right here in America.
10    He's not about to flee.
11              And where could he go?  As Mr. Allensworth
12    described, anywhere he goes, even if the U.S. deported him,
13    as is, to another country, he only has 90 days there, and
14    then they deport him back to El Salvador.  He has no
15    incentive to flee the country.
16              Another important aspect of flight risk is we look
17    at the type of penalty that a person would be facing.  And,
18    if the penalty is very high, that is more incentive for them
19    to flee.  Here --
20              THE COURT:  But Mr. McGuire argues here that he
21    faces a penalty of up to ten years per -- up to 90 years,
22    potentially, because he had nine people in the van with him.
23    Am I --
24              MR. MCGUIRE:  That's the case we've cited to the
25    Court.  Yes, Your Honor.  It stands for that proposition.
```

1          MR. SHABAZZ:  I understand that.  But I have a
2  hard time believing that when the boss of this criminal
3  organization, whose entire business is to transport people,
4  been doing it for decades, only got 30 months before he
5  cooperated, so I don't think that 90 years is on the table
6  for Mr. Abrego when his alleged boss and criminal mastermind
7  only got 30 months for the exact same conduct and is probably
8  responsible for thousands of people.
9          He also -- you know, his face has been on every
10 news outlet, newspapers, social media, everything.  Where can
11 he go?  Where can he flee to?  He's one of the most
12 recognizable people in the newspeople right now.  He can't
13 flee anywhere.  Not in the U.S.  He's going to be recognized
14 and turned in by a number of people.
15         We could also now talk about the dangerousness.
16 And the United States government from D.C. to Tennessee has
17 exaggerated his history.  Has exaggerated who he is.  They
18 made a big issue.  This man is MS-13.  He's a gangster.  He's
19 dangerous.  They started off saying he's MS-13 because he had
20 these tattoos.  There's been zero evidence that -- of any
21 tattoos linking him to MS-13.
22         And that's with good reason.  Because his tattoos
23 have no historical or current connection to MS-13.  When you
24 take the combination of the tattoos he has, the only person
25 in a Google search that shows with those tattoos in that

combination MS-13 is him.  Out of thousands and thousands of
MS-13 tattoo images, he is the only one that has the ones
they claim.

         So I understand why they have now backed away,
have not put in any proof about that.  Certainly not any
Photoshopped or doctored proof trying to show that he has
MS-13 on him.

         So I understand why they backed away from that
aspect.  But they've not backed away from the claim that he's
MS-13.

         And the only thing they have from that, again, is
some snitch -- some cooperators.  And the first one in his
original meeting with the government said he's not.  If the
dangerousness aspect falls on whether or not he's MS-13, he
represents no danger.

         There is zero -- when you take -- think about just
the common-sense factors of how to identify somebody in a
gang, you talk about the associations, the type of patterns
of behavior that these gangs get involved in.  MS-13 is
violent.  It's a transnational terrorist organization,
murder, rape, killing, strong-arm robbery.  He has none of
those convictions.  Never even been accused of being in those
situations, much less being MS-13.

         And, really, if Mr. Abrego Garcia is so dangerous,
this violent MS-13 guy, why did they wait almost three years

1    to indict him on this?  This so-called dangerous man that

2    they pulled over in 2022, despite not having any guns or

3    drugs or anything on him, but their claim that he's so

4    dangerous, why did the United States government wait until

5    literally after the Supreme Court told him they denied him

6    due process and to bring him back before they even began the

7    investigation?  This stuff is new.

8            Again, that's why I'm saying you should look at it

9    through the lens of suspicion and skepticism.  The only

10   reason they're calling him dangerous now is it justified

11   denying him due process and subjecting him to cruel and

12   unusual punishment.  They have to cover that up.

13           So, Judge, at the end of the day, where we are

14   is -- it distills down to this:  Is he a flight risk and is

15   he a danger to the community?  The evidence before this Court

16   today strongly suggests no.  The minimalistic, unweighty,

17   untested, unverified, unreliable cooperators carry zero

18   weight in this matter.  If they do, it's very small.

19           The government's talking about they got to get to

20   50 percent?  They're at the 13 yard line now, and it's four

21   downs in and they don't have a quarterback.  That is the

22   level of proof right now from these cooperators.

23           So, with that, Your Honor, we request that you

24   apply the law to the facts of the case and give Mr. Abrego

25   the due process that he has been asking for this entire time.

1          Thank you.

2          THE COURT:  All right.  Mr. McGuire, any final

3    remarks?

4          MR. MCGUIRE:  It's been a long day, Your Honor.

5    I'm going to be very, very brief.

6          Your Honor, I'm frankly just not even really

7    supposed to be here.  I'm the acting United States Attorney

8    because sort of -- I was the last man standing.  And I can't

9    speak for the rest of the government.  Wouldn't pretend to.

10   I learned about this case in April.  I wasn't there in 2022

11   to make a decision, and so I can't answer Mr. Shabazz's

12   question about why he wasn't charged in 2022.  All I know is

13   I didn't know about it.  And since I have learned about this

14   case, all I've tried to do is the right thing.  All I've

15   tried to do is follow the evidence, make the best decisions

16   that I could make, and focus on the facts.

17         And the facts are that I didn't whip up the body

18   cam.  I didn't create that in a lab.  I didn't force the

19   defendant to lie to the trooper from the very first moment he

20   encounters him.

21         And the trooper says, "Where are you coming from?"

22         And he says, "St. Louis."

23         And that's just a lie.

24         I didn't whip up witnesses and tell them to commit

25   perjury when they testified in front of the grand jury.

1          I feel confident that Agent Joseph did not forsake
2   his oath as a federal agent for a good time or because he
3   perceived that that was the thing to do.
4          Your Honor, we've tried to present everything as
5   professionally and as thoughtfully and as deliberately as we
6   could.  And I understand there are strong feelings about this
7   case on both sides.
8          What I can tell the Court is that the evidence
9   that is before the Court is persuasive, to me at least, that
10  the defendant committed a serious crime and that he is a
11  danger to the community.  And that the case involved not only
12  a minor victim, but the conspiracy he participated in
13  involved minor children.  And I want to protect those
14  children.
15         Your Honor, the pretrial services report
16  recommends detention, and they don't work for me; they work
17  for you.
18         I would submit, Your Honor, that, based on
19  everything that the Court has heard, you cannot presume that
20  a 15-year-old child who was being transported by the
21  defendant would be safe.  And that's really what this is
22  about.  Whether he will be in ICE custody, whether he will be
23  debated and fought over by everyone who has an opinion, my
24  job is to try to protect this community.  And I would submit,
25  Your Honor, that, based on the proof that you have, it should

```
 1   be your job too.

 2              And, because that's the case, Your Honor, I would

 3   respectfully move for the detention of the defendant.

 4              THE COURT:  Mr. McGuire, I don't want to make too

 5   much of the pretrial services report, but I do just want to

 6   make sure that you are precise in your characterization,

 7   which is that, due to the active immigration detainer, that

 8   that impacts the determination of what conditions of release

 9   might be reasonably imposed and the expectation that those

10   would be reasonably complied with.

11              So it is not a -- it is not a question of

12   detention because of other considerations; it is due to the

13   immigration hold.

14              Would you concede that?

15              MR. MCGUIRE:  Your Honor, I would note that the

16   way that the pretrial services report -- they recommend --

17   they make a recommendation, and they say it is certainly

18   influenced by the fact he has an immigration detainer.

19              But they don't have to make a recommendation at

20   all.  And I would submit, Your Honor, it is what it is.  The

21   bulk of the pretrial services report is the statements by

22   Ms. Vasquez that Mr. Allensworth described as

23   noncorroborated.

24              And I -- I don't want to be too clever by half,

25   but it sounded like he was suggesting to the Court that they
```

1  shouldn't be believed.  It's true that they're

2  uncorroborated, but the reason you say something is

3  uncorroborated is because you don't think it's true.  And I

4  think it's true.  And that's who I think the defendant is.

5          And I haven't called anybody any names, whoever's

6  side that they're on, because I don't think that's

7  appropriate.  But I do think that the people -- person who

8  knows him the best, the way she describes him cannot give

9  this Court confidence that he's not a danger, that he won't

10 lie, like he did to the trooper off the jump, and he won't do

11 whatever he has to do to be where he wants to be.

12          That's my argument.

13 THE COURT:  Thank you, Mr. McGuire.

14          All right.  Although I sometimes make a ruling the

15 day of the hearing, because I know that these decisions are

16 consequential ones, this is an unusual case, if only for no

17 other reason than because we have a detention hearing that's

18 gone for almost six hours, which, as Mr. McGuire and as

19 defense counsel know, is highly unusual in this district.  We

20 have evidentiary detention hearings, but we -- I maybe can

21 recall one other detention hearing in 11 years that has been

22 of this length.  And I have had multiple other cases in which

23 the issues were complicated enough or novel enough that I

24 took the matter under advisement, which I'm going to do in

25 this case.

1          I'm going to take the matter under advisement.  I
2    intend to write a decision.  My hope is to do that sooner
3    rather than later.  I'm not going to give you a prediction
4    about a date because, as soon as I do, then something's going
5    to come up that's going to completely sidetrack that
6    intention.  But I intend to do -- to issue a decision sooner
7    rather than later.
8          If there's a need to reconvene, then I will
9    address that in an appropriate order as well that schedules
10   another hearing and directs everyone to come back for some
11   reason if -- if required by my -- by my final determination.
12         So that is my intention.
13         I want to thank everyone in the audience for their
14   cooperation today in observing the courtroom protocols.
15   There was a lot of planning that went into today that made
16   sure we had an open proceeding and still had a proceeding
17   that was conducted decently and in good order and without any
18   events.  And, because you all cooperated in that, that's
19   exactly what we had today.
20         I want to thank the attorneys for their
21   presentation.  These are never easy decisions.  They are made
22   less difficult if the evidence is presented in a thorough and
23   well-prepared manner, which is always what is expected in
24   this district, and certainly with this group of attorneys.
25   And so thank you for not disappointing today, that you were

well prepared and presented all of the evidence in a manner
that was as efficient as could possibly be expected, and I
will do my best to be equally efficient in getting you a
decision.

Anything else, Mr. McGuire, that we need to
address before we recess today?

MR. MCGUIRE:  No, Your Honor.

THE COURT:  Anything else, Mr. Shabazz?
Mr. Allensworth, or Mr. Tennent?

MR. ALLENSWORTH:  No, thank you.

THE COURT:  All right.  Then we will be in recess.
And thank you all very much.

(Court adjourned.)

1  REPORTER'S CERTIFICATE

2

3          I, Lise S. Matthews, Official Court Reporter for

4  the United States District Court for the Middle District of

5  Tennessee, with offices at Nashville, do hereby certify:

6          That I reported on the Stenograph machine the

7  proceedings held in open court on June 13, 2025, in the

8  matter of UNITED STATES OF AMERICA v. KILMAR ARMANDO ABREGO

9  GARCIA, Case No. 3:25-cr-00115; that said proceedings in

10 connection with the hearing were reduced to typewritten form

11 by me; and that the foregoing transcript (pages 1 through

12 241) is a true and accurate record of said proceedings.

13          This the 22nd day of June, 2025.

14

15                              /s/ Lise S. Matthews
                               LISE S. MATTHEWS, RMR, CRR, CRC
16                              Official Court Reporter

17

18

19

20

21

22

23

24

25