IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA    )
                                  )
      v.                       )     NO. 3:25-cr-00115
                                  )
KILMAR ARMANDO ABREGO GARCIA   )     JUDGE CRENSHAW
                                  )

## UNITED STATES' MOTION TO REVOKE THE MAGISTRATE JUDGE'S ORDER OF RELEASE

Pursuant to 18 U.S.C. § 3145(a), the United States of America, by and through Robert E. McGuire, Acting United States Attorney, respectfully moves this Court to revoke the Magistrate Judge's release order, which denied the Government's motion for pretrial detention.   (Docket No. 43).

## SUMMARY OF THE ARGUMENT

For years, Kilmar Armando Abrego Garcia (hereinafter, "the defendant") conspired to smuggle aliens, unaccompanied children, firearms, and narcotics into the United States in furtherance of a transnational criminal operation.   On May 21, 2025, a federal grand jury indicted the defendant for serious felony offenses related to his participation in the conspiracy. Pursuant to the Bail Reform Act, the defendant should be detained pending trial because there is no combination of bail conditions that can reasonably assure the defendant's appearance in future court proceedings or the safety of the community if the defendant is released. The Magistrate Judge erred factually and legally in denying the Government's motion for pretrial detention.

*First*, the Magistrate Judge erred in determining that the United States was not entitled to a detention hearing. Notwithstanding the Government's presentation of a preponderance of the evidence to the contrary, and in contravention of prevailing case law, the Magistrate Judge found that this was *not* a case that "involves a minor victim" under 18 U.S.C. § 3142(f)(1)(E).

*Second*, the Magistrate Judge failed to properly consider all the Government's evidence at the hearing on June 13, 2025. This evidence showed that the defendant is both a danger to the community and a risk of non-appearance in future court proceedings, which cannot be reasonably mitigated by even the strictest bail conditions. The Magistrate Judge repeatedly failed to assign proper weight to sworn testimony by the Government's federal agent witness and found – without a sufficient basis – that the described statements of co-conspirators and other corroborating evidence were unreliable. The Magistrate Judge also failed to properly consider the evidence of the defendant's past domestic violence conduct, his incentives to flee, his lack of ties to this community, and the lack of evidence regarding the efficacy of conditions of release. Accordingly, the Magistrate Judge failed to weigh sufficiently all the factors enumerated in 18 U.S.C. § 3142(g).

## PROCEDURAL BACKGROUND

### A. The Indictment

On May 21, 2025, a grand jury in this district returned a two-count Indictment against the defendant. Count One charged the defendant with conspiring to transport aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I), and Count Two charged the defendant with

unlawfully transporting aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). (Docket No. 3).

The Indictment alleges that defendant was a member and associate of the transnational criminal organization, La Mara Salvatrucha, or "MS-13," which engages in acts of violence, firearms trafficking, narcotics trafficking, alien smuggling, and other criminal activities throughout North and Central America.[1] (Docket No. 3 at ¶¶ 5- 6). Beginning in or around 2016, the defendant joined a conspiracy to transport illegal aliens for profit and private financial gain. (Docket No. 3 at ¶¶ 9-10). The defendant and one of his co-conspirators (hereinafter, "CC-1") routinely picked up aliens in the Houston, Texas, area after the aliens had illegally crossed the United States-Mexico border. (Docket No. 3 at ¶ 12). The defendant and CC-1 then transported the aliens in interstate commerce from Texas to other parts of the United States. (Docket No. 3 at ¶ 12). After CC-1 was incarcerated for alien smuggling, and subsequently deported from the United States, the defendant began working with another co-conspirator (hereinafter, "CC-2") at CC-1's direction. In addition to illegally transporting aliens, the defendant and his co-conspirators also trafficked firearms and narcotics from Texas to Maryland. (Docket No. 3 at ¶¶ 14-15).

The Indictment also alleged the defendant and his co-conspirators routinely transported aliens in an unsafe manner, including using reconfigured vehicles with after-market unattached seating rows, and transporting children on the floorboards of vehicles. (Docket No. 3 at ¶ 23). According to the Indictment, another co-conspirator (hereinafter,

---

[1] On February 20, 2025, the United States Department of State designated MS-13 as a foreign terrorist organization (hereinafter, "FTO"), pursuant to 8 U.S.C. § 1189.

"CC-6") received reports that the defendant abused female undocumented aliens. This caused CC-6 to report these allegations of abuse to CC-1 and CC-2, who admonished the defendant from further abusing female aliens. (Docket No. 3 at ¶ 27).

The Indictment further described attempts by the defendant and his co-conspirators to evade detection by law enforcement. For instance, the defendant and his co-conspirators often varied their transportation routes within the United States and routinely confiscated the aliens' cellphones to prevent the aliens from contacting anyone else during the trip. (Docket No. 3 at ¶ 21 and 22). The defendant and his co-conspirators also routinely devised and employed false cover stories to provide to law enforcement if they were stopped while transporting aliens. (Docket No. 3 at ¶ 25). During the conspiracy, the defendant illegally transported aliens on over 100 trips between Texas and other states. (Docket No. 3 at ¶ 29).

On November 30, 2022, the defendant was driving a SUV carrying undocumented aliens on Interstate I-40 in Putnam County outside of Cookeville, Tennessee. (Docket No. 3 at ¶ 30(a)-(d)). After law enforcement stopped the defendant's vehicle, he knowingly and falsely told a Tennessee state trooper that he and the passengers were coming from St. Louis where they had allegedly been doing construction work for two weeks.[2] License Plate

---

[2] Government's Ex. 1 (to be admitted at evidentiary hearing) at 1:24 (video player counter)/19:57:28 (time on BWC footage) and 12:48 (video player counter)/20:08:54 (time on BWC footage):

<table>
<tr><td align="center">(1:24/19:57:28)</td><td align="center">(12:48/20:08:54)</td></tr>
<tr><td>
Trooper: Where you working at?<br>
Defendant: Where?<br>
Trooper: Where.<br>
Defendant: St. Louis, Missouri.<br>
Trooper: Missouri?<br>
Defendant: Yes, sir.
</td><td>
Trooper: Where did you say you was coming from?<br>
Defendant: So I come in from St. Louis, Missouri. My project, the project is over there. So right now, it's done. Two weeks. Two weeks over there.<br>
Trooper: Okay.<br>
Defendant: So right now, I'm going back to home.
</td></tr>
</table>

Reader (LPR) data showed that the SUV had not been near St. Louis in the preceding 12 months, and had instead been in the Houston, Texas area within the week leading up to the traffic stop on November 30, 2022.   (Docket No. 3 at ¶ 30(i)).   Shortly after the traffic stop, the defendant reported to his co-conspirators that he had been stopped by law enforcement in Tennessee but was released from the scene.   (Docket No. 3 at ¶ 30(k)).

**B.  The Government's Motion for Pretrial Detention and the Detention Hearing**

On June 6, 2025, the defendant made his initial appearance in front of the Magistrate Judge. (Docket No. 10).   That same day, the Government filed a motion for pretrial detention pursuant to 18 U.S.C. § 3142 which the Government later supplemented. (Docket. Nos. 8, 14).   On June 13, 2025, the Magistrate Judge conducted a hearing to determine whether the Government was entitled to seek detention in this case and whether the application factors outlined at 18 U.S.C. § 3142 warranted detention or release.   During the hearing, the Government presented testimony from Homeland Security Investigations Special Agent Peter T. Joseph and offered a series of exhibits, including, among other items, body-worn camera footage from the November 30, 2022 traffic stop, a picture of a roster of names and dates of birth of the individuals in the defendant's SUV during the traffic stop, and documents relating to orders of protection issued against the defendant in August 2020 and May 2021.   The Government's evidence at the hearing strongly supported the allegations in the Indictment.

Special Agent Joseph testified about the traffic stop of the defendant by Tennessee state troopers on November 30, 2022, which was also recorded on body-worn camera footage.   (Docket No. 47 at 13-23).   During the traffic stop, the defendant acknowledged

that he had been driving over the speed limit and had been driving with an expired driver's license. (Docket No. 47 at 15).[3] He also stated that the car belonged to his "boss," who was later identified through vehicle registration records to be a man named Jose Hernandez Reyes, who had previously been convicted of illegal reentry and alien smuggling. (Docket No. 47 at 15, 17).[4]

Special Agent Joseph also highlighted several false statements the defendant gave law enforcement during this traffic stop, including that the defendant's passengers were members of a construction crew who had spent the last two weeks in St. Louis, even though there was no luggage or construction tools found in the vehicle. (Docket No. 47 at 18).[5] The SUV had also been outfitted with a fourth row of seats and was carrying nine passengers. (Docket No. 47 at 19-20).

The state troopers then created a "roster" of the passengers by instructing them to write down their names, dates of birth, and residences on a pad of paper. (Docket No. 47

---

[3] Govt. Ex. 1, at 1:33/19:57:39 and 2:35/19:58:41:

(1:33/19:57:39)

Trooper: Course this is 65 down through here.
Defendant: I know, I go to 70.
Trooper: Going 70?
Defendant: Yeah, what the limits right now? 70 or 65?
Trooper: It's 65.
Defendant: Oh.

(2:35/19:58:41)

Defendant: So the problem with my license right now it's expired.
Trooper: It's suspended?
Defendant: Suspended.

[4] Govt. Ex. 1, at 3:30/19:59:36:

Trooper: Whose car is it?
Defendant: It's through my boss.
Trooper: Your boss?
Defendant: My boss, yeah.

[5] Govt. Ex. 1 at 12:48 (video player counter)/20:08:54 (time on BWC footage); see FN 1.

6

at 21).  At the time of the hearing, Special Agent Joseph had confirmed that six of the nine SUV passengers on the roster were nationals of Mexico, Honduras, and El Salvador who were illegally in the United States on the date of the traffic stop.  (Docket No. 47 at 25-27). Notably, two of the aliens had been previously apprehended by Border Patrol on November 6, 2022, just 24 days before the traffic stop on November 30, 2022. Despite having been returned to Mexico following their apprehension by Border Patrol on November 6, these two aliens had already crossed back into the United States illegally and were passengers in the defendant's vehicle by November 30.  (Docket No. 47 at 26).

Additionally, one of the alien passengers in the defendant's vehicle listed a birth date in 2007, and therefore, was only fifteen years old at the time of the traffic stop.  (Docket No. 47 at 27).  Special Agent Joseph further testified that the defendant's SUV did not hit on any LPR's in St. Louis during the entire year of 2022, but had registered a hit in Texas on November 18, 2022, twelve days before the traffic stop, and another hit at the Texas/Louisiana border on November 24, 2022, six days before the traffic stop in Tennessee. (Docket No. 47 at 30).

Special Agent Joseph next testified about several cooperator witnesses who were interviewed as part of the investigation into the human smuggling organization (CW-1,[6] CW-2,[7] NV[8], CW-3[9], and CW-4):

<u>CW-1</u>

---

[6]   CW-1 testified in grand jury as part of this investigation.   (Docket No. 47 at 51).
[7]   CW-2 testified in grand as part of this investigation.   (Docket No. 47 at 61).
[8]   NV testified in grand as part of this investigation.   (Docket No. 47 at 74).
[9]   CW-3 testified in grand as part of this investigation.   (Docket No. 47 at 75).

CW-1 advised he met the defendant in Maryland, in or around 2016, and subsequently employed the defendant as a driver in his human smuggling business. (Docket No. 47 at 33-34). CW-1's primary source of customers was from a foreign national based in Central or South America, and the business involved transporting aliens illegally across the United States. (Docket No. 47 at 34). CW-1 described how he and the defendant confiscated cellphones from aliens they smuggled to minimize risk of detection and communication. CW-1 also advised that he and the defendant used cover stories—like being in a construction crew—to deceive law enforcement. (Docket No. 47 at 35). CW-1 also described how the defendant would regularly travel with close family members and children, and during return trips, the defendant's children would sit on the floorboards of the vehicles while adults sat in seats to generate a higher revenue stream and to use the children as a cover. (Docket No. 47 at 42). CW-1 also described a conflict that arose between CW-1 and the defendant because of complaints that the defendant abused adult and minor female aliens. (Docket No. 47 at 129).

CW-1 also described learning about the defendant's traffic stop in Tennessee in November 2022, which CW-1 learned about through an in-person meeting and by phone (Docket No. 47 at 36). Special Agent Joseph confirmed that on November 30, 2022, during the traffic stop, the defendant called CW-1. (Docket No. 47 at 36).[10] CW-1 also indicated that the defendant had previously been stopped while transporting illegal aliens in Virginia on Interstate I-81. Notably, Special Agent Joseph located a traffic citation issued by the

---

[10] At the evidentiary hearing on July 16, the Government intends to introduce call detail records provided by Verizon that show a cellphone used by the defendant making multiple calls to CW-1 before, during, and after the traffic stop on November 30, 2022.

Virginia State Police that was consistent with CW-1's testimony.[11]  (Docket No. 47 at 37-38).   CW-1 stated that the defendant typically received as payment between $1,000 and $1,500 per trip. During the November 30, 2022 traffic stop, the defendant possessed an envelope with $1,400 in cash.   (Docket No. 47 at 38).[12]   CW-1 was not aware of any physical evidence of the defendant's membership in MS-13 but added that "asking those types of questions can be dangerous."   (Docket No. 47 at 39).   CW-1 also stated that he and the defendant "really liked guns" but initially stated that they would not have transported them because of the high risk.   (Docket No. 47 at 39).   During a follow-up interview, however, CW-1 stated that he regularly gave guns to his drivers and had given one or two guns to the defendant, which the defendant transported back to Maryland.   (Docket No. 47 at 40). CW-1 was moved to a federal halfway house and has been granted deferred deportation by the Department of Homeland Security so that he would be available as a witness at trial. (Docket No. 47 at 31-32.)

Importantly, CW-1 admitted he and the defendant routinely transported minor female aliens during this conspiracy.   (Docket No. 47 at 45). Further, CW-1 advised that he had received a complaint that the defendant acted sexually inappropriate towards them.   *Id*. During this testimony, the Magistrate Judge incorrectly sustained an objection on hearsay grounds which cut off the testimony, despite the fact that the Federal Rules of Evidence do

---

[11]     The Government also anticipates introducing a paper record of this law enforcement stop and citation, which further corroborates CW-1's statements.

[12]     See Ex. 1 BWC video at 26:03: "I did, he's got $1,400 dollars cash in his pocket, in an envelope."

not apply at a detention hearing.   (Docket No. 47 at 47).   The Magistrate Judge, later in the

hearing, reversed her ruling on that objection. (Docket No. 47 at 146).

CW-2

CW-2 advised he met the defendant in Maryland around 2019.   (Docket No. 47 at

53).   CW-2 personally observed the defendant's participation in human smuggling

activities, including the smuggling of children.   (Docket No. 47 at 53-54).   During at least

one alien-smuggling trip, CW-2 also observed the defendant trafficking narcotics.   CW-2

stated he advised the defendant that trafficking drugs during the alien-smuggling trips was

bad for business.   (Docket No. 47 at 54).   Similarly, on three alien-smuggling trips, CW-2

observed the defendant purchase five guns, including handguns and assault rifles, which the

defendant then concealed in the vehicle under children's belongings in the rear of the car.

(Docket No. 47 at 55).   CW-2 similarly noted that the defendant appeared to be very

"familial" with gang members that were being smuggled by the organization.   (Docket No.

47 at 60).   CW-2 also confirmed that drivers in the smuggling organization were typically

paid between $1,000 and $1,500 per load of eight to ten aliens per trip. This was consistent

with the $1,400 that was found in the defendant's possession during the November 30, 2022,

traffic stop in Tennessee.   (Docket No. 47 at 56).   CW-2 is currently under federal

indictment and expressed hope for judicial consideration in exchange for his cooperation,

but the United States has not filed any motions for substantial assistance in this matter.

(Docket No. 47 at 51-52.)

Importantly, in addition to stating to law enforcement that he had first-hand

knowledge that members of the conspiracy smuggled undocumented children, CW-2 also

received complaints by a co-conspirator that the defendant had been sexually inappropriate with minor girls during transports. (Docket No. 47 at 129).

<u>Female Witness-1</u>

A witness referred to as "NV" during the hearing was a confidential informant that had previously been compensated in exchange for providing information to law enforcement, and she stated that she had met the defendant in Maryland and believed him to be a member of MS-13 based on her personal experiences with both MS-13 and a rival gang known as 18th Street. (Docket No. 47 at 61-62). NV learned about the defendant's involvement in alien smuggling through conversations with the defendant, who asked NV to accompany him on some of the trips. (Docket No. 47 at 62-63). NV also described how the defendant asked her for nude images of herself when she was only 15 years old. (Docket No. 47 at 64).

<u>CW-3</u>

CW-3, who is female, was also interviewed about her role in the human smuggling organization. CW-3 participated in the human smuggling conspiracy with the Defendant and had relationships with other cooperating witnesses in the organization that were mentioned during the hearing. (Docket No. 47 at 74, 81-83). CW-3 observed the Defendant bring family members and children with him while smuggling aliens, and observed the Defendant use his family members and children to conceal his criminal activities. *Id*. CW-3 also testified before a federal grand jury about her knowledge of criminal activities related to this investigation. (Docket No 47 at 75.)

<u>CW-4</u>

11

Finally, CW-4 was also interviewed about her role in the human smuggling organization and was responsible for finances, deposits, and bookkeeping. (Docket No. 47 at 75-76). CW-4 was responsible for wire transfers between conspirators for the organization. (Docket No. 47 at 76-77). The organization attempted to avoid law enforcement detection by using multiple people to conduct financial transactions on behalf of the organization.

## C. The Magistrate Judge's Order Denying Pretrial Detention

On June 22, 2025, the Magistrate Judge issued a 51-page Memorandum Opinion denying the Government's motion for detention. (Docket No. 43).

The Magistrate Judge found that the Government was not entitled to a detention hearing under 18 U.S.C. § 3142 and found that the charged offenses did not involve a minor victim within the meaning of 18 U.S.C. § 3142(f)(1)(E). The Magistrate Judge adopted a view that the term "involves" for purposes of 18 U.S.C.§ 3142(f)(1)(E) "means something more than 'related to' and something less than 'necessarily entails.'" (Docket No. 43 at 19). As a result, the Magistrate Judge found that "involves" was broad enough for a court to consider the conduct of the offense charged in the case, but would not include cases in which minor children might have some incidental connection to the circumstances or consequences of the alleged crime. (Docket No. 43 at 19).

Turning to the Government's proof, the Magistrate Judge then found that the Government's evidence was not sufficiently reliable to find that the defendant's smuggling offense involved minors. For example, the Magistrate Judge questioned the reliability of the roster listing the birth dates of the SUV's occupants. (Docket No. 43 at 22).

Specifically, and without any basis in the record, she questioned whether the year "2007" in the September 2007 birth date might have been modified from "2001." (Docket No. 43 at 24-25). The Magistrate Judge also questioned the reliability of the Government's cooperating witnesses and "gave little weight" to the information originating from the witnesses, reasoning that they stood to benefit from providing information help to law enforcement in the case. (Docket No. 43 at 27).

Finally, even assuming that the Government was entitled to a detention hearing, the Magistrate Judge found that there were conditions of release that could be imposed to reasonably assure the defendant's appearance in court and the safety of the community. (Docket No. 43 at 43). The Magistrate Judge gave little weight to the Government's proffered evidence from cooperating witnesses that the defendant's human smuggling offenses involved minor victims, guns, and drugs. (Docket No. 43 at 44-45).

The Magistrate Judge failed to consider adequately the multiple orders of protection sought by the defendant's wife, finding that those concerns could be satisfied through family, mental health, or anger management counseling as a condition of pretrial release. (Docket No. 43 at 46-47). The Magistrate Judge further found that conditions could be crafted to prevent the defendant from contacting cooperating witnesses, or to promote safe contact between the defendant and his wife and children. (Docket No. 43 at 47).

The Magistrate Judge gave significant weight to the defendant's lack of criminal record and his prior employment as a sheet metal apprentice. Although the defendant offered no proof at the hearing that was subject to cross-examination, the Magistrate Judge gave significant weight to the defendant's supposedly strong ties to the Maryland

13

community, which was described in a single letter from a social service agency. (Docket No. 43 at 48-50). As a result, the Magistrate Judge denied the Government's motion for detention and indicated her intent to issue an order of release on bail conditions. (Docket No. 43 at 51).

## STANDARD OF REVIEW

When a defendant is ordered released by a magistrate judge, the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order. 18 U.S.C. § 3145(a)(1). Review of the magistrate judge's decision to release the defendant pending trial is *de novo*. *United States v. Zapien, No. 3:14-cr-00037-1,* 2014 WL 1028435, at *2 (M.D. Tenn. Mar. 17. 2014). The Court must make an independent determination of the proper pretrial detention or conditions of release. *United States v. Rueben*, 974 F.2d. 580, 585 (5th Cir. 1992).

## ANALYSIS

Based on the allegations in the Indictment and the record from the detention hearing on June 13, 2025, the defendant should be detained pending trial. The Magistrate Judge erred, legally and factually, in finding that the defendant could be released on bail and her problematic precedent could affect instances where offenders past victims include children.

The Government is entitled to a detention hearing in this case because there is significant and probative evidence that one or more of the charged offenses "involve a minor victim" as identified in 18 U.S.C. § 3142(f)(1)(E). The Magistrate Judge made improper and speculative findings about the reliability of the Government's evidence despite the presence of corroborating evidence and failed to evaluate the evidentiary record in its entirety. The

Magistrate Judge's opinion questioned individual pieces of evidence presented by the Government but failed to grapple meaningfully with the collective weight of all the corroborating evidence presented at the hearing. In doing so, the Magistrate Judge functionally held the Government to a higher standard than the preponderance of evidence. In these circumstances, the Government is undoubtedly entitled to a detention hearing pursuant to 18 U.S.C.§ 3142(f).

Similarly, the Magistrate Judge failed to properly consider all the Government's evidence in finding that there were conditions that could reasonably assure the safety of the community and the defendant's appearance in court. At the detention hearing, the Government presented evidence of, among indicators of flight risk and dangerousness: (1) the defendant's years-long involvement in dangerous human smuggling, including the smuggling of minors; (2) the defendant's involvement in trafficking guns and drugs while transporting illegal aliens; (3) the defendant's improper sexual advances towards adults and minor females that were being smuggled, as well as the defendant's sexual advances towards a 15-year old girl and request that she send nude photographs of herself to him; (4) the defendant's successful attempts to evade law enforcement detection, including the use of different routes, forbidding illegal aliens from possessing or using cellphones while in transit, and cover stories to be given to law enforcement; (5) the defendant's false statements to law enforcement on November 30, 2022 in Tennessee; (6) the defendant's continued participation in the human smuggling scheme even after the defendant was stopped by law enforcement in Tennessee and Virginia; and (7) the multiple orders of protection, and the

contemporaneously reported factual support for the same, obtained by the defendant's wife against the defendant.

Instead, the Magistrate Judge placed undue weight on the defendant's alleged prior employment and connections to the Maryland community, which was based on meager defense proof that was not subject to cross-examination or rigorously evaluated for potential bias and reliability. Simply put, the Magistrate Judge failed to meaningfully scrutinize the defendant's evidence in favor of detention, while repeatedly second-guessing and speculating about the evidence provided by the Government.

While the Magistrate Judge's opinion questioned and doubted the significance of each of the Government's individual pieces of evidence, the opinion again failed to consider the record as a whole in assessing whether the Magistrate Judge could be reasonably assured that bail conditions would adequately address the dangerousness and flight concerns posed by the defendant. Based on the record as a whole, the defendant should be detained here under the factors set forth in 18 U.S.C. § 3142(g).

## I. The Government was Entitled to a Detention Hearing Pursuant to 18 U.S.C. § 3142(f)

### A. The Defendant was Charged with Crimes that Involve a Minor Victim

#### 1. Applicable Law

Under 18 U.S.C. § 3142(f)(1)(E), the Government is entitled to a detention hearing in a case that involves "any felony that is not otherwise a crime of violence that involves a minor victim." In *United States v. Watkins*, 940 F.3d 152 (2d Cir. 2019), the Second Circuit specifically addressed the definition of the phrase "involves a minor victim," explaining that

"Congress clearly intended for courts to pierce the veil of the charged offense and consider the conduct underlying the offense, including who was harmed and whether any firearms were used in the course of committing the offense." *Id.* at 166. The phrase "suggest[s] factual details surrounding the charged conduct." *Id.* The *Watkins* court also explained that this broad reading of the term "involves a minor victim" in 18 U.S.C. § 3142(f)(1)(E) is consistent with the use of the same phrase in 18 U.S.C. § 3142(c)(1)(B), which mandates that any release order contain a condition of electronic monitoring "in any case that involves a minor victim under [certain enumerated statutes]," which includes some crimes that expressly criminalize conduct with minors, but others that do not. *Id.* at 166-67. In other words, "Congress must have intended for judicial officers to look beyond the elements of the charged offense to determine whether any minors were 'involved' in the particular offense committed." *Id.* at 167. The Second Circuit's *Watkins* opinion has been cited by multiple district courts around the country that also used the same fact-based analysis to determine if an offense "involves a minor victim or involves the possession or use of a firearm" such that it entitles the Government to a detention hearing under § 3142(f)(1)(E). *See e.g. United States v. Syed,* 634 F.Supp. 3d 1036, 1043 (D.N.M. 2022); *United States v. McAnally*, No. 24-cr-00324-JFH, 2025 WL 53343, at *3 (N.D. Okla. Jan. 8, 2025) ("Moreover, to the extent § 3142(f)(1)(E) is ambiguous, the Court is persuaded by the reasoning of the Second Circuit in *United States v. Watkins*...").

The Magistrate Judge's order in this case expressly declined to adopt *Watkins* in favor of a bespoke definition of "involves", spending nearly four pages of her opinion attempting to tease out the definition of "involves." The Magistrate Judge also rejected the defendant's

proffered interpretation of the word "involves", ultimately landing on her own definition: "In the Court's view, 'involves' as used in § 3142(f)(1)(E) means something more than 'related to' and something less than 'necessarily entails.'" (Docket No. 43, at 19.) Respectfully, this stand-alone perspective is a not a "view" that is supported anywhere in the case law and a standard that is completely unworkable.

Instead, the Magistrate Judge wrestled with theoretical or fanciful factual scenarios that involved transporting seafood (Docket No. 43 at 17) and traveling to pay a child support obligation (*id.*) but missed the point on the clear, straightforward approach urged by *Watkins*: did *this* offense (*i.e.* the one involving this defendant on these facts) involve a minor victim? "Accordingly, when analyzing whether the Government is entitled to a detention hearing under § 3142(f)(1)(E), we may consider the **actual conduct at issue in the specific case**." *Watkins*, 940 F.3d at 166. (emphasis added). The answer in this case is undoubtedly 'yes' based on the testimony at the detention hearing. The Magistrate Judge lamented that the questions about whether transporting seafood with children qualifies as an offense involving minor victims are questions "to which no answer is found in *Watkins*." (Docket No. 43 at 17). This Court need not address the seafood hypothetical but rather the facts of *this* case, which clearly shows by a preponderance of evidence that the defendant's participation in this human smuggling conspiracy involved minor victims.

In this case, the Government offered testimony describing statements by cooperating witnesses that minor girls were being transported and sometimes abused by the defendant during the course of the conspiracy. This evidence was corroborated by "NV", who recalled when the defendant solicited nude images from her when she was fifteen years old.

This evidence about the defendant's sexual interest and attempt to exploit a teenage girl corroborates the multiple cooperating witnesses who similarly heard complaints that the defendant was sexually abusing minor girls who were being smuggled as part the conspiracy.

The cooperators also described the transportation of unaccompanied minors (a dangerous prospect) and the unsafe transportation of minors. (Docket No. 47 at 54); *see also (*Docket No. 47 at 171, 192). The offense, therefore "involves" a minor victim. The Sixth Circuit has observed that "[c]ircuit courts have repeatedly held . . . that the term 'involve' is expansive." *United States v. Gould*, 30 F.4th 538, 545 (6th Cir. 2022) (collecting cases from Sixth, First, Second, Fifth, and Third Circuits); *see also United States v. Eason*, 919 F.3d 385, 391 (6th Cir. 2019) (defining "involving" as "relat[ing] to or connected with" though noting that the "relationship must not be too remote or tangential"). In this case, the object of the conspiracy was moving human cargo. Simply transporting minors in an unsafe manner is sufficient. Even more so, the abuse of minors while being transported by the defendant involved the victimization of a minor during the course of the crime. As noted, this factor need only be established by a preponderance. The Magistrate Judge created a new definition out of whole-cloth through which to view the Government's evidence.

The "necessarily involves" formulation urged by the defense and, to some extent, adopted partially by the Magistrate Judge, is simply wrong. This formulation comes from two Supreme Court decisions addressing immigration and criminal statutes that reference a prior criminal conviction. In those circumstances, the reviewing court evaluates a limited set of documents associated with the prior conviction and asks whether the offense elements

19

"necessarily entail" the conduct enumerated in the statute. *See Shular v. United States*, 589 U.S. 154, 161 (2020) (asking whether "the state crime's elements" "necessarily entail" the conduct enumerated in the Armed Career Criminal Act); *Kawashima v. Holder*, 565 U.S. 478, 484 (2012) (explaining that a federal statute covering offenses that "'involv[e]' fraud or deceit" encompasses "offenses with elements that necessarily entail fraudulent or deceitful conduct").

The Bail Reform Act factors enumerated in 18 U.S.C. § 3142 by contrast, invite a holistic assessment of all facts attendant to the defendant's charged conduct. As *Watkins* observed, the Bail Reform Act uses the phrase "involves a minor victim" in 18 U.S.C. § 3142(c) in a list of many statutes that would not "necessarily entail" a crime against a minor. *See* 940 F.3d at 166-67. Additionally, limiting the court's inquiry to the question of what the charged offense elements "necessarily entail" is nonsensical and would lead to absurd results. Consider a scenario where a defendant is charged with a Mann Act violation for transporting a child across a state line to engage in unlawful sexual activity and shows the child a firearm to gain the child's compliance. The elements of the Mann Act—found at 18 U.S.C. § 2421—do not explicitly reference a firearm nor children. However, under the "necessarily entail[s]" formulation adopted by the Magistrate Judge here, a magistrate judge considering that Mann Act case could not even *hold* a detention hearing on the basis that a child had been unlawfully transported with the aid of displaying of a firearm. Surely this is not what Congress intended in passing the Bail Reform Act. To the Government's mind in this hypothetical scenario, a detention hearing is justified under *both* prongs of § 3142(f)(1)(E) in that the offense "involved" a firearm *and* a minor victim by a clear,

commonsense application of the facts that would be shown at the detention hearing and as urged by *Watkins*. The Magistrate Judge made no such clear, commonsense application. The result was an erroneous finding that the Government was not entitled to a detention hearing.

### 2. The Government's Evidence at the Detention Hearing that the Offense Involved a Minor Victim

Applying the principles set forth above, the Government provided ample evidence that the defendant's participation in the crimes charged in the Indictment each "involved a minor victim" for purposes of 18 U.S.C. § 3142(f)(1)(E).

- CW-1, CW-2, and CW-3 described to law enforcement from their own firsthand knowledge that: (1) they and the defendant were involved in a conspiracy to smuggle and transport aliens for an extended period of time; (2) the transportation of minors and unaccompanied minors was a part of the conspiracy. (Docket No. 47 at 42, 45, 50, 54).

- Both CW-1 and CW-2 described a conflict that arose within in the conspiracy because the defendant had been acting sexually inappropriate toward female minor victims. They functionally described this as a "business problem" for the conspiracy and confronted the defendant about his sexual advances. (Docket No. 47 at 61).

- Additionally, CW-1 and CW-2 told law enforcement about how the defendant used his own children during some of the trips as a cover for his illegal activity, and the children were forced to ride on the floor of the vehicle during the return

trips back to Maryland to enhance profits for the conspiracy. (Docket No. 47 at 41-42, 53-54).

The testimony of CW-1 and CW-2 has been corroborated during the Government's investigation in multiple different and important ways.

- CW-1 and CW-2's statements about the defendant's inappropriate sexual behavior with minors were corroborated by NV, who described how the defendant solicited nude images from her when she was fifteen years old. (Docket No. 47 at 64.) Notably, NV was not a part of the conspiracy, has no pending charges, and is a U.S. citizen. (Docket No. 47 at 61-64.) She had no incentive to fabricate this fact.

- The "roster" of passengers obtained from the passengers themselves at the request of the troopers on scene, reflecting that one of the aliens being smuggled was born in 2007 and only 15 years old at the time. (Docket No. 47 at 24-27).

- The SUV the defendant was driving belonged to CW-1,[13] a convicted alien smuggler himself even before November 2022.[14]

- On the BWC footage, the defendant refers to the owner of the SUV as his "boss." The defendant then, on the BWC footage, tells the state trooper that

---

[13] The Government intends to offer at the evidentiary hearing a record showing that CW-1 owned the SUV the defendant was driving on November 30, 2022.

[14] The Government intends to offer at the evidentiary hearing a record showing that CW-1 was convicted in federal court of alien smuggling.

the defendant is going to call his boss and proceeds to place a call to CW-1, which is corroborated by cellphone records from Verizon.[15]   *See infra* fn. 3.

- When CW-1 was arrested in 2019 for alien smuggling, CW-1 had a cellphone in CW-1's possession that – in the contacts section of the cellphone – had a phone number used by the defendant saved as "Kitmar Chofer."[16]   The Government contends that this reflected that the defendant—Kilmar— functioned as a driver ("chofer" being Spanish for "driver") for the smuggling operation.

Additionally, the crimes alleged in the Indictment is captured on video in the BWC footage, which was introduced at the detention hearing as Exhibit 1.  It is extremely rare that a reviewing court has the opportunity to watch a video of a defendant caught red-handed in the act of committing a federal crime, but that is exactly what the evidence introduced at the detention hearing included.  In addition to being direct non-hearsay evidence of the defendant committing the crimes alleged in the Indictment, the BWC footage and investigation based on the video also offers significant corroboration of CW-1 and CW-2's testimony, including:

- Troopers describing the $1,400 in cash that the defendant had in his pocket during the stop;

- the after-market seat visibly present in BWC footage of the SUV;

---

[15]     At the evidentiary hearing on July 16, the Government intends to introduce paper records showing that the defendant used the number in question, which was subscribed in the name of the defendant's wife.
[16]     At the evidentiary hearing on July 16, the Government intends to introduce paper records evidencing this saved contact in CW-1's phone.

- the fact that the Government identified multiple individuals in the SUV the defendant was driving on November 30, 2022 as being illegally present in the United States[17]—including two of whom had been removed to Mexico on November 6, 2022, i.e., just a week before the defendant told the state trooper on the BWC footage that those same two individuals were working a construction job with the defendant in St. Louis for the past two weeks;[18] and

- the fact that no tools or luggage were in the SUV—making the group's work together on a construction site for the previous two weeks in St. Louis, as the defendant claimed to the state trooper, in addition to the cooperator testimony and license plate reader data evidence, a demonstrable lie.

All of this corroboration shows by at least a preponderance that CW-1 and CW-2 were being truthful in their recitation of the defendant's involvement in alien smuggling, and the details of how their alien smuggling conspiracy operated, including how the alien smuggling conspiracy involved minor victims.

In summary, this Court has a strong basis to credit the evidence the Government obtained from CW-1 and CW-2, both of whom testified under oath before a federal grand jury. The record from the bail hearing before the Magistrate Judge and as supplemented on

---

[17] At the evidentiary hearing on July 16, the Government intends to offer, under seal, pictures and biographical information of the individuals the Government has identified as being present in the SUV during the stop on November 30, 2022.

[18] At the evidentiary hearing on July 16, the Government intends to offer, under seal, records of the removal of two of the individuals from the United States to Mexico on November 6, 2022.

July 16, will show that by a preponderance of the evidence that the offense involved a minor victim under § 3142(f)(1)(E).

### 3. The Magistrate Judge's "sliding scale" for consideration of the Government's evidence has no basis in law and was inappropriately applied

The Magistrate Judge found that the charges failed to "involve" a minor victim under either a broader or narrower construction of § 3142(f)(1)(E), largely because of perceived concerns about the strength of the evidence and the Government's use of hearsay. (Docket No. 43 at 22-28). For example, the Magistrate Judge expressed concern about how the photograph of the ledger containing the date of birth was being admitted through several layers of hearsay, and the most reliable evidence of the accuracy of the date of birth would have been for the minor victim himself to testify, or for the Tennessee Trooper who conducted the traffic stop to testify. (Docket No. 43 at 22-23).

The Magistrate Judge also speculated that the number 2007 in the photograph of the ledger could easily be construed as a modification from the number 2001. (Docket No. 43 at 24). The roster clearly indicates that the birth year of the passenger was 2007. The Magistrate Judge also heard that three former members of the alien smuggling operation all stated to law enforcement that the conspiracy transported minors; all three later testified under oath before a federal grand jury. This evidence, taken together, makes it "more likely than not" that the birth year on the "roster" is 2007. However, the Magistrate Judge did not consider the evidence holistically, as the Bail Reform Act requires. Rather, she took the evidence piecemeal, attempting to knock each piece down individually instead of seeing the forest for the trees.

25

The Magistrate Judge also created a sliding scale of reliability, suggesting that the Court would only give weight to this photograph if the Government demonstrated a "high level of reliability." (Docket No. 43 at 25). Similarly, with respect to the Government's cooperating witnesses who testified about the conspiracy's regular transportation of minors and the defendant's own children across the country, the Magistrate Judge again suggested that because the "evidence is crucial to the Government's case, its reliability is weighed that much more carefully." (Docket No. 43 at 25). The Magistrate Judge elected to give "light weight" to the testimony from the cooperating witnesses because of their incentives to cooperate with law enforcement. (Docket No. 43 at 27). The Magistrate Judge's evaluation of the Government's evidence was flawed and erroneous for numerous reasons:

*First*, the Magistrate Judge's newly-articulated rule that the Government's "crucial" evidence needed extra reliability to be considered at the detention hearing completely contradicts well-established precedent that a detention hearing is not a "full evidentiary hearing," and the Government "may proceed by proffer or hearsay." *United States v. Webb*, 238 F.3d 426 (table), 2000 WL 1721060, at *2 (6th Cir. 2000); *see also United States v. Stone*, 608 F.3d 939, 948-49 (6th Cir. 2010) ("However, conducting a bail hearing by proffer is acceptable under the law and at the discretion of the district court."). As a result, the Magistrate Judge's refusal to give weight to the photograph of the ledger and the information from CW-1, CW-2, and CW-3 was improper. *See* 18 U.S.C. § 3142(f)("The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing.") and Fed R. Evid. 1101(d)(3).

Additionally, the Magistrate Judge gave no weight to the fact that the Government produced a video of the list being created. The BWC footage clearly shows a state trooper passing the list to the aliens in the vehicle for them to write down their identifying information; the Government admitted a photo of the same list and even admitted a photo showing the list on the BWC footage to confirm that the photo of the roster was the one that was obtained from the passengers at the time of the stop.

More fundamentally, the Magistrate Judge's opinion that this evidence was "crucial" for the Government's case and therefore only would be considered if it had a "high level of reliability" (Docket No. 43 at 25) is completely baseless and finds no support in the law. The effect of the Magistrate Judge's sliding scale of reliability was that it increased the Government's evidentiary burden to even qualify for a detention hearing, even though the law is clear that the Government need only prove by a preponderance of the evidence that it qualifies for a hearing under 18 U.S.C. § 3142(f). *See United States v. White*, No. 3:21-mj-04070, 2021 WL 2155441, at *3 (M.D. Tenn. May 27, 2021). Put another way, the Magistrate Judge's opinion creates a new heightened evidentiary burden for the Government to even have a detention hearing in the first instance.

*Second*, many of the Magistrate Judge's qualms about the reliability of the evidence presented at the detention hearing are also speculative and find no support in the record. For example, the Magistrate Judge doubted the reliability of the photograph of the ledger containing the date of birth of the minor victim from the November 2022 traffic stop merely because it was being offered by an agent who was not present at the scene, and it was theoretically possible that the ledger had initially listed the minor victim's year of birth as

2001 instead of 2007.   (Docket No. 43 at 22-24).   But there was no evidence in the record suggesting that the ledger had been altered or that anyone had tampered with the ledger in advance of the hearing.

Similarly, the Magistrate Judge appeared to discard the testimony of the cooperating witnesses merely because they stood to receive a benefit from the Government, but that alone is not a valid basis for a factfinder to disbelieve a cooperating witness.   Indeed, cooperator testimony can and often does form a significant part of a Government's case at trial, especially in cases involving conspiracy charges, when the standard is much higher – proof beyond a reasonable doubt.   Juries are cautioned to scrutinize cooperator testimony, but are also instructed that they may rely on cooperator testimony to convict.   Where, as here, the Government relies, in part, on multiple independent cooperators who corroborate each other and who are corroborated by objective evidence (such as the $1,400 cash in the defendant's envelope, the record of the phone call showing the defendant's call to CW-1 during the traffic stop, and so forth), the credibility of cooperator testimony is at its strongest.

*Finally*, perhaps the most significant flaw in the Magistrate Judge's opinion was its failure to collectively consider all the evidence in the record as a whole in deciding whether or not the defendant's participation in the alien smuggling conspiracy involved minor victims.   Ultimately, the evidence in the record that the defendant's smuggling operation involved minor victims was very strong and derived from a variety of different sources. When viewing the record as a whole, the evidence shows by far more than a preponderance that the charged offenses here involved a minor victim for purposes of 18 U.S.C. § 3142(f)(1)(E).   For this reason alone, the Magistrate Judge should have found that the

Government was entitled to seek pretrial detention for the defendant under 18 U.S.C. § 3142(g).

## IV.   The defendant should be detained as both a flight risk and a danger to the community

Despite ruling that the Government was not entitled to a detention hearing, the Magistrate Judge held such a hearing and determined there were suitable conditions of release despite the record described above.   (Docket No. 43 at 43–51.)   In this Court's June 25, 2025, Memorandum Opinion, the Court commented that this part of the Magistrate Judge's analysis was dicta that this Court would disregard because the Magistrate Judge's threshold § 3142(f) holding was outcome determinative.   (Docket No. 55 at 7, n.2).

If the Court finds that Government is entitled to a hearing under § 3142(f)(1)(E)— which the Court should, for the reasons discussed above—the record developed during the hearing already establishes, by at least a preponderance of the evidence, that there is "no condition or combination of conditions [that] will reasonably assure the appearance of the person as required" and, by at least clear and convincing evidence, that there is "no condition or combination of conditions [that] will reasonably assure . . . the safety of any other person and the community."   18 U.S.C. § 3142(e)(1).   Accordingly, this Court can and should reach the merits and order the defendant detained on the basis of the existing record.[19]

In assessing whether bail conditions can reasonably assure the appearance of the person and the safety of the community, the Court must consider the factors set forth in § 3142(g), which include (1) "the nature and circumstances of the offense charged, including

_____

[19] The Court has set a further evidentiary hearing for July 16, 2025.   As noted, the Government intends to present additional evidence at that hearing that will further support its arguments.

whether the offense . . . involves a minor victim," (2) "the weight of the evidence against the person," and (3) "the history and characteristics of the person, including (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings."

Those factors collectively show that there is no combination of bail conditions that can reasonably assure the appearance of the defendant or the safety of the community.

As an initial matter, the Government agrees with the Court and the Magistrate Judge that the merits analysis must be undertaken without considering the possibility that the defendant might otherwise be held in immigration custody. (Docket No. 55 at 9 ("Whether Abrego may be detained by DHS after his release is of no moment in the instant proceedings."); Docket No. 43 at 1–2 (declining to treat the issue of bail as an "academic exercise"). The Bail Reform Act permits courts to consider only whether a bail condition— or any combination of bail conditions—would be sufficient to assure appearance and safety. 18 U.S.C. § 3142(e). Immigration custody—which is determined according to an entirely separate body of law—is not a bail condition and could never be imposed as one. Indeed, it is well-established that a defendant cannot be held in immigration custody as a means to serve some aim in a criminal prosecution. *Abel v. United States*, 362 U.S. 217, 226 (1960); *see also United States v. Madrid-Quezada*, 403 F. Supp. 3d 1016, 1032 (D.N.M. 2019).

The Sixth Circuit has rejected the idea that the Bail Reform Act and the Immigration and Naturalization Act are in conflict with each other. *See generally United States v. Veloz-Alonzo,* 910 F.3d 266 (6th Cir. 2018). Citing district courts who have held that the "Executive

Branch should decide where it's priorities lie" when considering the application of the Bail Reform Act and the INA, the Sixth Circuit has held: "[t]his framework creates a problem when the government attempts to pursue both options simultaneously. When those pursuits come into tension, courts following the *Trujillo-Alvarez* framework have held that once an alien is submitted for criminal prosecution, the statutory permissions of the BRA supersede the statutory mandates of the INA. We do not agree." *Id* at 268. Rather, the Sixth Circuit stated that "we hold that ICE may fulfill its statutory duties under the INA to detain an illegal alien pending trial or sentencing regardless of a BRA release determination. The district court erred in finding that the BRA and INA must be read to conflict." *Id* at 270.[20] Thus, when assessing the merits of a detention motion under the Bail Reform Act, the Court should not consider the possibility that the defendant would otherwise be in immigration custody.

The proper question before the Court is thus: can any combination of bail conditions be crafted such that if the defendant is released *to the community* on those conditions, the Court can be reasonably assured that the defendant will appear in Court and not harm the community?

Based on the record that exists—and that the Government intends to supplement at the evidentiary hearing on July 16—the answer is no.[21]

---

[20] The Sixth Circuit has also noted "[a]s it pertains to illegal aliens with final deportation orders, such as Veloz-Alonso, there is no ambiguity: ICE is authorized and mandated under the INA to detain and deport." *Id* at 269.

[21]       On June 25, 2025, the Magistrate Judge imposed conditions of release that included a third-party custodian. Contrary to the normal practice in this District, the defense, after the Government provided anticipated lines of questioning on cross examination, elected not to call the third-party custodian to the stand on June 13, 2025, even though the third-party custodian was present in court during the bail hearing. *See* Doc. No. 47 at 147-148. ("If it is your intention to present someone as a third-party custodian, it is my standard practice to have them testify, to ask them questions about their understanding of the responsibilities of being a third-party custodian.") The Government alerted defense counsel (in writing before the hearing)

## A.    The defendant should be detained as a flight risk

The Government established by a preponderance of evidence that the defendant presents a serious risk of non-appearance that cannot be controlled by conditions.   He is an El Salvadoran national without lawful immigration status in the United States.   18 U.S.C. § 3142(g)(3)(A).   If convicted of the charged offenses, his removal from the United States would be mandatory.[22]  8 U.S.C. § 1227(a)(2)(A)(iii) (mandating removal of any alien convicted of "aggravated felony"); 8 U.S.C. § 1101(a)(43) (defining "aggravated felony" to include alien smuggling under 8 U.S.C. § 1324(a)(1)(A) or (2)).

Therefore, if released into the community, the defendant faces a simple choice: flee the United States to avoid prosecution or litigate the case and face certain removal upon conviction. The defendant also has incentive to choose a third path, one in which he escapes pre-trial supervision and remains a fugitive within the interior of the United States. The defendant now understands that in addition to clear video and audio evidence of the defendant committing the crimes in the Indictment, the Government can also introduce the following evidence at trial: (1) multiple co-conspirators' testimony that he smuggled aliens (including minors he made sexual overtures toward), (2) testimony from law enforcement officers who stopped the defendant while he was driving nine illegal aliens in a modified SUV; (3) evidence that the same SUV was owned by CW-1, who the defendant describes

---

and the Magistrate Judge (at side bar before the same third-party custodian was selected by the Magistrate Judge) of the significant reservations it had regarding the third-party custodian's fitness to serve—for multiple different troubling reasons that the Government intended to explore vigorously on cross examination. The Government never received that opportunity.

[22] Defendant is already subject to a removal order, but his removal to El Salvador is currently withheld pursuant to 8 U.S.C. § 1231(b)(3)(A). A conviction on the charges in the Indictment would place that grant of withholding of removal at serious risk of termination.

on video as his "boss", (4) body-worn camera footage corroborating the officers' account of the encounter and showing the defendant lying about where he had picked up the passengers and where he had been the past two weeks, and (5) phone evidence showing that, during that encounter, the defendant—who told the officers that he needed to call his "boss"—calling CW-1, a convicted alien smuggler.

The incentive to flee is amplified by the exposure the defendant faces at sentencing. The Government respectfully disagrees with the suggestion that a "transportation-based crime" like smuggling is merely a crime about transportation.[23]  (Docket No. 43 at 31). Many crimes involve transportation: the sole conduct undertaken by a drug trafficker, 21 U.S.C. § 841, or an arms trafficker, 18 U.S.C. § 933, or a Mann Act offender, 18 U.S.C. § 2422, might well be the driving of a vehicle from one location to another.  Yet it would trivialize those crimes, and the consequential victims, by describing them as mere "transportation-based" offenses.  Similarly with alien smuggling; especially under the circumstances in this case, where there are aggravating facts, including the defendant's smuggling of minors (including unaccompanied minors) and the defendant's access to firearms.  While the consideration of the 18 U.S.C. § 3553(a) factors and the imposition of sentence will of course be up to the Court, the Government intends to seek—and believes the record at sentencing will justify—the imposition of a significant prison sentence.

---

[23]     The Government appreciates that the quoted phrase appears in an ICE document distinguishing alien smuggling and alien trafficking.  Read in the context, however, the phrase "transportation-based" was intended to distinguish alien smuggling from alien trafficking.  The phrase should not be understood to suggest that alien smuggling is a trivial or victimless offense.

Further, the defendant has zero ties to the Middle District of Tennessee other than routinely traveling through the district as part of a criminal conspiracy. The Magistrate Judge noted that the defendant has no ties to this district but noted that there is tension in the federal courts about whether "community ties" means ties to the district of prosecution or another community. *Compare United States v. Rivera*, 90 F.Supp.2d 1338, 1343 (S.D. Fla. 2000) ("In the federal system, courts look to the ties of a defendant to the judicial district in which the criminal charges have been brought.") (internal citation omitted) *and United States v. Alverez-Lopez*, No. 2:14-CR-45-FTM 38CM, 2014 WL 2882906, at *3 (M.D. Fla. June 25, 2014) ("community ties" does not extend outside the prosecuting district because "[s]uch a result would run counter to whole consideration of risk of flight determination") with *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) (finding that "community" embraces ties to the community in which the charges are brought and the community in the United States to which the defendant has ties). The Magistrate Judge noted in this case that: "[t]he Court does not disagree that lack of ties to the prosecuting district can weigh in favor of detention. That is particularly so, when as here, the person charged was only incidentally in the prosecuting district. That circumstance therefore weights this factor against release." (Docket No. 43 at 49).

However, to resolve this conflict and overcome this factor (which the Magistrate Judge found weighed against release), the Magistrate Judge then inappropriately relied on a paucity of proof of the defendant's ties to his Maryland community. The Magistrate Judge cited a letter written by a social service organization unadorned by any witness testimony subject to cross examination by the Government. For all the discussion of hearsay in the

Government's case (and criticism of same by the Magistrate Judge), a hearsay letter written *for the express purpose* of assisting the defendant and offered by the defendant was accepted without question by the Magistrate Judge to conclusively show that the defendant would have ties to Maryland that would meaningfully deter the defendant from fleeing. The United States respectfully submits that this letter was inappropriately weighed by the Magistrate Judge and that, standing alone, the defendant's total lack of ties to this community—which the Magistrate Judge found significantly weighs against release. Considering the combined evidence in the record, the Government has shown by a preponderance of evidence that the defendant presents a risk of non-appearance that cannot be reasonably mitigated by conditions.

### B.     The defendant should be detained as a danger to the community

The evidence shows that defendant's release into the community would pose a significant danger to others, including his own family and potential witnesses, and the community in general.

At the outset, the dangerousness posed by the defendant is supported by facts specific to him. As discussed above, there is evidence that the defendant had access to and possessed guns during the smuggling conspiracy. (Docket No. 47 at 40.) There is evidence that the defendants' coconspirators were concerned about his tendency to make sexual advances to female transportees, including a minor girl. (Docket No. 47 at 129.) There is evidence that the defendant solicited child pornography from another minor girl. And there is uncontroverted evidence that the defendant's wife obtained multiple orders of protection against him. (Docket No. 43 at 37.)

With respect to the defendant's own family, the Government introduced at the bail hearing documentary evidence of the defendant's own troubling history of perpetuating domestic violence. (Docket No. 43 at 49). In August 2020, the defendant's wife filed a petition for a protective order against him in Prince George's County, Maryland. The defendant's wife, in her own contemporaneous words, detailed a string of alleged abuse that the defendant inflicted on her and their own children between 2019 and 2020. In the August 3, 2020, petition, the defendant's wife reported, among other troubling allegations, that he locked his kids in their room, grabbed her and slapped her, and broke her phone. She went on to write that the abuse on August 3, 2020, was part of a pattern for the defendant, i.e., that he had broken her phones before, broken TVs, and even her son's tablet. The petition documented four other instances of abuse within the past year of being filed, all troubling and violent. She reported that she had documented bruises on her body left by the defendant, and that she and her kids were scared of the defendant. According to the petition, the defendant also previously claimed that he could kill his wife with impunity. Specifically, the defendant's wife wrote that she recorded the defendant saying: "I also have a recorded[sic] that his[sic] told my ex-mother-in-law that even [if] he kills me no one can do anything to him." Court filings in Prince George's County reveal more abuse by the defendant the next year during 2021. In May 2021, the District Court in Prince George's County found reasonable grounds to believe that the defendant "punched and scratched [his wife], ripped off [her] shirt, grabbed and bruised [her]."

Despite a troubling record of violence, the defendant has perpetrated against his own family, the Magistrate Judge indicated the defendant's violence against his family was too

far removed, or "remote," in time to hold much sway. (Docket No. 47 at 178-81). The Government strongly disagrees with the weight afforded to the defendant's dangerousness when there are numerous instances of victim-documented horrific acts of domestic violence within the past five years. The Government submits this Court can, and should, appropriately weigh the acts of violence the defendant perpetrated against his own wife and children within the past five years when considering his potential danger to the community, which of course includes his own family.

Even more so, the defendant engaged in obstruction-related conduct during the course of the conspiracy: employed cover stories, used different routes to avoid law enforcement detection, took cellphones away from passengers to mitigate any unwanted attention that could deter his alien smuggling ventures. This specific evidence supports the arguments above related to both dangerousness and risk of flight. Moreover and finally, the evidence presented at the detention hearing overall shows that the defendant regularly violated the law and despite intervention by law enforcement on multiple occasions, he continued to do so.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests the Court revoke the Magistrate Judge's order of release.

Respectfully Submitted,

 _/s/ Robert E. McGuire_____
Robert E. McGuire
Acting United States Attorney
719 Church Street, Suite 3300
Nashville, TN   37203

_/s/ Jacob Warren_____
Jacob Warren
Co-Director, Task Force Vulcan

_/s/ Christopher Eason_____
Christopher Eason
Co-Director, Task Force Vulcan

_/s/ Jeremy Franker_____
Jeremy Franker
Deputy Director, Task Force
Vulcan