**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

UNITED STATES OF AMERICA

v.

KILMAR ARMANDO ABREGO GARCIA,

*Defendant.*

No. 3:25-cr-115

Judge Waverly D. Crenshaw, Jr.

**OPPOSITION TO THE GOVERNMENT'S**
**MOTION FOR REVOCATION**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................... 1

BACKGROUND ....................................................................................................... 2

ARGUMENT ........................................................................................................... 5

    I.   The Government Has Not Demonstrated That It Is Entitled to a Detention Hearing Under 18 U.S.C. § 3142(f)(1)(E) ..................................................................... 5

        A.   The Court Should Follow Recent Sixth Circuit Precedent in Interpreting "Involves" Under 18 U.S.C. § 3142(f)(1)(E) ........................................... 6

        B.   The Government Must Proffer Reliable Evidence to Meet its Burden .................. 10

        C.   The Government Has Not Met Its Burden to Establish That Minors Were Present ............................................................................................. 12

        D.   The Government Has Not Proven that Any Minors Were Victims ........................ 14

    II.  The Government Has Not Met Its Burden to Establish That No Conditions Will Reasonably Assure Mr. Abrego's Appearance and the Safety of the Community ........ 16

        A.   Mr. Abrego Does Not Present a Risk of Flight ....................................... 16

        B.   Mr. Abrego's Release Does Not Present Community Safety Concerns ................. 20

CONCLUSION ......................................................................................................... 21

# TABLE OF AUTHORITIES

**CASES**

*Abrego Garcia v. Noem*,
   No. 25 Civ. 951 (D. Md.) ................................................................ 2, 20

*Shular v. United States*,
   589 U.S. 154 (2020) ............................................................................. 7

*States v. Yuen*,
   No. 11 Mag. 3399, 2011 WL 5025134 (S.D. Fla. Oct. 21, 2011) ...................................... 19

*United States v. Accetturo*,
   623 F. Supp. 746 (D.N.J. 1985) ........................................................... 11

*United States v. Andrade-Castaneda*,
   205 F. App'x 233 (5th Cir. 2006) ......................................................... 15

*United States v. Angeles-Mendoza*,
   407 F.3d 742 (5th Cir. 2005) ............................................................. 14

*United States v. Bustamante*,
   199 F.3d 437 (5th Cir. 1999) ............................................................. 14

*United States v. Byrd*,
   969 F.2d 106 (5th Cir. 1992) .............................................................. 6

*United States v. Eason*,
   919 F.3d 385 (6th Cir. 2019) .............................................................. 7

*United States v. Fields*,
   53 F.4th 1027 (6th Cir. 2022) ........................................................... 7, 8

*United States v. Hazime*,
   762 F.2d 34 (6th Cir. 1985) .............................................................. 18

*United States v. Hinton*,
   113 F. App'x 76 (6th Cir. 2004) ....................................................... 16, 20

*United States v. Hir*,
   517 F.3d 1081 (9th Cir. 2008) ........................................................... 19

*United States v. Jeffries*,
   679 F. Supp. 1114 (M.D. Ga. 1988) ....................................................... 11

*United States v. Kirkpatrick*,
    No. 23 Cr. 4002, 2023 WL 4846620 (D. Kan. July 28, 2023)............................................ 10

*United States v. Miguel*,
    86 F. App'x 342 (9th Cir. 2004) ..................................................................................... 15

*United States v. Mohamud*,
    No. 10 Cr. 260, 2013 WL 1935506 (M.D. Tenn. May 9, 2013)........................................ 11

*United States v. Peebles*,
    No. 20 Cr. 152 (M.D. Tenn. June 29, 2020) ................................................................... 19

*United States v. Richardson*,
    948 F.3d 733 (6th Cir. 2020) ........................................................................................... 8

*United States v. Rizzuti*,
    611 F. Supp. 2d 967 (E.D. Mo. 2009)............................................................................ 10

*United States v. Salerno*,
    481 U.S. 739 (1987)................................................................................................. 5, 9, 17

*United States v. Schuetz*,
    No. 12 Mag. 3046, 2012 WL 2923171 (C.D. Ill. July 18, 2012)....................................... 10

*United States v. Stone*,
    608 F.3d 939 (6th Cir. 2010) ......................................................................................... 18

*United States v. Thomas*,
    No. 3 Cr. 150, 2006 WL 140558 (D. Md. Jan. 13, 2006) .................................................. 11

*United States v. Townsend*,
    897 F.2d 989 (9th Cir. 1990) ......................................................................................... 19

*United States v. Villegas*,
    No. 11 Cr. 28, 2011 WL 1135018 (E.D. Tenn. Mar. 25, 2011)........................................ 19

*United States v. Watkins*,
    940 F.3d 152 (2d Cir. 2019)...................................................................................... 7, 8, 9

*United States v. Webb*,
    149 F.3d 1185 (6th Cir. 1998) ....................................................................................... 11

*United States v. White*,
    No. 21 Mag. 4070, 2021 WL 2155441 (M.D. Tenn. May 27, 2021) ................................... 5

*United States v. Woodside,*
  No. 13 Cr. 97, 2013 WL 3479414 (M.D. Tenn. July 11, 2013) ......................................... 19

**STATUTES**

8 U.S.C. § 1231(b)(3)(A) .................................................................................................... 2

8 U.S.C. § 1324(a)(i)(A)(ii) .............................................................................................. 10

18 U.S.C. § 924(e)(2)(A)(ii) ............................................................................................... 7

18 U.S.C. § 3142(e)(3) ........................................................................................... 10, 17, 18

18 U.S.C. § 3142(f) ................................................................................................... *passim*

18 U.S.C. § 3142(g) ...................................................................................................... 16, 20

## PRELIMINARY STATEMENT

Under the Bail Reform Act, the government is not entitled to detain a defendant merely because it wishes to. Instead, the government must first proffer evidence sufficient to establish that the defendant's crime warrants a detention hearing under 18 U.S.C. § 3142(f), and then must prove that no conditions can reasonably assure the defendant's appearance or the safety of the community under Section 3142(g).

In a carefully reasoned and exhaustively detailed opinion, Judge Holmes concluded that the government had made neither showing in this case: It had not demonstrated by a preponderance of the evidence that Mr. Abrego's offense "involves a minor victim" under Section 3142(f)(1)(E), or that whatever risk of flight or danger to the community he posed could not be mitigated by appropriate conditions of release. The government's briefing gives the Court no good reason to decide differently. Instead, it continues to overstate the evidence, disregards serious reliability issues, and continues to press the Court to rest a decision on unreliable hearsay that Judge Holmes correctly declined to credit. In short, the government argues that it is entitled to a detention hearing, and ultimately detention, where it puts forth any evidence at all, no matter its quality. That is not the law.

On *de novo* review, this Court should affirm Judge Holmes's carefully considered judgment that a detention hearing is not warranted and that the government has not shown that no conditions of release could assure Mr. Abrego's appearance and the safety of the community. Under a faithful application of the Bail Reform Act, Mr. Abrego's continued detention in this case is not warranted.

## BACKGROUND

On November 30, 2022, Mr. Abrego was pulled over in Putnam County, Tennessee by Tennessee Highway Patrol, purportedly for speeding. He and the passengers in his vehicle were questioned, investigated, and sent on their way. Neither Mr. Abrego nor any of the passengers were arrested during the encounter. For more than two and a half years, that was apparently the end of the matter.

Fast forward to March 2025, when Mr. Abrego was picked up by ICE while coming home from work and promptly, and unlawfully, removed to the country of his birth, El Salvador, even though he was subject to a withholding of removal order under 8 U.S.C. § 1231(b)(3)(A), barring his removal to that country. Mr. Abrego was sent to CECOT, the notorious Salvadoran prison, where, for more than two months, he was beaten, suffered severe sleep deprivation, received inadequate nutrition, and endured psychological torture. Amended Compl. ¶ 116, *Abrego Garcia v. Noem*, No. 25 Civ. 951 (D. Md. filed July 2, 2025), ECF 211-3. During his first two weeks of incarceration at CECOT, Mr. Abrego lost 31 pounds. *Id.* ¶ 126.

Meanwhile, on or around April 28, 2025—while Mr. Abrego was being tortured at CECOT—federal law enforcement agents at Homeland Security Investigations ("HSI") in Nashville began to investigate his 2022 traffic stop. Over the month of May and into June, they spoke to a number of individuals who proffered information concerning Mr. Abrego.

First, the government twice interviewed CW-1,[1] the convicted leader of a human smuggling business, who provided grand jury testimony. ECF 61 at 31:18-23, 32:19-25, 51:12-14. The smuggling conviction was not his only felony: in total, he has three[2] prior felony convictions,

---

[1] To refer to the government's cooperators and witnesses, this brief uses the same naming convention the government uses in its motion. *See* ECF 70 at 7-12.

[2] Though testimony at the June 13 hearing indicated that CW-1 had two prior felony convictions,

has been deported five times, and was recently released early from a 30-month sentence to a halfway house as a reward for his efforts to cooperate in this case. *Id.* at 80:19-81:16. CW-1 purportedly told investigators that he had employed Mr. Abrego in his human smuggling business, and they had discussed strategies to evade detection. *See id.* at 33:23-25, 35.

CW-1's inconsistent statements between his first and second interviews call his credibility into serious question. At his first interview, CW-1 stated that while he and Mr. Abrego both liked guns, they would not carry them on smuggling trips. *Id.* at 39:8-11. At his second interview, he reversed course, stating that he would "regularly give guns to his drivers" and that he had given "one or two" to Mr. Abrego. *Id.* at 40:9-11. Similarly, at his first interview, CW-1 also stated that he did not know if Mr. Abrego was a member of MS-13, and had not observed any signs or markings that would suggest membership. *Id.* at 39:12-19, 41:6-9. But at the second interview, he noted that Mr. Abrego greeted gang members in a "different" manner than CW-1 did, indicating that he had a close relationship to them. *Id.* at 41:13-17.

Agents also spoke to CW-2, a close relative of CW-1, and a member of his smuggling organization, who is charged with a federal crime for which he hopes to be released, and has requested deferred action on deportation, in exchange for his attempted cooperation. *Id.* at 81:23-83:6. CW-2's statements are prone to exaggeration: He stated that he sold 15 guns to Mr. Abrego—five guns each on three occasions, including assault rifles, which he would transport along with the migrants—a far cry from CW-1's initial statement that Mr. Abrego would not transport guns

---

reporting by the Washington Post appears to indicate that this individual has been convicted of three felonies, including pleading "guilty to 'deadly conduct' in connection with a separate incident where he drunkenly fired a gun in a Texas community." Associated Press, *Star Witness Against Kilmar Abrego Garcia Won't Be Deported, Court Records Show*, Wash. Post (June 29, 2025), https://www.washingtonpost.com/politics/2025/06/29/jose-ramon-hernandez-reyes-kilmar-abrego-garcia-immigration-trump/ba41d148-5520-11f0-b45b-dc9aeb848c03_story.html [last visited July 9, 2025].

while smuggling. *Compare id.* at 39:9-11, *with id.* at 55:6-8. CW-2 asserted that he sold guns to Mr. Abrego in Texas, who transported them back to Maryland along with migrants, when CW-1 asserted that Mr. Abrego would not carry guns on smuggling trips. *Compare id.* at 39:9-11, *with id.* at 55:9-16. CW-2 also told the government that Mr. Abrego would do the 24-hour drive from Maryland to Texas and back three times per week with his children in the car, totaling 144 hours, or six out of seven days in a week. *Id.* at 116-17.

The government also spoke to CW-3, another close relative and co-conspirator of CW-1 and CW-2, and Female Witness-1, who told investigators that she had known Mr. Abrego five years previously. *Id.* at 83:8-11, 62:7-10. CW-3 is also seeking deferred action on deportation in return for her efforts to assist the government's investigation. *Id.* at 74:23-75:4, 85:11-14. She claimed to have observed Mr. Abrego bringing family members and his children with him while smuggling. *Id.* at 75:17-20. Female Witness-1, who is twenty years old, told the government that approximately five years earlier, she and Mr. Abrego had a "sexualized relationship" that included Mr. Abrego requesting "naked pictures" on Snapchat. *See id.* at 63-64. Female Witness-1, whose family is involved in the 18th Street or 18 Barrio gang, also claimed to "believe[]" that Mr. Abrego was a member of MS-13, though she did not give a basis for that belief. *Id.* at 62:13-20.

Finally, the government's agent spoke to Tennessee Highway Patrol Officer Douglas Foster, who was present at the 2022 traffic stop. *Id.* at 23. Foster told the government in an interview that after arriving on the scene, he collected and took pictures of each passenger's passport, and emailed those pictures to another officer after the stop had concluded. Apparently neither the photos nor his own body camera footage from the stop still exist. *Id.* at 120:10-12, 121:2-10.

4

Some of these witnesses testified in the grand jury. Others were only interviewed by the government. But none of them testified for the government at the detention hearing in this case. Nor was their prior testimony, where it existed, introduced into evidence. Instead, the government offered only Special Agent Peter Joseph to testify at the hearing on June 13. Special Agent Joseph testified about what the government learned from these disparate sources of information, including from witnesses whose interviews he did not personally participate in. *See, e.g.*, *id.* at 87:19-20.

In a thoughtful and carefully reasoned opinion, Judge Holmes concluded that the government had not met its burden to show by a preponderance of the evidence that a detention hearing was warranted either under 18 U.S.C. § 3142(f)(1)(E) or (f)(2). ECF 43 at 12-42. Additionally, Judge Holmes concluded that, even if a detention hearing were held, there were conditions that could reasonably assure Mr. Abrego's appearance and the safety of the community. *Id.* at 43-51. The government's motion for revocation followed. *See* ECF 45, 70.

## **ARGUMENT**

### I. **The Government Has Not Demonstrated That It Is Entitled to a Detention Hearing Under 18 U.S.C. § 3142(f)(1)(E)**

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Accordingly, the government is not entitled to pretrial detention—indeed, it is not even entitled to a pretrial detention hearing—unless it meets the necessary requirements under the Bail Reform Act. As the Court well knows, the government must first show by a preponderance of the evidence that it is entitled to a detention hearing under 18 U.S.C. § 3142(f). *United States v. White*, No. 21 Mag. 4070, 2021 WL 2155441, at *7 (M.D. Tenn. May 27, 2021). The government fails to do so here. The government's brief ignores binding precedent and, as a result, misinterprets the language of the Bail Reform Act governing the availability of hearings. And in any event, the evidence the

5

government has offered the court does not establish that a bail hearing is warranted. Following Judge Holmes's thoughtful conclusions based on her careful review of the evidence, the Court should agree that Mr. Abrego must be released from pretrial detention.[3]

### A. The Court Should Follow Recent Sixth Circuit Precedent in Interpreting "Involves" Under 18 U.S.C. § 3142(f)(1)(E)

Under the Bail Reform Act, the government is not entitled to a detention hearing just because it believes detention is warranted. *United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) (per curiam). Instead, the government must establish that one of the bases for such a hearing under 18 U.S.C. § 3142(f) applies. Of the various paths by which the government may be entitled to a detention hearing under that section, only subsection (f)(1)(E) is relevant here. That provision authorizes a detention hearing on the government's motion "in a case that involves . . . any felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive device." 18 U.S.C. § 3142(f)(1)(E). That is the only provision on which the government's motion relies. ECF 70 at 16-20.[4] The motion turns, in substantial part, on what the word "involves" means in 18 U.S.C. § 3142(f)(1)(E). Does "involves a minor victim" "necessarily require" that every crime under that statute have a minor victim? Or need it only "relate to or connect with" a minor victim in some way?

---

[3] Given the government's stated intention to remove Mr. Abrego to a "third country," Mr. Abrego has sought, and Judge Holmes has granted, a short delay of an order releasing Mr. Abrego until July 16. ECF 63, 67. The government recently reaffirmed that position in a hearing before Judge Xinis in the District of Maryland on July 7. *See* Alan Feuer & Minho Kim, *U.S. Will Try to Deport Abrego Garcia Before He Faces Trial, Justice Dept. Says*, N.Y. Times (July 7, 2025), https://www.nytimes.com/2025/07/07/us/politics/kilmar-abrego-garcia-trump-deport.html [last visited July 9, 2025].

[4] Because the government does not seek revocation based on 18 U.S.C. § 3142(f)(2), Mr. Abrego does not respond to any prior arguments based on those provisions. *See* ECF 14 at 8-14.

6

The government spends much of its motion arguing for the latter, expansive interpretation, in heavy reliance on the out-of-Circuit decision in *United States v. Watkins*, 940 F.3d 152 (2d Cir. 2019). Yet the government ignores more recent—and binding—precedent from this circuit, *United States v. Fields*, 53 F.4th 1027 (6th Cir. 2022), which dictates a contrary result. And the government's failure to address *Fields* is conspicuous, because Magistrate Judge Holmes relied on it in her opinion. *See* ECF 43 at 17. *Fields* applied the Supreme Court's decision in *Shular v. United States*, 589 U.S. 154 (2020), which interpreted the meaning of the word "involves" in the context of Section 924(e)(2)(A)(ii) (and which post-dated *Watkins*). Both cases interpreted the word "involve" to mean "necessarily entail," *see Fields*, 53 F.4th at 1048 (quoting *Shular*, 589 U.S. at 161-62), and this Court should follow their lead in interpreting the word "involves" under 18 U.S.C. § 3142(f)(1)(E).

In *Fields*, the Sixth Circuit considered whether possession of a methamphetamine precursor with intent to manufacture, in violation of Kentucky law, was a "serious drug offense"—meaning "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance." 55 F.4th at 1043 (citing 18 U.S.C. § 924(e)(2)(A)(ii) (cleaned up)). Overruling recent Circuit precedent interpreting "involv[ing]" in the same statute as "related to or connected with," *see United States v. Eason*, 919 F.3d 385, 390-91 (6th Cir. 2019), *Fields* followed *Shular* in interpreting "involve" as "necessarily require," finding it to be the "better understanding" of the term, 53 F.4th at 1047-48. In an exhaustive concurrence surveying the definitions of "involve" and its use in federal statutes, Judge Murphy concluded that while "'involve' can mean anything from 'include' to 'implicate' to 'relate to'," for a statute that "connects an intangible subject ('offense') with active objects

('manufacturing . . .')" the correct definition was "to include as a necessary circumstance, condition, or consequence." *Id.* at 1058-59 (Murphy, J., concurring).

This is how 18 U.S.C. § 3142(f)(1)(E) uses "involves": It connects an intangible subject ("felony") with an object ("minor victim"). As a result, it encompasses not all crimes that "relate to or connect with" minor victims in any tangential way, but that "includes [a minor victim] as a necessary . . . condition" of coming within Section 3142(f)(1)(E). *See Fields*, 53 F.4th at 1051, 1059.

*United States v. Watkins*, without the benefit of *Shular* and *Fields*, applies a definition of "involves" that is a poor fit for the word's usage in the statute and would lead to incongruous results that are out of step with the rest of the Bail Reform Act.

As an initial matter, *Watkins* avowedly applied two different definitions for the word "involves" in the *same provision*. *Watkins*, 940 F.3d at 165 ("[T]he term 'involves' [in subsection 3142(f)(1)(E)] bears a different meaning than the term 'involves' in the prefatory language to § 3142(f)(1)."). The Second Circuit concluded that the word "involves" immediately preceding the five capital-lettered subsections in Section 3142(f)(1) called for the application of the categorical approach, while the same word a few lines later, in subsection (E), "expands the scope of review to the conduct giving rise to the charged offense." *Id.* To be sure, as the *Watkins* court argued, "identical language may convey varying content when used in different statutes, sometimes even in different provisions of the same statute." *Id.* at 165. But courts routinely recognize the "natural presumption that identical words used in different parts of the same act are intended to have the same meaning," *United States v. Richardson*, 948 F.3d 733, 750 (6th Cir. 2020) (citation and internal quotation marks omitted), and neither the *Watkins* court nor the government in this case explain why Congress would use different meanings of the same word,

8

not just in the same statute, but in the *same provision* of the same statute, used in the same manner, where the two phrases using the same word must be read together in a single sentence. A far better reading of the language in context is to read words used in the same manner, in the same provision, the same way.

More to the point, *Watkins*'s broad interpretation of "involves" in (f)(1)(E) is out of step with the structure and purposes of the Bail Reform Act and the Adam Walsh Act (which amended the Bail Reform Act with respect to certain crimes against children). Indeed, *Watkins* itself recognizes this when interpreting "involves" as used in (f)(1), because "[w]hen Congress enacted the Bail Reform Act, it intended to limit the availability of detention hearings to individuals who are actually charged with certain enumerated offenses." *Watkins*, 940 F.3d at 164; *see also id.* at 165 ("The [Bail Reform] Act operates only on individuals who have been arrested for a specific category of extremely serious offenses." (quoting *Salerno*, 481 U.S. at 750)). Interpreting "involves" in (f)(1)(E) to broadly encompass any crime that even tangentially relates to a minor is in conflict with the *Watkins* court's own interpretation of Congress's intent when enacting the Bail Reform Act. And the *Watkins* court's interpretation of the Adam Walsh Act, which inserted the language in (f)(1)(E), does not save it. Though the court notes that the purpose of the Adam Walsh Act was "[t]o protect children from sexual exploitation and violent crime," it goes on to interpret "involves" to encompass a broad range of crimes that may only tangentially involve minors or firearms, let alone protecting children from such. *Id.* at 166.

As Judge Holmes noted, this broad interpretation can lead to incongruous results entirely untethered from the purpose and structure of the Bail Reform Act. How close does a minor have to be to the facts of the crime before (f)(1)(E)'s catchall provision comes into play? *Watkins* provides no answer, and nor do the small number of other cases adopting its reasoning. Those

cases consider the difficult issue of a crime involving the sexual exploitation of a minor where the minor was either fictional or never actually in danger.[5] But those cases are also comfortably encompassed by using *Fields*'s definition of "involves." Indeed, many courts coming out the same way, before and after *Watkins*, interpreted the phrase "involves a minor victim" as a "categorical term that refers to the category of crimes that harm minors"—put another way, a precursor to *Fields*. *United States v. Schuetz*, No. 12 Mag. 3046, 2012 WL 2923171, at *4 (C.D. Ill. July 18, 2012); *see also United States v. Rizzuti*, 611 F. Supp. 2d 967, 970-71 (E.D. Mo. 2009). That construction avoids the difficult complications of what crimes *Watkins*'s broader definition of "involves" might sweep into the Bail Reform Act—a statute predicated on detention being the exception, not the rule. And this case exemplifies the prospect of that overreach: The defense has found no case where alien smuggling was the predicate offense requiring a detention hearing under (f)(1)(E). This should not be the first.

The Court should interpret "involves a minor victim" in line with *Fields* and hold that the Bail Reform Act only authorizes detention hearings where the charged crime includes a minor victim as a necessary condition of commission of the crime. Because 8 U.S.C. 1324(a)(i)(A)(ii) does not include a minor victim as a necessary element, that should be the end of the matter.

## B. The Government Must Proffer Reliable Evidence to Meet its Burden

Nevertheless, even if the Court ascribes "involves a minor victim" a broader meaning, the government must still prove by a preponderance of the evidence that a minor was even *present* during the charged crime here. Seemingly aware of the shortcomings in its evidence, the government spends much of its briefing accusing Judge Holmes of engaging in an improper

---

[5] *See, e.g.*, *United States v. Kirkpatrick*, No. 23 Cr. 4002, 2023 WL 4846620 (D. Kan. July 28, 2023) (applying *Watkins* to a determination of whether the rebuttable presumption under 18 U.S.C. § 3142(e)(3) applies to enticement and attempted transportation of a minor who was actually an adult undercover officer).

10

"sliding scale" approach in assessing its evidence, or failing to see the "forest for the trees" by considering each piece of evidence individually, as opposed to holistically. ECF 70 at 25. But the government merely criticizes Judge Holmes for refusing to accept the government's unreliable and weak evidence, whether viewed in whole or in part.

First, though the government is correct that hearsay may be considered in bail proceedings, critically, only reliable hearsay should be credited. *United States v. Mohamud*, No. 10 Cr. 260, 2013 WL 1935506, at *22 (M.D. Tenn. May 9, 2013) (noting that "hearsay evidence must be reliable" to be credited under § 3142); *United States v. Accetturo*, 623 F. Supp. 746, 755 (D.N.J. 1985) ("[T]he freedom to admit hearsay in bail proceedings in no way negates the traditional requirement that such evidence must first be found reliable."); *United States v. Thomas*, No. 3 Cr. 150, 2006 WL 140558, at *9 (D. Md. Jan. 13, 2006) ("[T]he [c]ourt must nevertheless ensure that the evidence upon which it relies is reliable."); *United States v. Jeffries*, 679 F. Supp. 1114, 1118 (M.D. Ga. 1988) (stating that "the judicial officer should make efforts to determine the reliability of such hearsay" in pretrial detention hearings). Accordingly, judges presented with proffers or hearsay may "selectively insist upon the production of the underlying evidence or evidentiary sources where their accuracy is in question." *United States v. Webb*, 149 F.3d 1185, 1998 WL 381686, at *1 (6th Cir. 1998) (table). Contrary to the government's representations, in bail proceedings, the Court need not credit every piece of evidence it proffers. This is particularly true where, as here, that evidence has significant weaknesses revealed through rigorous cross-examination, was the product of multiple layers of hearsay, and came via a law enforcement agent's description of interviews with cooperators who made contradictory statements and had many reasons to say what the government wanted to hear.

11

Second, even accepting the government's argument that "the Bail Reform Act requires" a "holistic[]" assessment of the government's evidence, ECF 70 at 25, that does not mean that the Court must accept a confluence of weak evidence that, even taken together, fails to reach a preponderance. If judges must rely on reliable proof—whether by proffer, hearsay, or other source—to make bail determinations, a mass of unreliable proof cannot provide a substitute. This is what Judge Holmes meant when she reasoned that "there is a direct correlation between the importance of the evidence and the level of reliability." ECF 43 at 23. This is not holding the government to an inappropriately heightened burden, as the government contends. Rather, Judge Holmes was noting that even if some pieces of the government's evidence are stronger on other points, the Court must decide based on reliable evidence relevant to the question at hand—in this case, whether the offense involved a minor victim. Because Judge Holmes correctly determined that that evidence was lacking—taken individually or as a whole—she properly held the government to its burden.

### C.    The Government Has Not Met Its Burden to Establish That Minors Were Present

And a *de novo* review of the evidence demonstrates that Judge Holmes was right: The government has not established by a preponderance of the evidence that minors were even present during the commission of the offense.

The government has put forth three pieces of evidence that minors were present in the SUV during any of Mr. Abrego's alleged smuggling trips. But none of the government's evidence, individually or collectively, carries the government's burden.

First, the government points to hearsay statements from a cooperator that minor female aliens were present on various trips Mr. Abrego made between Texas and Maryland, and that the cooperator received complaints that Mr. Abrego "acted sexually inappropriate towards them." ECF

12

70 at 9. But as Judge Holmes aptly put it, this testimony is based on "alleged complaints made to the second male cooperator by some other unidentified person at some unknown time about Abrego's supposed but undescribed inappropriate behavior toward minor females during transports." ECF 43 at 28. This allegation is so formless, and so riddled with hearsay, that it is hardly creditable as gossip, let alone a piece of evidence.

Second, the government points to two cooperators' statements that Mr. Abrego would bring his own children on trips between Texas and Maryland multiple times per week, making them sit on the floorboard of the vehicle to provide more room for the migrants. ECF 61 at 53:19-54:1. But this allegation, while slightly less formless, is similarly not credible: CW-2 told the government that Mr. Abrego would take this 24-hour trip with his children, out and back, two to three times per week. *Id.* at 116:13-117:20. At the high end, this would mean Mr. Abrego spending 144 hours, or six out of the seven days in a week, in a car with his children—two of whom are autistic—on the floorboard. As Judge Holmes observed, this verges on not just implausible but physically impossible. ECF 43 at 27. Combined with the other exaggerations and inconsistencies in the cooperators' statements to law enforcement, *see supra* at 3-4, the allegation Mr. Abrego brought his children on significant numbers of trips between Texas and Maryland is simply unbelievable, and certainly not supported by a preponderance of the evidence.

Third, the government proffers the "roster" of the passengers of the SUV during the traffic stop in 2022, allegedly created by the troopers who pulled over Mr. Abrego that evening, which the government argues irrefutably establishes that one of the passengers was born in 2007. To understand why this slip of paper is unreliable, it is important to understand the multiple layers of hearsay that separate the testimony of the SUV's passengers from this proceeding—even taking the government's assertions about the creation and maintenance of this document as true. First, the

13

occupants of the vehicle were asked to write their birthdays on the slip of paper by Trooper Foster; next, that slip of paper was then photographed and sent to Special Agent Joseph; and finally, Special Agent Joseph testified as to the contents of the paper—which he had no direct knowledge of beyond his own conversation with Trooper Foster—at the June 13 hearing. ECF 61 at 24:24-25:10; ECF 43 at 23. As a result, the contents of this piece of paper—having gone through a lengthy game of Telephone—can only be judged by how they appear, not what the government proffers they represent. And how the paper appears certainly does not invite confidence: First, the number in question appears to be overwritten at some point; and second, even as overwritten, it could either be read as a 1 or a 7. ECF 61 at 197:8-16; ECF 43 at 24-25.[6]

### D.    The Government Has Not Proven that Any Minors Were Victims

Finally, even if the government has demonstrated that minors were somehow present for the commission of the charged crime, it has not made any effort to demonstrate why those minors should be considered "victims" under 18 U.S.C. § 3142(f)(1)(E). While some minors who are smuggled have been considered victims under the law, they are not invariably so. In the sentencing enhancement context, courts have held that where a person has held smuggled aliens "against their will after being transported," those aliens could be "victims."[7] *United States v. Angeles-Mendoza*,

---

[6] Indeed, the original HSI report from the 2022 traffic stop, publicly released by the Department of Homeland Security in April, noted that the "[e]ncountering officer gathered names of other occupants in vehicle, *but could not read their handwriting*," and that was why "he did not pass the names, *dates of birth* and IDs of those individuals," and why the incident was not "pursue[d] further." Press Release, Dep't of Homeland Sec., DHS Releases Bombshell Investigative Report on Kilmar Abrego Garcia Suspected Human Trafficking Incident (Apr. 18, 2025), https://www.dhs.gov/news/2025/04/18/dhs-releases-bombshell-investigative-report-kilmar-abrego-garcia-suspected-human (emphasis added) [last visited July 9, 2025].

[7] Of course, the sentencing context is distinct because the United States Sentencing Guidelines provide that the word "victim" includes both victims of the offense of conviction *and* of any relevant conduct: "Thus, it is permissible for a court to apply the vulnerable victim enhancement in an alien smuggling case, even if aliens are not victims of the offense, if the defendant's conduct was relevant to the offense." *United States v. Bustamante*, 199 F.3d 437, 1999 WL 1067536, at *2

407 F.3d 742, 747 (5th Cir. 2005). Absent that aggravating conduct, however, a smuggled alien, even a minor, need not necessarily be a "victim." *See id.* at 748 n.9 ("There is no evidence, however, that the youth of some of them made them especially vulnerable to being victimized."); *see also United States v. Andrade-Castaneda*, 205 F. App'x 233, 236 (5th Cir. 2006) ("The record reflects that the conditions referenced by the district court were conditions of smuggling, not personal characteristics of a vulnerable victim.").

The government's proffered case for this proposition, *United States v. Miguel*, 86 F. App'x 342 (9th Cir. 2004), exemplifies this distinction. *See* ECF 43 at 28-29. In *Miguel*, the Ninth Circuit noted that the children were "unusually vulnerable" in part because they were very young—one was only five—and as a result "may be more vulnerable to illegal transportation because they do not appreciate the danger involved or are too frightened to assert themselves." *Miguel*, 86 F. App'x at 344. And there were particular facts attributable to the children in *Miguel* to establish that they were particularly vulnerable to being victimized: They "obediently climbed" into the trunk of a car despite the fact that it was so hot that one of the children passed out, and the children did not ask for water from the driver. *Id.* at 344-45. For these reasons, the particular facts of *Miguel* allowed the Ninth Circuit to conclude that those children were vulnerable victims, but *Miguel* does not hold that all minors who are smuggled are necessarily victims.

Unlike in *Miguel*, the government has not proffered any facts regarding the vulnerability of the purported fifteen-year-old traveling with Mr. Abrego on November 30, 2022.[8] In fact, the

---

(5th Cir. 1999) (table). By contrast, § 3142(f)(1)(E), by its plain meaning, only allows a detention hearing where the minors in question were victims of the charged felony.

[8] To the extent that the Court credits the government's theory that Mr. Abrego was bringing his children along on these 24-hour trips, they were not victims of the offense under 18 U.S.C. § 3142(f)(1)(E), as they were not being smuggled.

15

government cannot find him to verify any details about him—not even his age, let alone any other characteristics. The mere existence of a fifteen-year-old in the vehicle—absent any other particular characteristics—is not sufficient to label him a "victim" of the smuggling charge in this case.[9]

In sum, because the government has not established by a preponderance of the evidence that the charged offense "involves a minor victim" under 18 U.S.C. § 3142(f)(1)(E), the government is not entitled to a detention hearing.[10]

## II. The Government Has Not Met Its Burden to Establish That No Conditions Will Reasonably Assure Mr. Abrego's Appearance and the Safety of the Community

Even if the Court finds that a detention hearing is warranted under 18 U.S.C. § 3142(f)(1)(E), the Court should hold that release is proper under § 3142(g), because the government has not demonstrated—either on the existing record or based on the evidence it intends to introduce on July 16—that no conditions can reasonably assure Mr. Abrego's appearance or the safety of the community.

### A. Mr. Abrego Does Not Present a Risk of Flight

The government has not demonstrated by a preponderance of the evidence that there are no conditions that may be imposed that would assure Mr. Abrego's appearance at trial. *See* 18 U.S.C. § 3142(g); *United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004). Instead, the government relies on its old standbys: the nature of the charges against Mr. Abrego and his

---

[9] The government might point to Special Agent Joseph's statement at the June 13 hearing that drivers would take cell phones away from passengers as "a measure of control." ECF 61 at 35:10. But this was Joseph's observation, not any testimony from a cooperator. And in any case, the government puts forth no evidence that Mr. Abrego took his passengers' phones away from them during the trip that precipitated the November 30, 2022 traffic stop.

[10] To the extent that the government hints at the argument that the charged offense "involves the possession or use of a firearm" under (f)(1)(E), *see* ECF 70 at 20-21, this argument too fails. The government's cooperators made inconsistent statements regarding whether Mr. Abrego ever carried firearms on smuggling trips, and there is no other evidence that he did so. *See supra* at 3-4.

16

immigration status. ECF 70 at 32-35. It is likely that Mr. Abrego will be subject to immigration detention if he is released in this case, which would foreclose any possibility of flight. But even setting that aside, the government has not met its burden to establish that Mr. Abrego presents a risk of flight.

The smuggling charges against Mr. Abrego, while serious, do not, by themselves, indicate that he is a flight risk. It bears repeating that, under the Bail Reform Act, "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Salerno*, 481 U.S. at 755. While many crimes are entitled to a presumption that no conditions will reasonably assure appearance and the safety of the community, Mr. Abrego's charges are not among them. *See* 18 U.S.C. § 3142(e)(3). That a grand jury indicted Mr. Abrego of a crime, even a serious crime, is not sufficient to overcome the presumption in favor of release. *See* ECF 70 at 33. The government must instead prove based on reliable evidence, not the charges themselves, that Mr. Abrego presents a risk of flight that cannot be mitigated by any conditions.

The government's attempts to do so are entirely inadequate. The government points to its evidence (flawed as it is) that Mr. Abrego committed the crime for which he is charged: That he was driving CW-1's SUV when he was stopped in this District; that he was driving nine individuals who the government contends are aliens that he was driving from Houston to Maryland, when Mr. Abrego told the officer who stopped him that he was driving a construction crew from St. Louis to Maryland; and that he called CW-1 after the encounter, and often made similar trips for CW-1. *Id.* at 32-33. The government also gestures toward concerns about obstruction, noting CW-1's statements, relayed by Special Agent Joseph, about his discussions of "cover stories," use of different routes from Texas to Maryland, and confiscating the phones of those being transported. *Id.* at 37; ECF 61 at 35:4-21.

17

But the government does not explain why this is evidence of Mr. Abrego's risk of flight, either to another country or to "escape[] pre-trial supervision and remain[] a fugitive within the interior of the United States." ECF 70 at 32. The government apparently views its own evidence as so irrefutable that Mr. Abrego would have no choice but to flee instead of facing trial. But as the Sixth Circuit has explained, the weight of the evidence factor under Section 3142(g) goes to the weight of the evidence that the defendant presents a flight risk or a danger, not the weight of the evidence that he is guilty of the offense with which he is charged. *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010) ("This factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt."); *see also United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985). Applying the correct standard—what evidence the government can muster not for its charges but for Mr. Abrego's risk of flight—the government's motion is conspicuously silent.

Nor does Mr. Abrego's immigration status inherently require that he be deemed a flight risk. *See* ECF 70 at 32. As Judge Holmes pointed out, while the Bail Reform Act contains a presumption of detention for defendants charged with a number of crimes, it does not presume or require detention for defendants with ICE detainers. *See* ECF 43 at 48; 18 U.S.C. § 3142(e)(3). Surely Mr. Abrego's concern about deportation would apply to anyone with Mr. Abrego's immigration status, and yet no similarly situated defendant is *per se* a flight risk under the BRA. It is particularly galling for the government to argue that *Mr. Abrego* is the source of any risk of non-appearance in this case, when the government's malfeasance was the only reason Mr. Abrego was outside of the country this year, and when Mr. Abrego's conduct since his improper removal exclusively reflects his own fervent desire to return to this country.

Finally, the government points to Mr. Abrego's lack of community ties to this District, and

the apparent "tension" among courts regarding which community—the location of prosecution or the location of residence—counts under the BRA. *See* ECF 70 at 34; ECF 43 at 49. On the law, the government ignores the weight of authority, which permits consideration of the defendant's ties to his own community.[11] *See United States v. Hir*, 517 F.3d 1081, 1087-88 (9th Cir. 2008); *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990); *United States v. Woodside*, No. 13 Cr. 97, 2013 WL 3479414, at *2-3 & n.1 (M.D. Tenn. July 11, 2013) (Shar, J.) (finding that a Florida resident had a "long history in and many connections to the community," and citing *Townsend* and *Hir*); *United States v. Villegas*, No. 11 Cr. 28, 2011 WL 1135018, at *7 (E.D. Tenn. Mar. 25, 2011) (considering defendant's ties to California, where he lived, and citing *Townsend*, but ordering detention on other grounds); United *States v. Yuen*, No. 11 Mag. 3399, 2011 WL 5025134, at *4-5 (S.D. Fla. Oct. 21, 2011) (noting that applying district court precedent to the contrary "would essentially mean that every defendant who was arrested and charged in a district other than the district where he or she lived . . . would be a flight risk and subject to pretrial detention").

As for the facts, the government faults Judge Holmes for relying upon the defense's exhibited letter from a local Maryland social services organization, CASA, to establish Mr. Abrego's community ties, but does not meaningfully contest the veracity or reliability of the facts proffered by the defense. ECF 70 at 34-35.[12] The government does not and cannot seriously dispute

---

[11] The government appears to consider Mr. Abrego's ties to certain communities only when convenient. By the government's logic, Mr. Abrego's ties to Maryland are of no concern when assessing Mr. Abrego's risk of flight, but they are of paramount concern when assessing his dangerousness. *Compare* ECF 70 at 34-35, *with id.* at 36-37. The government cannot have it both ways: If the government wants to include Mr. Abrego's family, who reside in Maryland, when assessing the safety of the "community," it cannot also wave aside Mr. Abrego's ties to that same "community" when assessing his risk of flight.

[12] The government criticizes Mr. Abrego for not putting forward Cesar Abrego, his brother, to testify at the June 13 detention hearing. ECF 70 at 31 n.21. Mr. Abrego is not aware of any

Mr. Abrego's consistent and substantial ties to Maryland, where Mr. Abrego lived and worked for nearly fifteen years. Am. Compl. ¶ 48, *Abrego Garcia v. Noem*, No. 25 Civ. 951; June 13 Hearing Def. Ex. 2. Mr. Abrego's ties with Maryland are significant evidence that he does not present a serious risk of flight.[13]

### B. Mr. Abrego's Release Does Not Present Community Safety Concerns

Finally, the government has not demonstrated by clear and convincing evidence that there are no conditions that would reasonably assure the safety of the community in the event of Mr. Abrego's release. 18 U.S.C. § 3142(g); *Hinton*, 113 F. App'x at 77.

First, as discussed above, the government's evidence of Mr. Abrego's treatment of minor girls does not rise to the level of clear and convincing evidence of dangerousness. The government relies on triple hearsay testimony that Mr. Abrego made advances toward females he allegedly transported and relayed testimony from another cooperator, Female Witness-1. ECF 70 at 35. As to the former, we have already discussed why the Court should reject that evidence as unreliable, *see supra* at 12-13. As to the latter, the government has produced no evidence that Mr. Abrego would do anything to endanger Female Witness-1 prospectively, and the conditions Judge Holmes

---

requirement that third-party custodians testify, and affidavits like Cesar Abrego's have been accepted in this District as proof of fitness to serve. *See, e.g.*, Order, *United States v. Peebles*, No. 20 Cr. 152 (M.D. Tenn. June 29, 2020) (allowing defendant's release into cousin's custody based on affidavit). In any case, Judge Holmes's practice that she described at the June 13 hearing is not intended to test a third-party custodian's fitness to serve or the government's opportunities to cross them on that question, but their understanding of the responsibilities of being a third-party custodian. ECF 61 at 148:1-5. Cesar Abrego understands and agrees to abide by the requirements of his service as a third-party custodian and is willing, if necessary, to provide an updated affidavit attesting to that understanding.

[13] Assuming the government's premise that these issues must be decided without reference to the likelihood that Mr. Abrego will be placed in ICE detention were the Court to deny its motion, the government's failure to acknowledge the circumstances surrounding Mr. Abrego's possible return to Maryland is odd, to say the least. Mr. Abrego has not been in the company of his family outside of a courtroom since he was picked up by ICE five months ago. The idea that Mr. Abrego would choose to flee rather than reunite with his family is baseless.

imposed include an absolute moratorium on direct or indirect contact with cooperators and witnesses. ECF 62 at 16:25-17:4. The government has not explained why this is insufficient to protect Female Witness-1 during any pretrial release.

The government also points to two petitions for orders of protection filed by Mr. Abrego's wife in 2020 and 2021 "when considering his potential danger to the community, which of course includes his own family." ECF 70 at 36-37. We do not seek to downplay the seriousness of the actions alleged in these petitions. But as Judge Holmes noted, these petitions were dismissed shortly after they were brought; there is no evidence that Mr. Abrego violated any order of protection; and there is no evidence that Mr. Abrego has continued this behavior in the years following. ECF 43 at 42. And Ms. Vasquez Sura's steadfast support of Mr. Abrego—throughout his unlawful removal to and detention in El Salvador and since his return to the United States to face these charges—indicates that Mr. Abrego has not continued the actions that led Ms. Vasquez Sura to file the proffered petitions. In any case, in light of the petitions, Judge Holmes imposed additional conditions of release, including a prohibition on drinking to excess and requiring that Mr. Abrego undergo anger management counseling. ECF 62 at 18:5-9, 19:19-23. The government has made no effort to explain why these conditions are insufficient to assure the safety of Mr. Abrego's family and community.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the government's motion for revocation.

Dated: July 9, 2025
    New York, New York

Respectfully submitted,


 /s/ *Sean Hecker*
Sean Hecker*
Jenna M. Dabbs*
David Patton*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
shecker@heckerfink.com
jdabbs@heckerfink.com
dpatton@heckerfink.com

* admitted *pro hac vice*

Rascoe Dean (No. 034209)
SHERRARD ROE VOIGT & HARBISON PLLC
1600 West End Avenue, Suite 1750
Nashville, Tennessee 37203
Telephone: (615) 742-4200
Fax: (615) 742-4539
rdean@srvhlaw.com

*Counsel for Defendant Kilmar Armando
Abrego Garcia*

22

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2025, I electronically filed the foregoing document with the clerk of the court by using the CM/ECF system, which will send a notice of Electronic Filing to the following: Acting United States Attorney, Robert E. McGuire, 719 Church Street, Suite 3300, Nashville, Tennessee 37203.

/s/ Sean Hecker