## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:25-cr-00115 |
| | ) | |
| KILMAR ARMANDO ABREGO | ) | |
| GARCIA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

After "ha[ving] lived safely in the United States with his family for a decade and ha[ving] never been charged with a crime[,]" Noem v. Abrego Garcia, 604 U.S. ----, 145 S. Ct. 1017, 1018 (2025), Kilmar Armando Abrego Garcia ("Abrego") returned to the United States of America from his involuntary and "improper[]" stay in El Salvador. Id. The United States District Court of Maryland issued an order requiring the United States Secretary of Homeland Security, the Attorney General of the United States, the United States Secretary of State, the Acting Director of U.S. Immigration and Customs Enforcement ("ICE"), the Acting Executive Associate Director of ICE Enforcement and Removal Operations, and the Director of ICE's Baltimore Field Office to "facilitate" Abrego's return. See Abrego Garcia v. Noem, 2025 WL 1024654, at *1 (D. Md. Apr. 4, 2025); amended, 2025 WL 1085601 (D. Md. Apr. 10, 2025); see also Abrego Garcia v. Noem, 2025 WL 1014261 (D. Md. Apr. 6, 2025) (Memorandum Opinion in support of April 4, 2025 order). The United States Court of Appeals for the Fourth Circuit did not disturb the lower court's order, denying the Government's motion to stay the district court's order pending appeal. See Abrego Garcia v. Noem, 2025 WL 1021113, at *1 (4th Cir. Apr. 7, 2025). Yet, Abrego remained in El Salvador. Even after the Supreme Court of the United States affirmed the district court's

instruction that the Government "facilitate" Abrego's "release from custody in El Salvador, Abrego continued to wait to return home. <u>Abrego Garcia</u>, 145 S. Ct. at 1018. In the meantime, the Government presented its criminal case against Abrego to a grand jury in the Middle District of Tennessee. On May 21, 2025, the grand jury filed a two-count Indictment against Abrego. When an arrest warrant for Abrego issued, the Government effectuated his return, arrested him on June 6, 2025, and brought him to Tennessee..

The Magistrate Judge has ordered Abrego's release. The Government disagrees and has filed a Motion for Revocation of Release Order (Doc. No. 45), which has been fully briefed (Doc. Nos. 70, 79, 89). The Court held an evidentiary hearing on July 16, 2025. Based on the June 13, 2025 and July 16, 2025 evidentiary hearings, the Court will deny the Government's Motion. (Doc. No. 45). Abrego should be released under conditions to be set by the Magistrate Judge.

## I.    BACKGROUND[1]

At the time the Court issued its Memorandum Opinion and Order denying the Government's Motion to Stay the decision of the Magistrate Judge (Doc. Nos. 55, 56), it only considered the issue of whether the Government was entitled to a detention hearing. Following the Court's ruling, the Magistrate Judge informed the parties at the June 25, 2025 hearing about the conditions of Abrego's release (see Doc. No. 62). The parties have now briefed whether there are conditions for Abrego's release alongside Government's appeal challenging the Magistrate Judge's release order (see Doc. Nos. 70, 79). Accordingly, the record is now complete for the Court to consider both (1) whether the Government is entitled to a detention hearing, and (2) if so, whether there are no set of conditions that warrant Abrego's release pending trial.

---

[1] The Court need not extensively recite the background of the instant motion, which has been set forth aptly in the Magistrate Judge's June 22, 2025 Memorandum Opinion and this Court's June 25, 2025 Memorandum Opinion. (See Doc. Nos. 43, 55).

Abrego remains detained, notwithstanding this Court's denial of the Government's Motion to Stay (Doc. Nos. 55, 56). While he initially opposed the Government's Motion to Stay his release order (Doc. Nos. 46, 49), he moved to delay the Magistrate Judge issuing her release order until this Court's July 16, 2025 evidentiary hearing. (Doc. No. 63). The Magistrate Judge granted Abrego's Motion (Doc. No. 63) and postponed issuing the release order (and conditions of release) until this Court decided the Government's Motion for Revocation. (Doc. No. 67).

During the July 16, 2025 evidentiary hearing, the Government again called the same witness who testified before the Magistrate Judge: Homeland Security Agent Peter T. Joseph ("Agent Joseph"). He supplemented his prior testimony based on his ongoing investigation in the following ways: (1) he testified that he has now personally interviewed all officers that responded to the November 30, 2022 traffic stop, although he did not offer much information about what those interviews revealed; (2) he discussed exhibits showing that the car Abrego drove on November 30, 2022 was registered to the first cooperating witness ("CW-1"),[2] who pled guilty to Aiding and Abetting the Illegal Transportation of an Alien within the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii); (3) he discussed an exhibit showing the phone number Abrego provided to officers responding to the November 30, 2022 traffic stop; (4) he discussed an exhibit of Abrego's phone records showing that he called CW-1, his "boss," in Texas before, during and after the traffic stop; (5) he introduced an iCloud backup of CW-1's phone showing a contact entry with the name "Kitmar Chofer," which Agent Joseph believed to be a reference to Abrego; (6) he discussed a traffic citation Abrego received in Virginia in October 2021; (7) he testified about a recent interview with the second female cooperating witness ("FC-2"), who heard Abrego say that

---

[2] Despite the Government disclosing CW-1's identity during the public June 13, 2025 and July 16, 2025 evidentiary hearings, for the sake of consistency, the Court will refer to him as CW-1.

3

he fled El Salvador as a teenager after taking part in a murder of a rival gang member's mother; (8) he testified that he has been unable to corroborate FC-2's statement about why Abrego fled El Salvador; and (9) he discussed an exhibit showing the identities and immigration status of six of the nine passengers who were in the vehicle during the November 30, 2022 traffic stop. The Government also submitted the FBI Cellular Analysis Survey Team CAST report ("CAST report"), which tracked Abrego's path of travel throughout the United States around the time of the November 30, 2022 traffic stop.

During the hearing, Abrego challenged Agent Joseph's credibility and the thoroughness of his work, because of: (1) the close familial bond between CW-1, the second cooperating witness ("CW-2"), and the first female cooperating witness ("FC-1"); (2) his failure to read three interviews CW-1 had with Homeland Security Investigations ("HSI") in April 2025; (3) his failure to listen to recorded phone calls between CW-1 and CW-2; and (4) his failure to consider the witnesses' motivations for their testimony and the suspicious phrasing in their statements.

Abrego supplemented the record with the HSI interview notes on CW-1's and CW-2's various interviews prepared by Agent Joseph and other HSI agents. The interview notes show that HSI agents interviewed CW-1 on April 22, 24, and 29, 2025 about his and others' involvement in a human smuggling conspiracy. During the second interview, CW-1 expressed that he would not provide HSI more information unless he got protection for him and his family. Agent Joseph later interviewed one of his family members, CW-2. During those interviews, CW-1 told HSI agents that he was born in El Salvador, met Abrego roughly ten years ago when he was living in Maryland, and later moved to Texas to start a taxi service because he had clients requesting that he transport people to various states, including New York, New Jersey, and Virginia.

4

CW-1 gave HSI agents information about his human smuggling business, both generally and Abrego. For example, he informed the agents that his taxi service smuggled undocumented individuals, who would typically pay $350 to $500 dollars each to be transported. He also stated that he saved drivers' contact names in his phone as "Driver" or "Chofer." He further informed the HSI agents that Abrego worked for his business, and had been stopped by law enforcement in 2021 and 2022 while transporting undocumented individuals. Specifically, he confirmed that Abrego had previously been stopped in Virginia on I-81 and in Georgia in 2021 or 2022 and that he had been stopped in 2022 with seven to nine individuals in his vehicle. He told agents that Abrego was paid anywhere from $1,300 to $1,700 per trip. CW-1 did not tie Abrego to any gang affiliations during his first two interviews. During the third, CW-1 stated that he did not notice anything to suggest that Abrego was part of a gang.

Agent Joseph conducted CW-1's fourth and fifth HSI interviews on May 7 and 15, 2025. Again, CW-1 confirmed his business relationship with Abrego, and that the individuals Abrego had in his vehicle on November 30, 2022 were being smuggled. CW-1 also confirmed that Abrego was driving CW-1's vehicle during the November 30, 2022 stop. He also further explained his business relationship with Abrego, namely that he would give Abrego referrals to transport undocumented individuals for $1,000 to $1,500 a trip. During the fifth interview, CW-1 identified a photo of one of the primary individuals who funneled undocumented persons to CW-1's business. He told Agent Joseph that the individual had complained on three or four occasions about Abrego's treatment of women and minor females on trips. During that interview, he also stated for the first time that Abrego would conduct his transports with his wife and children to obscure his illegal activities.

During the interviews with Agent Joseph, CW-1 provided additional information about Abrego's purported affiliation with gangs, drugs, and guns during these interviews. For instance, in the fourth interview, CW-1 confirmed that he did not see any signs that Abrego was a member of MS-13. During the fifth interview, however, he remarked for the first time that Abrego would greet members of MS-13 in a "familial" manner, but stopped short of saying Abrego himself was a member. During the fourth interview with Agent Joseph, CW-1 started that both he and Abrego liked guns, but would not carry them and Abrego would confiscate them from individuals he transported. In the fifth interview, CW-1 changed his story, stating that he would sometimes give guns to drivers and gave or sold one or two guns to Abrego, who carried them with undocumented individuals in the vehicle. As to drugs, CW-1 stated for the first time in his fifth interview that Abrego had been transporting marijuana in Houston during a trip.

The Court requested the factual basis for CW-1's plea, which the Government provided. At his plea hearing, CW-1 admitted to smuggling seven individuals from Houston, Texas to various locations throughout the United States on December 4, 2019. Three of the individuals were citizens of Mexico, two were citizens of El Salvador, one was a citizen of Honduras, and one was a citizen of Guatemala. None of the individuals had proper identification documents, and all were found to be illegally present in the United States. Law enforcement also concluded that CW-1 was present in the United States illegally and had previously been deported.

A HSI special agent and a HSI Border Enforcement Security Team Officer interviewed CW-1. CW-1 admitted that he is an illegal alien to the United States. CW-1 told the agents that he used to live in Maryland but moved to Texas and started a business called "Trans Express." As part of his business, he transported individuals to various places in the United States, including

6

South Carolina, Virginia, Maryland, and Georgia for roughly $350 per person. He informed agents that he had made five trips transporting people from Houston to other states.

Agent Joseph interviewed CW-2 on May 5 and 15, 2025. In CW-2's first interview, he told Agent Joseph that he met Abrego through CW-1, and that he was also involved in CW-1's human smuggling business. He recalled Abrego transporting 120 undocumented individuals from Houston to various cities throughout the United States. He believed law enforcement stopped Abrego in Mississippi, Alabama, and Louisiana during those transports. He stated that Abrego would often bring his two children and girlfriend on these trips to appear less suspicious to law enforcement. He also believed Abrego was involved in narcotics or marijuana smuggling based on who Abrego interacted with, but he offered little elaboration on that issue.

During CW-2's second interview with Agent Joseph, he confirmed Abrego's involvement in the human smuggling conspiracy for CW-1's business, "TransExpress." He also expanded on Abrego's use of his family during these smuggling trips, stating that Abrego made his children sit on the floor to make room for more undocumented individuals on trips. Also, Abrego would modify vehicles to fit additional passengers. CW-2 admitted that he was personally responsible for transporting ten unaccompanied minors during his work for the business. He identified a picture of the business associate who provided CW-1 with undocumented individuals to transport, and recounted the same story as CW-1 about the source complaining on three or four occasions that Abrego had been acting inappropriately with women and minor females he transported.

CW-2 expanded on his prior statements that Abrego had been involved with drug transportation, and claimed CW-1 knew of the same. He also stated for the first time that Abrego had purchased five firearms from CW-1 and transported them back to Maryland. Like in CW-1's

final interview, CW-2 also commented that Abrego greeted gang members with a "familial manner," but also stopped short of stating that he knew Abrego to be a member himself.

## II.    LEGAL STANDARD

"The default position of the law . . . is that a defendant should be released pending trial." United States v. Stone, 608 F.3d 939, 945 (6th Cir. 2010).  When a defendant is released by order of a Magistrate Judge, the "Government may file with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order."  18 U.S.C. § 3145(a)(1). Although the Magistrate Judge has not yet issued her order releasing Abrego on conditions, the Court finds that the Government's Motion (Doc. No. 45) is nevertheless ripe for decision because the record clearly demonstrates that her order is forthcoming pending the Court's instant ruling. The parties do not dispute this procedure.  (Doc. No. 45).

The district court's review of the matter is *de novo*, although it "may conduct its review and base its decision on the evidence presented to the magistrate at the detention hearing."  United States v. Stokes, 2006 WL 3843589, at *1 (M.D. Tenn. Dec. 22, 2006) (citation and quotations omitted).  The Court, in its discretion, may also consider proffer testimony and order an additional evidentiary hearing if necessary.  Stone, 608 F.3d at 948.  The Court did so here, and in conducting its *de novo* review the Court will consider all of the evidence in the record that the parties presented to both this Court and the Magistrate Judge.

The parties' vigorous dispute about what evidence the Court can consider and how it should consider that evidence is a non-issue.   The Court reiterates that "[t]he rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at [a detention] hearing."  18 U.S.C. § 3142(f).  Because of this relaxed evidentiary standard, "the government may proceed in a detention hearing by proffer or hearsay."  United States v. Webb, 238 F.3d 426 (table), 2000 WL 1721060, at *2 (6th Cir. 2000) (citation omitted);

8

see United States v. Salerno, 481 U.S. 739, 743 (1987) (discussing proffered evidence in detention hearing context). In fact, courts may even consider evidence "sought to be suppressed as if it were admissible" during such hearings. United States v. Pina-Aboite, 97 F. App'x 832, 835 (10th Cir. 2004). Nevertheless, as the Magistrate Judge emphasizes, courts should still ensure that the evidence they rely upon to make detention determinations is reliable, even if not technically admissible. See United States v. Webb, 149 F.3d 1185 (table), 1998 WL 381686, at *1 (6th Cir. 1998) (court may seek testimony or underlying evidence, at its discretion, where accuracy of evidence is in question); United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000) (same).

The Government presented only one witness before the Court and the Magistrate Judge: Agent Joseph. Because of this, the Court can only judge the credibility of *his* testimony. Of course, to the extent witnesses' stories changed, or were enhanced, throughout the investigation, the Court considers that and weighs them with all the other evidence in the record. The Court does the same to the extent Agent Joseph testified that witnesses' statements were, or were not, corroborated by other witnesses or additional information. However, the Court declines Abrego's invitation to sift through the record before it to determine the credibility of each of the confidential or cooperating witnesses Agent Joseph testified about who did not appear in person at the evidentiary hearing. See Webb, 1998 WL 381686, at *1 ("A credibility determination is a finding of fact.") (citing United States v. Aron, 904 F.2d 221, 224 (5th Cir. 1990)); see also Marshall v. Lonberger, 459 U.S. 422, 434 (1983) (higher courts do not question district courts' findings of credibility on witnesses because district courts come "*[f]ace to face with living witnesses*") (emphases added) (citations and quotations omitted); Gonzales v. Elo, 233 F.3d 348, 357 (6th Cir. 2000) (not disturbing lower court's credibility determination where the magistrate judge discredited the petitioner's "selective memory" testimony).

9

### III. ANALYSIS

The Government argues that the Court should revoke the Magistrate Judge's release order for two primary reasons: (1) it has demonstrated by a preponderance of the evidence that the crimes Defendant is charged with constitute crimes involving a minor victim under 18 U.S.C. § 3142(f)(1)(E), entitling it to a detention hearing; and (2) it has carried its burden under 18 U.S.C. § 3142(g) to establish that there are no conditions or combination thereof that will reasonably assure Abrego's appearance or the safety of other persons and the community if Abrego is released.[3]  The Court will address each.

#### A. The Government is Entitled to a Detention Hearing Under § 3142(f)(1)(E)

Under § 3142(f)(1)(E), the Government is entitled to a detention hearing if it can establish by a preponderance of the evidence that the case involves "any felony that is not otherwise a crime of violence that involves a minor victim[.]"[4]  The parties' disagreement about whether Abrego's charged crimes "involves a minor victim" centers around three issues: (1) the definition of "involves" under § 3142(f)(1)(E); (2) the definition of "victim" under § 3142(f)(1)(E); and (3) whether the Government has presented sufficient evidence to show by a preponderance of the evidence that Abrego's alleged crimes actually involved minor victims.

---

[3] The Government also moves to revoke the Magistrate Judge's release order based upon her review of the evidence, which it contends is an unprecedented "sliding scale" approach that considered evidence in a piecemeal fashion.  (Doc. No. 70 at 25–29).  This, in the Government's view, led to it being subject to a higher evidentiary burden than statutorily required for detention hearings.  Because the Court makes a *de novo* review of the evidence presented before the Magistrate Judge and this Court, the Court will make its own evidentiary determinations and need not address the merits of the Government's argument on this issue.

[4] The Government did not appeal the Magistrate Judge's rulings that the Government is not entitled to a detention hearing under §§ 3142(f)(2)(A) and (B).  Accordingly, the Court need not address those issues.

1.    Definition of "Involves" Under § 3142(f)(1)(E)

The parties dispute how the Court should interpret the word "involves" as used in § 3142(f)(1)(E).  The Government urges the Court to follow the Second Circuit's interpretation of "involves" as articulated in United States v. Watkins, which would allow the Court to consider the "factual details surrounding the charged conduct," including "the conduct underlying the offense[.]"  940 F.3d 152, 166 (2d Cir. 2019).  Abrego asks this Court to adopt the narrower, more categorical, interpretation of "involves" set forth in United States v. Fields, 53 F.4th 1027 (6th Cir. 2022) and Shular v. United States, 589 U.S. 154 (2020).  In a well-reasoned and thoughtful opinion, the Magistrate Judge found that the definition of "involves" falls somewhere in the middle and "means something more than 'related to' and something less than 'necessarily entails.'"  (Doc. No. 43 at 19).  What is evident from this dispute is that the meaning of "involves" under § 3142(f)(1)(E) presents a complicated question, one that reasonable jurists and attorneys alike can disagree on.  Upon its independent review of the statutory scheme of § 3142(f)(1)(E), this Court agrees with the Government and Watkins that "involves" as used in § 3142(f)(1)(E) should be interpreted to include the underlying conduct of the charged offenses at issue.

As an initial matter, Watkins interpreted the term "involves" as it is used in the context of § 3142(f) (i.e. the same statute at issue in this case), whereas Fields and Shular interpreted the term "involving" as it is used in a different statute—18 U.S.C. § 924(e)(2)(A)(ii) of the Armed Career Criminal Act ("ACCA").  As the Court stated during the evidentiary hearing, reliance on cases that interpret different statutory language from a different statute is in obvious error.  Given that Watkins addressed the exact statutory provision involved here, the Court finds that Watkins carries more persuasive weight than the cases cited by Abrego.

11

Moving to the merits, "[t]he starting point for any question of statutory interpretation is the language of the statute itself." United States v. Coss, 677 F.3d 278, 283 (6th Cir. 2012) (citation and quotations omitted). Section 3142(f) provides as follows:

> The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person as required and the safety of any other person and the community—
>
> (1) upon motion of the attorney for the Government, in a case that involves—
>
> (E) *any felony that is not otherwise a crime of violence that involves a minor victim* or that involves the possession or use of a firearm or destructive device (as those terms are defined in section 921), or any other dangerous weapon, or involves a failure to register under section 2250 of title 18, United States Code[.]

18 U.S.C. § 3142(f)(1)(E) (emphases added). When reviewing the statutory language, the Court gives undefined terms their ordinary meaning, looking to contemporaneous dictionaries and the context provided by the remainder of the statute for support. Keen v. Helson, 930 F.3d 799, 802–04 (6th Cir. 2019).

That is precisely what the Watkins panel did. There, the three-judge panel looked to the context of the word "involves" by identifying how that word is used in § 3142(f). In doing so, it distinguished between how "involves" is used in the prefatory language of § 3142(f)(1) and how it is used later in § 3142(f)(1)(E). Watkins, 940 F.3d at 165. While the Watkins panel found the former to "restrict[] a judicial officer's review to the charged offense," it interpreted the latter to "expand[] the scope of review to the conduct giving rise to the charged offense." Id. The reason for this distinction is that "the prefatory phrase '*in a case that involves*' in § 3142(f)(1) refers, variously, to a 'crime,' an 'offense,' and a 'felony,'" each of which "suggests charged conduct." Id. at 166 (emphases added). "By contrast, the phrase '*any felony . . . that involves*' in § 3142(f)(1)(E) refers to a 'minor victim' or 'the possession or use of a firearm,'" which "suggest

12

factual details surrounding the charged conduct." Id. (emphases added). Thus, based on a plain reading of the statute, the Watkins court reasoned that "when analyzing whether the Government is entitled to a detention hearing under § 3142(f)(1)(E), [courts] may consider the actual conduct at issue in the specific case." Id.

The Watkins panel acknowledged that its reading of the statute departed from the "natural presumption that identical words used in different parts of the same act are intended to have the same meaning." Atl. Cleaners & Dryers v. United States, 286 U.S. 427, 433 (1932). Of course, that general rule of statutory interpretation is only a presumption, and that presumption "readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." Id.; see Yates v. United States, 574 U.S. 528, 537 (2015) ("Ordinarily, a word's usage accords with its dictionary definition. In law as in life, however, the same words, placed in different contexts, sometimes mean different things."). By interpreting "involves" based on the statutory language surrounding each use of the word, Watkins "give[s] effect, if possible, to every clause and word" of the statute.[5] United States v. Smith, 756 F.3d 1179, 1187 (10th Cir. 2014) (citation and quotations omitted).

What is critical to remember on this question is that "[w]hether a statutory term is unambiguous . . . does not turn solely on dictionary definitions of its component words." Yates,

---

[5] The Court shares the Magistrate Judge's and Abrego's concerns that, if the Watkins definition of "involves" is applied too broadly, it could open the door for the Government to be entitled to detention hearings that Congress never would have thought appropriate under the Bail Reform Act. However, such circumstances seem unlikely to come to fruition, given that Watkins limits "involves" to "the conduct *giving rise to* the charged offense." Watkins, 940 F.3d at 165 (emphases added). In any event, the Court need not grapple with this issue to resolve the instant motion because this case does not present a circumstance where minor victims were only tangentially related to the conduct giving rise to Abrego's alleged criminal activity.

13

574 U.S. at 537. "Rather, '[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.'" Id. (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997). This is yet another reason for the Court to follow Watkins. Although the Bail Reform Act, as amended in 1984, does not define the word "involves," contemporaneous dictionaries issued around that time confirm that "involves" has different meanings. For instance, the Webster's Dictionary states that the definition of "involve" means: "to enfold or envelope so as to encumber," "to draw in as a participant," "to oblige or become associated," "to relate closely," and "to have within or as part of itself," among others. Webster's Third New International Dictionary 1191 (3d. ed. 1993). These varying definitions require the Court to look to the broader text of § 3142(f) to decide how to interpret the word in each respective passage, just as Watkins did.

The Watkins' interpretation of "involves" in § 3142(f)(1)(E) also finds support in the broader structure of the Bail Reform Act. For instance, § 3142(c)(1)(B) provides that "[i]n any case that involves a minor victim under [enumerated statutes], any release order shall contain, at a minimum, a condition of electronic monitoring." "While most of the enumerated statutes in this list expressly criminalize conduct with minors, some do not[,]" which supports Watkins' conclusion that Congress intended "involves" under § 3142(f)(1)(E) to "look beyond the elements of the charged offense to determine whether any minors were 'involved' in the particular offense committed." Watkins, 940 F.3d at 167.

Further, while the Court need not address the Bail Reform Act's legislative history to resolve the statutory interpretation question at issue, the ambiguity of "involves" in § 3142(f)(1)(E) invites additional clarity. In re Comshare Inc. Sec. Litig., 183 F.3d 542, 549 (6th Cir. 1999)

(legislative history is examined "only when the language of the statute is not clear").  The <u>Watkins</u>

panel reasoned that the Act's legislative history supports a broader definition of "involves" under

§ 3142(f)(1)(E):

> Legislative history lends further support to this textual interpretation. Subsection (E) was enacted as part of the Adam Walsh Child Protection and Safety Act of 2006 (the "Adam Walsh Act"). One of the purposes of the Adam Walsh Act is "[t]o protect children from sexual exploitation and violent crime." In order to afford minor victims of crime the greatest degree of protection, Congress added § 3142(f)(1)(E), which authorizes a pretrial detention hearing for any individual who commits a felony "that involves a minor victim" or, as relevant to Watkins, "that involves the possession or use of a firearm." By using the phrase "that involves" in this subsection, Congress clearly intended for courts to pierce the veil of the charged offense and consider the conduct underlying the offense, including who was harmed and whether any firearms were used in the course of committing the offense. If courts could not do so, felons who clearly pose the risks contemplated by the Adam Walsh Act (*i.e.*, by targeting minors or employing firearms) might not be subject to detention hearings unless the involvement of a minor or possession or use of a firearm was an element of the charged crime.

<u>Watkins</u>, 940 F.3d at 166.  Abrego contends this is an incomplete depiction of the Bail Reform

Act, citing the <u>Watkins</u> court's own admission that Congress "intended to limit the availability of

detention hearings to individuals who are actually charged with certain enumerated offenses[.]"

<u>Id.</u> at 164.  However, the Bail Reform Act "operates only on individuals who have been arrested

for a specific category of extremely serious offenses[,]" <u>Salerno</u>, 481 U.S. at 750, some of which

are, by statutory definition, not specifically enumerated.  <u>See</u> 18 U.S.C. §§ 3142(f)(1)(E), (f)(2).

Congress clearly knew how to describe specific offenses entitling the Government to a detention

hearing under § 3142(f) when it wished to do so.  <u>See</u> § 3142(f)(1)(A)–(D).  That Congress did not

do so for § 3142(f)(1)(E) and § 3142(f)(2) demonstrates that it did not intend to draft the Bail

Reform Act *so* narrowly as to only allow for detention hearings pursuant to specifically

enumerated offenses.  To read § 3142(f)(1)(E) otherwise would ignore the text of the statute and

the legislative history in support of a different outcome.

Indeed, Abrego ignores that the Bail Reform Act "was enacted as a response to what Congress viewed as a 'bail crisis in the federal courts' and 'the alarming problem of crimes committed by persons on [pretrial] release.'" United States v. Kirkpatrick, 2023 WL 4846620, at *11 (D. Kan. July 28, 2023) (quoting Salerno, 481 U.S. at 742). In response to those issues, Congress passed the Bail Reform Act to give judges the authority to determine detentions by "giv[ing] appropriate recognition to the danger a person may pose to others if released." Salerno, 481 U.S. at 742. Abrego's suggestion that "involves" means "necessarily entails" largely ignores actual dangerousness in favor of the formalities of the offenses charged that would deprive the Government to a detention hearing where clearly otherwise appropriate.[6]

Last, the Court is unaware of, and Abrego does not cite to, any cases explicitly rejecting this interpretation from Watkins. Even more, several district courts throughout the country have adopted Watkins' interpretation of "involves," both prior to and after Fields and Shular were decided. See Kirkpatrick, 2023 WL 4846620, at *9 (applying Watkins definition to "involves a minor" language under § 3142(f)(1)); see also United States v. Syed, 634 F. Supp. 3d 1036, 1043 (D.N.M. 2022) (applying Watkins to find that the Government was entitled to a detention hearing for defendant accused of knowingly making a false statement on a Form 447, which involved a firearm under § 3142(f)(1)); United States v. Elizondo, 2024 WL 1546488, at *3 (S.D. Tex. Apr. 9, 2024) (applying Watkins in finding that the Government was entitled to a detention hearing for

---

[6] Abrego also ignores other basic faults in its statutory interpretation. In asking the Court to expand the statutory analysis done in relation to § 924(e)(2)(A)(ii) of the ACCA to the instant context, it ignores instruction from the Sixth Circuit that its interpretation of "involving" under § 924(e)(2)(A)(ii) does not even extend to *other* passages of the ACCA. See United States v. Brown, 2023 WL 1861318, at *9 (6th Cir. Feb. 9, 2023) (declining to extend Fields to enhancement under § 841(b)(1)(C)). Surely if the Sixth Circuit declined to extend Fields to other uses of "involving" in the ACCA, the same statute at issue there, it would be inappropriate to blindly apply Fields here.

16

defendant accused of being a felon in possession of ammunition, which involved a firearm under § 3142(f)(1)); United States v. Chokr, 2023 WL 375336, at *4 (E.D. Mich. Jan. 24, 2023) (applying Watkins in finding that the Government was entitled to a detention hearing for defendant accused of knowingly providing a false statement during the attempted acquisition of a firearm, which involved a firearm under § 3142(f)(1)). Given the foregoing, the Court finds it appropriate to trail in other district courts' footsteps that have considered this issue, and follow Watkins as persuasive authority. In doing so, it will decide whether minor victims were part of the conduct giving rise to the instant offenses such that the Government is entitled to a detention hearing under § 3142(f)(1)(E).

2. Definition of "Victim" Under § 3142(f)(1)(E)

Having determined what "involves" means in § 3142(f)(1)(E), the Court turns to the second part of the parties' dispute: assuming Abrego's crimes involve minors, whether those minors are "victims" for the purpose of § 3142(f)(1)(E). None of the cases cited by either side, all of which discuss the vulnerable victim enhancement under U.S.S.G. § 3A1.1 for sentencing, define "victim" in this context. Nor is the Court aware of any other court that has addressed this issue. Given this lack of guidance, the Court will interpret "victim" according to traditional principles of statutory interpretation. See supra, Section III.A.1 (discussing statutory interpretation principles).

The Court, again, starts with the text of § 3142(f)(1)(E), which requires a detention hearing for any felony that is not a crime of violence "that involves a minor victim[.]" At the time of the Bail Reform Act's amendment, Webster's Dictionary defined "victim," in part, as "one that is acted on and usu[ally] adversely affected by force or agent," "one that is injured, destroyed, or sacrificed under any of various conditions," "one that is subjected to oppression, hardship, or mistreatment, or "one that is tricked or duped." Webster's Ninth New Collegiate Dictionary 1314

17

(9th ed. 1983). These definitions fit neatly with the other uses of the word "victim" in the statute, all of which contemplate individuals that are harmed, adversely acted upon, or subject to mistreatment by the crimes at issue. See, e.g., 18 U.S.C. § 3142(c)(1)(B)(v) ("avoid all contact with an alleged victim of the crime"); § 3142(e)(3)(E) ("an offense involving a minor victim under [enumerated sections]"); §3142(g)(1) ("the nature and circumstances of the offense charged, including whether the offense . . . involves a minor victim"). Because the Court sees no reason to stray from this straightforward definition of the word "victim" in §3142(f)(1)(E), the Court will apply that definition here.

3. Applicability of the "Involves a Minor Victim" Clause Under § 3142(f)(1)(E)

Applying the Watkins definition of "involves" and the above definition of "victim" under § 3142(f)(1)(E) to the present case, the Court finds that the Government has shown by a preponderance of the evidence that the crimes Abrego is charged involve minor victims. To establish that Abrego's crimes involved minor victims, Agent Joseph testified that he interviewed two witnesses, CW-1 and CW-2, and he reviewed testimony by a witness who testified before a grand jury, FC-1.[7] See Stone, 608 F.3d at 948 (stating district court properly accepted proffer testimony from FBI agent with no firsthand knowledge of alleged crimes); United States v. Smith, 79 F.3d 1208, 1210 (D.C. Cir. 1996) ("Every circuit to have considered the matter . . . [has] permitted the Government to proceed by way of proffer."); see also Webb, 2000 WL 1721060, at *2 (permitting hearsay at detention hearings). The Government also presented video footage and pictures taken at the traffic stop on November 30, 2022. Although the veracity of some of this evidence is best assessed at trial, one constant thread appeared throughout these various pieces of information that lends itself to a logical conclusion: the Government has demonstrated by a

---

[7] As the record reflects, the Court also read the grand jury testimony of FC-1.

18

preponderance of the evidence that the crimes Abrego is charged with, if true, would constitute crimes involving a minor victim.

The Court starts with Agent Joseph's testimony about his interviews with CW-1. Agent Joseph testified credibly about CW-1's interviews and the evidence presented by the Government shows that many of CW-1's statements were consistent with other evidence, providing indicia of reliability. Based on this testimony, it appears that CW-1 has personal knowledge of a human smuggling conspiracy because *he participated* in the alleged conspiracy at issue in this case. For example, the Government introduced a criminal judgment showing that he had been sentenced in 2020 for Aiding and Abetting the Illegal Transportation of an Alien within the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). The Government also presented the factual basis for CW-1's plea, stating that when he was pulled over in December 2019, he was smuggling seven individuals, three of which were from Mexico, two from El Salvador, one from Honduras, and one from Guatemala. CW-1 confirmed that he owned a smuggling business called "Trans Express" that transported individuals throughout the United States, including to Virginia, South Carolina, Georgia, and Maryland.

The Government also presented evidence demonstrating that Abrego was involved in the same human smuggling conspiracy with CW-1. For instance, the Government introduced evidence that CW-1 owned the car that Abrego was driving the night of the November 30, 2022 traffic stop, and that Abrego called CW-1, who he referred to as his "boss," before, during, and after that stop. In fact, Abrego's phone records show that he made multiple calls to his "boss" on November 30, 2022, before, during and after, the traffic stop. Agent Joseph also testified that CW-1 informed him that Abrego had been pulled over the year prior in Virgina when smuggling humans. Agent Joseph was able to confirm this event, at least as to the traffic stop, through a

19

Virgina Uniform Summons directed at Abrego from October 2021. Further, Agent Joseph testified that CW-1 informed him that he paid Abrego $1,000 to $1,500 per trip, and that the troopers that pulled Abrego over on November 30, 2022 found $1,400 in Abrego's possession. The publicly filed documents confirming CW-1's involvement in a human smuggling conspiracy and his knowledge of Abrego's involvement in the same lends credibility to Agent Joseph's testimony recounting CW-1's hearsay statements.

Given this, Agent Joseph's testimony that CW-1 received complaints from a primary source of his business that Abrego had negative interactions with some women and minor females he was responsible for transporting, while undoubtedly riddled with hearsay, carries at least some weight. Agent Joseph testified that CW-1 had concerns about Abrego's conduct, not because of its inappropriate nature, but because it was harmful to his business. While an outside observer certainly could question the details of this story (for the reasons both Abrego and the Magistrate Judge articulate), Agent Joseph's testimony about his interview with CW-2 corroborated these events. Agent Joseph testified that CW-2 confirmed that a primary source complained about Abrego acting inappropriately with women and minor females he transported, which threatened the human smuggling business and their relationship with the primary source. These remarks are also reflected in Agent Joseph's written reports about his interviews with CW-1 and CW-2 on May 15, 2025. Because the Court finds no reason to question the credibility of Agent Joseph's consistent representations about this matter, it must give this testimony considerable weight.

The remarks from CW-1 and CW-2 alone add to the evidence that Abrego's charged crimes involved minor victims. However, taking all of the other consistent pieces of evidence into consideration, the Government manages to carry its burden. For instance, the Government proffered, and Agent Joseph testified, that three separate witnesses—CW-1, CW-2, and FC-1—

had personal knowledge of the conspiracy and stated that part of the conspiracy involved transporting families and/or minors. The Court agrees with the Magistrate Judge that the inquiry under the Bail Reform Act for detention hearings is an individualized one, such that there are no per se detention rules based on the existence of a criminal enterprise. (See Doc. No. 43 at 15); see also United States v. Afyare, 2011 WL 1397820, at *3 n.2 (M.D. Tenn. Apr. 13, 2011) ("A substantial amount of the Government's proof on the detention issue involves other defendants' acts and statements. To be sure, with a conspiracy charge, any act of one conspirator is attributable to another, but on a motion to detain the Court must consider the specific facts involving the individual defendant for whom detention is sought."). For this reason, Agent Joseph's testimony about the witnesses' separate statements regarding the general nature of the human smuggling business, standing alone, could not entitle the Government to a detention hearing under § 3142(f)(1)(E). But when combined with other evidence demonstrating that the defendant was involved in that very activity, as here, the testimony about the general nature of the criminal enterprise lends credibility to and supports that defendant-specific information. See Pinkerton v. United States, 328 U.S. 640, 647 (1946) (overt act of one partner in crime is attributable to all members of the conspiracy).

One final piece of evidence presented by the Government remains: the body camera footage of the November 30, 2022 traffic stop from Tennessee Highway Patrol ("THP"), featuring a still shot of a roster of individuals in the van. The roster, generated at THP Trooper Foster's direction, suggests one of the nine individuals being transported in the van may have been a minor. According to Agent Joseph, THP Trooper Foster took a photo of the roster shortly after it was created. The image from the roster shows as follows:



According to the Government, the roster shows that the person who filed out the above birth date was born in 2007, making them a minor at the time the individual was allegedly smuggled. Like the Magistrate Judge, the Court has reservations about this evidence—which on its face is difficult to discern whether it reads "2001" or "2007"—to demonstrate that Abrego was smuggling a minor on the night of November 30, 2022. Even still, the Court must consider all of the evidence presented.

Agent Joseph testified that THP Trooper Foster took the photo of the roster depicting the 2007 birth date above. Despite the Magistrate Judge informing the Government that THP Trooper Foster is the best person to testify about this photo, the Government failed to call him during the Court's evidentiary hearing to speak on this issue. Indeed, THP Trooper Foster's testimony would have been particularly helpful here, considering that the Court cannot discern from the body camera footage who filled out this birth date, what the person looked like, or what the date looked like immediately after it was handed back to THP troopers. While the Government presents a still shot of the roster from the video, the image is so unintelligible that the Court cannot give it any weight. (See Doc. No. 84, Ex. 3). Complicating matters further, the Government still has not found or identified who this alleged minor is, despite presenting evidence that it has identified six individuals in the van on November 30, 2022 as adults that were in the United States illegally. Nevertheless, it would be a step too far at this point to conclude (without any evidence in the

record) that the 2007 birth date has been fabricated. At best, this evidence amounts to no more than a coin flip.[8]

The Court is not persuaded by the roster evidence alone that Abrego involved a minor in his crimes. However, when all of the other evidence is considered, this Court is persuaded that the Government is entitled to a detention hearing. The Government presents evidence from Agent Joseph about CW-1, CW-2, and FC-1's consistent statements on the topic of minors being smuggled in their shared business with Abrego. This shows that Abrego's charged offenses more likely than not involved conduct involving minors. Abrego contends the Government has presented no evidence that those minors were "victims" for the purposes of § 3142(f)(1)(E). While the Court agrees with Abrego that undocumented individuals in these circumstances are likely consenting to their illegal transport over country lines, that does not mean they are not victims of the circumstances under which Abrego has allegedly put them in.[9]

As HSI states, human smuggling creates security risks for the agency but also harms those being smuggled. Human Smuggling, U.S. Immigration and Customs Enforcement, https://www.ice.gov/about-ice/hsi/investigate/human-smuggling (last visited July 23, 2025). In explaining the harm to those smuggled, HSI instructs that such individuals "may become victims of human trafficking or exploitation during their journeys," "may be forced into labor or sex

---

[8] The Government also cites to evidence that Abrego used his own children as cover to support its argument that it is entitled to a detention hearing under § 3142(f)(1)(E). The Court need not consider these witness statements for this analysis, given the Government has presented no evidence that Abrego's children would be minor victims, i.e., minors who were smuggled, under § 3142(f)(1)(E).

[9] The Court finds Abrego's bald assertion during the evidentiary hearing that the Department of Homeland Security ("DHS") is the "victim" of human smuggling to diminish the nature of the crimes alleged. A person can be a victim of criminal conduct even if that conduct benefits them. An easy example is a child who is kidnapped from an abusive family situation—even though the child may benefit from this conduct, he or she is still a victim of the kidnapping.

23

trafficking," "their families may be extorted," they may be "exploited by criminal networks," they could be "expose[d] . . . to health hazards, including lack of access to medical care, unsanitary conditions[,] and the spread of infectious diseases," and could "cost[] migrants and their families large amounts of money[.]"  Id.  Information from the United States Sentencing Commission shows that such activity poses physical risks, in that while the vast majority of cases do not involve physical injury, more than a third of them do involve that risk.  Alien Smuggling, United States Sentencing Commission, https://www.ussc.gov/research/quick-facts/alien-smuggling (last visited July 23, 2025).  As Former Attorney General Merrick B. Garland opined in 2021, "[t]ransnational human smuggling . . . poses a serious criminal threat," in that "networks profit from the exploitation of migrants and routinely expose them to violence, injury, and death."  Attorney General Announces Initiatives to Combat Human Smuggling and Trafficking and to Fight Corruption in Central America, U.S. Dep't of Justice, https://www.justice.gov/archives/opa/pr/attorney-general-announces-initiatives-combat-human-smuggling-and-trafficking-and-fight (last visited July 23, 2025).  This makes combating such activity necessary, both for U.S. border security and to "help save the lives of vulnerable people these organizations routinely prey upon."  Id.  While the Government has not presented evidence that Abrego's conspiracy or transportation caused any specific minors serious harm to their health, there is at least some evidence that migrants had to pay significant sums of money for their transport under his care, and that his interactions with some female minors may have been far from pleasant.  Per HSI's and the Sentencing Commission's observation, there is always some risk to minors placed in these conditions, even if those harms do not come to fruition.  To find that those

individuals are not "victims" undermines the struggles they likely endured in coming to the United States, notwithstanding their consent to the process.[10]

It is important to remember that the Government's burden on this issue is not significant. All the Government must show to be entitled to a detention hearing under § 3142(f)(1)(E) is that it is "more likely so than not so" that the conduct Abrego allegedly engaged in involved minor victims. Williams v. Eau Claire Pub. Sch., 397 F.3d 441, 444, 446 (6th Cir. 2005) (affirming district court's use of that definition of "preponderance of the evidence"). Or, in the Government's words, it need only show this likelihood by 50% plus a feather. The Court has no reason to completely discredit Agent Joseph's testimony about his interviews with CW-1 and CW-2, and his review of FC-1's testimony, stating that Abrego both personally, and as part of the human smuggling conspiracy, transported minor victims. To the extent the witnesses' statements are as unreliable and untruthful as Abrego believes them to be, such determinations will be appropriately made when those individuals testify before the jury at trial. There, they will be subject to a rigorous cross-examination by Abrego's very capable counsel. For the time being, having weighed all of the evidence, the Government has shown by a preponderance of the evidence that Abrego's crimes involved minor victims, entitling it to a detention hearing under § 3142(f)(1)(E).

B.   The Government Cannot Demonstrate No Conditions Permit Release Under § 3142(g)

Whether "any condition or combinations of conditions of release will protect the safety of the community and reasonably assure the defendant's appearance at trial" presents no tricky issues

---

[10] Whether a minor *can* even meaningfully consent to such a process is a question that Abrego takes for granted. While the Court need not definitely answer this question for the purposes of ruling on the instant motion, it notes that the notion that a minor can consent to human smuggling such that the individual is not a victim of that crime goes against the consensus that minors often lack the ability consent by virtue of their age that pervades throughout both criminal and civil law, as well as simple humanity.

25

for the Court.  United States v. Friedman, 837 F.2d 48, 49 (2d Cir. 1988); see United States v. Madoff, 586 F. Supp. 2d 240, 247 (S.D.N.Y 2009) (same); United States v. Medoza-Balleza, 420 F. Supp. 3d 716, 716–17 (E.D. Tenn. 2019) (same).  This analysis focuses on whether there are conditions that will "reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  In making that determination, the Court considers: "(1) the nature and circumstances of the offense charged[;]" "(2) the weight of the evidence against the person; (3) the history and characteristics of the person[;]" and "(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g)(1)–(4).  For the reasons that follow, the Court agrees with the Magistrate Judge's determination that the Government has failed to establish that there are no set of conditions under which Abrego can be released.

     1.  Nature and Circumstances of Offenses

   The Court turns to the first factor—the nature and circumstances of the offenses—the Court must consider "whether the offense is a crime of violence, . . . a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device."  18 U.S.C. § 3142(g).  For the reasons discussed above, see supra, Section III.A.3, the offenses Abrego are charged with involve minor victims.  Accordingly, this factor weighs in favor of detention.

     2.  Weight of Evidence

   "This factor goes to the weight of the evidence of [risk of nonappearance and] dangerousness, not the weight of the evidence of the defendant's guilt."  Stone, 608 F.3d at 948; see also United States v. Gebro, 948 F.2d 1118, 1121 (9th Cir. 1991) (noting that Section 3142(g) "neither requires nor permits a pretrial determination of guilt"); see also 18 U.S.C. § 3142(j).  "By its terms, it deals with the factors to be considered in determining whether there are conditions

which will assure the appearance of the accused and safety of the community." United States v. Hazime, 762 F.2d 34, 37 (6th Cir. 1985). The Court will address the weight of the evidence raised by the Government on Abrego's risk of nonappearance and danger to the community in turn.

a.     *Risk of Non-Appearance*

The Government must establish by a preponderance of the evidence that Abrego is a risk of nonappearance to warrant detention under § 3142(g). See United States v. Hinton, 113 F. App'x 76, 77 (6th Cir. 2004) ("The government must prove risk of flight by a preponderance of the evidence[.]"). In support, the Government argues that Abrego is more likely not to appear if released because: (1) Abrego has a motivation to flee from ICE, given his recent unlawful detention at CECOT in El Salvador, see Abrego Garcia, 145 S. Ct. at 1018; (2) Abrego has an ICE detainer on him that makes him subject to deportation, if released; (3) Abrego was not truthful to law enforcement during the November 30, 2022 traffic stop demonstrates he seeks to evade law enforcement; (4) the weight of the evidence the Government has presented on the crimes at issue supports detention; and (5) Abrego faces a lengthy sentence, if convicted. Considering all this evidence together, the Government falls far short of the preponderance standard.

The pieces of evidence the Government cites to, taken alone or together, warrant a finding that Abrego is, at best, a low risk of nonappearance. As an initial matter, the Court agrees with Abrego that the nature of the crimes he is accused of do not, on their own, fall within the categories of crimes Congress specifically enumerated as warranting a presumption of detention. See 18 U.S.C. § 3142(e)(3). Further, to the extent the Government asks the Court to engage in a premature decision on Abrego's guilt by considering the weight of the evidence on the charges brought against him, it declines to do so, as that is not the purpose of this inquiry. See Stone, 608 F.3d at 948. The Government does not tie any of the evidence of Abrego's purported guilt to a legitimate

conclusion that makes Abrego a risk of nonappearance. Further, the weight of the evidence does not involve credible use of drugs or firearms, and his usefulness in the smuggling conspiracy is now severely compromised. And, after all, the Supreme Court noted that for years, Abrego lived a life of no known criminal behavior. See Abrego Garcia, 145 S. Ct. at 1018. Thus, the Court finds this evidence to be of little import on whether Abrego is likely to not appear for future Court proceedings.

That leaves the Government with two remaining, related arguments: that the ICE detainer and Abrego's prior unlawful deportation make him a risk of nonappearance. Neither argument, considered together or separately, is persuasive. On the first, the Court is far from satisfied. Contrary to the Government's representations, the mere existence of an ICE detainer on Abrego is insufficient, alone, to establish that he is a risk of nonappearance. See United States v. Veloz-Alonso, 910 F.3d 226, 269–70 (6th Cir. 2018) (discussing that the Bail Reform Act and immigration analyses are distinct matters that do not conflict). Indeed, "a risk of involuntary removal does not establish a 'serious risk that [Abrego] will flee' upon which pre-trial detention may be based." United States v. Ailon-Ailon, 875 F.3d 1334, 1337 (10th Cir. 2017). While it is a factor that the Court can and does consider, see United States v. Avelarea-Padilla, 2018 WL 8899334, at *3 (N.D. Ohio Oct. 25, 2018), the core inquiry here is whether Abrego will, on his own volition, not appear in court. United States v. Santos-Flores, 794 F.3d 1088, 1091–92 (9th Cir. 2015) (the "risk of nonappearance referenced in 18 U.S.C. § 3142 must involve an element of volition"). Because the existence of the ICE detainer, standing alone, does not speak to whether Abrego would voluntarily choose to not appear for court proceedings, it does little to move the needle in the Government's favor. See United States v. Sanchez-Martinez, 2013 WL 3662871, at *5 (D. Colo. July 12, 2013) ("While the court cannot detain Mr. Sanchez-Martinez based solely

28

on his immigration status or the ICE detainer, those facts are relevant and should be considered in the court's application of the Bail Reform Act."); see also Veloz-Alonso, 910 F.3d at 270 ("deportable aliens are not per se ineligible for bail"). Still, the Court acknowledges the reality that Abrego may be "released" into ICE detention, rather than the community, and considers that here.

Nor is the Court persuaded that Abrego's unlawful removal from the United States now presents a risk that he will fail to appear in court to avoid similar treatment in the future. As the Court expressed during the evidentiary hearing, it is not difficult to see why one might seek to avoid ICE after experiencing what Abrego did in recent months. See Abrego Garcia, 145 S. Ct. at 1018. Still, the irony of the Government making this argument when *it* (albeit a different department in the Executive Branch) created these circumstances is not lost on this Court. In any event, any determination that the Court would make on Abrego's likeliness to not appear because of his prior contact with ICE would be, at best, pure speculation.

The insufficiency of this evidence is underscored by what is *not* in the record that normally warrants a finding that a defendant is at risk for nonappearance. The Government has presented no evidence that Abrego has failed to appear for court proceedings in the past, that he failed to abide by the protective orders Ms. Vasquez took out against him, or that he has otherwise ever shown a pattern of disrespect for the law. Nor has the Government presented evidence that Abrego has the financial means to finance flight, even if he wanted to. To the contrary, the Court has evidence before it that suggests that if the Court released Abrego on conditions, he would comply. As the Pretrial Services Report demonstrates, Abrego has reported to an ICE officer on four separate occasions from October 23, 2020 to January 2, 2024. Further, as the THP body camera footage from November 30, 2022 demonstrates, when Abrego was pulled over that night, although

not fully truthful, he did not flee or attempt to flee, was cooperative, answered the officer's questions, and provided the officer with the information requested to the extent he was able to do so. This cuts against the notion that Abrego disrespects the law so much that he would voluntarily avoid future court proceedings or court orders if released.

Having fully considered the circumstances of Abrego's immigration status and the other pieces of evidence proffered by the Government, the Court finds the Government has failed to prove by a preponderance of the evidence that Abrego is a risk of nonappearance. Accordingly, this factor weighs against detention.

b.    *Danger to the Community*

The Government is no more successful in its efforts to demonstrate through clear and convincing evidence that Abrego is a danger to the community. See Hinton, 113 F. App'x at 77 (The government "must prove dangerousness to any other person or the community by clear and convincing evidence."). On this issue, the Government must present evidence that demonstrates "a high probability of success" on Abrego's dangerousness. Matter of Briscoe Enters., Ltd., II, 994 F.2d 1160, 1164 (5th Cir. 1993); see Gammons v. Adroit Med. Sys., Inc., 91 F.4th 820, 828 (6th Cir. 2024) ("Clear and convincing is a high burden[.]"). The evidence that the Government relies on to show this—Abrego's alleged participation in the human smuggling conspiracy, the protective orders imposed on him by Ms. Vasquez, the witness statements suggesting that Abrego had guns and drugs in his possession while smuggling, and the insinuation that Abrego is a member of MS-13—is a far cry from showing that Abrego is such a danger to others or the community that he cannot be released with conditions.[11]

_____

[11] The Government also relies on "evidence that [Abrego] solicited child pornography from another minor girl[,]" (Doc. No. 70 at 35), seemingly referring to the Government's exhibit

As the Court discussed above, the Government's general statements about the crimes brought against Abrego, and the evidence it has in support of those crimes, do not prove Abrego's dangerousness. <u>See</u> <u>supra</u>, Section III.B.2.a. Although the Government has presented evidence by a *preponderance* that Abrego transported minors, there is no solid evidence in the record indicating any of them, or others transported, were physically or emotionally harmed by Abrego. And Abrego is correct that these crimes are not those that are considered typically violent such that a presumption of detention is warranted. <u>See</u> <u>supra</u>, Section III.B.2.a. While the Court does give some weight to Agent Joseph's testimony that CW-1 and CW-1 stated Abrego was involved with guns and drugs while participating in the human smuggling conspiracy, the Court notes that this testimony was based on witness statements that *evolved* throughout the interview process, and so it alone cannot show that Abrego is a danger to the community such that he cannot be released.

The Court's mind is also not swayed after considering the 2020 and 2021 protective orders that Ms. Vasquez took out against Abrego. The Court shares the Government's and the Magistrate Judge's views that the allegations against Abrego in the protective orders are both serious and concerning. The Court does not question the veracity of Ms. Vasquez's representations, nor does it dispute the Government's argument that such conduct is difficult to monitor, given it often occurs behind closed doors. Still, the protective orders alone cannot establish by clear and convincing evidence that Abrego is such a danger to the community *today* that conditions cannot allow his release. The protective orders reflect that both matters were resolved. Ms. Vasquez dropped one, and failed to appear for the other. There is no proof offered to suggest that Abrego failed to comply with those orders while they were in place, nor evidence suggesting that Abrego has engaged in

---

showing Snapchat communications between a minor female and an individual it believes to be Abrego. While the Court has considered this evidence, it finds it does little to support the Government's argument, given it has not sufficiently tied these communications to Abrego.

31

1

8

similar conduct over the past four years. Without more, these representations of Abrego's conduct, while undoubtedly serious, are not enough in conjunction with Agent Joseph's limited testimony about guns and drugs to carry the Government's burden.

Nor does the Government's poor attempts to tie Abrego to MS-13 get it there. Of the three witnesses Agent Joseph testified about that discussed Abrego's purported affiliation with MS-13, the closest any of them come to stating that Abrego is a member of MS-13 is two witnesses stating he was "familial" with gang members and a third witness stating she "believed" him to be a member. Entirely absent from the record, however, are any indications that such "belief" is rooted in fact or that such "familial" nature came from his actual membership in or support of MS-13 rather than the simple fact that he, like many members of MS-13, is El Salvadorian. For instance, there is no evidence before the Court that Abrego: has markings or tattoos showing gang affiliation; has working relationships with known MS-13 members; ever told any of the witnesses that he is a MS-13 member; or has ever been affiliated with any sort of gang activity.[12] To the contrary, Agent Joseph presented testimony based on statements from cooperating witnesses that Abrego transported both Barrio 18 and MS-13 members alike, and was cordial with both during those trips. This cuts against the already slim evidence demonstrating Abrego is a member of MS-13. Based on the record before it, for the Court to find that Abrego is member of or in affiliation with MS-13, it would have to make so many inferences from the Government's proffered evidence in its favor that such conclusion would border on fanciful.

---

[12] The one exception to this is Agent Joseph's testimony that FC-2 told him in a recent interview that Abrego informed her that he fled El Salvador after murdering a rival gang member's mother. Because Agent Joseph has done little to corroborate this statement, whether it be through additional evidence or other witnesses' consistent statements, the Court cannot give this statement much weight.

Despite the issues raised above, the Court has considered all the evidence the Government presents on Abrego's dangerousness: the statements about Abrego's involvement with minors, guns, and drugs; Ms. Vasquez's protective orders against him; and his purportedly friendly nature with those in MS-13. In doing so, the Government fails to show by a preponderance of the evidence—let alone *clear and convincing* evidence—that Abrego is such a danger to others or the community that he such concerns cannot be mitigated by conditions of release. Given that the Government cannot meet this high bar, this factor weighs against detention. See Gammons, 91 F.4th at 828.

### 3. History and Characteristics

The Court next turns to the third factor it considers under § 3142(g), Abrego's history and characteristics. When looking at this issue, the Court considers:

> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law[.]

18 U.S.C. § 3142(g).

The Pretrial Services Report provides the Court details on Abrego's personal history and characteristics. Per the report, Abrego is 29 years old. He was born on July 26, 1995 in San Salvador, El Salvador. His father is from El Salvador, and his mother is from Beltsville, Maryland. He has three siblings: two in El Salvador, and one in the United States. Abrego is married to Ms. Vasquez, with whom he shares one child. On October 10, 2019, the United States Immigration Court in Baltimore, Maryland issued an order granting the withholding of Abrego's removal from the United States to El Salvador. Abrego has resided in Maryland for the past 13 years, during

33

which time he has repeatedly reported to ICE. Abrego was removed from the United States and transported to El Salvador on March 15, 2025. He was returned on or about June 6, 2025. Abrego has an active immigration detainer.

Abrego completed up to eighth grade education in El Salvador. Per the CASA immigrations services correspondence, Abrego was employed as a sheet metal apprentice and is a member of the Sheet, Metal, Air, Rail and Transportation ("SMART") union. The CASA correspondence indicates that SMART is willing to continue Abrego's apprenticeship and assist him with finding employment, if released. There are no assets, liens, or judgments against Abrego, and he did not report any serious physical or mental conditions to the U.S. Marshals. His prior record includes only: (1) the protective orders taken out by Ms. Vasquez against him in August 2020 and May 2021; and (2) an arrest in March 2019 for being an alien present in the United States without admission or parole.

For the reasons articulated above, see supra, Section III.B.2, and for those that follow, the Court does not find that Abrego's history and characteristics warrant detention. As discussed, there is evidence in the record that Abrego has had some limited run-ins with the law previously, his arrest in 2019 and the protective orders Ms. Vasquez issued against him. However, this short criminal history indicates that all issues were resolved without interference by Abrego. Importantly, there is no indication that he has had problems with his wife in recent years. Further, there is no evidence in the record that Abrego has any history relating to drug or alcohol abuse, or has ever failed to appear for court proceedings. The record reflects that Abrego is in good physical and mental condition, and has familial ties in the United States in the form of immediate siblings, a wife, and children. Further, the record before the Court demonstrates that Abrego also has extensive ties to Maryland, where he has lived for more than a decade.

34

The Government takes issue with Abrego's ties to Maryland, contending those ties are insufficient considering his lack of ties to the area where he faces his charges, the Middle District of Tennessee. The Government is correct that there is competing authority on whether "community ties" for this purpose refers to the community where the defendant is charged or the community where the defendant has ties. See United States v. Rivera, 90 F.Supp.2d 1338, 1343 (S.D. Fla. 2000) ("In the federal system, courts look to the ties of a defendant to the judicial district in which the criminal charges have been brought.") (citation and quotations omitted); but see United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990) (holding that "'community' in this section of the statute embraces both the community in which the charges are brought and also a community in the United States to which the defendant has ties"). Still, the Court shares the view of the Magistrate Judge and other judges in this District that Townsend is the better approach, given the mobility of the modern world and the unfairness that would result in following Rivera for defendants charged outside their areas of residence. See United States v. Woodside, 2013 WL 3479414, at *2–3, *3 n.1 (M.D. Tenn. July 11, 2013) (relying on Townsend for proposition that Florida resident had a "long history in and many connections to the community"). Accordingly, Abrego's extensive ties to Maryland, at the very least, neutralize his lack of ties to the Middle District of Tennessee.[13]

---

[13] The Government takes issue with the Magistrate Judge's reliance on the CASA immigrations services correspondence in considering Abrego's nature and characteristics, given the correspondence was "unadorned by any witness testimony subject to cross examination by the Government." (Doc. No. 70 at 34). The Court cannot imagine that the Government makes such objections here, considering this Court has accepted various pieces of evidence offered by the Government that fall under that umbrella.

At bottom, the Government fails to provide any evidence that there is something in Abrego's history, or his exhibited characteristics, that warrants detention. The Court finds the third factor weighs against detention.

4. Danger to Any Person or the Community

Lastly, the Court considers "the nature and seriousness of the danger to any person or the community that would be posed" by Abrego's release under 18 U.S.C. § 3142(g)(4). For the reasons already stated, see supra, Section III.B.2.b, the Court finds that this factor also weighs against detention.

Because the law's "default position . . .is that a defendant should be released pending trial," Stone, 608 F.3d at 945, and because three of the four § 3142(g) factors counsel release, the Court agrees with the Magistrate Judge that the Government has failed to carry its burden of showing that no condition or combination of conditions will reasonably assure Abrego's appearance or the safety of others.[14] Accordingly, Abrego should be released with the conditions imposed by the Magistrate Judge during the June 25, 2025 hearing.

IV. CONCLUSION

The Government has failed to show on appeal that this case is one of the "carefully limited exception[s]" where detention pending trial is justified, entitling Abrego to his liberty in the meantime. Salerno, 481 U.S. at 754. Accordingly, the Government's Motion for Revocation of Release Order (Doc. No. 45) will be denied. Abrego should be released upon the Magistrate Judge's issuance of the release order.

---

[14] Because 18 U.S.C. § 3142(e)(3) does not apply here, the Government does not benefit from a presumption of detention.

36

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE