# AFFIDAVIT IN SUPPORT OF RESPONSE TO MOTION

As evidenced by the signatures below, the following statements are made under oath and in support of the Government's Response to the defendant's Motion to Dismiss Indictment:

1. Robert McGuire has been a federal prosecutor since April 2018. Prior to that, Mr. McGuire was a state prosecutor for thirteen years and engaged in criminal defense work while in private practice for nearly four years. From May 2019 to January 2023, Mr. McGuire served as both the Deputy Chief over the General Crimes Unit and the Immigration Crime Coordinator for the United States Attorney's Office for the Middle District of Tennessee (USAO-MDTN). Mr. McGuire has previously tried two alien smuggling cases to a jury verdict and prosecuted several more which resolved prior to trial.
2. On December 28, 2024, Mr. McGuire became the Acting United States Attorney for the Middle District of Tennessee.
3. Christopher Eason and Jacob Warren were selected as the Co-Directors of Joint Task Force Vulcan (JTFV) in February 2025. Jeremy Franker was selected as a Deputy Director for JTFV in February 2025. Jason Harley was selected as a trial attorney for JTFV in May 2025. The JTFV attorneys are all long-standing Department of Justice attorneys.
4. On the evening of Sunday, April 27, 2025, Mr. McGuire received a call from Special Agent Rana Saoud, the Special Agent in Charge (SAC) for Homeland Security Investigations (HSI) in the Middle District of Tennessee. SAC Saoud informed Mr. McGuire that HSI was referring a case to USAO-MDTN that involved potential human smuggling committed by Kilmar Armando Abrego Garcia (Abrego Garcia). Mr. McGuire decided to handle the matter himself and asked SAC Saoud to assign an HSI agent to the investigation.
5. On April 28, 2025, JTFV agreed to provide assistance to Mr. McGuire and the USAO-MDTN in the investigation of Abrego Garcia. The assistance JTFV agreed to provide Mr. McGuire and his office was consistent with how JTFV operates. Specifically, JTFV provides resources and support to United States Attorneys in their investigations of alleged members and associates of La Mara Salvatrucha (MS-13) and Tren de Aragua.
6. Prior to April 27, 2025, the undersigned had no involvement in the Abrego Garcia case, either the criminal investigation or any civil or immigration case, in any capacity.
7. Given that the matter was potentially controversial and, because he had previously handled multiple alien smuggling cases in the past, Mr. McGuire decided he would work and lead the investigation himself on behalf of the USAO-MDTN.
8. After opening the investigation, Mr. McGuire learned that the Tennessee Highway Patrol (THP) had made a referral to another HSI agent about this traffic stop on or about December 1, 2022. This matter was never presented to the USAO-MDTN for review.
9. During November and December 2022, the procedure for any federal law enforcement agency wishing to have the USAO-MDTN consider an immigration-related crime for prosecution was to present the case to Mr. McGuire as the General Crimes Unit Chief and the Immigration Coordinator. The investigation involving Abrego Garcia's conduct on

1

November 30, 2022, was never presented to Mr. McGuire during his tenure as the General Crimes Chief and Immigration Coordinator. Mr. McGuire has found no record that it was ever presented to the USAO MDTN for consideration until April 27, 2025.

10. During the week of April 28, 2025, Mr. McGuire received and reviewed the Body Worn Camera (BWC) footage obtained by the THP in Putnam County on November 30, 2022. Given his experience, Mr. McGuire immediately noted the similarities between the conduct portrayed on the BWC and the conduct by other human smugglers in previous cases.

11. Over the next several weeks, law enforcement conducted multiple interviews of individuals with information about Abrego Garcia's activities in Tennessee and elsewhere. Several of these individuals eventually testified in federal grand juries in Tennessee and Texas. The evidence collected established not only that Abrego Garcia had committed a crime while transporting individuals on November 30, 2022, but that he had been involved in a human smuggling conspiracy for years.

12. Prior to April 2025, Jose Hernandez Reyes, a convicted human smuggler and the owner of the vehicle the defendant was driving in November 2022 when he was stopped by the THP, had not been interviewed by law enforcement about the November 30, 2022, traffic stop where the defendant was driving Hernandez Reyes' vehicle. Prior to April 2025, Hernandez Reyes had not provided a statement that the defendant was using Hernandez Reyes' vehicle to smuggle illegal aliens on November 30, 2022. Prior to April 2025, Hernandez Reyes had not provided a statement that the defendant had called him during and after the traffic stop in Tennessee. Prior to April 2025, Hernandez Reyes had not provided a statement that the defendant had been paid for transporting illegal aliens during the course of the conspiracy.

13. Prior to April 2025, none of the passengers in the defendant's vehicle on November 30, 2022, had been identified as having previously been deported from the United States which would establish their identity as illegal aliens being transported.

14. The evidence about the defendant's participation in a conspiracy was not known to the undersigned or available prior to April 2025 because co-conspirators had not been located, interviewed, or testified in front of a grand jury prior to that date.

15. Additional evidence, such as the phone records that established that the defendant had not been in St. Louis as he claimed to the THP troopers during November 2022 was also not available to the undersigned until after April 2025.

16. During May 2025, after reviewing the evidence in this case and consistent with Department policy, Mr. McGuire became firmly convinced that, at trial, he could prove beyond a reasonable doubt that Abrego Garcia committed the offenses of unlawful transportation of an illegal alien for financial gain and that he conspired to commit the offense of unlawful transportation of an illegal alien for financial gain. The attorneys from JTFV agreed that there was clear proof beyond a reasonable doubt that Abrego Garcia had committed federal crimes.

17. Mr. McGuire led the Indictment presentation to the federal grand jury sitting in Nashville on May 21, 2025. That same grand jury had previously heard from multiple witnesses during the course of the investigation. A true bill was returned later that day.
18. The undersigned had no involvement in the return of Abrego Garcia to the United States.
19. The undersigned did not seek and would not have sought the Indictment of Abrego Garcia for an improper purpose such as to punish him for his assertion of a right.
20. Starting on July 13, 2025, Mr. McGuire sent an email to the defense regarding a potential plea agreement for the defendant. Mr. McGuire's email did not reference a potential third country deportation as part of a plea agreement.
21. On July 16, 2025, after a court hearing on this case, Mr. McGuire spoke with Mr. Hecker about potential resolution of the case. It was a cordial and respectful conversation. During that conversation Mr. Hecker noted that finding an acceptable third country for the defendant to be deported to post-sentencing would be an important as part of a plea agreement and Mr. Hecker mentioned Mexico as a potential acceptable third country destination. At no time during this conversation was the issue of potential coercion of the defendant raised.
22. The next communication on plea discussions came from defense counsel on July 18, 2025, Mr. Dean replied to Mr. McGuire's email on July 13, 2025 on behalf of defense counsel and stated that the defendant was willing to engage in plea negotiations but stated: "Mr. Abrego is only interested in a plea deal that also resolves his outstanding immigration issues by ensuring that upon the completion of his sentence, he is deported to a Spanish-speaking third country in North or Central America—like Mexico—where he can live freely and safely without the specter of refoulement to El Salvador. If you and your colleagues are willing to work with Mr. Abrego to resolve his case along those lines, we welcome plea discussions." All of the defendant's attorneys were copied on this email.
23. Also on July 18, 2025, via email, the parties agreed to jointly seek a stay of the defendant's release from custody to provide for additional time for the parties to negotiate a potential plea agreement.
24. Based on the defense counsel's written request on July 18, 2025, Mr. McGuire began to work with Mr. Dean, each as their party's representative, on a potential plea agreement. On July 25, 2025, Mr. McGuire emailed all the defense attorneys a draft plea agreement for their review.
25. On July 29, 2025, the defense responded with a revised draft of the plea agreement that, to the Government's understanding, was a draft of the plea agreement acceptable to the defendant and involved him entering a guilty plea.
26. On August 2, 2025, the defense informed the Government by email that the countries that the defendant would accept post-conviction deportation to were Mexico, Panama, and Costa Rica. All defense attorneys were copied on this communication.
27. By early August 2025, Mr. McGuire and Mr. Dean were speaking by phone almost daily in attempts to resolve the case by plea agreement. During these discussions and subsequent

3

emails, specific points of the draft plea agreement were refined and with an agreement reached on each point.

28. On August 7, 2025, Mr. Dean and Mr. McGuire represented their respective parties in a chambers conference with the Court about scheduling. During this meeting, both lawyers informed the Court the parties were engaged in "serious" plea discussions.

29. By mid-August, Mr. McGuire, by virtue of his conversations with Mr. Dean, believed that with virtually all other points of negotiation resolved, the parties' plea discussions revolved almost entirely on the third country to which the defendant could be deported to after serving his sentence.

30. During the course of plea negotiations, the defense was insistent that the Government provide some documentary proof from the third country that the defendant would be accepted, be at liberty, and not be refouled to El Salvador. Obtaining this document from a foreign government was not easily obtained and took multiple weeks, a fact that Mr. McGuire communicated to the defense on several occasions.

31. Based on Mr. McGuire's conversations with Mr. Dean as well as in public filings and statements on the record at hearings, it was well known by the defense that the defendant faced deportation to a country not of his choosing were he to be released from Bureau of Prisons custody. At various points, Mr. Dean expressed that finding an acceptable third country for the defendant to be deported to after serving his sentence was the most important part of the plea negotiation from the defendant's perspective.

32. On August 19, 2025, the defense filed a motion to dismiss for vindictive prosecution and a motion to schedule the defendant's release.

33. However, Mr. McGuire and Mr. Dean, as their parties' representatives, were still discussing a potential plea agreement even after these motions were filed.

34. On August 21, 2025, Mr. McGuire sent the defense attorneys the letter from the Costa Rican government that the defense had insisted on indicating that Costa Rica—a country identified by the defendant as an acceptable country for him to be deported to—would accept the defendant, keep him at liberty, provide him some status and not refoul him to El Salvador. All of these points were ones that the defense explicitly requested as a necessary component of any plea agreement.

35. At the time he sent the Costa Rica letter to the defense, Mr. McGuire believed the negotiations were far from preliminary but, instead, they were concluded and that the Costa Rica letter was the culmination of over a month of reciprocal and good faith plea negotiations.

36. On Friday, August 22, 2025, Mr. McGuire went to the Putnam County Jail to meet with Mr. Dean who, in turn, was meeting with the defendant prior to his release from federal custody. During that meeting Mr. McGuire had a copy of the draft plea agreement in its final form.

37. Mr. Dean informed Mr. McGuire that while the defendant wanted to be released that day, he hoped to consider the plea agreement "in the future". At no time did Mr. Dean express

4

that the defendant felt coerced by the plea offer. Mr. McGuire, for his part, stated he would keep the plea agreement offer open for at least the weekend given that the parties had been working on it for over a month.

38. The prosecution team had no prior knowledge that the Department of Homeland Security (DHS) would order the defendant to report to an Immigration and Customs Enforcement office in Baltimore on Monday, August 25, 2025, or that DHS would notify the defendant that he would potentially be deported to Uganda. In fact, Mr. McGuire learned these developments from Mr. Dean while they were still together at the Putnam County Jail and Mr. McGuire expressed some surprise about both developments to Mr. Dean.

39. Later on August 22, 2025, the Government sent an email to defense counsel keeping the plea offer open through the weekend, in line with Mr. McGuire's oral promise to Mr. Dean earlier that same day, and gave an expiration date and time of 8 AM on Monday, August 25, 2025. The Government selected this particular date and time both because of the uncertainty with respect to the timing of the defendant's deportation and due to the fact that the agreement was the result of extensive plea negotiations that – based on representations from defense counsel – the Government believed Abrego Garcia would accept.

40. Prior to August 23, 2025, the defense had never suggested that the plea discussions amounted to coercion.

41. On Saturday morning, August 23, 2025, the defense filed a supplement to their Motion to Dismiss claiming to the Court that the Government sought to coerce the defendant into accepting a plea agreement.

42. On Saturday afternoon, Mr. Dean contacted Mr. McGuire and inquired if the plea offer was still "open" because, according to Mr. Dean, the entire defense team, as well as the defendant's immigration attorneys, were recommending that the defendant accept the government's plea offer despite their filing earlier that morning. Mr. McGuire informed Mr. Dean that the offer was still open but noted that this position was at odds with their filing earlier that morning. Mr. Dean agreed that they were inconsistent but stated that the defense still hoped to reach an agreement with the Government.

43. At no time during the weekend of August 23-24, 2025, did anyone on the defense, apart from the Saturday morning filing, express that the defendant felt coerced to take the Government's plea agreement. Rather, the communications from the defense—through Mr. Dean to Mr. McGuire—was that the Government's offer was fair, reasonable, and in the defendant's best interest.

44. Ultimately, on Sunday August 24, 2025, Mr. Dean informed Mr. McGuire that the defendant had rejected the Government's plea offer.

45. At no time did any of the prosecution team attempt to coerce the Defendant to enter a guilty plea. Rather, the Government engaged in good faith negotiations to resolve a pending criminal case. Negotiations surrounding a third country of deportation were initiated by the defendant through counsel, the acceptable countries he could be deported to were chosen by him and not the Government, and at all times the defense was actively engaged in

5

seeking positive resolution for the defendant. All of Mr. McGuire and Mr. Dean's communications during these discussions were cordial, respectful, and honorable. Any allegations of attempted coercion by the defense are provably false.

46. The undersigned bears no ill-will toward Abrego Garcia personally nor his family. The undersigned supported the Indictment of Abrego Garcia to hold him accountable for the offenses he committed and to protect public safety.
47. The plea negotiations conducted by the undersigned were conducted in good faith with an intent to resolve the case against Abrego Garcia on the terms that he requested through counsel.
48. The undersigned never received any direction from the Office of the Attorney General or the Office of the Deputy General, or any other attorney at Main Justice, that was unethical or inappropriate.
49. The undersigned does not have, nor have we ever had, any personal or professional interest in the outcome of Abrego Garcia's immigration-related lawsuit in Maryland, nor did we have contact with the attorneys involved in it prior to presenting the Indictment, nor would the undersigned stand to benefit in a particular outcome of that matter.
50. After a thorough review of the evidence, which the undersigned deemed to be overwhelming, we reached the conclusion that charging Abrego Garcia was the correct legal decision, consistent with Department of Justice Policy for such criminal activity, and that choosing to not charge Abrego Garcia, given the evidence, would be the wrong legal decision without any lawful justification.
51. At all times during this prosecution, the undersigned have sought to act in concert with applicable Department of Justice policy, our oaths as prosecutors, and our oaths as attorneys.

FURTHER THE AFFIANTS SAYETH NOT.

Signed the 15th day of September, 2025.

_____
ROBERT E. McGUIRE
Acting United States Attorney

_____
JACOB WARREN
Director, Task Force Vulcan

_____
CHRIS EASON
Director, Task Force Vulcan

_____
JEREMY FRANKER
Deputy Director, Task Force Vulcan

_____
JASON HARLEY
Task Force Vulcan