IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

UNITED STATES OF AMERICA

v.

KILMAR ARMANDO ABREGO GARCIA,

*Defendant.*

No. 3:25-cr-115

Judge Waverly D. Crenshaw, Jr.

**MOTION AND MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT KILMAR ARMANDO ABREGO GARCIA'S
MOTION TO SUPPRESS TRAFFIC STOP AND FRUITS
THEREOF**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ....................................................................................................................... 2

ARGUMENT ............................................................................................................................. 5

    I.    Applicable Law .............................................................................................................. 5

    II.    Trooper Brawner's Mistake of Law Was Unreasonable .................................................. 6

    III.    There Is No Credible Evidence Mr. Abrego Was Speeding ............................................. 9

CONCLUSION ........................................................................................................................ 12

# **TABLE OF AUTHORITIES**

**CASES**

*Akima v. Peca*,
　85 F.4th 416 (6th Cir. 2023) ................................................................................................ 7, 9

*Barrera v. City of Mount Pleasant*,
　12 F.4th 617 (6th Cir. 2021) .................................................................................................... 6

*Delaware v. Prouse*,
　440 U.S. 648 (1979) ................................................................................................................. 5

*Hart v. Hillsdale County*,
　973 F.3d 627 (6th Cir. 2020) ............................................................................................... 7, 9

*Heien v. North Carolina*,
　574 U.S. 54 (2014) ................................................................................................................... 6

*Noem v. Abrego Garcia*,
　145 S. Ct. 1017 (2025) ............................................................................................................. 3

*Northrup v. City of Toledo Police Dep't*,
　785 F.3d 1128 (6th Cir. 2015) ................................................................................................. 7

*People v. Owen*,
　No. 339668, 2019 WL 3312531 (Mich. Ct. App. July 23, 2019) ............................................ 9

*State v. Steinhagen*,
　No. M2009–01592–CCA–R3–CD, 2010 WL 2712531 (Tenn. Ct. Crim. App. July 9, 2010) .. 8

*United States v. Beal*,
　810 F.2d 574 (6th Cir. 1987) .................................................................................................... 6

*United States v. Blair*,
　524 F.3d 740 (6th Cir. 2008) .................................................................................................... 5

*United States v. Collazo*,
　818 F.3d 247 (6th Cir. 2016) .................................................................................................... 5

*United States v. Davis*,
　430 F.3d 345 (6th Cir. 2005) .................................................................................................... 6

*United States v. Fletcher*,
　978 F.3d 1009 (6th Cir. 2020) .................................................................................................. 7

*United States v. Freeman*,
  209 F.3d 464 (6th Cir. 2000) ............................................................................................... 5

*United States v. Gross*,
  550 F.3d 578 (6th Cir. 2008) ............................................................................................... 5

*United States v. Hayes*,
  458 F. Supp. 3d 857 (E.D. Tenn. 2020) ....................................................................... 10, 11

*United States v. Huff*,
  630 F. App'x 471 (6th Cir. 2015) ........................................................................................ 9

*United States v. Jackson*,
  544 F. Supp. 3d 817 (M.D. Tenn. 2021) .......................................................................... 5, 6

*United States v. Marsh*,
  95 F.4th 464 (6th Cir. 2024) .............................................................................................. 6, 7

*United States v. Mesa*,
  62 F.3d 159 (6th Cir. 1995) ................................................................................................. 1

*United States v. Ruiz*,
  832 F. Supp. 2d 903 (M.D. Tenn. 2011) ..................................................................... *passim*

*United States v. Sowards*,
  690 F.3d 583 (4th Cir. 2012) ............................................................................................... 9

*United States v. Stevenson*,
  43 F.4th 641 (6th Cir. 2022) ................................................................................................ 7

*United States v. Taylor*,
  121 F.4th 590 (6th Cir. 2024) .............................................................................................. 5

*United States v. Townsel*,
  No. 2:16-CR-20084, 2016 WL 7109677 (W.D. Tenn. Dec. 6, 2016) ................................ 10

*Wesley v. Campbell*,
  779 F.3d 421 (6th Cir. 2015) ............................................................................................... 9

*Wong Sun v. United States*,
  371 U.S. 471 (1963) .......................................................................................................... 12

**STATUTES**

Tenn. Code § 55-8-123 ............................................................................................................. 4

Tenn. Code § 55-8-152 ......................................................................................................... 5, 8

Tenn. Code § 55-8-153 ......................................................................................................... 3, 8

**OTHER AUTHORITIES**

Tenn. Op. Atty. Gen. No. 05-105 (July 7, 2005) ................................................................. 8

# PRELIMINARY STATEMENT

Under the Fourth Amendment, officers retain broad authority to stop "vehicles for any infraction, no matter how slight," and no matter the officer's "real purpose" behind the stop. *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995). But because such authority has been "extended to the broadest extent possible," this Circuit has recognized its own concurrent duty "to see that the authority is not abused." *Id.* An officer cannot expand the scope of his mandate to conduct "fishing expeditions" to search for evidence of criminal activity where he lacks probable cause or reasonable suspicion to initiate the stop in the first place. *Id.* There is a strong likelihood that such an abuse of authority occurred in the traffic stop that gave rise to this case.

On the evening of November 30, 2022, Tennessee Highway Patrol Trooper Joshua Brawner turned on his body camera while already in pursuit of a Chevy Suburban being driven by Kilmar Armando Abrego Garcia. Seconds into the footage, Trooper Brawner pulled Mr. Abrego over and told him that the speed limit was 65 miles per hour, but Mr. Abrego was going 75. The first clause in that statement was false. And the government has produced no evidence corroborating the second. Mr. Abrego, for his part, promptly told Trooper Brawner that he was driving the correct speed limit, 70 miles per hour; but Trooper Brawner maintained that Mr. Abrego was driving over the incorrect speed limit, 65. There is no radar or vehicle data confirming Mr. Abrego's speed. There is no evidence that Trooper Brawner paced Mr. Abrego's car at any point. Instead, the evidence the government has produced contains two competing statements: that of a trooper who was wrong about the speed limit and claimed Mr. Abrego was exceeding it, and that of Mr. Abrego, who correctly noted that the speed limit was 70 and claimed to have been driving at that speed. This record is simply insufficient to meet the government's burden to prove the lawfulness of the stop by a preponderance of the evidence, and it requires suppression of the

1

stop and all fruits thereof or, at a minimum, a suppression hearing.

## BACKGROUND

On November 30, 2022, at approximately 7:57 p.m., Tennessee Highway Patrol Trooper Joshua Brawner pulled Mr. Abrego over at mile marker 289.4 on Interstate 40 in Cookeville, Tennessee, allegedly for speeding. According to Trooper Brawner's body camera footage—the camera was turned on less than a minute before the stop itself—Trooper Brawner tailed Mr. Abrego for mere seconds and then turned on his lights, indicating that Mr. Abrego should pull over. (*See* Ex. A at 0:00-0:53). When Mr. Abrego did, Trooper Brawner came to the passenger side of the vehicle and told Mr. Abrego that the reason he was stopped was because he was "running 75 down through here," even though the speed limit "is 65 through here." (*Id.* at 1:35-1:42). Mr. Abrego, surprised, said that he was going "70," and asked what the speed limit was where he was stopped, indicating that he thought it was 70 miles per hour. (*Id.* at 1:45-2:05). Trooper Brawner responded that the speed limit was 65 miles per hour on this stretch of highway. (*Id.*)

Trooper Brawner then prolonged the stop for an hour and twenty minutes. (*See id.*) During that time, Mr. Abrego was interviewed by multiple officers; he provided his license (which he willingly told Trooper Brawner was expired, (*id.* at 2:35-2:40)) and the car's registration, (*id.* at 3:45-3:55); Trooper Brawner brought his dog around the Suburban but it did not alert, (*id.* at 13:20-14:54); Mr. Abrego was detained in a police car while the passengers in the Suburban were asked to provide their names and dates of birth, (*id.* at 26:45-26:55, 53:44-1:03:45); and multiple troopers appeared to report Mr. Abrego to Homeland Security Investigations ("HSI") and the FBI for human smuggling, (*id.* at 41:50-52:00, 1:07:10-1:07:15), or, as the troopers put it, "ass-hauling," (*id.* at 15:15-15:20; 23:15-23:25). Apparently failing to pique the interest of either agency to come

pick up Mr. Abrego or the passengers in the Suburban, Trooper Brawner let Mr. Abrego go without a citation. (*Id.* at 1:18:30-1:19:35).

Unbeknownst to Mr. Abrego—and perhaps to the Tennessee Highway Patrol itself—the stop caused HSI's Baltimore field office to launch an investigation into Mr. Abrego that would last two and a half years. (Ex. B at 1-2). After apparently failing to muster evidence for any crimes—including smuggling—HSI Baltimore's investigation instead culminated in Mr. Abrego's unlawful removal to El Salvador. (*Id.* at 2). After the Supreme Court affirmed the district court's order requiring the government to "facilitate" Mr. Abrego's return from El Salvador, *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025), the November 30, 2022 traffic stop—which occurred because Mr. Abrego was allegedly going 75 miles per hour in a 65 miles-per-hour zone— was resurrected as the centerpiece of the government's newfound smuggling charge. Indictment ¶¶ 30, 32. But there are two problems with the initiation of that stop.

The first is that Trooper Brawner's statement—that the speed limit was 65 at and before the mile marker where Mr. Abrego was stopped—is false. In November 2022, the speed limit on the eastbound stretch of I-40 at mile marker 289.4 in Cookeville was 70 miles per hour, not 65. A compilation of Google Earth photographs of I-40 from November 2022 reveals that the closest speed limit sign on I-40 going eastbound, at mile marker 287.6, shows a speed limit of 70 miles per hour. (*See* Ex. C at 3:10-3:40). There are no other speed limit signs before mile marker 289.4, the location of the traffic stop. (*See id.*) And records obtained from the Tennessee Department of Transportation ("TDOT") show the posted speed limits in Putnam County: The speed limit is 70 for almost the entire county, save for a short stretch *after* the traffic stop location where it is 65 for five miles, then jumps back up to 70. (*See* Ex. D).[1] In sum, Trooper Brawner's claim that Mr.

---

[1] TDOT produced to the defense a spreadsheet showing the speed limits on I-40 in Putnam County. (*See* Ex. D). That spreadsheet shows that, 24.78 miles into Putnam County, the speed limit drops

3

Abrego was driving in a 65 mile-per-hour zone when he was pulled over for speeding was incorrect.

Second, apart from Trooper Brawner's statement to Mr. Abrego that he was going 75, there is no other evidence that Mr. Abrego was speeding. There is no Automatic Vehicle Location (AVL) data or Mobile Data terminal (MDT) data from Trooper Brawner's vehicle. (*See* Ex. H). Radio from the stop does not describe Brawner's justification for the stop. (*See* Ex. I). Trooper Brawner never stated that he used a radar gun to check Mr. Abrego's speed, nor is there any evidence that he used one. And even if the government argues that observing the speedometer in Trooper Brawner's vehicle could be used to approximate Mr. Abrego's speed, the speedometer in Trooper Brawner's vehicle is not viewable in the body camera video. (*See* Ex. A at 0:00-0:40). The government has confirmed to the defense that it has been "provided with all of the information that presently exists for this traffic stop," confirming the lack of objective evidence of Mr. Abrego's speed. (Ex. J at 5). Accordingly, apart from Trooper Brawner's statement—uttered within seconds of a demonstrably false statement about the speed limit—there is no evidence that Mr. Abrego was speeding.[2]

---

to 65. *Id.* Google Earth photographs from 2022 show that the stretch of I-40 in Putnam County begins just before mile marker 267.4. (*See* Ex. E). This means that the speed limit drops to 65 just after mile marker 292, more than two and a half miles past the location of Trooper Brawner's stop of Mr. Abrego. Google Earth photographs from 2022 also confirm the placement of the 65 speed limit sign just after mile marker 292. (*See* Ex. F.)

In addition, records obtained from TDOT show that there were only two actions in the vicinity on that day that might constitute road work that could have caused TDOT to temporarily alter the speed limit along I-40 in Putnam County: removal of a dead coyote at midnight right before mile marker 280, and a roadway inspection for litter between mile marker 279.9 and 280.1 at 11:02 a.m. (*See* Ex. G at 1-2); *see also* Tenn. Code § 55-8-153(a). Both took place miles away from mile marker 289.4 and hours away from the stop. There is no sign of construction zones or other road work in the body camera footage, or any evidence that the speed limit was altered as a result. (*See generally* Ex. A).

[2] Trooper Brawner also tells another officer half an hour into the stop that Mr. Abrego was "right in the middle of the interstate there for a minute." (Ex. A at 30:10-30:15). But there is no evidence,

4

# ARGUMENT

**I.      Applicable Law**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop is unquestionably a Fourth Amendment seizure and thus must be reasonable. *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). "To qualify as a *reasonable* seizure, the traffic stop must be supported (1) by probable cause to believe a civil traffic violation occurred, or (2) by reasonable suspicion of ongoing criminal activity." *United States v. Jackson*, 544 F. Supp. 3d 817, 820 (M.D. Tenn. 2021) (Crenshaw, J.) (citing *United States v. Collazo*, 818 F.3d 247, 253-54 (6th Cir. 2016)). "If the initial traffic stop is unreasonable, then it violates the Fourth Amendment and the evidence and statements obtained from that illegality must be excluded as 'fruit of the poisonous tree.'" *Id.* (citing *United States v. Gross*, 550 F.3d 578, 583 (6th Cir. 2008)).

Because a violation of Tennessee Code § 55-8-152—making it unlawful for a vehicle to drive in excess of the speed limit—is a traffic violation, law enforcement must have probable cause to believe such a violation has occurred. *United States v. Ruiz*, 832 F. Supp. 2d 903, 911-12 (M.D. Tenn. 2011) (Trauger, J.).[3] Probable cause exists "where the facts and circumstances within [the

---

apart from Trooper Brawner's statement, that Mr. Abrego moved between lanes without signaling or otherwise drove "in the middle" of the highway. *See* Tenn. Code § 55-8-123(1) ("A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with safety."). Trooper Brawner did not tell Mr. Abrego that he was being pulled over for driving between lanes.

[3] We note that there is some confusion within the Circuit regarding whether probable cause or reasonable suspicion is required to stop a vehicle for a traffic violation. *Compare, e.g.*, *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) ("A police officer legally may stop a car when he has probable cause to believe that a civil traffic violation has occurred."), *with United States v. Taylor*, 121 F.4th 590, 594 (6th Cir. 2024) ("The reasonableness of a traffic stop depends on whether the police have reasonable suspicion to believe that a traffic violation has occurred."). In

officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005) (cleaned up). "The government bears the burden of showing, by a preponderance of the evidence, that probable cause for the traffic stop existed." *Ruiz*, 832 F. Supp. 2d at 912 (citing *United States v. Beal*, 810 F.2d 574, 577 (6th Cir. 1987)); *see also Jackson*, 544 F. Supp. 3d at 820 (applying the preponderance of the evidence standard to traffic stop based on reasonable suspicion). While probable cause or reasonable suspicion can be based on a mistake of fact or law, such mistakes must be objectively reasonable. *Heien v. North Carolina*, 574 U.S. 54, 60-61 (2014).

## II. Trooper Brawner's Mistake of Law Was Unreasonable

While "to be reasonable is not to be perfect," "an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce." *Heien*, 574 U.S. at 60, 67. *Heien* and its progeny are not intended and must not be read to "discourage officers from learning the law." *Id.* at 66. In determining whether an officer's interpretation of a law is objectively reasonable, the Sixth Circuit has explained that a district court should first look to state caselaw. *United States v. Marsh*, 95 F.4th 464, 468 (6th Cir. 2024); *see also Barrera v. City of Mount* Pleasant, 12 F.4th 617, 621 (6th Cir. 2021) ("Favorable case law goes a long way to showing that an interpretation is reasonable."). If, for instance, a state appellate court has described a statute as ambiguous or susceptible to multiple interpretations, then an officer's suspect interpretation of that law is more likely to be reasonable. *See Marsh*, 95 F.4th at 469-470 (holding officer's mistake of law to be objectively reasonable where (among other things) the Tennessee

---

any case, the distinction is ultimately "academic," since Trooper Brawner "had either reasonable suspicion or probable cause to believe that [Mr. Abrego was] speeding if, and only if, he actually observed [him] speeding." *Ruiz*, 832 F. Supp. 2d at 912 n.12.

6

Supreme Court had described the statute at issue as "hardly a model of clarity"). If there is no applicable state caselaw, courts "must consider the statutory language itself." *United States v. Stevenson*, 43 F.4th 641, 646 (6th Cir. 2022).

*Marsh*, *Stevenson*, and other cases in this Circuit have established the uncontroversial principle that while reading an "ambiguously worded statute" might require an officer to make a judgment call as to whether a particular situation falls within the ambit of criminal liability, officers are accorded no such leeway where the law is clear. *Hart v. Hillsdale County*, 973 F.3d 627, 637 (6th Cir. 2020); *see also Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1132 (6th Cir. 2015) ("If it is appropriate to presume that citizens know the parameters of the criminal laws, it is surely appropriate to expect the same of law enforcement officers—at least with regard to unambiguous statutes.").

The caselaw is replete with examples of this principle in action. In *Hart*, officers mistakenly required the plaintiff to register as a sex offender even though the Sex Offender Registry Act ("SORA") plainly did not require him to do so. Though Defendants argued that the mistake was objectively reasonable, the Circuit disagreed: "No objectively reasonable reading of SORA includes Hart within its scope. SORA is long, but it is perfectly clear." *Hart*, 973 F.3d at 637. In *Northrup*, an officer stopped, disarmed, and handcuffed a man who was openly carrying his firearm, even though the man had a concealed carry permit, unambiguously rendering his carry legal in Ohio. 785 F.3d at 1129-32. In *Akima v. Peca*, an officer's misreading of a breathalyzer did not render the mistake reasonable, because reading a breathalyzer "invites no[]…hazy judgment calls." 85 F.4th 416, 428 (6th Cir. 2023). It instead "yields a single, objective reading that every reasonable officer should be able to ascertain." *Id.*; *see also United States v. Fletcher*, 978 F.3d 1009, 1018 (6th Cir. 2020) (holding a search of a cell phone unreasonable where the scope of the

7

authorization did not explicitly include such a search).

So too here. First, consider the statute itself. Tennessee Code § 55-8-152(c) provides:

> On all controlled-access highways with four (4) or more lanes, which are designated as being on the state system of highways or the state system of interstate highways, it is unlawful for any person to operate or drive a motor vehicle or a truck at a rate of speed in excess of seventy miles per hour (70 mph).

Apart from the default speed limit as described in § 55-8-152(c), TDOT is empowered to set lower speed limits where "the public safety requires" it. *See id.* § 55-8-153(a); *see also* § 55-8-152(f); Tenn. Op. Atty. Gen. No. 05-105 (July 7, 2005). Mr. Abrego is not aware of any Tennessee caselaw suggesting that this statutory language is ambiguous or otherwise susceptible to any interpretation other than that unless TDOT has set a lower speed limit, the default speed limit for interstate highways is 70 miles per hour. To the contrary, Tennessee courts—including the Tennessee Court of Criminal Appeals—have interpreted the statute in accordance with its plain meaning. *See, e.g., State v. Steinhagen*, No. M2009–01592–CCA–R3–CD, 2010 WL 2712531, at *3 (Tenn. Ct. Crim. App. July 9, 2010) (finding sufficient evidence supported defendant's conviction under Tennesseee Code § 55-8-152(c) where he was traveling 86 miles per hour on Interstate 40 where the speed limit was 70 miles per hour). Given Tennessee caselaw and unambiguous statutory language, the Court's analysis should begin and end here—that the speed limit was the statutory default, 70 miles per hour.

Still, it bears noting that Trooper Brawner's mistaken understanding that the speed limit was 65—based on no objective evidence—does not somehow render his mistake reasonable. Nor does Trooper Brawner's observation that the speed limit may "jump[] up and down," (*see* Ex. A at 2:00-2:05), change this calculus.[4] Even assuming that the speed limits on I-40 are sprawling and

---

[4] In any case, Trooper Brawner appears to be wrong about this observation too. The speed limit on I-40 in Putnam County is ordinarily 70—the statutory default—with only a short stretch at 65. (*See* Ex. D; Ex. F).

8

difficult to keep track of—which seems to be untrue, at least in Putnam County—complexity of a statutory scheme does not render a misreading of "perfectly clear" statutory language objectively reasonable. *See Hart*, 973 F.3d at 637. And crucially for purposes of this motion, a speed limit sign—especially for an officer of the Tennessee Highway Patrol—is susceptible to only a "single, objective reading that every reasonable officer should be able to ascertain." *Akima*, 85 F.4th at 428; *see also People v. Owen*, No. 339668, 2019 WL 3312531, at *4 (Mich. Ct. App. July 23, 2019) (holding that deputy did not make a reasonable mistake of law in misunderstanding the speed limit while making a traffic stop in part because "an officer enforcing a speed limit should know the speed limit"). Whether an innocent mistake or a calculated falsehood, Trooper Brawner's statement of the law—that Mr. Abrego immediately corrected based on his own accurate observation of the speed limit—was unreasonable.

### III. There Is No Credible Evidence Mr. Abrego Was Speeding

Similarly, Trooper Brawner's statement of fact—that Mr. Abrego was going 75 miles per hour—is itself insufficient to establish by a preponderance of the evidence that the Tennessee Highway Patrol had probable cause or reasonable suspicion to stop him. This question turns on whether the officer "had an *objectively verifiable reason* for pulling over Defendant's vehicle in light of the facts and circumstances known to the officer at the time of the stop." *United States v. Huff*, 630 F. App'x 471, 496 (6th Cir. 2015) (emphasis added) (cleaned up); *see also Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) (requiring facts and circumstances within the officer's knowledge "of which he had reasonably trustworthy information…sufficient to warrant a prudent man in believing that the defendant had committed or was committing an offense"). Particularly where a stop for speeding is "based exclusively on an officer's visual estimate—uncorroborated by radar or pacing and unsupported by any other indicia of reliability"—probable cause to initiate a stop is often lacking. *United States v. Sowards*, 690 F.3d 583, 585 (4th Cir. 2012). In cases in

9

this Circuit where an officer pulls over a defendant for speeding, the standard requires more than just the officer's uncorroborated statement that the defendant was going over the speed limit—particularly where, as here, the officer in question has serious credibility issues. *See Ruiz*, 832 F. Supp. 2d at 913; *United States v. Hayes*, 458 F. Supp. 3d 857, 864-66 (E.D. Tenn. 2020) (Varlan, J.); *see also United States v. Townsel*, No. 2:16-CR-20084, 2016 WL 7109677, at *5 (W.D. Tenn. Dec. 6, 2016) ("Because Jones made the traffic stop, and Brown does not contend that he witnessed any seatbelt violation, the determination that Jones's testimony was not credible is fatal to any finding that Jones had a reasonable suspicion to justify the stop.").

*United States v. Ruiz* illustrates this point. In *Ruiz*, the officer who initiated the stop, Lieutenant Daugherty, stated he used radar to observe Ruiz's vehicle going 79 miles per hour in a 70 miles-per-hour zone. *Ruiz*, 832 F. Supp. 2d at 905-06. He then stated in a report of the stop two days later that he pulled beside Ruiz's vehicle and paced it at 77 miles per hour for ten seconds. *Id.* at 906. The dash cam video of Daugherty's patrol vehicle only captured some of the pursuit, but the video showed the Ruiz vehicle going at a constant speed of 69 or 70 miles per hour, below the speed limit. *Id.* at 907. Another officer, sitting next to Daugherty during the entire process, did not see the radar readout, apparently made no assumptions as to whether Ruiz was speeding or not, and the two officers did not discuss the pursuit while it was occurring. *Id.* at 907-08. The Court concluded that a reasonable explanation for why the other officer would not corroborate Daugherty's account of Ruiz's speed was because Ruiz's vehicle was not, in fact, speeding. *Id.* at 913-14. And Daugherty's "credibility suffered from his demeanor on the stand." *Id.* at 914. In sum, the Court concluded that "the only evidence that the Ruiz vehicle was [speeding] is Daugherty's own testimony." *Id.* at 913. Because the court found that Daugherty was not credible, the traffic stop was unlawful and any resulting evidence suppressed. *Id.* at 916-17.

In many ways, this case has arguably even fewer indicia of reliability than *Ruiz*: There is no hint of radar or pacing in any of the discovery or body camera footage or any report of the stop; there is no report from Trooper Brawner stating what he did, if anything, to check or confirm or corroborate Mr. Abrego's speed; we are aware of no third party who can corroborate (or contradict) Trooper Brawner's actual observation of Mr. Abrego's speed. Instead, all that remains is Trooper Brawner's own statement. And though the defense has not yet had an opportunity to hear from Trooper Brawner at a suppression hearing, as the Court in *Ruiz* did with Lieutenant Daugherty, the statements on the body camera footage already call his credibility into question: Most significant is his statement to Mr. Abrego that he had been driving through a 65-mile-per-hour zone which, as we have demonstrated, is false.[5]

Finally, there are clear reasons—especially under the government's theory of the case—why Mr. Abrego would have been inclined to drive within the speed limit. First, Mr. Abrego was quickly able to recall the correct speed limit when Trooper Brawner told him the wrong one—indicating that Mr. Abrego was hewing closely to it while driving. (*See* Ex. A at 1:40-2:05). Second, Mr. Abrego was driving with an expired license, which he admitted immediately to Trooper Brawner upon being asked to present it. (Ex. A at 2:15-3:00); *see also Ruiz*, 832 F. Supp. 2d at 914 ("In fact, it makes sense that [Ruiz] would drive at or just below the speed limit. At best, he was driving without a valid license…."). Third, Trooper Brawner—perhaps, as the dog sniff suggests, trawling for a car that seemed out of place in the hopes of more than just a traffic stop—

---

[5] And statements in this context need not be intentionally false to call into question a witness's credibility: The Court in *Ruiz* did not find that Daugherty "intentionally misstated the truth," but nonetheless, "serious questions concerning the accuracy of his testimony logically lead to the conclusion" that the government did not meet the preponderance threshold. *Ruiz*, 832 F. Supp. 2d at 914 n.18; *see also Hayes*, 458 F. Supp. 3d at 866 n.7 ("*Ruiz* does not require direct contradiction before a court can find a witness not credible or establish some minimum amount of contradiction prior to a court attaining the authority to reject part or all of a witness's testimony." (citations and internal quotation marks omitted)).

would have significant incentive to stretch the truth about Mr. Abrego's speed. *See id.* at 915 ("It is not beyond the realm of possibility that, as argued by the defense, a drug interdiction officer might racially profile two Hispanics traveling on the freeway in a car with out-of-state license plates."); (*see also* Ex. A at 17:55-18:00 (another officer praising Trooper Brawner for a "good stop")). And fourth, it is difficult to imagine why other technological means would not have been used to corroborate Trooper Brawner's observations, nor, if they were used, why they weren't preserved, especially given the apparent interest from the Tennessee Highway Patrol in prompting an HSI or FBI investigation into Mr. Abrego to be launched right away. (*See, e.g.*, Ex. A at 1:06:30-1:08:10); *see also Ruiz*, 832 F. Supp. 2d at 916 (observing that, given that the stop of Ruiz was pretextual, "[i]t is difficult to imagine a legitimate reason for not making all reasonable efforts to create objective, documentary evidence of a defendant's initial traffic violation").

## **CONCLUSION**

For the foregoing reasons, Mr. Abrego respectfully requests that the Court suppress the traffic stop and all evidence deriving from it. *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). At a minimum, the Court should order a suppression hearing to assess the government's proof of the lawfulness of the stop.

Dated: October 10, 2025  
    New York, New York

Respectfully submitted,

/s/ Sean Hecker  
Sean Hecker*  
Jenna M. Dabbs*  
David Patton*  
HECKER FINK LLP  
350 Fifth Avenue, 63rd Floor  
New York, NY 10118  
Telephone: (212) 763-0883  
Fax: (212) 564-0883  
shecker@heckerfink.com  
jdabbs@heckerfink.com  
dpatton@heckerfink.com  

* admitted *pro hac vice*

Rascoe Dean (No. 034209)  
SHERRARD ROE VOIGT & HARBISON PLLC  
1600 West End Avenue, Suite 1750  
Nashville, Tennessee 37203  
Telephone: (615) 742-4200  
Fax: (615) 742-4539  
rdean@srvhlaw.com  

*Counsel for Defendant Kilmar Armando Abrego Garcia*

# CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2025, I electronically filed the foregoing document with the clerk of the court by using the CM/ECF system, which will send a notice of Electronic Filing to the following: Acting United States Attorney, Robert E. McGuire, 719 Church Street, Suite 3300, Nashville, Tennessee 37203; Assistant United States Attorney, Jason Harley, 210 Park Avenue, Suite 400, Oklahoma City, Oklahoma 73102.

/s/ Sean Hecker