IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KILMAR ARMANDO ABREGO GARCIA,<br><br>*Defendant.* | No. 3:25-cr-115<br><br>Judge Waverly D. Crenshaw, Jr. |

**KILMAR ARMANDO ABREGO GARCIA'S MOTION AND
MEMORANDUM OF LAW IN SUPPORT OF MOTION TO
SUPPRESS FRUITS OF UNLAWFUL ARREST**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 1

    I.    Mr. Abrego's Arrest on March 12, 2025 ........................................................... 1

    II.    The Custodial Interview of Mr. Abrego ............................................................ 3

ARGUMENT ......................................................................................................................... 5

    I.    Applicable Law .................................................................................................. 5

    II.    Mr. Abrego's Statements Should Be Suppressed Because of His Unlawful Arrest ........ 6

        A.    Mr. Abrego's Warrantless Arrest Violated the Fourth Amendment ......................... 6

        B.    Mr. Abrego's Statements Were Not Voluntary .......................................................... 8

        C.    The Remaining Attenuation Factors Warrant Suppression of the Statements ........ 10

CONCLUSION .................................................................................................................... 12

## TABLE OF AUTHORITIES

**CASES**

*Abrego Garcia v. Noem*,
  No. 25 Civ. 951, 2025 WL 2062203 (D. Md. July 23, 2025) .................................... 1, 2, 11

*Abrego Garcia v. Noem*,
  No. 25-1345, 2025 WL 1021113 (4th Cir. Apr. 7, 2025) ...................................................... 6

*Abrego Garcia v. Noem*,
  777 F. Supp. 3d 501 (D. Md. 2025) ................................................................... 1, 2, 6, 7, 11

*Brown v. Illinois*,
  422 U.S. 590 (1975) .............................................................................................. 5, 6, 11, 12

*Dunaway v. New York*,
  442 U.S. 200 (1979) ............................................................................................................ 6

*Fare v. Michael C.*,
  442 U.S. 707 (1979) ............................................................................................................ 8

*Ingram v. City of Columbus*,
  185 F.3d 579 (6th Cir. 1999) .............................................................................................. 5

*Kaupp v. Texas*,
  538 U.S. 626 (2003) ............................................................................................................ 6

*Montana v. United States*,
  440 U.S. 147 (1979) ............................................................................................................ 7

*Morales v. Chadbourne*,
  793 F.3d 208 (1st Cir. 2015) ........................................................................................... 5, 7

*Moran v. Burbine*,
  475 U.S. 412 (1986) ............................................................................................................ 8

*Steagald v. United States*,
  451 U.S. 204 (1981) ............................................................................................................ 7

*Taylor v. Alabama*,
  457 U.S. 687 (1982) ............................................................................................... 6, 10, 11

*United States v. Abdi*,
  463 F.3d 547 (6th Cir. 2006) .............................................................................................. 7

*United States v. Al-Cholan*,
    610 F.3d 945 (6th Cir. 2010) .................................................................................................. 8, 9

*United States v. Arrington*,
    440 F. Supp. 3d 719 (E.D. Mich. 2020) ...................................................................................... 11

*United States v. Brignoni-Ponce*,
    422 U.S. 873 (1975) .................................................................................................................. 7

*United States v. Garibay*,
    143 F.3d 534 (9th Cir. 1998) ..................................................................................................... 9

*United States v. Gross*,
    662 F.3d 393 (6th Cir. 2011) ..................................................................................................... 11

*United States v. Leyva*,
    No. 18-2440, 2020 WL 2614617 (6th Cir. Jan. 9, 2020) ........................................................... 9

*United States v. Lopez-Arias*,
    344 F.3d 623 (6th Cir. 2003) ..................................................................................................... 11

*United States v. Madrid-Quezada*,
    403 F. Supp. 3d 1016 (D.N.M. 2019) ......................................................................................... 9

*United States v. Pacheco-Alvarez*,
    227 F. Supp. 3d 863 (S.D. Ohio 2016) ........................................................................... 5, 7, 8, 12

*United States v. Pacheco-Lopez*,
    531 F.3d 420 (6th Cir. 2008) ..................................................................................................... 10

*United States v. Patel,*
    No. 11 Cr. 20540, 2013 WL 784642 (E.D. Mich. Mar. 1, 2013) ............................................... 10

*United States v. Quintana*,
    623 F.3d 1237 (8th Cir. 2010) .................................................................................................... 6

*United States v. Ray*,
    803 F.3d 244 (6th Cir. 2015) ..................................................................................................... 8

*United States v. Reed*,
    349 F.3d 457 (7th Cir. 2003) ..................................................................................................... 11

*United States v. Roark*,
    36 F.3d 14 (6th Cir. 1994) ......................................................................................................... 5

*United States v. Shaw*,
    464 F.3d 615 (6th Cir. 2006) ................................................................... 5, 6, 8, 11

*United States v. Short*,
    790 F.2d 464 (6th Cir. 1989) ................................................................................. 9

*United States v. Williams*,
    615 F.3d 657 (6th Cir. 2010) ............................................................................... 12

*Wong Sun v. United States*,
    371 U.S. 471 (1963) ....................................................................................... 5, 12

**STATUTES**

8 U.S.C. § 1357(a)(2) ................................................................................................. 6

**REGULATIONS**

8 C.F.R. § 208.16(f) ................................................................................................... 1

8 C.F.R. § 208.24(c) ................................................................................................... 2

8 C.F.R. § 241.4(l)(2) ................................................................................................. 2

8 C.F.R. § 287.8(c)(2) ................................................................................................. 6

**PRELIMINARY STATEMENT**

On March 12, 2025, agents from the Department of Homeland Security ("DHS") "seized Abrego [] without any lawful authority." *Abrego Garcia v. Noem*, 777 F. Supp. 3d 501, 519 (D. Md. 2025). Mr. Abrego was taken to an Immigration and Customs Enforcement ("ICE") field office, where federal agents interviewed him in connection with an investigation into suspected human smuggling without properly advising him of his *Miranda* rights and without a translator present. A few days later, DHS unlawfully removed Mr. Abrego to El Salvador.

The government's conduct on March 12 violated Mr. Abrego's Fourth and Fifth Amendment rights. Because of this flagrant abuse of law enforcement authority, we move to suppress the statements that Mr. Abrego made to law enforcement when he was unlawfully arrested and detained.

**BACKGROUND**

**I.     Mr. Abrego's Arrest on March 12, 2025**

When the government arrested Mr. Abrego on March 12, 2025, prior to removing him to El Salvador, he was lawfully living and working in Maryland. *See Abrego Garcia v. Noem*, No. 25 Civ. 951, 2025 WL 2062203, at *3 (D. Md. July 23, 2025). In 2019, Mr. Abrego secured an order from an immigration court granting him withholding of removal to El Salvador. (D. Md. Am. Compl. ¶¶ 1, 48, 70-72; *see also* Compl. Ex. B).[1] The government never appealed the withholding decision, nor did it seek to remove him to a third country at the time. *Id.*; *see* 8 C.F.R.

---

[1] "Dkt." refers to entries on this Court's docket for this case; "D. Md. Dkt." refers to entries on the docket in Mr. Abrego's immigration-related civil lawsuit against the government in the United States District Court for the District of Maryland, *Abrego Garcia v. Noem*, No. 25 Civ. 951 (D. Md.); "D. Md. Am. Compl." refers to the First Amended and Supplemental Complaint for Injunctive Relief and Declaratory Judgment Mr. Abrego has requested leave to file in that lawsuit (D. Md. Dkt. 211-3); "Compl. Ex. _" refers to the exhibits to the Amended Complaint, labeled A through R (D. Md. Dkt. 211-6 to 211-23); "Ex. _" refers to an exhibit to this brief.

1

§ 208.16(f). Instead, Mr. Abrego was released from ICE custody on an order of supervision. *Abrego Garcia*, 2025 WL 2062203, at *3. Pursuant to that order of supervision, Mr. Abrego had the government's "permission to live in Maryland," and he also received authorization to work in the United States. *Id.* Mr. Abrego was required to check in periodically at the ICE Baltimore Field Office, and he "remained in compliance with the ICE Supervision Order at the time he was wrongfully deported to El Salvador." *Id.*

On March 12, 2025, ICE agents pulled over Mr. Abrego while he was "driving home from work with his young son in the car," and detained him. *Abrego Garcia*, 777 F. Supp. 3d at 508. The government has not proffered a basis for that traffic stop. And "[t]he officers had no warrant for his arrest and no lawful basis to take him into custody." *Id.* "[T]hey told him only that his status had changed," *id.* (quotations omitted), which was untrue. Mr. Abrego's supervised release had not been revoked through the appropriate channels, *see* 8 C.F.R. § 241.4(l)(2), and his withholding order remained in place as the government had not commenced proceedings to reopen his case or terminate withholding of removal, *see* 8 C.F.R. § 208.24(c), (f).

A Homeland Security Investigations ("HSI") report of the March 12 arrest asserts that Mr. Abrego was administratively arrested for unspecified "███████████████." (Ex. A at 5; *see* Ex. B). Mr. Abrego, however, was not in violation of any "█████████" at the time of his arrest. *See Abrego Garcia*, 2025 WL 2062203, at *3. Indeed, in connection with Mr. Abrego's civil case, the government has acknowledged it had "no legal authority to arrest him" and "no justification to detain him," *Abrego Garcia*, 777 F. Supp. 3d at 507, as demonstrated in this exchange between the Court and counsel for the government:

> The Court: …[W]hat document got this process started? There is no warrant for his arrest by an order of removal. There is no statement of probable cause. There's no charge. There's no report that says that anyone saw Mr. Abrego Garcia doing anything illegal or criminal. So what is the actual document that gave these officers

2

the authority to start this process?

Mr. Reuveni: … That is not in the record, and the government has not put that into the record. And that's the best I can do.

D. Md. Dkt. 33 at 21:14-21:22.

## II. The Custodial Interview of Mr. Abrego

After pulling him over on March 12, 2025, three ICE agents handcuffed Mr. Abrego, put him in the back of their vehicle, and took him to the Baltimore Field Office. After shuffling Mr. Abrego between different rooms, one of the agents eventually placed Mr. Abrego in a room where he was interviewed by two HSI agents.

Mr. Abrego's recollection is that there was no translator present for this interview, and neither agent spoke Spanish well enough to translate for Mr. Abrego. The agents did not read Mr. Abrego his *Miranda* rights in Spanish, proceeding instead to ask him several questions in English. On multiple occasions, Mr. Abrego recalls telling the agents that he did not understand what they were saying. On such occasions, one of the agents, who did not speak Spanish well, would attempt to translate what the other agent was saying into Spanish. After the agents asked their questions, he recalls the agents asking him to sign a document. (D. Md. Am. Compl. ¶ 89). The government has represented that the document he signed was a *Miranda* rights waiver in Spanish, which the government produced in discovery just this week. Although Mr. Abrego recalls signing *a* document, he does not recall signing this waiver, nor does he recall the agents explaining the waiver to him. Instead, he recalls feeling panicked and pressured to sign, under the mistaken belief that by signing the document, he would be released from custody and be permitted to go home. (*Id.* ¶ 88). Under no circumstances did Mr. Abrego understand that he was about to be removed from the United States.

3

HSI's account of Mr. Abrego's custodial interview is quite different.² HSI's account states that agents "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████." (Ex. C at 5). But Mr. Abrego does not recall it that way; his recollection is that he was never read his *Miranda* rights in Spanish, and signed a form only after he was questioned. HSI's report is also incomplete, because it purports to describe only █████████████████████████████████████████████████████████," specifically:



(*Id.*)³

Soon after this custodial interview, Mr. Abrego was transported to an ICE detention facility in Louisiana, and then was forcibly deported to El Salvador on March 15, 2025.

---

² Curiously, the only account of Mr. Abrego's interview that the government has produced in discovery appears not in its own report, but at the end of a report about a subsequent proffer of CC-1. (Ex. C). Counsel for the government has not been able to explain why this account was reported in this fashion and not in its own report.

³ On October 3, 2025, during a meet and confer to discuss discovery issues, the government represented to the defense that there are no recordings, notes, or other contemporaneous reports of Mr. Abrego's custodial interview.

# ARGUMENT

## I. Applicable Law

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. "A warrantless…seizure is '*per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions." *United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994) (citation omitted). "It is a well-settled principle of constitutional jurisprudence that an arrest without probable cause constitutes an unreasonable seizure in violation of the Fourth Amendment." *Ingram v. City of Columbus*, 185 F.3d 579, 592-93 (6th Cir. 1999). "[I]mmigration stops and arrests [are] subject to the same Fourth Amendment requirements that apply to other stops and arrests—reasonable suspicion for a brief stop, and probable cause for any further arrest and detention." *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 887 (S.D. Ohio 2016) (quoting *Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015)).

"Supreme Court precedent is clear [that] [a] confession 'obtained by exploitation of an illegal arrest' may not be used against a criminal defendant, *unless* such confession results from 'an intervening independent act of a free will' sufficient to purge the primary taint of the unlawful invasion." *United States v. Shaw*, 464 F.3d 615, 626 (6th Cir. 2006) (first quoting *Brown v. Illinois*, 422 U.S. 590, 603 (1975), then quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)). The "threshold requirement" for admissibility of post-arrest statements "tainted by illegality is that [the statements] must have been voluntary for purposes of the Fifth Amendment." *Id.* (quoting *Brown*, 422 U.S. at 604). As such, "[i]f the confession was not voluntary, it must be excluded and no further inquiry is necessary." *Id.* If the statements were voluntary, courts consider additional factors to determine whether the statements are attenuated from the illegality, including "[t]he temporal proximity of the illegal conduct to the statements, the presence of any intervening

5

circumstances, and…the purpose and flagrancy of the police misconduct." *Id.* at 626-27 (citation omitted); *see Taylor v. Alabama*, 457 U.S. 687, 690 (1982). Nevertheless, "*Miranda* warnings, *alone* and *per se*, cannot always…break, for Fourth Amendment purposes, the causal connection between the illegality and the confession." *Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (quoting *Brown*, 422 U.S. at 603). The government bears the burden of proving that the statements are admissible. *See Dunaway v. New York*, 442 U.S. 200, 218 (1979).

## II. Mr. Abrego's Statements Should Be Suppressed Because of His Unlawful Arrest

### A. Mr. Abrego's Warrantless Arrest Violated the Fourth Amendment

The government's March 12, 2025 traffic stop, arrest, and detention of Mr. Abrego were collectively an unlawful seizure in violation of the Fourth Amendment. As the District Court in Maryland has already concluded, "there were no legal grounds whatsoever for [Mr. Abrego's] arrest, detention, or removal." *Abrego Garcia*, 777 F. Supp. 3d at 510; *see also Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113, at *1 (4th Cir. Apr. 7, 2025) (Thacker, J., with King, J., concurring) ("The United States Government has no legal authority to snatch a person who is lawfully present in the United States off the street and remove him from the country without due process. The Government's contention otherwise, and its argument that the federal courts are powerless to intervene, are unconscionable.").

ICE officers had no authority to administratively arrest Mr. Abrego without a warrant. Federal law generally requires ICE officers to obtain a warrant to make an administrative arrest, but an officer is authorized to make a warrantless arrest "if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2); *see* 8 C.F.R. § 287.8(c)(2). "Because the Fourth Amendment applies to arrests of illegal aliens, the term 'reason to believe' in § 1357(a)(2) means constitutionally required probable cause." *United States v. Quintana*, 623 F.3d

6

1237, 1239 (8th Cir. 2010) (collecting cases); see Morales, 793 F.3d at 216 ("reason to believe" is the "equivalent of probable cause"); United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (1975) (immigration officer may question suspected aliens "about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention…must be based on consent or probable cause"). Thus, to administratively arrest Mr. Abrego without a warrant, ICE officers had to have probable cause that he was both (1) present unlawfully in the United States, and (2) posed a risk of escape. See Pacheco-Alvarez, 227 F. Supp. 3d at 887, 889.

There is no evidence that ICE agents had probable cause as to either of these circumstances when they arrested Mr. Abrego. ICE officers had no "articulable reason to believe that [Mr. Abrego] would flee before a warrant could be obtained," (D. Md. Am. Compl. ¶ 83), and over the last sixth months of litigating Mr. Abrego's unlawful arrest, detention, and deportation, the government has never asserted otherwise. See Abrego Garcia, 777 F. Supp. 3d at 507 ("As Defendants acknowledge, they had no legal authority to arrest him, no justification to detain him, and no grounds to send him to El Salvador…."). Having conceded the lack of legal authority to arrest Mr. Abrego in his civil case, the government cannot now reverse course and litigate the lawfulness of that arrest in this case. See generally Montana v. United States, 440 U.S. 147, 153 (1979); cf. Steagald v. United States, 451 U.S. 204, 209 (1981) ("The Government…may lose its right to raise factual issues…before this Court when it has made contrary assertions in the courts below, when it has acquiesced in contrary findings by those courts, or when it has failed to raise such questions in a timely fashion during the litigation.").

Nor is there any evidence that ICE agents had probable cause to believe that Mr. Abrego was "engaged in the commission of a felony at the time of his public warrantless arrest," which would otherwise justify a warrantless arrest. United States v. Abdi, 463 F.3d 547, 559 (6th Cir.

7

2006). Indeed, the arresting HSI agent's report of the arrest indicates only that Mr. Abrego was "██████████████," and there are no allegations that he was engaged in any criminal activity of any kind at the time, or that he engaged in any conduct that warranted even a traffic stop. (Ex. B at 2; *see* Ex. A).

In sum, Mr. Abrego's arrest on March 12, 2025 violated the Fourth Amendment, requiring suppression of his post-arrest statements and derivative evidence. *See Pacheco-Alvarez*, 227 F. Supp. 3d at 890 (holding suppression of post-arrest statements was warranted where ICE officers arrested defendant without probable cause that he posed a risk of escape in violation of § 1357(a)(2) and "lacked probable cause to believe that [he] committed an independent felony offense justifying his warrantless arrest").

### B. Mr. Abrego's Statements Were Not Voluntary

Mr. Abrego's statements to HSI agents after he was unlawfully arrested and detained must be suppressed because they were not voluntary. *See Shaw*, 464 F.3d at 626. "A statement made in response to custodial police interrogation must be suppressed unless the suspect first waived his *Miranda* rights 'voluntarily, knowingly and intelligently.'" *United States v. Ray*, 803 F.3d 244, 266 (6th Cir. 2015) (quoting *United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010)). A waiver is valid "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension…." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

Contrary to HSI's conclusory account of events, it is Mr. Abrego's recollection that he was not advised of his *Miranda* rights in Spanish at all and signed no document before he was questioned. He also does not understand English well enough to know whether he was read his rights in English, let alone understand such rights even in the event that they were read to him in English. "It is well-settled that 'language difficulties may impair the ability of a person in custody

8

to waive [her *Miranda*] rights in a free and aware manner.'" *United States v. Leyva*, No. 18-2440, 2020 WL 2614617, at *3 (6th Cir. Jan. 9, 2020) (quoting *Al-Cholan*, 610 F.3d at 954). In *United States v. Short*, the Sixth Circuit held that the defendant, who had been read her *Miranda* rights in English, had not knowingly and voluntarily waived those rights, because her native language was German, her English was "broken," and her understanding of English was "deficient." 790 F.2d 464, 469 (6th Cir. 1989). She also had little familiarity with the criminal justice system and required the assistance of an interpreter at trial. *Id.* at 466, 469.

      The circumstances of Mr. Abrego's custodial interview and his comprehension of English are no different. Mr. Abrego's native language is Spanish, his English is halting, he was questioned in English, and he requires the assistance of a translator in his civil and criminal proceedings. On multiple occasions during the interview, Mr. Abrego told the HSI agents that he did not understand what they were saying. Even if Mr. Abrego was read his *Miranda* rights in English—which is unknown, because the government has produced scant evidence that he was properly informed of his rights—his waiver could not have been knowing or voluntary. *See id.* at 469; *see also United States v. Garibay*, 143 F.3d 534, 537-40 (9th Cir. 1998) (defendant whose primary language was Spanish and had difficulty understanding English, even though he received English instruction at a U.S. high school, did not knowingly and intelligently waive *Miranda* rights where warnings were read in English); *United States v. Madrid-Quezada*, 403 F. Supp. 3d 1016, 1034 (D.N.M. 2019) (defendant whose English speaking and comprehension skills were "limited," even though he sometimes spoke to roofing clients in English, and spoke "limited English" with his children, did not make knowing and intelligent waiver of *Miranda* rights). Indeed, Mr. Abrego's understanding of English is more limited than that of other defendants who were read their *Miranda* rights in English and were found not to have knowingly and voluntarily waived those rights. *See, e.g.*,

9

Case 3:25-cr-00115   Document 155   Filed 10/10/25   Page 14 of 19 PageID #: 1628

*United States v. Patel*, No. 11 Cr. 20540, 2013 WL 784642, at *4-5 (E.D. Mich. Mar. 1, 2013) (holding defendant whose first language was not English but was "educated and capable of understanding science texts written in English" did not "fully understand and appreciate" waiver of *Miranda* rights).

Additionally, the government's extremely belated production of a waiver form purportedly signed by Mr. Abrego makes no difference here. Agents told Mr. Abrego to sign the document only after questioning him. A *Miranda* waiver does not apply retroactively to pre-warned statements, and this is not a case involving a mid-interview *Miranda* warning. *See United States v. Pacheco-Lopez*, 531 F.3d 420, 425 (6th Cir. 2008). Mr. Abrego also did not sign the waiver voluntarily, as agents told him to sign the document, and he did so in a panic without understanding the contents, believing that he would be released and sent home if he complied with the agents' request.

### C. The Remaining Attenuation Factors Warrant Suppression of the Statements

Even if Mr. Abrego had waived his *Miranda* rights knowingly, voluntarily, and intelligently, the Supreme Court has "firmly established that the fact that the confession may be 'voluntary' for purposes of the Fifth Amendment, in the sense that *Miranda* warnings were given and understood, is not by itself sufficient to purge the taint of the illegal arrest." *Taylor*, 457 U.S. at 690.

Here, the remaining factors concerning attenuation make plain that Mr. Abrego's post-arrest statements remain the product of his illegal arrest. There was substantial temporal proximity between Mr. Abrego's arrest and his interrogation; at most a few hours passed between arrest and interrogation. And during that time, there were no intervening circumstances: From the moment Mr. Abrego was grabbed off the street without probable cause, he remained in ICE custody at all times. He was dragged away from his car and his child, brought to the Baltimore

10

Case 3:25-cr-00115    Document 155    Filed 10/10/25    Page 15 of 19 PageID #: 1629

Field Office, and shuttled between rooms, in handcuffs, before being interrogated. There are no facts that suggest any attenuation that would break the causal connection between the illegal arrest and the interrogation. *See Taylor*, 457 U.S. at 691 (concluding confession obtained within six hours was fruit of illegal arrest, even where defendant was given *Miranda* warnings three times and visited with girlfriend and male companion); *Brown*, 422 U.S. at 604-05 (suppressing statement separated by illegal arrest by less than two hours, where "there was no intervening event of significance whatsoever").

Finally, "the purpose and flagrancy" of the agents' misconduct warrants suppression of Mr. Abrego's statements. *See Shaw*, 464 F.3d at 630 (observing this factor is "most important because 'it is tied directly to the rationale underlying the exclusionary rule, deterrence of police misconduct'" (quoting *United States v. Reed*, 349 F.3d 457, 464-65 (7th Cir. 2003))). "An officer's conduct is flagrant if it violates well-established legal rules." *United States v. Arrington*, 440 F. Supp. 3d 719, 732 (E.D. Mich. 2020) (citing *United States v. Gross*, 662 F.3d 393, 405-06 (6th Cir. 2011)). Here, "the illegality of the arrest was blatant." *United States v. Lopez-Arias*, 344 F.3d 623, 630 (6th Cir. 2003); *see also Abrego Garcia*, 777 F. Supp. 3d at 510. Federal law is clear that ICE agents cannot make a warrantless administrative arrest except in narrow circumstances, none of which were met here. Mr. Abrego's presence in the United States was lawful, and his ICE order of supervision remained valid and had not been revoked. *See Abrego Garcia*, 2025 WL 2062203, at *8 (ordering that Mr. Abrego be restored to that ICE order of supervision following release from pretrial detention in Tennessee). None of the agents who pulled over, arrested, detained, or interrogated Mr. Abrego appear to have validated whether there was a lawful basis to stop or arrest him. Or, worse but perhaps more likely, they simply ignored that there was none. Such a blatantly illegal arrest warrants suppression of Mr. Abrego's statements.

The illegality also had a "quality of purposefulness." *Brown*, 422 U.S. at 605. "[T]he purposefulness factor is met when the unlawful action is investigatory, that is, when officers unlawfully seize a defendant 'in the hope that something might turn up.'" *United States v. Williams*, 615 F.3d 657, 670 (6th Cir. 2010) (quoting *Brown*, 422 U.S. at 605). Mr. Abrego appears to have been swept up as part of the Trump Administration's indiscriminate immigration enforcement push. When HSI agents had the opportunity to question Mr. Abrego when he was detained, they used an unlawful arrest on a "suspected immigration violation to further [their] criminal investigation" into human smuggling. *Pacheco-Alvarez*, 227 F. Supp. 3d at 896. Ultimately, the government followed its unlawful arrest of Mr. Abrego with an unlawful deportation, which "accomplished all goals for this case." (Dkt. 129-1 at 2).

## CONCLUSION

For the foregoing reasons, Mr. Abrego respectfully requests that the Court suppress Mr. Abrego's statements made to HSI agents after he was arrested on March 12, 2025, and all other fruits of the unlawful arrest. *See Wong Sun*, 371 U.S. at 487-88.

Dated: October 10, 2025  
      New York, New York

Respectfully submitted,

/s/ Sean Hecker  
Sean Hecker*  
Jenna M. Dabbs*  
David Patton*  
HECKER FINK LLP  
350 Fifth Avenue, 63rd Floor  
New York, NY 10118  
Telephone: (212) 763-0883  
Fax: (212) 564-0883  
shecker@heckerfink.com  
jdabbs@heckerfink.com  
dpatton@heckerfink.com

* admitted *pro hac vice*

Rascoe Dean (No. 034209)
SHERRARD ROE VOIGT & HARBISON PLLC
1600 West End Avenue, Suite 1750
Nashville, Tennessee 37203
Telephone: (615) 742-4200
Fax: (615) 742-4539
rdean@srvhlaw.com

*Counsel for Defendant Kilmar Armando Abrego Garcia*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 10, 2025, I electronically filed the foregoing document with the clerk of the court by using the CM/ECF system, which will send a notice of Electronic Filing to the following: Acting United States Attorney, Robert E. McGuire, 719 Church Street, Suite 3300, Nashville, Tennessee 37203; Assistant United States Attorney, Jason Harley, 210 Park Avenue, Suite 400, Oklahoma City, Oklahoma 73102.

/s/ Sean Hecker