**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **v.** | **)** | **No. 3:25-CR-00115** |
| | **)** | |
| **KILMAR ARMANDO ABREGO GARCIA,** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |

**UNITED STATES RESPONSE IN OPPOSITION TO THE DEFENDANT'S MOTION TO STRIKE SURPLUSAGE FROM THE INDICTMENT**

Comes now the Plaintiff, The United States of America, by and through Robert E. McGuire, Acting United States Attorney, and Jason Harley, United States Department of Justice, Joint Task Force Vulcan, and provides the following response to the defendant's Motion to Strike Surplusage from the Indictment. (ECF No. 158).

As a preliminary matter, the Government notes that this Court does not always provide a copy of the Indictment to the jury, and even in situations where the Court does provide a copy of the Indictment, it is the Court's practice to redact sections. The Government is not asking the Court to provide a copy of the Indictment to the jury in this case and anticipates that the Court, consistent with the Court's usual practice, will describe the allegations in the jury's written instructions. Therefore, the Defendant's Motion (ECF No. 158), to the extent it largely concerns transmitting the indictment to the jury, can be denied as moot.

However, and regardless of whether the Indictment were to be given to the jury, the portions cited by the defendant are relevant to the charge and are not inflammatory and prejudicial and should therefore not be stricken as surplusage.

Defendant Kilmar Armando Abrego Garcia participated in a long-running human smuggling operation that illegally transported undocumented aliens throughout the United States for profit. On May 21, 2025, the Grand Jury sitting in the Middle District of Tennessee, returned a two-count Indictment against the defendant. Count One charged the defendant with conspiring to transport aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) and Count Two charged him with unlawfully transporting aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). (ECF No. 3).

## ARGUMENT

### I. The Indictment

Count One alleges the defendant engaged in a yearslong conspiracy with multiple co-conspirators, specifically "CCs-1 through 6, and other known and unknown to the Grand Jury, to knowingly and in reckless disregard of the fact that certain aliens had come to, entered, and remained in the United States in violation of law, transport and move said aliens within the United States by means of transportation and otherwise in furtherance of such violation of law, with intent to further the unlawful purpose in the United States and for private financial gain." (*Id.* at ¶ 9). Count One then provides a detailed description of the scope, overt acts, and the conspirators' roles and interdependence during the charged timeframe.

The Indictment alleges that defendant was a member and associate of the transnational criminal organization, La Mara Salvatrucha, otherwise known as MS-13, which was a criminal enterprise that engaged in violence, firearms trafficking, narcotics trafficking, alien smuggling, and other criminal activities through North and Central America. (*Id.* at ¶¶ 5- 6). In or around 2016, the

defendant began participating in a conspiracy to transport undocumented aliens for profit and private financial gain. (*Id*. at ¶¶ 9-10). The defendant and one of his co-conspirators ("CC-1") ordinarily picked up the undocumented aliens in the Houston, Texas area shortly after the aliens had unlawfully crossed the Southern border of the United States from Mexico. (*Id*. at ¶ 12). The defendant and CC-1 then transported the undocumented aliens from Texas to other parts of the United States. (*Id*. at ¶ 12). When CC-1 was incarcerated for alien smuggling and deported from the United States, the defendant began working with another co-conspirator ("CC-2") at CC-1's direction. In addition to transporting undocumented aliens, the defendant and other members of the conspiracy also transported firearms and narcotics illegally purchased in Texas for distribution and resale in Maryland. (*Id*. at ¶¶ 14-15).

The Indictment also details how the defendant and other members of the conspiracy transported undocumented aliens in an unsafe manner, including using reconfigured vehicles with after-market unattached seating rows, and transporting children on the floorboards of vehicles, to maximize the number of passengers transported and maximize profits. (*Id*. at ¶ 23). While the conspiracy was actively ongoing, one of the primary suppliers of undocumented aliens, CC-6, reported allegations of abuse against some female undocumented aliens that was committed by the defendant. This caused CC-1 and CC-2 to confront the defendant because it was bad for business and direct him to stop the abuse. (*Id*. at ¶ 27).

The Indictment also outlines the variety of ways that the defendant and his co-conspirators used to evade law enforcement detection. They varied their transportation routes within the United States (*Id*. at ¶ 21), and routinely took the undocumented aliens' cellphones so that they could not and would not contact anyone else during the trip. (*Id*. at ¶ 22). The defendant and his co-conspirators also routinely devised and employed false cover stories to provide to law enforcement if they were

stopped while transporting undocumented aliens. (*Id*. at ¶ 25). Over the course of the conspiracy, the defendant transported undocumented aliens on approximately more than 100 trips between Texas and other states. (*Id*. at ¶ 29).

Count Two alleges that on November 30, 2022, the defendant aided and abetted by others did, "knowing and in reckless disregard of the fact that certain aliens had come to, entered, and remained in the United States in violation of law, did transport and move said aliens within the United States…." (*Id.* at ¶ 32). The conduct encompassed in Count 2 of the Indictment stems from a traffic stop, conducted by the Tennessee Highway Patrol ("THP"), where the defendant was pulled over while transporting nine undocumented aliens. The traffic stop of the defendant transporting illegal aliens was captured on THP body-warn camera. After being stopped by law enforcement, the defendant knowingly and falsely told a THP trooper that he and the passengers were coming from St. Louis, that they had been in St. Louis for two weeks doing construction, and that they were on their way "back" to Maryland. (*Id*. at ¶ 30(e)). License Plate Reader ("LPR") data showed that the SUV had not been near St. Louis in the preceding 12 months, and had instead been in the Houston, Texas area within the week leading up to the traffic stop on November 30, 2022. (*Id*. at ¶ 30(i)).

The defense motion argues that language from the Indictment returned by the Grand Jury is "irrelevant and inflammatory (and unfounded)." It is not. Every detail contained in the Indictment has "any tendency" to make a fact of consequence more probable. Fed. R. Evid. 401. Specifically, the language stems from testimony and evidence presented to the Grand Jury that returned the Indictment in this case. The evidence presented in the Indictment will be introduced at trial and is not only relevant, but instrumental in explaining the lengthy and complex conspiracy that the defendant participated in with others.

## II. Applicable Law

Under Fed. R. Crim. P. 7(d), "[u]pon the defendant's motion, the Court may strike surplusage from the indictment" and that decision "rests within the sound discretion of the district court." *United States v. Johnson*, 256 F.Supp.3d 755, 759 (M.D. Tenn. 2017) (internal citations omitted). However, the motion to strike the surplusage should only be granted where it is clear that the language is irrelevant and prejudicial. *United States v. Neller*, 229 F.3d 1154 (6th Cir. 2000) (citing *United States v. Moss*, 9 F.3d 543, 550 (6th Cir. 1993)).

Further, "if the language in the indictment is information which the government hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be (provided, of course, it is legally relevant)." *Moss*, 9 F.3d at 550 (6th Cir. 1993) (quoting *United States v. Thomas*, 875 F.2d 559, 562 n.2 (6th Cir. 1989)). In this Circuit, Rule 7(d) motions are generally disfavored, and the standard has generally been one against striking surplusage. *See United States v. Kemper*, 503 F.2d 327, 329 (6th Cir. 1974); *United States v. Bartlett*, 2025 WL 1635390, at *10 (E.D. Mich. June 9, 2025); *United States v. Mills*, 2019 WL 1915762, at *3 (E.D. Mich. Apr. 30, 2019) (citing *Neller*, 229 F.3d at *2).

Under the *Moss* standard, the critical portion of the analysis comes down to relevancy since relevant evidence can still be admitted despite prejudice. Relevant evidence is not limited to those facts which directly establish elements of the charged crime and relevant evidence might include evidence that adds context to the charges. *Johnson*, 256 F.Supp.3d at 760 (citing *United States v. Manual-Santiago*, 562 F.3d 411, 427 (1st Cir. 2009) (citations omitted)). In *Johnson*, this Court correctly noted that even though information in an Indictment might not constitute an element of the charged offense, it does not require that it be stricken. *Johnson*, 256 F.Supp.3d at 760.

Courts across the country have applied this high hurdle and routinely refused to strike allegations in an Indictment that provide context or scope of the conspiracy. *See Moss, 9 F.3d at*

*549-550 (*upholding district court's denial to strike an allegation where one of the defendant's bribed a witness even though it was not an overt act in the conspiracy); *United States v. Rich*, 2021 WL 4144059 at *35 (6th Cir. 2021) (holding that court did not err by including overt acts that were supported by the evidence in the Indictment); *United States v. Kidd*, 963 F.3d 742, 751 (8th Cir. 2020) (upholding district court's denial to strike references to a state law because the defendants had motive to conceal their violations of the statute to avoid further inquiry by insurers); *United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017) (upholding a denial to strike information to show the defendant acted knowingly and intentionally to commit mail fraud); *United States v. Bothra*, 2022 WL 1528577, at *2 (E.D. Mich. May 13, 2022) (refusing to strike information that demonstrated there was an agreement and common plan amongst the co-conspirators); *United States v. Daugherty*, 2017 WL 781048, at *4 (E.D. KY Feb. 28, 2017) (refusing to strike details in Indictment regarding the scope of the conspiracy).

To the extent the defendant contests the accuracy of the matters in the Indictment, "the truth of the Indictment's allegations are to be tested at trial, not through pretrial motion, *see United States v. Knox*, 396 U.S. 77, 83, 90 (1969), and any unfair prejudice that remains can be eliminated through a simple instruction to the jury that the indictment is not evidence." *United States v. Garton*, 2009 WL 1424429, at *3 (E.D. Ky. May 21, 2009); *see also, e.g.*, *United States v. Johnson*, 585 F. Supp. 80, 81 (M.D. Tenn. 1984).

**III. The Court Should Not Strike Allegations and References to MS-13**

The defense moves to strike allegations and references to MS-13 throughout the Indictment, specifically in paragraphs 5, 6, 7, 11, 16, 17, and 18. The defense motion states that the defendants MS-13 membership is both wholly irrelevant to the crimes charged and highly prejudicial. (ECF 158 at p. 5). As discussed supra, the fact that information contained in an Indictment is prejudicial is not

persuasive. Therefore, the analysis should begin and end with a review of the relevance of the information related to gang membership and specifically MS-13.

CC-1 and CC-2 will both testify that they are from El Salvador and are familiar with the MS-13 street gang from their upbringing there. During this conspiracy, a strong majority of the aliens that were being smuggled were from Central America and CC-1 and CC-2 would both testify that, based on their experiences and observations, at least some of those aliens were MS-13 and other gang members. One of their primary sources of undocumented aliens came from CC-6 who operated out of Central America, primarily Guatemala, and he/she was a powerful and wealthy international human smuggler with ties to organized crime, street gangs, and international drug cartels. CC-6 coordinated the transportation of undocumented aliens and gang members from Central America, including MS-13 members, through Mexico and into the United States. At trial, CC-2 will testify that CC-6 often provided gang members, including MS-13 members, to the conspiracy for transportation into the United States to be coordinated and conducted by CC-1, CC-2, and the defendant.

This is important to the jurors understanding of the context of the conspiracy because this MS-13 connection directly impacted the conspirators' overall goal – to earn money from transporting undocumented aliens. CC-1 and CC-2 will testify that they, often through the defendant, collected cash fees directly from the aliens being transported. They collected the cash directly from the aliens, rather than from CC-6, to conceal their activities from law enforcement by avoiding the detection of repeated payments sent by CC-6 to the United States via electronic payment or bulk cash.

However, the gang members sent by CC-6, more specifically the MS-13 members, did not always pay their transportation fees. For example, CC-2 will testify that the MS-13 members routinely refused to pay him the fees for transportation. However, the MS-13 members would pay the defendant the fees. Both CC-1 and CC-2 will testify that they observed the defendant interact

with the MS-13 members, that they treated the defendant with respect, and that the defendant could collect fees from MS-13 members that they could not collect. As the Grand Jury has alleged in the Indictment, the defendant is a member and associate of the MS-13 gang. Therefore, the defendant's ability to collect alien smuggling debts from MS-13 members, largely due to his own status and associations, was an instrumental part of the conspiracy because it allowed the defendant to achieve the overall goal of the conspiracy – to collect profits from transporting undocumented aliens, including MS-13 members – where other co-conspirators failed.

Additionally, it will be important for the jurors to hear evidence about the MS-13 members that were unlawfully smuggled by the defendant because their status impacted the destination and travel route. At trial, the government will likely present evidence that during the timeframe of the charged conspiracy, Maryland had one of the highest MS-13 populations in the entire United States. The defendant's primary route of travel was to smuggle aliens from Texas to Maryland and this information is corroborated not only by the defendant's co-conspirators but also by cellular telephone records, license plate reader data, and other evidence. In fact, the trial evidence will show that the Defendant's destination was almost always Maryland. Certainly, the defendant also lived in Maryland at the time, but it is not wholly irrelevant in the context of this conspiracy that his destination—while transporting MS-13 members—was to a place where MS-13 had one of their largest strongholds in the United States. The ability to get undocumented aliens, including MS-13 members, to the Maryland area was instrumental part of the defendant's role within the conspiracy because that is how he completed the objective of the conspiracy and how he made a profit.

As noted throughout the progression of this case, the defense will undoubtedly dispute that the defendant is a member or associate of MS-13 and attack any idea that his associations played a role in this conspiracy. Those issues are more properly addressed at a trial and not in a pretrial motion

to exclude evidence the government "hopes to properly prove at trial." *See Moss*, 9 F.3d at 550 (6th Cir. 1993).

## IV. The Court Should Not Strike Allegations and References to Transporting Firearms and Narcotics

The defense moves to strike allegations and references to the defendant transporting guns and drugs in paragraphs 14 and 15 of the Indictment. (ECF 158). The defense asserts that paragraphs 14 and 15 are irrelevant to the offenses charged and are highly prejudicial. Similar to the contextual MS-13 information, the evidence of the defendant's gun and drug transportation is important part of the alien smuggling conspiracy and relevant evidence to show the relationship, roles, interdependencies, and motives amongst the defendant and his co-conspirators.

Paragraph 14 of the Indictment states, "In addition to transporting undocumented aliens, KILMAR ABREGO-GARCIA, CC-1, and CC-2 occasionally and simultaneously transported firearms illegally purchased in Texas for distribution and resale in Maryland." (ECF No 3. at ¶ 14).

CC-2 will testify that he and CC-1 personally assisted the defendant in loading and hiding firearms in the defendant's vehicle for transportation to Maryland and that CC-2 was also paid for assisting the defendant with the guns. CC-2 will explain that the guns were purchased by members of the conspiracy and given to the defendant for sale in Maryland because the firearms were worth more in Maryland. CC-2 will testify that the guns were transported while the defendant was also transporting the undocumented aliens. CC-2 will describe to the jury how the members of the conspiracy, including the defendant, made the decision to transport less people when they moved firearms to avoid scrutiny by law enforcement if traffic stopped. Thus, the transportation of firearms is relevant and inextricably intertwined with the smuggling of aliens because it not only impacted their normal methods of transportation, it also impacted their decision making on how best to achieve

the goals of the conspiracy without detection, and it was done at the same exact time as the smuggling of undocumented aliens, in the same vehicle. Given this significant impact on their methods of operation, the transportation of firearms is clearly relevant to the alien smuggling operation and should not be stricken as surplusage from the Indictment.

As noted above, the defense also seeks to exclude mention of the defendant's transportation of drugs while he was simultaneously transporting the undocumented aliens. Paragraph 15 of the Indictment states, "In addition to transporting undocumented aliens, and firearms at times, KILMAR ABREGO-GARCIA occasionally and simultaneously transported undocumented aliens and narcotics purchased in Texas for distribution and resale in Maryland." (*Id*. at ¶ 15). This evidence is highly relevant as it relates to the co-conspirators' intentions during the conspiracy and demonstrates to the jury how the defendant eventually attempted to overtake control of the conspiracy.

CC-1 and CC-2 will both testify that unlike the transportation of firearms, they did not approve of the defendant transporting drugs when he was also transporting aliens for the conspiracy. CC-1 and CC-2 will testify that they did not want the defendant to transport drugs because it was too risky to the overall alien smuggling operation and, if caught, could impact their profits. CC-1 and CC-2 were aware of the possibilities that law enforcement might use a K-9 trained to detect drugs if the defendant was ever pulled over while transporting undocumented aliens. CC-1 and CC-2, as outlined in the Indictment, would testify about the methods they employed to avoid law enforcement detection to include crafting and using false cover stories while transporting the undocumented aliens. However, CC-1 and CC-2 believed that the transportation of drugs exposed the alien smuggling conspiracy to an unacceptable amount of risk and therefore they forbid the defendant from doing it. Despite CC-1 and CC-2 emphasizing the importance of not transporting drugs while also smuggling aliens, the defendant did it anyways.

It is often said that there is no honor among thieves, a similar analogy applies here to alien smugglers. CC-1 and CC-2 will testify that they did not always trust the defendant, and therefore they installed location tracking capabilities in the vehicles that the defendant used to smuggle aliens. CC-1 and CC-2 would then watch the route and progress of the alien smuggling trips that the defendant engaged in. CC-2 will testify that based on watching the GPS information he discovered that defendant was deviating from the planned route to Maryland. So, CC-2 decided to investigate where the defendant was going. CC-2 caught the defendant deviating from his route from Houston to Maryland in order to go to a well-known area in Houston known for drug sales. Once CC-2 found the defendant trying to purchase marijuana for transport, CC-2 confronted him, a verbal altercation ensued, and the defendant threatened to leave the aliens that he was currently transporting on the side of the highway.

This type of evidence demonstrates the importance of the roles and agreements in the conspiracy. CC-1 and CC-2 were the conduits to CC-6, which was a large source of their profits, however, they heavily relied on the defendant to conduct the actual transport and did not want him to jeopardize their operation. When the defendant was caught in the act of buying drugs for transportation to Maryland, instead of acquiescing to a leader of the organization, the defendant capitalized on the importance of his role in the conspiracy, and he threatened to leave the undocumented aliens on the side of the highway which would have undoubtedly impacted profits.

The defendant's blatant disregard for the conspirators' rules also came at a time when the defendant's intentions and motives within the conspiracy evolved. CC-1 had been arrested and was federally indicted for transporting aliens, so the defendant primarily dealt with CC-2. CC-2 will testify that the defendant tried to increase his role and status within the conspiracy by ignoring the prohibitions against drug transportation, attempting to increase his transportation fees, and trying to

leverage control over CC-2 because the defendant was older and had more experience in the alien smuggling business. In further describing the defendant's role in transporting drugs, CC-2 will testify that the defendant told him that he could do whatever he wanted. CC-2 will testify that defendant's increased aspirations in the conspiracy and struggle for power control increased after CC-2 caught him trying to buy drugs to transport to Maryland while also transporting the undocumented aliens. This evidence also demonstrates the defendant's recognition and knowledge of the opportunities that his role in the organization presented.

## V. The Court Should Not Strike Allegations of Abuse of Female Undocumented Aliens

The defense also moves to strike portions of paragraph 27 of the Indictment. Paragraph 27 in its entirety states,

> KILMAR ABREGO-GARCIA sometimes brought close relatives with him when he picked up undocumented aliens and transported them within the United States. On other occasions, he came alone. During some of the trips KILMAR ABREGO-GARCIA operated when he did not bring a close relative, CC-6 received reports from undocumented aliens that KILMAR ABREGO-GARCIA had abused some of the female undocumented aliens, including minors. Knowing this was bad for business, CC-6 reported these allegations of abuse by KILMAR ABREGO-GARCIA to both CC-1 and CC-2, and CC-6 directed CC-1 and CC-2 to cause KILMAR ABREGO-GARCIA to stop the abuse.

(ECF 3 at ¶ 27).

The defense specifically moves to strike the fact that, "Mr. Abrego has abused some of the female undocumented aliens" and that "CC-6 directed CC-1 and CC-2 to cause the defendant to stop the abuse." Paragraph 27 is not surplusage and is highly relevant to the crimes charged because it involves the defendant's direct actions against female undocumented aliens that he was supposed to be transporting to execute the conspiracy goals. These were not tangential acts taken outside of the conspiracy, but instead, these were acts were done while he was supposed to be completing acts necessary to achieve the organization's objectives.

CC-1 and CC-2 will testify at trial that they were told by CC-6 that the defendant was abusing undocumented female aliens during transport, including minor female victims. As noted throughout, CC-1 and CC-2 depended heavily on CC-6 to supply aliens to be smuggled into the United States. Further, CC-1 and CC-2 will testify that CC-6 charged the aliens a higher fee than other smugglers and that CC-6 supplied at least half of the aliens they smuggled, which resulted in higher profits for the coconspirators. For example, CC-2 would explain that CC-6 charged $1,000 per alien, twice as much as other smugglers, and that CC-6 expected a higher level of service to include delivery to specific addresses and not asking any questions about or from the undocumented aliens. CC-6 also supplied the conspirators with minors, gang members, and aliens from countries outside of South America who were willing to pay the higher fees and maintain discretion. In sum, keeping CC-6 satisfied was paramount to the goals of their conspiracy.

When CC-6 complained to CC-1 and CC-2 about the defendant abusing the undocumented female aliens, including minors, they became upset, not out of principle or moral opposition, but because it could severely impact their operations and profits. The defendant's actions against these undocumented females had a direct impact on achieving organizational goals so they had to intervene immediately. It was not acceptable to let the defendant disrupt their operation and potentially lose money, so they confronted him. Like his response when CC-2 confronted the defendant about creating risk by transporting drugs, the defendant responded aggressively and had a negative reaction. CC-1 and CC-2 will testify that the defendant never denied the allegations and instead focused his fury on CC-1 and CC-2 for confronting him.

It will be critical for the jurors to understand how the organization operated, where they placed their priorities, and what the leaders did in situations where someone, like the defendant, did things in addition to his assigned tasks that could impact profits. In nearly all conspiracy trials, these types

of details are admissible and necessary to demonstrate the scope of the agreement, the expected roles the members will play and rules they must follow, and overt acts the parties engaged in to complete the conspiracy. Put another way, the Grand Jury's allegations are not surplusage; instead, they, taken independently and especially together, have "any tendency" to make facts of consequence more probable. The allegations returned by the Grand Jury as detailed in the Indictment are relevant.

**CONCLUSION**

Regardless of whether the Indictment were to be given to the jury, the portions cited by the defendant are relevant to the charge and are not inflammatory and prejudicial and should therefore not be stricken as surplusage. The defendant's motion to strike surplusage from the Indictment should be denied.

Respectfully Submitted,

*/s/ Robert E. McGuire*
Robert E. McGuire
Acting United States Attorney
719 Church Street, Suite 3300
Nashville, TN 37203

*/s/ Jason Harley*
JASON M. HARLEY
Trial Attorney, Joint Task Force Vulcan
*Pro Hac Vice*
719 Church St., Suite 3300
Nashville, TN 37203