IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

UNITED STATES OF AMERICA

v.

KILMAR ARMANDO ABREGO GARCIA,

*Defendant.*

No. 3:25-cr-115

Judge Waverly D. Crenshaw, Jr.

**MOTION AND MEMORANDUM OF LAW IN OPPOSITION TO GOVERNMENT'S MOTION IN LIMINE PROHIBITING DISCUSSION OF THE DEFENDANT'S IMMIGRATION STATUS AND HISTORY**

# PRELIMINARY STATEMENT

For the past eight months, officials at the highest levels of the United States government have told the world that Mr. Abrego is a "violent criminal" who was rightfully deported to El Salvador and should never be permitted to go free on American soil. They have made crystal clear that keeping him locked up is a top priority for the Executive Branch. The government's cooperating witnesses, all of whom emerged from the woodwork only after the government made its objectives clear, have certainly heard that message and sought to capitalize on it. In fact, the government's star witness, CC-1, who is intimately connected with four of the other cooperating witnesses, began cooperating two days after he told agents that he saw President Trump talk about Mr. Abrego on the news from prison.

The government seeks to exclude from this case all evidence of Mr. Abrego's unlawful deportation and his return to the United States. But that evidence is crucial impeachment material that will show that the government's witnesses are either too self-interested, or too afraid, to contradict the story the government has been shouting about Mr. Abrego from the rooftops. At least three of the government's cooperating witnesses have extracted valuable and unusual benefits from the government in exchange for their testimony, including release from prison and relief from deportation (notwithstanding one witness's multiple prior unlawful entries), and another witness is a paid informant who began cooperating only after Mr. Abrego's face was all over the news. The Confrontation Clause of the Sixth Amendment guarantees Mr. Abrego the right to cross-examine witnesses about their biases and motivations for cooperating against him. Their knowledge that this case was a high priority for the government is critical to upholding that constitutional right. Allowing cross-examination about Mr. Abrego's unlawful deportation, his return to the United States, the Trump Administration's fixation on him, and the witnesses'

deciding to cooperate while knowing about those things, is necessary to ensure that the jury has a complete understanding of witnesses' credibility.

## BACKGROUND

I. **Mr. Abrego Challenges His Unlawful Deportation and the Government Initiates a Widely Publicized Retribution Campaign**

On March 15, 2025, the United States government unlawfully deported Mr. Abrego to El Salvador, where he was detained in the Terrorism Confinement Center ("CECOT"), a notorious supermax prison. *Abrego Garcia v. Noem*, 777 F. Supp. 3d 501, 506-07 (D. Md. 2025). On March 24, 2025, Mr. Abrego sued the government in the District of Maryland to challenge his unlawful deportation to El Salvador. *Id.* at 510. The government confessed that it had no legal authority to arrest Mr. Abrego and send him to El Salvador, *id.* at 507, and Mr. Abrego prevailed against the government in obtaining court orders to "facilitate" his return to the United States. *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025); *Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113, at *1 (4th Cir. Apr. 7, 2025).

Instead of complying with those court orders, President Donald Trump, Vice President JD Vance, Attorney General Pamela Bondi, and other high-ranking officials began a prolific public campaign seeking to paint Mr. Abrego as "a 'gang member,' a 'violent criminal' and a 'terrorist.'" (Dkt. 138 at 4; *see also* Dkt. 69 at 1, 3-5).[1]

---

[1] *See, e.g.*, *Kristi Noem to Newsmax: Man Deported in Error "Very Dangerous"*, Newsmax (Apr. 4, 2025), https://www.newsmax.com/newsmax-tv/kristi-noem-deported-kilmar-abrego-garcia/2025/04/04/id/1205764/ (Noem: "[H]e was a gang member, violent criminal, definitely a member of one of these terrorist organizations and did not belong in this country and needed to face consequences."); Forbes Breaking News, *Bondi Asked Why Abrego Garcia Must Stay in Foreign Prison If Admin Admitted Deportation Was Mistake*, at 00:22-00:24 (YouTube, Apr. 8, 2025), https://www.youtube.com/watch?v=MXh4lmUAKZA (Bondi: "[H]e is a known gang member."); *Homan to Newsmax: Abrego Garcia Has Himself to Blame*, Newsmax (Apr. 11, 2025), https://www.newsmax.com/newsmax-tv/homan-abrego-garcia/2025/04/11/id/1206624/ (Homan: "He's a MS-13 gang member, according to our intelligence and…the intelligence of El Salvador.").

As early as April 2025, the Executive Branch's public statements, which were broadcast widely by the government and the media, made it abundantly clear that painting Mr. Abrego as a criminal was a political priority for the government. On April 8, 2025, President Trump told the public about Mr. Abrego: "We don't want [him] back. Can you imagine, you spend all of that time, energy, and money on getting [him] out and then you have a judge that sits there…and says no, no, bring [him] back."[2] On April 16, Attorney General Bondi told the press that

> [U]nder Donald Trump's incredible plan to get these alien enemies, these terrorists out of our country—[Mr. Abrego] is deported….He is sitting in a prison, and every American should be thanking President Trump tonight. And every liberal journalist who has called him a "Maryland man" and [said] he was rightfully in this country, should be apologizing tonight to President Trump.[3]

Two days later, in an Oval Office press conference, President Trump described Mr. Abrego as "an illegal alien, an MS-13 gang member, and a foreign terrorist." He continued:

> In 2019, Garcia was issued a deportation order; two separate judges affirmed Garcia was a member of MS-13, which is a gang that may be even worse than Tren de Aragua, it may be worse. They kill people with knives because it's more painful. Very famous for the knifing and killing of two young sixteen-year-old girls walking to school one day and they sliced them up into little pieces and killed them. That's MS-13. And two separate judges affirmed, affirmed Garcia was a member of MS-13. When Garcia was originally arrested he was wearing a sweatshirt with rolls of money pouring out and an MS-13 gang symbol. That he was driving with two other known violent MS-13 gang members, two of the most violent members that we know of in the MS-13 gang of thugs.
>
> In 2022 Garcia was stopped by the Tennessee Highway Patrol, was found to be transporting seven people from Texas to Maryland, and he had no driver's license. He was driving violently….
>
> This is the man that the Democrats are wanting us to fly back from El Salvador to be a happily ensconced member of the USA family. Isn't it a shame? And, by the way, I've been hit pretty hard by fake shows, fake news, MSDNC in particular, where they talk about how evil I am that this man would be thrown out of our country. This man is, according to certified statements that we get, is a very violent

---

[2] Video posted by ABC News (@ABC), X (Apr. 8, 2025), https://x.com/ABC/status/1909745348127367171.
[3] Video posted by Attorney General Pamela Bondi (@AGPamBondi), X (Apr. 16, 2025), https://x.com/AGPamBondi/status/1912682960156795369.

3

person. And they want this man to be brought back into our country, where he can be free and stay as a happily Maryland…You know…they call him the Maryland man. He's a Maryland father. No, this is a violent person.[4]

Thereafter, the government continued to claim to the world that Mr. Abrego is a criminal and that it was right to detain and deport him, with media describing the government's campaign against him as "a symbol of the Trump administration's hard-line immigration tactics."[5] On May 8, 2025, Department of Homeland Security ("DHS") Secretary Kristi Noem stated on national television: "Abrego Garcia is a citizen of El Salvador and should never have been in this country and will not be coming back to this country. There is no scenario where Abrego Garcia will be in the United States again. If he were to come back, we would immediately deport him again because he is a terrorist, he's a human smuggler, and he is a wife beater."[6] On May 14, 2025, DHS posted on X: "Kilmar Abrego Garcia is a confirmed MS-13 terrorist, wife beater, and human trafficker. We have confronted the media and public with overwhelming evidence….It's astonishing Democrats spend more time fighting for criminal illegal aliens than law-abiding Americans."[7] Between early April and May 21, 2025, when this indictment was returned, government officials including President Trump, Vice President Vance, Attorney General Bondi, Secretary Noem, Border Czar Tom Homan, and Homeland Security Adviser Stephen Miller made more than forty public statements about Mr. Abrego.

---

[4] Forbes Breaking News, *Trump Attacks Kilmar Abrego Garcia in Defense of Mistaken Deportation to El Salvador*, at 2:47-4:49, 5:32-6:26 (YouTube, Apr. 18, 2025), https://www.youtube.com/watch?v=6-oDjdWvzkU.
[5] Hamed Aleaziz & Alan Feuer, *Abrego Garcia Now Facing Shifting Threats of Deportation*, N.Y. Times (Sept. 5, 2025), https://www.nytimes.com/2025/09/05/us/politics/trump-deportations-abrego-garcia-el-salvador.html.
[6] *Kristi Noem: "There Is No Scenario Where Abrego Garcia Will Be In The United States Again"*, Forbes Breaking News (Youtube, May 8, 2025), https://www.youtube.com/watch?v=DI1Y8gk-Lt8.
[7] Homeland Security (@DHSgov), X (May 14, 2025), https://x.com/DHSgov/status/1922672678340555173.

4

## II. The Government Assembles a Group of Cooperators at the Highest Levels of the Alleged Conspiracy and Grants Them Atypical and Substantial Benefits

While President Trump and his cabinet officials made public pronouncements about Mr. Abrego, the government simultaneously began assembling a group of cooperators as part of its investigation, offering them unusual benefits in exchange for their testimony. The government's first cooperator, CC-1, is the convicted leader of a human smuggling operation, has three other felony convictions, has "been deported multiple times," and is "serving a sentence for illegal reentry." (Dkt. 99 at 55). Four of the government's other cooperators are CC-1's relatives and former romantic partners, who assisted CC-1 in running his human smuggling operation. The government's final alleged cooperator, who was allegedly "one of the primary sources of supply of undocumented aliens for the conspiracy" (Dkt. 3 at 3), is currently facing charges of conspiracy to transport aliens into the United States.

The cooperators, like people across the globe, saw the government's many public statements about Mr. Abrego. Just four days after President Trump's April 18 Oval Office press conference, on April 22, HSI agents went to visit CC-1 for the first time regarding this case and asked him if he knew Mr. Abrego. CC-1 then "███████████████████████████████████████████████████████████████████████████████" (P000410). Two days later, CC-1 was interviewed by HSI agents again after he "███████████████████████████████████████" (P000412). CC-1 was keenly aware of the publicity surrounding Mr. Abrego's case. CC-1's counsel told the interviewing agent that CC-1 "████████████████████████████" (*Id.*). Witness-1, like the cooperators, was interviewed well after the government's public statements about Mr. Abrego began. (Dkt. 47 at 61). In fact, all of the known witnesses in this case began speaking with the government in late April and throughout May, while high-level officials

5

were pronouncing publicly that Mr. Abrego was a criminal.

From the earliest stages of the investigation, the cooperators manifested their understanding of how important this case is to the federal government by immediately making their cooperation contingent on the receipt of significant benefits. In CC-1's first interview, on April 22, 2025, he told HSI agents to "███████████████████████████████████████" (P000410). Two days later, in his second interview, during which CC-1 alleged that Mr. Abrego was a driver for CC-1's "███████" (P000412), CC-1 "███████████████" that "███████████████████████" (P000414-P000415). He was particularly "███████████████" a close family relative, whom "███████████████████████████████████████" (P000415). At CC-1's third interview, on April 29, 2025, he asked HSI agents "███████████████████████████████████████████████████████████████████████████████████" (P000417). An HSI agent told him that ███████████████████████████████████████████████████████████████. (*Id.*). On May 5, 2025, only eleven days after CC-1 expressed his concern about CC-2's arrest and deportation, CC-2 was arrested by Immigration and Customs Enforcement ("ICE") officers and began cooperating himself. (P000342). Similarly, CC-3 testified at the grand jury that HSI agents told her "███████████████████████████████████████████████████████████" (Dkt. 88 at 7).

If the cooperators—having watched the news—bet that the government's fixation on Mr. Abrego would lead prosecutors to offer them exceptional benefits for any dirt they could provide about Mr. Abrego, they were right. In exchange for his testimony, CC-1 was moved from federal prison to a halfway house and granted relief from deportation for a year. (Dkt. 61 at 31-32, 123). HSI Special Agent Peter Joseph, who testified for the government at the June 13, 2025 and July

6

16, 2025 evidentiary hearings, admitted that those benefits are "atypical" for someone with a criminal and immigration history like CC-1's. (Dkt. 99 at 55). It is even more unusual to grant those benefits to the convicted leader of a human smuggling operation in return for his cooperation against a person who was, according to CC-1's own statements, merely one of multiple drivers for him.

Other cooperators have also received immigration relief in exchange for their testimony. CC-2 "███████████████████████████████████████████████████████████████████████████████████████" (P000356). By July 2025, CC-2, who allegedly took over the human smuggling business from CC-1 while CC-1 was incarcerated (Dkt. 3 at 4), had requested "early release and at least deferment of deportation as part of his cooperation." (Dkt. 99 at 62-63). CC-3, another member of CC-1's family, also expects not to be deported in exchange for her cooperation in this case. (Dkt. 99 at 63-64, 80; Dkt. 61 at 85, 135).

Not only did the cooperators begin speaking with the government after high-level officials' narrative about Mr. Abrego gained nationwide prominence, as this Court has noted, the testimony of the cooperators "*evolved* throughout the interview process" (Dkt. 95 at 31), suggesting that the cooperators' testimony may have been further influenced by the government's public pronouncements about Mr. Abrego over time. CC-1's testimony, in particular, changed over the course of his interviews with HSI. In his first and second interviews, for example, CC-1 "did not tie [Mr. Abrego] to any gang affiliations," and in his third and fourth interviews he "stated that he did not notice anything to suggest that [Mr. Abrego] was part of a gang" and "that he did not see any signs that [Mr. Abrego] was a member of MS-13." (Dkt. 95 at 5-6). In "the fifth interview, however, he remarked for the first time that [Mr. Abrego] would greet [gang members] in a 'familial' manner." (*Id.* at 6). CC-1 similarly "changed his story" with respect to guns, stating in

7

his fourth interview that neither he nor Mr. Abrego carried guns, then reversing course in his fifth interview to state that he gave guns to Mr. Abrego, "who carried them with undocumented individuals in the vehicle." (*Id.*).

On November 24, 2025, the government moved *in limine* to preclude the defendant from describing "[Mr. Abrego's] immigration issues (his deportation, lawsuit, and return)" "during opening statement, direct examination or cross-examination of witnesses, and closing argument" (Dkt. 231 at 1-2). The government further requested that the Court prohibit Mr. Abrego from arguing "for nullification by the jury on the basis of their motion for vindictive and selective prosecution." (*Id.* at 1).

## ARGUMENT

Evidence of Mr. Abrego's widely publicized unlawful deportation, his successful lawsuit seeking his return to the United States, and the government's public statements about the importance of keeping Mr. Abrego detained to punish him for challenging his deportation are relevant to show the bias and motives of the government's witnesses. Mr. Abrego does not intend to present a vindictive prosecution defense to the jury, *see United States v. Abboud*, 438 F.3d 554, 579 (6th Cir. 2006), or to argue for jury nullification, *see Wofford v. Woods*, 969 F.3d 685, 709 (6th Cir. 2020). But the factual background here is crucially important impeachment evidence that will show that the government's witnesses, whether out of a desire for significant benefits, or fear of retribution, or both, have shaped their testimony to conform to the government's public narrative of Mr. Abrego as a "gang member," a "violent criminal," and a "terrorist."

### I. Applicable Law

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v.*

*Kentucky*, 476 U.S. 683, 690 (1986) (internal citations omitted). Cross-examination, in particular, is "a fundamental right essential to a fair trial in a criminal prosecution," *Pointer v. Texas*, 380 U.S. 400, 404 (1965), "and the ability to show bias, motive, or prejudice on the part of a witness is an integral part of cross-examination," *Abboud*, 438 F.3d at 580.

"[A] trial court may not prevent a criminal defendant from exploring a witness' bias, prejudice, or motive for testifying, or curtail cross-examination concerning whether testimony is given with the expectation of immunity or out of fear or coercion." *Stevens v. Bordenkircher*, 746 F.2d 342, 346 (6th Cir. 1984) (internal citations omitted). "It has repeatedly been held that a trial court abuses its discretion when it completely bars exploration of a relevant subject on cross-examination," *Dorsey v. Parke*, 872 F.2d 163, 166 (6th Cir. 1989), or when its evidentiary rulings prevent the jury from having "enough information…to assess the defense theory of bias or improper motive." *United States v. Taylor*, 127 F.4th 1008, 1014 (6th Cir. 2025) (internal quotations omitted). Only a "very substantial" government interest in limiting cross-examination can outweigh a "defendant's interest in showing the bias of an adverse witness," which "is often 'paramount.'" *Id.* at 1017 (internal quotations omitted).

In challenging a witness's credibility, defendants are not limited to cross-examination alone. Federal Rule of Evidence 608, which limits the admissibility of extrinsic evidence to show a witness's character for truthfulness or untruthfulness, does not apply to evidence of bias. *United States v. Harris*, 881 F.3d 945, 949 (6th Cir. 2018) ("By limiting the application of [Rule 608] to proof of a witness' character for truthfulness…[the Federal Rules of Evidence] leave[] the admissibility of extrinsic evidence offered for other grounds of impeachment (such as contradiction, prior inconsistent statement, bias and mental capacity) to Rules 402 and 403." (internal quotations omitted)); *see also United States v. Baker*, 494 F.2d 1262, 1266 (6th Cir. 1974)

("[W]e cannot view as collateral the defendant's attempt to discredit the inculpatory testimony of a sole accusing witness by proof of bias or motive to falsify."). Instead, the admissibility of extrinsic evidence of a witness's bias is governed by Federal Rules of Evidence 402 and 403, which, together, provide that relevant evidence is admissible so long as its probative value is not "substantially outweighed by a danger of…unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see also Harris*, 881 F.3d at 949.

"Bias is always relevant in assessing a witness's credibility," *Schledwitz v. United States*, 169 F.3d 1003, 1015 (6th Cir. 1999); and "the credibility of a witness is always relevant," *United States v. Vandetti*, 623 F.2d 1144, 1150 (6th Cir. 1980). The Supreme Court has described bias as "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest.'" *Allen v. Warden, Toledo Corr. Inst.*, No. 2:12-CV-154, 2012 WL 6114742, at *22 (S.D. Ohio Dec. 7, 2012), *report and recommendation adopted*, No. 2:12-CV-154, 2013 WL 1946198 (S.D. Ohio May 9, 2013) (quoting *United States v. Abel*, 469 U.S. 45, 52 (1984)).

Finally, in order to "present a complete defense," the defense must be permitted to explain why the government's witnesses are not credible in its opening statement, on cross-examination, and in closing. The purpose of an opening statement "is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole." *United States v. Johnson*, 299 F. Supp. 3d 909, 923 (M.D. Tenn. 2018). To do so, as courts have recognized, defense counsel must frequently refer to the bias of the government's witnesses. *E.g.*, *United States v. Wells*, 623 F.3d 332, 340 (6th Cir. 2010); *Wilson*

*v. Howes*, No. 10 Civ. 1030, 2014 WL 1255968, at *7 (W.D. Mich. Mar. 26, 2014). That is particularly true where, as here, the bias of the government's witnesses is a core component of the defendant's case.

> II. **Evidence of Mr. Abrego's Widely Publicized Unlawful Deportation and Return Is Relevant to Assessing the Credibility of the Government's Witnesses**

It is difficult to imagine circumstances more likely to cause a witness "to slant, unconsciously or otherwise, his testimony," *Abel*, 469 U.S. at 52, against a defendant than the circumstances of this case. After Mr. Abrego successfully challenged his unlawful deportation, the government launched a widely publicized campaign to brand him as a "gang member," a "violent criminal," and a "terrorist." Instead of facilitating Mr. Abrego's return to the United States as the Supreme Court had ordered, President Trump and his high-ranking subordinates made clear in a series of public statements that they viewed Mr. Abrego as a criminal who should be locked up and kept out of this country at all costs.

Although "a defendant is not required to articulate a precise theory of bias at the trial level to merit cross-examination," *Boggs v. Collins*, 226 F.3d 728, 740 n.7 (6th Cir. 2000), he can readily do so here: as a logical matter, it is easy to see how the government's campaign against Mr. Abrego and anyone who dares to tell the truth about his case might bias the witnesses in this case or cause them to fabricate their testimony about Mr. Abrego.

And as a factual matter, that is exactly what happened. The government's star witness has, from the very beginning of his cooperation, been well aware of the news coverage of this case. In fact, CC-1 began cooperating with the government only after seeing President Trump's statements about Mr. Abrego on the news. The widespread publicity surrounding Mr. Abrego's case, as well as CC-1's knowledge of the case, makes it virtually certain that the government's other cooperators, four of whom are family members or former romantic partners of CC-1, also know

11

that this case is a priority for the government.

In light of the government's very public efforts to brand Mr. Abrego a criminal in order to justify his unlawful deportation, it is likely the cooperators saw and still see that Mr. Abrego's case offers them an opportunity. They have the power to give the government something it desperately wants—a story about Mr. Abrego that allows the government to prove up his criminality and obtain a conviction. At least three of the government's cooperating witnesses are receiving significant and "atypical" benefits, (Dkt. 99 at 55), in exchange for their cooperation, which is "core impeachment evidence." *Taylor*, 127 F.4th at 1015 (quoting *United States v. Ralston*, 110 F.4th 909, 918 (6th Cir. 2024)). For CC-1 in particular, his assistance served as a literal get-out-of-jail-free card. (*See* Dkt. 61 at 31-32, 123). Under the Sixth Amendment, the defense must be permitted to do more than simply ask whether a witness has been "promised anything in connection with his testimony." *Taylor*, 127 F.4th at 1015. The defense must be permitted to dig deeper into the circumstances under which those benefits were promised. *Id.* Here, that means digging into the cooperators' understanding of the importance of Mr. Abrego's case to the government, to explain why the cooperators believed they could get significant benefits in exchange for their testimony and why the government was in fact willing to provide those significant (and atypical) benefits.

But Mr. Abrego's case offers not just an opportunity, but a warning. The government's retaliation against Mr. Abrego—in the form of public statements and widely reported efforts to evade court rulings in his favor and deport him to countries where he likely to be tortured—is enough to instill fear in anyone, and especially in witnesses who, like the cooperators, have precarious immigration status and a history of involvement in crime. And it is not just the cooperators who may be affected: It is reasonable to expect that law enforcement witnesses might be intimidated enough by the government's fixation on Mr. Abrego to alter their testimony in favor

12

of his conviction.[8] The obvious importance of this case to the government only heightens the likelihood that all witnesses—law enforcement and cooperators alike—would fear retaliation if they failed to fall in line with the government's narrative.

> III. Evidence of the Government's Retribution Campaign Is Admissible Notwithstanding Its Relevance to Mr. Abrego's Separate Motion to Dismiss for Vindictive Prosecution

Courts have repeatedly recognized that although the question of whether a prosecution is vindictive is one for the judge, not the jury, the same evidence that supports vindictiveness may be admissible to impeach the government's witnesses. *United States v. Fieger*, No. 07-CR-20414, 2008 WL 996401, at *3 (E.D. Mich. Apr. 8, 2008); *see also United States v. Demosthene*, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004), *aff'd,* 173 F. App'x 899 (2d Cir. 2006); *United States v. Yagman*, No. CR 06-227(A)-SVW, 2007 WL 9724391, at *1 (C.D. Cal. May 16, 2007) ("[E]vidence that conceivably relates to vindictiveness might also support relevant arguments unrelated to vindictive prosecution."). The Sixth Circuit has explained that it will "not adopt the…argument that…evidence of the government's motivation should not be presented to the jury because it is relevant only to a claim of vindictive prosecution, which should be decided by the judge not the jury. Insofar as evidence of the government's motives may cast doubt on the credibility of evidence or testimony presented by the government, it is certainly relevant to the defendant's case." *United States v. Burge*, 990 F.2d 244, 248 (6th Cir. 1992).[9]

---

[8] In fact, one former high-ranking Department of Justice official has already faced consequences for refusing to lie about Mr. Abrego in court. Letter from Dana L. Gold, Gov't Accountability Project, et al. to Michael E. Horowitz, Inspector Gen., U.S. Dep't of Just., et al., at 23-25 (June 24, 2025), https://www.judiciary.senate.gov/imo/media/doc/06-24-2025_-_Protected_Whistleblower_Disclosure_of_Erez_Reuveni_Redacted.pdf (the "Reuveni Disclosure"). There is no reason for the law enforcement agents involved in the investigation to think that they are any less vulnerable to losing their livelihoods than Mr. Reuveni was.

[9] The Court can mitigate the risk that the jury would consider evidence of the government's conduct towards Mr. Abrego to assess the nature of the prosecution in the standard way: by delivering a limiting instruction stating that this evidence may be used for the sole purpose of

13

The government's reliance on *United States v. Abboud* is misplaced. In *Abboud*, the Sixth Circuit held that it was proper for the district court to preclude the defense from "present[ing] a defense of selective prosecution" to the jury. 438 F.3d at 580. But the court specifically noted that "Defendants fully admitted that the purpose of the cross-examination was not to test the reliability of the witnesses, but instead to present a defense of selective prosecution." *Id.* The defense here does not intend to present a defense of vindictive or selective prosecution, but seeks to use evidence concerning Mr. Abrego's very public unlawful deportation and removal and the high priority of this case for the government to probe witnesses' biases and motives to fabricate—an issue not present in *Abboud*. Indeed, in *Abboud*, the Sixth Circuit emphasized that "cross-examination plays a vital role in the adversarial system of our country, and the ability to show bias, motive, or prejudice on the part of a witness is an integral part of cross-examination." *Id.*

Nor is the defense precluded from introducing relevant impeachment evidence simply because the government fears it might lead the jury to consider nullification. Mr. Abrego does not intend to argue for jury nullification and does not seek to introduce evidence of the government's campaign against Mr. Abrego for that purpose. But this is not a case where evidence is relevant only to nullification. *See United States v. Saylor*, No. 7:23-CR-14, 2024 WL 3528639, at *3 (E.D. Ky. July 24, 2024) ("[D]efendants do not have the right to present evidence or arguments *solely* to encourage jury nullification." (emphasis added)). Courts will not "provide jury instructions acknowledging [jury nullification], or allow lawyers to argue overtly for it." *Wofford*, 969 F.3d at 709. But neither will courts exclude relevant and admissible evidence simply because it might lead a jury to exercise its right "as a buffer between the accused and the state, to reach a verdict despite what may seem clear law." *United States v. Krzyske*, 836 F.2d 1013, 1021 (6th Cir. 1988).

---

assessing the credibility of the government's witnesses. *Cf. United States v. Hopper*, 436 Fed. App'x 414, 422-23 (6th Cir. 2011).

14

## **CONCLUSION**

Mr. Abrego respectfully requests that the Court deny the government's motion to exclude all evidence of Mr. Abrego's unlawful deportation and his return to the United States.

Dated: December 8, 2025
      New York, New York

Respectfully submitted,

/s/ Sean Hecker
Sean Hecker*
Jenna M. Dabbs*
David Patton*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
shecker@heckerfink.com
jdabbs@heckerfink.com
dpatton@heckerfink.com

* admitted *pro hac vice*

Rascoe Dean (No. 034209)
SHERRARD ROE VOIGT & HARBISON PLLC
1600 West End Avenue, Suite 1750
Nashville, Tennessee 37203
Telephone: (615) 742-4200
Fax: (615) 742-4539
rdean@srvhlaw.com

*Counsel for Defendant Kilmar Armando Abrego Garcia*

**CERTIFICATE OF SERVICE**

      I hereby certify that on December 8, 2025, I electronically filed the foregoing document with the clerk of the court by using the CM/ECF system, which will send a notice of Electronic Filing to the following: Acting United States Attorney, Robert E. McGuire, 719 Church Street, Suite 3300, Nashville, Tennessee 37203; Assistant United States Attorney, Jason Harley, 210 Park Avenue, Suite 400, Oklahoma City, Oklahoma 73102; Associate Attorney General Stanley E. Woodward, Jr., 950 Pennsylvania Avenue NW, Washington, D.C. 20530.

      /s/ Sean Hecker