**CASE NUMBER**
BA36FA23BA0001

**CASE OPENED**
12/22/2022

**CURRENT CASE TITLE**
MS-13 Human Trafficking/Smuggling
PG County

**REPORT TITLE**
Additional Information Gathered from 4/24/25 Proffer of CC-1 [redacted]

**REPORTED BY**
Francis McGarvey Jr
NO TITLE FOUND

**APPROVED BY**
John VanWie
SUPERVISORY SPECIAL AGENT

**DATE APPROVED**
5/12/2025

## SYNOPSIS

On December 1, 2022, the Combined Intelligence Unit (CIU) received information that Kilmar Armando ABREGO-Garcia was queried in NCIC by the Tennessee Highway Patrol (615) 920-3638. DHS sources indicate that ABREGO was identified through official law enforcement investigations as a member of the Mara Salvatrucha (MS-13). This case was referred to Homeland Security Investigations (HSI) Baltimore, Maryland for investigative follow-up.

The following Report of Investigation documents additional information gathered from a proffer interview of CC-1 [redacted]

1

9/10/2025



This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

DEFENDANT EXHIBIT 017

Case 3:25-cr-00115 Document 315-2 Filed 08/13/26 Page 1 of 5 PageID #: 5134

## DETAILS OF INVESTIGATION

On Thursday, April 24, 2025, HSI Birmingham Special Agents (SA), Task Force Officers (TFO), and HSI Baltimore SA's participated in a proffer interview of CC-1 [redacted]. The following is a recount of the report generated from HSI Birmingham following the proffer, with additional observations at the end made by HSI Baltimore SA's.

HSI Birmingham Narrative:

On April 24, 2025, Immigration and Customs Enforcement (ICE) / Homeland Security Investigations (HSI) conducted a proffer interview with CC-1 [redacted] (alien file number [redacted]) at the Federal Bureau of Prisons (BOP), Federal Correctional Institution (FCI) in [redacted]. It was learned by HSI personnel that CC-1 [redacted] had contacted family members and stated he wanted to speak with HSI. HSI Special Agent (SA) Hinkle was also told by [redacted] staff that CC-1 [redacted] reached out to prison staff asking to speak with HSI.
Before the proffer, Federal Public Defenders (FPD)s OP 57 [redacted] and OP 58 [redacted] had privileged conversations with CC-1 [redacted]. After speaking with CC-1 [redacted], FPD OP 57 [redacted] spoke to SA Hinkle. FPD Anwar stated CC-1 [redacted] was worried about his name being in the news. SA Hinkle stated he would ask management if CC-1 [redacted] name could be kept out of the news.
CC-1 [redacted] was provided a proffer letter, also known as a Kastigar letter, from the United States Attorney's Office for the Southern District of Texas. FPDs OP 58 [redacted] and OP 57 [redacted] went over the letter with CC-1 [redacted]Z.
After FPD OP 57 [redacted] had time to speak to her client privately, a proffer interview was conducted with CC-1 [redacted]. Present for the proffer interview were SA Hinkle, SA Williams, and HSI Task Force Officer (TFO) in person along with the following via telephone: FPD OP 58 [redacted], FPD OP 57 [redacted], interpreter OP 88 [redacted], and HSI Baltimore SAs McGarvey and Pramas. There were multiple breaks taken during the interview so FPD OP 57 [redacted] could have privileged conversations with CC-1 [redacted]. FPD OP 57 [redacted] advised CC-1 [redacted] of the proffer letter and FPD OP 57 [redacted] stated advisal of Miranda Rights were not necessary. (The following is an interview summary. It is not intended to be a verbatim account and does not memorialize all statements made during the interview. Communications by the parties were electronically recorded.)
At the beginning of the interview, SA Hinkle confirmed with CC-1 [redacted] that CC-1 [redacted] reached out to family and prison staff requesting to speak to HSI. During the interview, CC-1 [redacted] stated CC-1 [redacted] met Kilmar ABREGO-Garcia sometime at the end of 2015/2016 in Maryland. CC-1 [redacted] stated ABREGO worked for either "Taxi Latino" or "Barrio Fino" in Langley Park, Maryland. CC-1 [redacted] stated he also worked at "Taxi Latino" and believed that was where he met ABREGO. CC-1 [redacted] stated he allowed ABREGO to use his vehicles


This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

later when they became friends. CC-1 [redacted] stated he moved to Houston to start a taxi service because clients began asking him to transport people to other states such as Virginia, New Jersey, and New York.

CC-1 [redacted] stated ABREGO had told CC-1 [redacted] he had been stopped in Tennessee in 2022, but CC-1 [redacted] did not think much about it because ABREGO told CC-1 [redacted] that ABREGO had papers. At this time, SA Hinkle told CC-1 [redacted] he appreciated CC-1 [redacted] meeting and speaking to agents but not to lie. CC-1 [redacted] stated he understood. CC-1 [redacted] stated during the 2022 stop, ABREGO was driving either CC-1 [redacted] gold or black Suburban as ABREGO used both of those vehicles depending on which one was running at the time. CC-1 [redacted] stated ABREGO had seven or nine passengers in the vehicle at the time of the stop that CC-1 [redacted] stated ABREGO had picked up in Houston. CC-1 [redacted] stated all the passengers in the vehicle during the stop called CC-1 [redacted] on his cell phone, number [redacted]-[redacted]-5191, to be picked up. CC-1 [redacted] stated he communicated with ABREGO on the same phone and used an application called Zelle, like the banking app, to communicate as well. CC-1 [redacted] stated taxi drivers in Maryland would use the Zelle app to communicate with each other because it looked more professional than talking on the radio. CC-1 [redacted] stated he started a taxi service he called "Taxi Express." CC-1 [redacted] stated it was not a registered business; CC-1 [redacted] just created the name. CC-1 [redacted] stated he created the Zelle radio app channel named "Taxi Express" but they only used it briefly. CC-1 [redacted] stated they stopped using the app and began giving out CC-1 [redacted] phone number for clients to call. CC-1 [redacted] stated the clients paid cash because they did not know how to use payment apps.
AGENT NOTE: While Zelle is a banking app and the cash transactions were most likely facilitate by that app it is believed the Zello app is what CC-1 [redacted] is referring to for the radio communications.
At this time, FPD OP 57 [redacted] asked to have a privileged conversation with CC-1 [redacted]. A break was taken at approximately 4:17 p.m.
The interview started again several minutes later.
CC-1 [redacted] stated ABREGO worked for CC-1 [redacted] and all their transports were illegal aliens. CC-1 [redacted] stated he knew they were illegal because passengers wanted to avoid Greyhound buses. CC-1 [redacted] stated when he first started transporting illegal aliens, CC-1 [redacted] told ABREGO that CC-1 [redacted] was involved in transporting illegal aliens. CC-1 [redacted] stated ABREGO said to him that he wanted to work for CC-1 [redacted] and wanted to travel. CC-1 [redacted] stated all the passengers ABREGO transported were illegal aliens.
CC-1 [redacted] stated he communicated with ABREGO and clients with CC-1 [redacted] phone, number [redacted]-5191. CC-1 [redacted] stated these clients were bringing in aliens into the country and would call CC-1 [redacted] to pick up multiple individuals at a time. CC-1 [redacted] stated the clients would provide the addresses to pick up aliens as well as provided the number of

9/10/2025



This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

aliens and what States the aliens needed to be transported to. CC-1 [redacted] stated the clients were "heavy hitters" out of McAllen and went by the following nicknames: OP 31 [redacted], OP 59 [redacted], OP 60 [redacted]. CC-1 [redacted] stated OP 31 [redacted] gave them a lot of work. CC-1 [redacted] stated clients such as OP 31 [redacted], OP 59 [redacted], and OP 60 [redacted] were very careful and would change their names regularly. CC-1 [redacted] stated clients would provide the address for pickups and CC-1 [redacted] or ABREGO would meet to pick up illegal aliens. CC-1 [redacted] stated anywhere from six to eight illegal aliens were transported at a time. CC-1 [redacted] stated ABREGO would make two trips per week and would be paid by CC-1 [redacted] either $1300, $1500, or $1700 per trip depending on the trip. CC-1 [redacted] stated ABREGO transported approximately 600 aliens a year and CC-1 [redacted] paid ABREGO approximately $90,000 to $96,000 a year to transport illegal aliens. CC-1 [redacted] stated passengers would pay between $350 to $500 each to be transported. CC-1 [redacted] stated ABREGO continued to transport aliens even after CC-1 [redacted] was deported. CC-1 [redacted] stated ABREGO started working for CC-1 [redacted] again once CC-1 [redacted] returned to the United States. CC-1 [redacted] stated he transported aliens for money through 2016 to 2017, for approximately two months 2019, and during 2021.

During the interview, CC-1 [redacted] stated his cell phone was at his "home."

CC-1 [redacted] stated he and ABREGO would collect money from clients and passengers. CC-1 [redacted] stated when they would meet the clients to pick up aliens to transport, the clients would have a list of the passengers and how much they still owed for the transport. CC-1 [redacted] stated an example would be the client would state they had five aliens to transport, and they would owe $1000 each. CC-1 [redacted] stated if aliens did not pay, CC-1 [redacted] would call the "owner", the person who transferred the alien to him, or the family and let the person know the alien refused to pay and one or the other would complete the payment.

SA Williams then asked CC-1 [redacted] if CC-1 [redacted] had observed any abuse of the aliens. At this time, FPD OP 57 [redacted] asked to have a privileged conversation with CC-1 [redacted]. A break was taken at approximately 4:59 p.m.

The interview continued at approximately 5:31 p.m.

SA Hinkle showed a picture of OP 4 [redacted] to CC-1 [redacted]. CC-1 [redacted] stated he did not recognize the person in the photo. SA Hinkle then asked CC-1 [redacted] if ABREGO's spouse knew ABREGO was transporting illegal aliens. CC-1 [redacted] began to smile. Before he answered, FPD OP 57 [redacted] asked to stop the interview.

The interview ended.

After the recorded interview ended, CC-1 [redacted] began spontaneously uttering on his own accord and unprovoked. CC-1 [redacted] stated he wanted protection for him and his family. CC-1 [redacted] stated he

was worried about his son, CC-2 [redacted] (date of birth [redacted]). CC-1 [redacted] stated he had his son in hiding because he was worried his son would be arrested and deported. CC-1 [redacted] stated his son had previously been deported from the United States.

CC-1 [redacted] also stated he could show SAs the information on his phone, but he would have to be

9/10/2025


This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

let go. CC-1 [redacted] stated if not, he could lock the phone. SA Hinkle then asked if the phone was at his last known residence in Texas and he stated yes.
CC-1 [redacted] was then taken back to his cell.
Investigation continues.

Investigative Findings:

On March 12, 2025, following the administrative arrest of ABREGO GARCIA, HSI Baltimore SA's conducted a custodial interview of ABREGO GARCIA at the Fallon Federal Building in Baltimore. HSI Baltimore SA's read ABREGO GARCIA his Miranda Rights in Spanish, after which point he agreed to speak to investigators and signed a Miranda Rights waiver. Some statements made by ABREGO GARCIA during the custodial interview conflict with information gathered from the proffer interview with CC-1 [redacted]. Some of the statements made to HSI Baltimore SA's during this interview with ABREGO GARCIA include the following:

-Investigators showed ABREGO GARCIA a photograph of CC-1 [redacted]. At this time, ABREGO GARCIA denied knowing the individual CC-1 [redacted] in the photo.

-ABREGO GARCIA stated during the interview he only made one trip total to transport people (referring to the 2022 trip where ABREGO GARCIA was stopped by Tennessee Highway Patrol). ABREGO GARCIA stated he only made a total of $250 to make this trip, and that he never made any additional trips or made any additional money. ABREGO GARCIA continued and stated that he stopped after the one trip because $250 was not worth making the trip.

-ABREGO GARCIA stated during the interview that he made the 2022 trip (referenced above) at the direction of "his boss." ABREGO GARCIA continued and stated that the trip's purpose was to bring in out-of-state workers for a construction job in Ohio that "his boss" was working. Agent note: ABREGO GARCIA made similar statements to the THP trooper in 2022 when he was pulled over regarding "his boss" and construction work. These comments are captured on the trooper's body worn camera footage.

The investigation continues.

9/10/2025



This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.